SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
A Limited Liability Partnership
Including Professional Corporations
STEVEN B. SACKS, Cal. Bar No. 98875
ssacks@sheppardmullin.com
MICHAEL M. LAUTER, Cal. Bar No. 246048
mlauter@sheppardmullin.com
SHADI MAHMOUDI, Cal. Bar No. 301610
smahmoudi@sheppardmullin.com
Four Embarcadero Center, 17th Floor
San Francisco, CA 94111-4109
Telephone:  415-434-9100
Facsimile:  415-434-3947

Attorneys for Creditor
MUFG UNION BANK, N.A.

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re<br><br>ROBERT BROWER, SR.,<br><br>Debtor. | Case No. 15-50801<br><br>Chapter 11<br><br>**MUFG UNION BANK, N.A.'S OBJECTION TO FIRST INTERIM APPLICATION FOR COMPENSATION AND REIMBURSEMENT OF EXPENSES BY ATTORNEY FOR DEBTOR**<br><br>Date:  November 5, 2015<br>Time:  10:30 a.m.<br>Place:  280 S. First Street, Room 3070<br>          San Jose, CA 95113<br>Judge:  Hon. Elaine Hammond |

## I. INTRODUCTION

Creditor and party-in-interest MUFG Union Bank, N.A. ("Union Bank" or "Bank") files this objection to the first interim fee application (the "Fee Application") of Campeau Goodsell Smith ("CGS") filed on October 14, 2015 as Docket No. 57.

The Bank, as the largest creditor in this case by far, is concerned about the recovery to creditors being diluted by the significant administrative expense represented by the Fee Application, in which CGS seeks roughly $87,000 for the first 5 ½ months of the case in which did very little work at all, much less work that benefited the estate. This is in a case where the only assets consist of about $27,000 in the DIP account and equity interests the Debtor asserts to be worth $584,000. It is a significant reduction in the value of the estate, especially considering that it is for work done in the initial stage of the case when little was accomplished.

No plan has been filed in this case, nor do the fee statements attached to the Fee Application reflect that the Debtor has been working on a plan. The only step that could be deemed to be progress – the filing of the recent motion to redeem the Debtor's shares in Coastal Cypress and thereby liquidate that interest to cash – occurred after the conclusion of the period covered by the instant Fee Application. Thus, the $87,000 as a whole appears high given the little benefit to the estate conferred by the work. A closer look at the categories in the Fee Application bears this out – several of the categories reflect work that is unreasonable and/or unnecessary, and is therefore not compensable under the Bankruptcy Code. In addition, there are mistaken time entries for the pre-petition period and for the same work performed twice by the same attorney, which should be corrected. As such, the Fee Application should be substantially reduced, as requested below.

## II. BACKGROUND FACTS

This individual chapter 11 case was filed on March 11, 2015 in order to avoid the seasoning of liens obtained by the Bank against the Debtor pursuant to an attachment proceeding in a state court action against the Debtor and Chateau Julien, Inc. Since the bankruptcy filing occurred within 90 days of entry of a protective order against the Debtor,

the liens dissolved automatically by operation of state law.  *See*, Cal. Civ. Proc. Code § 493.030(b) ("The filing of a petition commencing a voluntary or involuntary case under Title 11 of the United States Code (Bankruptcy) terminates a lien of a temporary protective order or of attachment if the lien was created within 90 days prior to the filing of the petition.").

No plan has been filed in this case, nor does the Fee Application or the timesheets attached to it refer to any plan having been worked on or developed.  Other than filing the petition and a simple set of Schedules and Statement of Financial Affairs, the Debtor has done very little in this case.

The Bank is the largest creditor in this case, with a claim of roughly $5 million against the Debtor based on a guaranty of a commercial loan to Chateau Julien, Inc.  *See*, Proof of Claim No. 7.  As set forth in the Statement of Financial Affairs, Brower was at all relevant times the President of Chateau Julien, but asserts in his Schedule A that he had no equity interest in Chateau Julien.  *See*, Dkt. Nos. 1, 17.  Consequently, this bankruptcy estate did not have any equity interest in Chateau Julien.  As the Debtor has explained in previous filings in this action, Chateau Julien ceased doing business when it moved off the real property owned by Coastal Cypress in mid-April 2015.  *See, e.g.,* Dkt. No. 29, p. 2, l. 6-24.

The Debtor's sole assets consider of approximately $27,000 in cash in the DIP account, and stock in Coastal Cypress which the Debtor is separately seeking to redeem for approximately $584,000.  (Fee Application, at p. 9).

## III.  ARGUMENT

**A.**  **Standard for Approval of Professional Fees Under Sections 330 and 331**

Bankruptcy Code section 331 allows estate professionals to seek interim approval of compensation that would be allowed under section 330.  Section 330 in turn provides for the allowance of "reasonable compensation for actual, necessary services."  In evaluating requests for reasonable compensation under sections 330 and 331, courts consider the following factors: (i) reasonableness; (ii) actual, necessary services rendered;

2

SMRH:473580245.2                                                    OBJECTION TO FIRST INTERIM FEE APPLICATION

Case: 15-50801    Doc# 65    Filed: 10/29/15    Entered: 10/29/15 16:46:47    Page 3 of 7

(iii) the nature, extent and value of such services; (iv) the time spent on such services; (v) board certification or demonstration of skill and expertise; and (vi) the cost of comparable services in nonbankruptcy cases. *See, In re Eliapo*, 468 F.3d 592, 597 (9th Cir. 2006); *see also*, Collier on Bankruptcy (16th ed. rev. 2015) ¶ 331.01[4][a].

Notably, courts have held that when professionals are actually representing the interests of principals rather than the interests of the estate, fees will be reduced or denied. *See, In re Bonneville Pacific Corp.,* 147 F.R. 803, 806 (Bankr. D. Utah) ("It is essential that attorneys laboring under the constraints of the Bankruptcy Code requirements never forget that when representing a debtor-in-possession, the interests of the estate must take priority. If attorneys are found to have actually represented the interest of the principals of the debtors, to the detriment of the estate, then compensation must be denied.")*; In re Kendavis Indus. Int'l, Inc*., 91 B.R. 742 (Bankr. N.D. Tex. 1988); Collier on Bankruptcy (16th ed. rev. 2015) ¶ 331.01[4][b].

In addition, counsel for individual debtors are not entitled to compensation from the estate for defending the debtor in a non-dischargeability proceeding. *See, e.g.,* In re Oakes, 135 B.R. 511, 513 (Bankr. N.D. Ohio 1991).

Cases also hold that compensation will be denied when "the court finds that there was unproductive, unnecessary litigation or excesses." Collier on Bankruptcy (16th ed. rev. 2015) ¶ 331.01[4][b].

**B.     Significant Portions of the Compensation Sought in the Fee Application Are Unreasonable and/or Unnecessary, and Should Not Be Approved.**

Applying the above standards to CGS' Fee Application, it is clear that significant portions of the Fee Application are unreasonable and/or unnecessary, such that the compensation sought should be significantly reduced. These portions are as follows:

1. <u>Adversary Proceedings</u>.

Under the category "Adversary Proceedings," CGS billed 42.60 hours for a cost to the estate of $17,835.00. (Fee Application, at pp. 7-8). The purported adversary proceedings included working up "a potential preference action against one creditor

relative to a state court writ of attachment." (Fee Application, at p. 7, l. 18-21). This of course refers to the writ of attachment obtained against the Debtor by the Bank pre-petition. However, since the lien dissolved automatically upon the bankruptcy filing as a matter of state law, there was no need to work up a potential preference action, which was never filed, likely for that reason. *See*, Cal. Civ. Proc. Code § 493.030(b).

The rest of the fees in this category were for unsuccessfully defending the Bank's motion for a brief extension of time to file a non-dischargeability proceeding, and a Rule 2004 examination taken in connection with then-potential non-dischargeability proceeding. Since these fees all related to a non-dischargeability action, they should not be paid by the estate.

2. Post-Petition Operations

CGS billed 39.50 hours at a cost to the estate of $16,575.00 for "Post-Petition Operations/Executory Contracts and Leases." CGS asserts that these fees were for work relating to the "Debtor's involvement with by [sic] Coastal and CJ, prospective employment and/or business opportunities, and working to liquidate assets and the impact such may have on debts guaranteed by the Debtor." (Fee Application, at p. 6, l. 12-15). The only portion of this that is seemingly compensable is the portion related to liquidating the assets of Coastal, but there is a separate category (Asset Sales) that appears to deal with that work. As to employment and business opportunities, the Debtor has not identified any such opportunities, but stated in his 341 meeting that his plan was to retire and live off social security. The operations of Chateau Julien and Coastal, including any personnel issues, should have been handled by counsel for Chateau Julien and Coastal and paid for by those entities. There is no reason for counsel to the Debtor to that work, or be paid for it by the Debtor personally.[1] This is especially true as to Chateau Julien, since the Debtor asserts that he had no equity interest in that company.

---

[1] On page 5 of the Fee Application, the Debtor states that among the purposes of the bankruptcy filing was "to protect CJ's ability to continue to operate and fulfill its financial obligations." (Fee Application, at p. 5, l. 7-8). The Debtor then refers to a $140,000 note

### 3. Cash Collateral

CGS billed 15.90 hours at a cost to the estate of $6,907.50 for work regarding potential cash collateral issues. CGS admits that no cash collateral issues ever arose (Fee Application, at p. 7, l. 2-4), so it is not clear why so much time was spent on this. CGS refers to the issue as having become "moot," but in reality it is really a ripeness issue. No one ever alleged that any of the Debtor's cash constituted cash collateral, so spending 15.90 hours on this issue seems unnecessary and wasteful.

### 4. Creditor Claims Analysis

CGS billed 44.00 hours at a cost to the estate of $19,780.00 for "Creditor Claims Analysis." Of these fees, those for the negotiations with the Bank are compensable, including those related to the one-day mediation in May (save for the Mistaken Entry regarding that mediation, mentioned in the next section). But the category stretches far beyond negotiating with the Bank, to include the review and analysis of "numerous creditor claims." While CGS admits that this type of analysis is normally done at the conclusion of a case (Fee Application, at p. 8, l. 9-10), it gives no reason for why it was done at the outset here. Indeed, the reason for limiting claim analysis to the end of a case is because it is not until the available assets are determined that an estate fiduciary can determine the appropriate amount of time and expense to spend on claims analysis.

---

owed by Chateau Julien to the Debtor, to support the notion that these goals would provide benefit to the estate. (Fee Application, at p. 5, l. 8-10). However, it is unclear how a bankruptcy filing by the Debtor personally would help preserve the business of Chateau Julien. In addition, when this bankruptcy case was filed, Coastal was already under contract to sell the real property on which Chateau Julien operated, and so the closure of Chateau Julien's operations was imminent. Indeed, those operations ceased only about a month into the case. With a roughly $5 million secured note owed by Chateau Julien to the Bank and operations that were going to imminently cease, it is hard to see how the Debtor could reasonably perceive there to be any value in the $140,000 unsecured note owed by Chateau Julien to the Debtor.

**C. Mistaken Entries.**

In addition to the unreasonable and unnecessary compensation sought in the above categories, the fee statement submitted by CGS had some mistaken entries that need to be removed (the "Mistaken Entries"). These are the following:

(i) The two entries at the top of page 1 of the fee statement for pre-petition time – *i.e.*, for services rendered on 3/9/15 and 3/10/15.

(ii) On page 18 of the fee statement, there are two separate time entries of over 7 hours for Scott Goodsell's attendance at the May 11th mediation with the Bank. This appears to be a clerical error; one of the entries should be removed.

## IV. CONCLUSION

For the reasons set forth above, this Court should substantially reduce the amount sought in the Fee Application. The time entries in Adversary Proceedings, Post-Petition Operations, and Cash Collateral should be disallowed in their entirety. The entries in Creditor Claim Analysis should be reduced to reflect the efforts to settle with the Bank only. Finally, the Mistaken Entries should be disallowed as well.

Dated: October 29, 2015             SHEPPARD, MULLIN, RICHTER & HAMPTON LLP


                                    By:    /s/ *Steven B. Sacks*
                                           STEVEN B. SACKS
                                           Attorneys for Creditor
                                           MUFG Union Bank, N.A.