SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
A Limited Liability Partnership
Including Professional Corporations
STEVEN B. SACKS, Cal. Bar No. 98875
ssacks@sheppardmullin.com
MICHAEL M. LAUTER, Cal. Bar No. 246048
mlauter@sheppardmullin.com
ISAIAH Z. WEEDN, Cal. Bar No. 229111
iweedn@sheppardmullin.com
Four Embarcadero Center, 17th Floor
San Francisco, CA 94111-4109
Telephone:    415-434-9100
Facsimile:    415-434-3947

Attorneys for Creditor
MUFG UNION BANK, N.A.

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

In re

ROBERT BROWER, SR.,

        Debtor.

Bk. No. 15-50801

Chapter 11

**DECLARATION OF STEVEN SACKS IN SUPPORT OF CREDITOR MUFG UNION BANK, N.A.'S MOTION TO COMPEL COMPLIANCE WITH SUBPOENAS**

[*Notice of Motion and Motion to Compel Compliance with Subpoenas and Memorandum of Points and Authorities in Support Thereof filed concurrently herewith*]

Hearing Date: March 17, 2016
Time: 8:30 a.m.
Courtroom: 3020

# DECLARATION OF STEVEN B. SACKS

I, Steven B. Sacks, declare as follows:

1. I am an attorney duly admitted to practice before this Court. I am a partner with SHEPPARD, MULLIN, RICHTER & HAMPTON LLP, attorneys of record for MUFG Union Bank N.A. ("the Bank") in this bankruptcy proceeding as well as a related California Superior Court lawsuit against the Debtor and one of his companies, which has been stayed as to Debtor due to his bankruptcy filing. If called as a witness, I could and would competently testify to all facts within my personal knowledge except where stated upon information and belief.

2. This declaration is submitted in support of the Bank's motion to compel compliance with the subpoenas it served on Coastal Cypress Corporation, Hayashi Wayland, and Richard Babcock (collectively the "Subpoenaed Parties") and for an award of its fees incurred in connection with this proceeding. True and correct copies of the subpoenas are attached hereto as Exhibits A, B, and C, respectively (collectively, the "Subpoenas").

3. This bankruptcy case was filed in March 2015 for the purpose of avoiding an attachment lien the Bank had obtained against Debtor in a guaranty enforcement action in state court arising from the Bank's $4.85 million loan to Chateau Julien, Inc., an entity run by Debtor for 30 years. Debtor claims he has never actually been an owner of Chateau Julien, yet before he filed for bankruptcy, he always described himself as Chateau Julien's owner and/or proprietor. Similarly, Debtor ran at least three other corporations during that time period, but now he claims to only own a small share of one, his alleged 24 percent interest in Coastal, and none of the other two. During this case, after closing the sale of the sole real property owned by Coastal, the Debtor closed Chateau Julien, and testified that he destroyed its business records and computers. The Debtor sought no approval from the Court for these activities. The only person Debtor will admit is involved in the ownership of any of these entities is his wife of over 35 years, who he now claims owns interests in these corporations as her separate property. He refuses on

-2-

grounds of purported privacy rights to reveal the other supposed owners of any other entity, including Coastal.[1] He also refuses to produce basic documents pertaining to the value of the Coastal shares, such as the closing statement for the April 2015 sale of its sole real estate holding, the purported contents of which are recited by Mr. Babcock and Debtor in their declarations in support of Debtor's motion to sell.

4. In December 2015, the Bank had the Subpoenas served on the Subpoenaed Parties. Hayashi Wayland is Coastal's accountant whose valuation was the basis of Debtor's first motion to sell his shares. Richard Babcock is Coastal's "special corporate counsel" whose "valuation" was cited in Debtor's second, currently pending motion to sell his shares. The subpoenas sought the production of the documents referred to in the declarations offered in support of Debtor's motions to sell his Coastal shares as well as additional documents relevant, among other things, to an understanding of Coastal's assets, liabilities, business activities, involvement with the Debtor, and, ultimately, the value of Debtor's interest in Coastal before and during this bankruptcy case.

5. Debtor is the president of Coastal Cypress and has at all relevant times been the person who acted on behalf of Coastal Cypress in dealings with the Bank. Similarly, throughout these proceedings (and specifically during the meet and confer discussions relevant to this motion), I have never heard of anyone other than Debtor having any managerial role with respect to Coastal. Debtor alleges he owns 24 percent of Coastal Cypress Corporation's ("Coastal") outstanding shares but he is unwilling to disclose the identity of any other shareholders other than his wife, who he claims owns 13 percent as her separate property. Though Debtor has produced some documents in this bankruptcy case that suggest there are other shareholders of Coastal, he has redacted these

---

[1] The Debtor, wearing his Coastal hat, has never provided any support for his assertion that shareholders have legally cognizable privacy rights that need to be protected. In fact, the opposite is true. Since the Debtor's shares in Coastal are property of the estate, the estate is a shareholder in Coastal. California Corporations Code section 1600 provides that shareholders, such as the Debtor's bankruptcy estate, have the right to review corporate records, including specifically "the record of shareholders' names and addresses and shareholdings..." See, Cal. Corp. Code § 1600(a) and (c). Thus the Debtor's refusal to provide this basic information is contrary to applicable non-bankruptcy law, not to mention the Debtor's own duties as fiduciary of his bankruptcy estate.

-3-

documents to obscure the identifying information. Based on the lack of any evidence of an actual beneficial interest in Coastal held by anyone besides the Debtor and his spouse, and the fact that the Debtor was the only person managing Coastal's affairs, the Bank has sought to ascertain who else, if anyone, benefits from the sale of Coastal's real estate. Based on Debtor's previous statements as well as the moving papers, Coastal's primary asset was a parcel of real estate that it allegedly recently sold for $12 million. But no documents reflecting the terms of that sale or the proposed distribution of proceeds have ever been produced.

6. Debtor has twice sought leave of the Court to sell his Coastal shares, which he claims are the only significant asset of the estate. The first such motion was denied without prejudice on November 12, 2015 due to Debtor's failure to present any admissible evidence to support his proposed share valuation. Indeed, it was the Bank that pointed out that the only purported evidence of the share value was an e-mail from Coastal's accountant at Hayashi Wayland – an e-mail that had not been provided in the motion – in which the accountant asserted that the per share value of Coastal's shares was approximately $2.54 per share without any explanation of how that valuation was determined or what documents and information were relied on.

7. The second such motion was filed less than a month after the first was denied and has been continued multiple times in light of the ongoing discovery dispute that is the subject of this Motion. The only purported evidence of the Coastal share price in the second motion were the declarations of Debtor and Richard Babcock. Though those declarations referenced certain documents and figures upon which the proffered share valuation was supposedly based, those documents were not attached to the declarations.

8. On December 3, 2015 I sent an e-mail to Debtor's counsel, William Healy asking that Debtor voluntarily produce "all documents set out in the 2004 request and those referred to or underlying the motion [to sell Debtor's Coastal shares] and supporting declarations." I never received a response. A true and correct copy of the e-mail is attached hereto as Exhibit D. In light of Debtor's apparent refusal to provide the

-4-

requested documents, we prepared and caused the Subpoenas to be served. Through the Subpoenas, the Bank sought documentation generally as to the Debtor's relationship to Coastal and, relatedly, documentation sufficient to provide a full understanding of the value of Debtor's interest in Coastal and to determine whether Debtor has structured his interest in Coastal to maintain control over and receive the benefit of it while not holding it in his name. The subpoenas and attendant document requests were drafted and served to obtain the documents necessary for the Bank to make these evaluations. As the original hearing date for Debtor's second motion for leave to sell his Coastal shares was January 7, 2016, we specified December 28, 2015 as the subpoena compliance deadline.

9. On December 23, 2015, I received a letter from Neal Wolf, wherein he identified himself as counsel for Coastal. During a subsequent telephone conversation with Mr. Wolf, he stated to me that, in addition to Coastal, he was also representing Hayashi Wayland and Mr. Babcock for purposes of responding to the Subpoenas, and acknowledged service of the Subpoenas on Coastal, Hayashi Wayland, and Mr. Babcock. In his letter, Mr. Wolf also expressed concern about the scope of the Subpoenas and that the return date for the Subpoenas was December 28, during the holiday season. A true and correct copy of Mr. Wolf's December 23 letter is attached hereto as Exhibit E. I responded to Mr. Wolf's letter via e-mail of December 23, wherein I noted that we would meet and confer with him regarding the Subpoenas and that the December 28 return date was a function of the January 7 hearing date for Debtor's motion to sell the Coastal shares. A true and correct copy of my e-mail of December 23 to Mr. Wolf is attached hereto as Exhibit F.

10. After receiving Mr. Wolf's letter, I e-mailed Debtor's counsel, William Healy, wherein I attached Mr. Wolf's letter and requested that he agree to a continuance of the upcoming motion to sell Debtor's Coastal shares. Mr. Healy responded later that day and agreed to continue the hearing. A true and correct copy of my December 23 e-mail exchanged with Mr. Healy is attached hereto as Exhibit G. After receiving this

-5-
SMRH:475576989.3

DECLARATION OF STEVEN B. SACKS ISO MUFG UNION BANK, N.A.'S MOTION TO COMPEL COMPLIANCE WITH SUBPOENAS

Case: 15-50801    Doc# 102    Filed: 03/02/16    Entered: 03/02/16 20:11:19    Page 5 of 9

e-mail from Mr. Healy, I spoke to Mr. Wolf via phone and confirmed that the Subpoenaed Parties would not need to comply with the Subpoenas by the December 28 return date.

11. After December 23, I had a number of meet and confer calls with Mr. Wolf, culminating in an e-mail exchange that spanned from January 13 through January 20 wherein we reached an agreement revising the scope of the Subpoenas and setting a date for the Subpoenaed Parties to produce their responsive documents. A true and correct copy of the e-mail string is attached hereto as Exhibit H. As reflected in the e-mail string, Mr. Wolf was in contact with his client regarding the Subpoenas and authorized to negotiate an agreement concerning their compliance. Indeed, in his e-mail of January 14, Mr. Wolf confirmed that he was in direct contact with his client regarding the scope of the "reach back period" for the Subpoenas. Mr. Wolf first advised that though certain of the requests originally asked for documents dating back to January 1, 2004, the reach-back period would be revised to extend no earlier than January 1, 2010. But before that agreement was finalized, Mr. Wolf advised that he had had a further conversation with Mr. Brower and that Coastal was only willing to produce documents as of January 1, 2011 and thereafter.

12. In his January 20, 2016 email, Mr. Wolf agreed that the Subpoenaed Parties would produce documents responsive to the Subpoenas by February 18, 2016, subject to the following limitations:

- Though certain of the requests originally asked for documents dating back to January 1, 2004, the reach-back period would be revised to extend no earlier than January 1, 2011.

- Request No. 17 (seeking documents reflecting transactions, payments, transfers etc. by Coastal to individuals or entities) would extend only to transactions of $20,000 or more (not the $5,000 specified in the original request), and would not extend to attorneys' fees payments of any amount.

- No documents subject to the attorney-client privilege or work product protection would be produced.

-6-

13. Mr. Wolf further noted that if this proposal was acceptable to the Bank, Debtor had agreed to have his counsel, Mr. Healy, further continue the hearing of Debtor's motion to sell the Coastal Cypress shares from February 1, 2016 to March 17, 2016. After the Bank responded that it would accept the proposed limitations detailed above so long as it was without prejudice to a subsequent request for documents from an earlier time period, Mr. Wolf advised that his "client accepted" the resolution, and Debtor instructed his counsel to move the hearing date pursuant to the agreement. Moreover, Mr. Healy confirmed that he would seek to further continue the hearing for the pending motion to sell Debtor's Coastal shares "once I receive direct confirmation from my client." Mr. Healy apparently received such confirmation because the hearing was subsequently continued to March 17.

14. On January 21, 2016, Mr. Wolf spoke to my colleague, Isaiah Weedn by telephone and informed him that he was leaving his current firm and would hand this matter over to someone else in the firm. On January 27, 2016, Mr. Weedn e-mailed John Benson at Mr. Wolf's former firm to ascertain who the new handling attorney would be. Mr. Benson responded that we should follow up with his colleague, Jeff Schwartz. A true and correct copy of this email correspondence is attached as Exhibit I.

15. On January 27, 2016, David Balch, who had no apparent connection with Mr. Wolf or his former firm, emailed Mr. Weedn, stating that "Bob Brower at Coastal Cypress asked that I respond to the subpoenas that have been issued by the bank." In a subsequent e-mail on January 28, Mr. Balch confirmed that he would be coordinating all of the Subpoenaed Parties' response to the Subpoenas. Mr. Weedn provided Mr. Balch with the previous e-mail correspondence (*i.e.*, Exhibit H) wherein Mr. Wolf had agreed that the Subpoenaed Parties would produce documents responsive to the Subpoenas by February 18 subject to the specified limitations. On February 2, 2016, Mr. Weedn, Mr. Balch and I had a telephone conference call. Mr. Balch indicated that he had been instructed by Debtor on behalf of the Subpoenaed Parties to disavow the previous agreement reached and that Mr. Wolf was not authorized to make that agreement. Mr. Balch asked our office

-7-

to wholly renegotiate which requests the Subpoenaed Parties would agree to respond to. In a follow-up email from Mr. Weedn and myself to Mr. Balch, we declined and insisted that the Subpoenaed Parties abide by the original agreement struck when Mr. Wolf was their counsel. We advised that unless the Subpoenaed Parties agreed to abide by the terms of the original agreement struck with Mr. Wolf, we would seek Court intervention to compel the required productions. Aside from the agreement, the Bank asserted to Mr. Balch, as it had to Mr. Wolf, that the subpoenas sought documents that were relevant and appropriate to the issues pending in this bankruptcy case, such that there was no basis to withhold documents regardless of who was serving as counsel. We requested that Mr. Balch let us know by February 4, 2016 whether or not his client would comply with the subpoenas. A true and correct copy of the referenced e-mail exchanges between Mr. Weedn and Mr. Balch from January 27 and 28 and February 2 are attached hereto as Exhibit J. The Subpoenaed Parties have not agreed to provide these documents and Mr. Balch has provided no explanation for Debtor's change of heart.

16. As of today, the Bank has not received any formal subpoena responses from Hayashi Wayland or Mr. Babcock. On February 10, 2016, the Bank received Coastal Cypress's Objections and Responses to Subpoena (via e-mail), untimely served some seven weeks after service was acknowledged. A true and correct copy of the transmitting e-mail and the objections and responses is attached hereto as Exhibit K Therein, Coastal Cypress agreed to produce certain, limited documents, and even as to those, it proposed to redact the identities of Coastal Cypress's alleged other shareholders (which Debtor has done in previous productions of his own documents). The compliance promised in these belated responses falls far short of what was requested, or the scope agreed to by the Subpoenaed Parties' previous counsel.

17. In light of the Subpoenaed Parties failure to comply with the agreement struck by their previous counsel, the Bank submitted a letter brief regarding the discovery dispute to the Court on February 16. A true and correct copy of my transmitting e-mail and the letter brief is attached hereto as Exhibit L. During the subsequent

-8-

| | |
|---|---|
| 1 | telephonic hearing, the Court issued a tentative order in the Bank's favor, ordering the |
| 2 | Subpoenaed Parties to fully comply with the Bank's subpoenas. Unfortunately, the |
| 3 | Subpoenaed Parties refused to stipulate to the tentative ruling and have forced the Bank to |
| 4 | file a formal motion to compel. |
| 5 |       18. As of January 20, the Bank had reached an agreement with Mr. Wolf |
| 6 | concerning the Subpoenaed Parties' compliance with the Subpoenas. Since Mr. Balch |
| 7 | made his first appearance in this matter on January 27 and advised that the Subpoenaed |
| 8 | Parties would not honor their agreement, counsel for the Bank (including myself, Sheppard |
| 9 | Mullin partner Michael Lauter and associates Isaiah Weedn and Ashton Massey) has spent |
| 10 | 54.4 hours (at a blended hourly rate of $450) meeting and conferring several times with |
| 11 | Mr. Balch, drafting the initial letter brief to the Court, preparing for and attending the |
| 12 | subsequent telephonic hearing, and preparing this formal motion to compel, for total |
| 13 | charges of $24,475. In addition, counsel expects that they will spend in excess of an |
| 14 | additional 10 hours reviewing the opposition, preparing a reply, and attending the hearing |
| 15 | on the motion, for an additional charge of at least $4,500. Therefore, the Bank requests |
| 16 | that it be awarded its costs in the amount of $28,975. |
| 17 | I declare under penalty of perjury under the laws of the United States of |
| 18 | America that the foregoing is true and correct. |
| 19 | Executed March 2, 2016, at San Francisco, California. |

                                            /s/ Steven B. Sacks
                                            Steven B. Sacks

SMRH:475576989.3            -9-           DECLARATION OF STEVEN B. SACKS ISO MUFG UNION BANK, N.A.'S MOTION TO COMPEL COMPLIANCE WITH SUBPOENAS

Case: 15-50801   Doc# 102   Filed: 03/02/16   Entered: 03/02/16 20:11:19   Page 9 of 9