SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
A Limited Liability Partnership
Including Professional Corporations
STEVEN B. SACKS, Cal. Bar No. 98875
ssacks@sheppardmullin.com
MICHAEL M. LAUTER, Cal. Bar No. 246048
mlauter@sheppardmullin.com
ISAIAH Z. WEEDN, Cal. Bar No. 229111
iweedn@sheppardmullin.com
Four Embarcadero Center, 17th Floor
San Francisco, CA 94111-4109
Telephone: 415-434-9100
Facsimile: 415-434-3947

Attorneys for Creditor
MUFG UNION BANK, N.A.

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re<br><br>ROBERT BROWER, SR.,<br><br>Debtor. | Case No. 15-50801<br><br>Chapter 11<br><br>**MUFG UNION BANK, N.A.'S OPPOSITION TO DEBTOR'S RENEWED MOTION TO SELL PERSONAL PROPERTY**<br><br>Date: August 4, 2016<br>Time: 10:30 a.m.<br>Place: 280 S. First Street, Room 3070<br>San Jose, CA 95113<br>Judge: Hon. Elaine Hammond |

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................... 1

II. FACTUAL BACKGROUND ....................................................................................... 3

   A. The Proffered Sale Price is the Product of Self-Dealing. ............................................ 3

      1. Debtor Has Total Control Over Coastal Cypress. ...................................................... 3

      2. The Basis for the Original Motion to Sell Was a Sham "Valuation" That Coastal Cypress's Accountant Refused to Stand Behind. ......................................................... 3

      3. The Basis for this Motion is a Sham "Valuation" from Mr. Babcock, who Debtor Failed to Disclose as a Fellow Coastal Cypress Shareholder. ........................................ 5

   B. The Ascribed Value and Number of Debtor's Shares is Far Less Than Debtor's Previous Representations. ................................................................................................ 6

III. ARGUMENT ................................................................................................................ 9

   A. The Proposed Sale Must Have a Valid Business Justification and Be Proposed in Good Faith, and the Sales Price Must Be Reasonable. ................................................. 9

      1. Lack of Business Justification. .................................................................................. 10

      2. Lack of Good Faith. .................................................................................................. 11

      3. Lack of Support for the Price Paid. ........................................................................... 11

IV. CONCLUSION ............................................................................................................. 12

# I.

# INTRODUCTION

Debtor Robert S. Brower. Sr.'s Motion to Sell Personal Property (the "Motion")[1] – specifically his stock in Coastal Cypress Corporation ("Coastal Cypress") – vastly undervalues Debtor's interest in Coastal Cypress and should be denied. The Debtor fails to meet his burden to obtain approval of a sale under Bankruptcy Code section 363(b) in the context of an insider transaction, as the Debtor fails to establish a valid business justification, show that the sale is made in good faith, or that the price obtained for the estate is fair and reasonable.

The present Motion gives only lip service to the Court's ruling on the last sale motion that the Debtor needed to offer admissible evidence in support of his proposed valuation of the Coastal Cypress shares. The Debtor omits key details as part of a self-serving narrative that obscures his assets and their real value. The Bank opposes the Motion, as it unfairly deprives the bankruptcy estate of the fair value of the Debtor's interest in Coastal Cypress.

The proposed sale is an insider transaction that the Debtor "negotiated" with himself, as the President of Coastal Cypress, and is therefore subject to a higher level of scrutiny. Nonetheless, the Motion is more notable for what it leaves out than what it includes. The present motion again offers <u>no</u> admissible evidence that actually supports the sale price – just hearsay and/or conclusory statements from Debtor and valuation statements made on "information and belief" by Coastal Cypress's "special corporate legal counsel," Richard Babcock. Notably, neither the Debtor nor Mr. Babcock disclose that Mr. Babcock claims to be another shareholder of Coastal Cypress – a fact that Debtor sought to hide. Indeed, the Motion was filed without including any supporting documents—not even the ones referenced in the supporting declarations. Coastal Cypress resisted discovery all the way through a formal motion to compel as to the identity of the

---

[1] Filed by Debtor on December 3, 2015 as Docket No. 77.

other purported Coastal Cypress shareholders and refused to produce a copy of the closing statement for the sale of the real estate or the documents showing where the sales proceeds went.

And while Debtor claims there are other shareholders whose interests must be considered, it is not at all clear that these other people have an ownership stake in Coastal Cypress in any real sense. How else to explain the absence of any documentation (other than a bare-bones stock ledger) to substantiate others' ownership of Coastal Cypress shares – no stock certificates, no documents reflecting consideration paid for those shares or how that consideration was determined. Most tellingly, the Debtor simply treats Coastal Cypress's assets as his own to do with as he wishes. How else to explain the transfers of Coastal Cypress assets to Debtor's other company, Great American Wineries, Inc. ("Great American"), the inexplicable agreements to transfer additional funds (over $1.7 million) to two companies owned by Anthony Nobles (another putative Coastal Cypress shareholder), or the near constant stream of money Coastal Cypress is paying out to cover expenses ranging from the Debtor's country club bills to his restaurant dining expenses, and including attorneys apparently working for all of the Brower-affiliated companies.

Indeed, once Debtor's insuperable giveaways of Coastal Cypress funds, along with his projections of non-existent tax liabilities are swept away, it appears even his professed minority interest is worth somewhere between $1,148,977 to $2,393,702. And these amounts obviously do not reflect what appears to be Debtor's total dominion and control over the Coastal Cypress assets such that his estate should include all of those assets.

The Debtor's schedules show that the shares in Coastal Cypress are the primary asset of the Debtor's estate, and thus provide the primary source of recovery for the Bank's claim for over $5 million and for his other creditors. If this sale is approved, the Debtor will be able to do what he will with the remaining millions of dollars at Coastal Cypress, to the detriment of his bankruptcy estate. The Motion does not comply with the Debtor's fiduciary duties to his creditors, is woefully unsupported despite the Court's prior ruling, and does not benefit the estate. The Motion should be denied.

SMRH:478654023.4

Case: 15-50801    Doc# 124    Filed: 07/28/16    Entered: 07/28/16 21:21:28    Page 4 of 15

2 OPPOSITION TO SALE MOTION

# II.

# FACTUAL BACKGROUND[2]

**A.     The Proffered Sale Price is the Product of Self-Dealing.**

    1.     Debtor Has Total Control Over Coastal Cypress.

The Motion describes Coastal Cypress Corporation as if it were an independent third party corporation in which the Debtor happens to own a small interest. It is not, and the supposed Redemption Agreement reached between the Debtor and Coastal Cypress is not an arm's length transaction. The Debtor founded Coastal Cypress in 1982 and has been the President of Coastal Cypress and a director since that time. *See*, Amended SOFA, ECF Docket No. 17, item 18, pp. 4-5. Coastal Cypress is therefore both an affiliate and an insider within the meanings of those terms. *See*, 11 U.S.C. §§ 101(2)(B) and 101(31)(A)(iv).

Since the Debtor controls Coastal Cypress, the "Redemption Agreement" he has negotiated is something he negotiated with himself. The Debtor conveniently fails to mention this in the Motion, and also fails to provide a copy of the Redemption Agreement mentioned in the Motion, which does not appear to actually exist. Thus, the Motion would have the Court approve an insider transaction without even disclosing the terms of the alleged agreement or even acknowledging to the Court that it was an insider transaction. All of this is quite remarkable, and wholly improper, given that the Debtor's shares in Coastal Cypress are the primary asset of this estate.

    2.     The Basis for the Original Motion to Sell Was a Sham "Valuation" That Coastal Cypress's Accountant Refused to Stand Behind.

This is not the first time Debtor has filed a motion to sell his Coastal Cypress shares. He filed his first motion on October 21, 2015, proffering a per share price of $2.54 and a total of $584,200 for his alleged 230,000 shares of Coastal Cypress stock. *See* ECF

---

[2] The factual discussion herein is supported by the declarations of John C. LaBella ("LaBella Decl.") and Steven B. Sacks ("Sacks Decl.") filed concurrently herewith.

Doc. 59, p. 1. The only evidentiary support for this price was Debtor's declaration – not a single exhibit was submitted therewith – and Debtor represented that the $2.54 per share value had been calculated by Coastal Cypress's accounting firm. *See* ECF Doc. 59-1, p. 2:21-22. That motion offered no supporting information as to how the share price had been calculated or what data was referenced. *Id.*

At the time of the first motion, the Bank only had access to a single e-mail from Coastal Cypress's accountant to Debtor – produced by Debtor pursuant to the Bank's 2004 request – purporting to set forth Coastal Cypress's per share price, which the Bank submitted with its opposition to the motion to sell. *See* ECF Doc. 67-2, Exh. A. Like Debtor's declaration, the accountant's e-mail offered no substantial justification for the calculated price and its existence begged the question – why didn't Debtor submit a declaration from the accountant or other expert attesting to the per share valuation and the basis for that conclusion? The answer to that question is that Coastal Cypress's accountant refused to stand behind the calculation by providing a declaration, but that only became clear after Coastal Cypress and its accounting firm were compelled by Court order to produce documents responsive to the Bank's subpoenas.

The resulting document productions are still continuing because the Debtor has dragged his feet in causing Coastal Cypress to fully comply with the subpoenas as ordered by the Court. *See* Sacks Decl., ¶ 7. From what has already been produced, the Bank has learned that the email produced by the Debtor in response to the Rule 2004 examination (Sacks Decl., Exh. B) was a contrivance that the Debtor arranged to receive from Coastal Cypress's accountant—he told her that she should include only three lines from her previous calculation of the Coastal Cypress equity so that he could hide how the amounts were being derived. *See* Sacks Decl., Exh. Y. Further, the $2.54 per share offered by the Debtor in his first motion reflected a reduction in Coastal Cypress' equity by over $600,000 in taxes that the accountant told the Debtor the company would not incur if it merely redeemed Brower's shares. *See* Sacks Decl., Exh. Z. Then, when the Debtor asked the accountant to sign a declaration attesting to this Court that the calculation she had

provided to the Debtor would be a fair price to liquidate the estate's interest, she refused to go along. (*See* Sacks Decl., Exhs. AA and BB.

Accordingly, Debtor's original motion to sell his Coastal Shares was based on a sham valuation.

3. **The Basis for this Motion is a Sham "Valuation" from Mr. Babcock, who Debtor Failed to Disclose as a Fellow Coastal Cypress Shareholder.**

Debtor is now trying to pass off another sham "valuation" – this time from "special corporate legal counsel" and secret Coastal Cypress shareholder, Richard Babcock – in support of his proffered share sale price. Mr. Babcock is obviously not independent—he is a lawyer for Coastal and if he is a Coastal Cypress shareholder he would personally benefit from an under-valuation of Debtor's shares (the value lost by the bankruptcy estate from the undervaluation of Debtor's shares would inure to Mr. Babcock and his fellow remaining shareholders' benefit). Mr. Babcock does not profess to have any valuation expertise and his conclusions regarding Coastal Cypress's value are based on unaudited Coastal Cypress financial statements and undisclosed calculations that plainly incorporate the same flaws as infected the previous valuation. Mr. Babcock is merely an insider who was willing to stand behind the Debtor's proposed payment after the accountant for Coastal Cypress declined.

Casting further doubt on the legitimacy of Mr. Babcock's valuation is the fact that the share price proffered by Debtor in this motion to sell is $135,700 less (*i.e.*, a reduction of $0.59 per share) than the price proffered in his original motion to sell. *See* ECF Doc. 59 (proffering a $584,200 sale price at $2.54 per share, which was rejected by the Court for lack of evidence). Debtor attempts to explain this discrepancy by claiming that the original proffered sale price did not account for "operational expenses" incurred by Coastal Cypress from January 1, 2015 through October 31, 2015. Motion, p. 3:5-11. There is no attempt to explain what these "operational expenses" were or why they weren't incorporated into the first motion to sell. Coastal Cypress sold its primary asset – the Coastal Property – in April 2015 and would not have had any significant, legitimate

operating expenses thereafter. In fact, as discussed below, the lower valuation is the result of Debtor's undisclosed attempt to claim credit for $600,000 he wants to have Coastal Cypress pay to an affiliate of its shareholder (on top of an unjustified payment already made to a different affiliate). As further detailed below, Debtor has a demonstrated penchant for tapping Coastal Cypress's resources to cover his personal expenses, to cover expenses incurred by Debtor's other businesses, and/or to otherwise enrich himself and his cronies.

### B. The Ascribed Value and Number of Debtor's Shares is Far Less Than Debtor's Previous Representations.

While the Debtor now claims to have only a 24% interest in Coastal Cypress which he says is worth a mere $448,500, for years he held himself out to have a much more valuable stake. Significantly, the value ascribed to his interest in Coastal Cypress in recent years dwarfs the value given to his stock now. For example, in a December 31, 2013 financial statement provided to the Bank, the Debtor asserted that he and his wife's combined interest in Coastal Cypress was worth $3,486,700. Sacks Decl., Exh. C. Since the Debtor claims that his wife only has a 13% interest, the Debtor's valuation as of the end of 2013 made the Debtor's claimed 24% interest worth $2,261,643 – roughly five times the amount he claims it to be worth in the Motion.[3]

Similarly, at the time Coastal Cypress entered into an agreement to sell the real estate sale in the fall of 2014, the Bank was told that "we expect Bob's net share of the sales proceeds to be approximately $2 million." Sacks Decl., Exh. A.

While it is unnecessary in view of the failure of proof by the Debtor in his Motion, the Bank has obtained expert analysis of the value of the Coastal shares and the Debtor's involvement with that company from a forensic accountant, John C. LaBella. In Mr.

---

[3] Moreover, the difference cannot be explained by any overly optimistic view of the value of Coastal Cypress's property, since the value of the Debtor's shares in the December 2013 financial statement was based on a $12,170,000 valuation of the Coastal Property, which is almost identical to the eventual sale price of $12,000,000.

LaBella's declaration he sets out his review of the documents produced in this matter and provides revised estimates of the value of the Debtor's shares, and of the interest the Debtor actually holds in Coastal Cypress, as well as an analysis of how the Debtor has controlled Coastal Cypress for his own benefit and that of his other companies.

Mr. LaBella's analysis shows that instead of the $2.54 per share calculated by Coastal Cypress' accountant, the actual value should be over $5.00 per share. Instead of estimated taxes, LaBella uses the taxes shown on the tax returns produced by the accountants. He removes the fictitious tax that Coastal Cypress will not pay if it liquidates Brower's interest in the company, as the accountant told the Debtor. He also eliminates the supposed commissions of over $1.7 million paid or to be paid by Coastal Cypress on account of nonexistent services performed by putative shareholder Anthony Nobles through companies that have long been suspended by the California Secretary of State.

There is also serious question about the extent of the Debtor's interest in Coastal Cypress, which the Debtor pegs at 24 percent. The Debtor claims that he and his wife owned 50 percent of Coastal Cypress only until 2011, when he says that Coastal Cypress sold 250,000 shares to two new shareholders for $1 per share, though the Debtor and Coastal Cypress refused to disclose the identity of these purported new shareholders until forced to do so after the Court granted the Bank's motion to compel. (Sacks Decl., ¶¶ 6-7). As it turned out, the "mystery" shareholders Debtor was so intent on concealing were Mr. Babcock and Mr. Nobles. (Sacks Decl., ¶ 8(a)). However, aside from uncorroborated notations on a bare-bones stock ledger, LaBella found no evidence that shares were actually issued to Mr. Nobles or Mr. Babcock in 2011 or that they paid any consideration for those shares.[4] The purported share issuance was thus just a means for the Debtor to make it appear as though his interest was reduced without actually giving anything up.

---

[4] Though Babcock was subpoenaed to produce documents, and subject to the Court's order to do so after the motion to compel was granted, he has produced no documents reflecting his acquisition of any shares, no copies of communications with the Debtor or Coastal

Mr. LaBella's declaration shows that, despite supposedly issuing shares in 2011 that reduced the Debtor's interest to 24% and his total interest with his wife to 37%, the Debtor nonetheless continued in the years thereafter to claim an interest in Coastal Cypress, either separately or jointly with his wife, that was in the range of 47-50 percent, even listing himself as the 47 percent owner on the 2013 Coastal tax return.

However, in 2011 Coastal Cypress did enter into the first of two nearly identical agreements with Nobles' affiliates to transfer monies out of the company in the event of a sale in exchange for purported investment banking services. This is of course just another asset protection scheme used by the Debtor—akin to his transfer of the shares in Great American Wineries to his one-month old son in 1987, or his arrangement to own no interest in Chateau Julien, Inc. while running the company for over 20 years and telling the world he was its owner or proprietor.

Consistent with his pattern of having full control of assets in which he has little or no record ownership, LaBella's analysis shows that the Debtor has used Coastal Cypress sales proceeds as his own. The entities into which the assets have been dispersed share common addresses. There is no record of any shareholder or director approval for investments or spending. Both are done by Mr. Brower for his benefit, including payment of what appear to be his personal expenses and investments in and payments to his affiliates—Great American Wineries, Chateau Julien, and American Commercial Properties.

In addition, the Debtor fails to mention in the Motion that his wife, Patricia, is reflected on the records of Coastal Cypress as owning 13% of the company's stock. Thus, the Debtor's undervaluation of his own shares in the "redemption agreement" effectively transfers equity in Coastal Cypress from himself to his wife's alleged separate property by increasing the value of all other shares in Coastal, including his wife's.

---

Cypress, and in fact nothing other than the documents that he was given by the Debtor in order to create the declaration he filed supporting this Motion. Sacks Decl, ¶ 7.

This would be consistent with the Debtor's overall strategy in this case to characterize his liabilities as his own and his assets as those of various related entities and relatives. For example, in Schedule I (ECF Doc. 22), the Debtor lists his monthly income as $3,450, comprised mostly of shareholder loan repayments from Coastal Cypress. In Schedule J (Doc. 22), the Debtor then lists his monthly expenses as $9,756, including the rental payments of roughly $3,000 that he makes to American Commercial Properties, an entity that owns the house in which he and his wife reside, and which is owned 100% by his wife. According to the Debtor, he conveniently owns next to nothing, and yet he is somehow able to make up the over $6,000 shortfall between his income and expenses each month, including by making roughly $3,000 rental payments to his wife's company for the use of their house. By design, those rental payments shift the Debtor's own funds into his wife's company, out of his bankruptcy estate and away from his creditors.

In reality, the discussion of the non-Debtor shareholders and how they will or won't be impacted by the sale of Debtor's shares is academic because there is only one real owner of Coastal Cypress – the Debtor, who utterly controls Coastal Cypress's every move and treats its assets as his own. As the LaBella Declaration demonstrates, a very large portion of the money expended by Coastal Cypress since the sale other than that necessary for taxes has gone to the Debtor's affiliates or his own expenses. In the Motion, the Debtor would have the bankruptcy estate bear these expenses by reducing the sale price of the Coastal shares.

## III.

## ARGUMENT

**A.  The Proposed Sale Must Have a Valid Business Justification and Be Proposed in Good Faith, and the Sales Price Must Be Reasonable.**

The proposed transaction is an out of the ordinary course sale under Section 363(b). As such, the Debtor has to establish: (i) that the sale "has a valid business justification," *In re 240 North Brand Partners, Ltd.*, 200 B.R. 653, 659 (B.A.P. 9th Cir. 1996); (ii) that it is

"proposed in good faith," *id*.; and (iii) that the price paid is "fair and reasonable." *In re Delaware & Hudson Railway Co*., 124 B.R. 169, 176 (Bankr. D. Del. 1991).

Where debtors fail to provide evidence to support these elements, the motion will be denied. *See, e.g., In re Exaeris Inc*., 380 B.R. 741, 744 (Bankr. D. Del. 2008) (debtor failed to establish any of the foregoing elements, including because it did not describe the relationship between the buyer and the debtor, did not provide any evidence of the value of the assets, and did not provide any evidence of marketing or any negotiations between buyer and seller, among other things); *In re Garbinski*, 465 B.R. 423, 428 (Bankr. W.D. Penn. 2012) ("To sum up, given the insider status of the proposed sale, the lack of any evidence to show the fairness of the proposed price, the other options available to the Trustee apart from an insider sale, and the proposed distribution of sale proceeds, the Court would be unable to conclude the sale meets the applicable good faith standard.").

In addition, sales to insiders are subject to "higher scrutiny," given the "potential for abuse." *In re W.A. Mallory Co*., 214 B.R. 834, 837 (Bankr. E.D. Va. 1997) (rejecting proposed insider sale). Courts have explained that "[t]his higher scrutiny requires (1) that the proposed purchase price be at the very least the lesser of an acceptable appraised value or the tax assessment value, and (2) that the property must have been offered to the public in some form before the court can approve an insider sale. In fact, the debtor must show that the assets are being sold for the highest price attainable. At the very least the court must be satisfied that an insider transaction is the result of bona fide arm's length transactions and not driven by other factors." *In re Tidal Constr. Co*., 446 B.R. 620, 624 (Bankr. S.D. Ga. 2009) (internal citations and quotations omitted).

Debtor has not satisfied any of the requirements for approval of his proposed Coastal Cypress shares sale. Accordingly, as in *Exaeris* and *Garbinski*, the Motion must be denied.

1. <u>Lack of Business Justification</u>.

As set forth above, the Debtor does not provide any admissible, much less credible, evidence in support of the proposed transaction. He merely states that it will be a

SMRH:478654023.4 -10- OPPOSITION TO SALE MOTION
Case: 15-50801   Doc# 124   Filed: 07/28/16   Entered: 07/28/16 21:21:28   Page 12 of 15

redemption of the stock in Coastal Cypress owned by the Debtor for $1.95 per share, but does not provide a copy of the Redemption Agreement referred to in the Motion, and provides nothing but unsubstantiated, conclusory statements in support of his price calculation. The Debtor simply has not provided any evidence that would provide a valid business justification for this particular deal, which appears mostly designed to enrich himself at the expense of the bankruptcy estate.

2. <u>Lack of Good Faith</u>.

In the absence of any admissible supporting evidence (the Debtor's and Mr. Babcock's supporting declarations are comprised almost entirely of hearsay and/or conclusory statements that provide no support for the sale price proffered in the Motion), it is also impossible to determine that the sale is being proposed in good faith. Indeed, the Debtor's history and actions to date, the lack of supporting evidence, and the revelations from the incomplete documents Coastal Cypress and its accountants only grudgingly produced under Court order lead to the logical conclusion that it is not. Without any evidence that anyone besides the Debtor truly has an interest in Coastal Cypress assets, or any indication that the Debtor has come forward with a fair and honest account of his actual interest in the company, the Court can only conclude that the Motion does not satisfy any of the criteria for approval. Instead, the Court is justified in seeing this as simply another scheme by the Debtor to enhance the value of his wife's and other cronies' purported ownership interests to the Debtor's ultimate benefit and at the expense of the bankruptcy estate and creditors.

3. <u>Lack of Support for the Price Paid</u>.

As detailed at length above, Debtor's proffered valuation of his Coastal Cypress shares is covered in red flags. These include, but are not limited to, the following:

- Coastal Cypress's accountant's refusal to provide a declaration supporting even the original value of $2.54 per share;

SMRH:478654023.4 -11- OPPOSITION TO SALE MOTION

Case: 15-50801   Doc# 124   Filed: 07/28/16   Entered: 07/28/16 21:21:28   Page 13 of 15

- Debtor's failure to disclose that his "valuation expert" is also a fellow Coastal Cypress shareholder who may personally benefit from undervaluing Debtor's shares;

- Debtor's failure to submit any supporting documentation to the Motion to justify the proposed share valuation even though the Court denied the last motion for lack of evidentiary support

- The Debtor's demand to keep all of the details confidential and refusal to comply with document subpoenas until ordered to do so by the Court, and even then only providing incomplete productions, in an obvious attempt to suppress evidence undermining the valuation;

- Debtor's previous representations that he owned a significantly larger percentage of Coastal Cypress's stock;

- Debtor's previous representations that the value of his interest in Coastal Cypress was worth four or five times more than the price proffered in the Motion; and

- Debtor's use of Coastal Cypress funds for his exclusive benefit in paying personal expenses, benefitting his other companies, and to make transfers that have no business justification other than asset protection.

These red flags and the concomitant lack of evidence to support the share value would be disqualifying in seeking the Court's approval of an ordinary Section 363(b) sale, but are impossible to overlook here, where the sale is an insider transaction between the Debtor and a corporation that he controls and concerns the only significant asset the Debtor admits to owning.

## IV.

## CONCLUSION

The Debtor has again failed to meet the requirements of the Bankruptcy Code to have the proposed sale approved. In addition, the Bank has demonstrated that the Debtor's

SMRH:478654023.4 -12- OPPOSITION TO SALE MOTION

Case: 15-50801    Doc# 124    Filed: 07/28/16    Entered: 07/28/16 21:21:28    Page 14 of 15

share interest in Coastal is greater and more valuable than he admits.  The Motion should be denied.

Dated: July 28, 2016				SHEPPARD, MULLIN, RICHTER & HAMPTON LLP


					By:	/s/ *Steven B. Sacks*
						STEVEN B. SACKS
						Attorneys for Creditor
						MUFG Union Bank, N.A.