# REDACTED VERSION

1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
   A Limited Liability Partnership
2  Including Professional Corporations
   STEVEN B. SACKS, Cal. Bar No. 98875
3  ssacks@sheppardmullin.com
   MICHAEL M. LAUTER, Cal. Bar No. 246048
4  mlauter@sheppardmullin.com
   ISAIAH Z. WEEDN, Cal. Bar No. 229111
5  iweedn@sheppardmullin.com
   Four Embarcadero Center, 17th Floor
6  San Francisco, CA 94111-4109
   Telephone:   415-434-9100
7  Facsimile:   415-434-3947

8  Attorneys for Creditor
   MUFG UNION BANK, N.A.
9

10              UNITED STATES BANKRUPTCY COURT

11              NORTHERN DISTRICT OF CALIFORNIA

12                     SAN JOSE DIVISION

13

14  In re                                   Case No. 15-50801

15                                          Chapter 11
    ROBERT BROWER, SR.,
16                                          **DECLARATION OF STEVEN B.**
                        Debtor.             **SACKS IN SUPPORT OF MUFG**
17                                          **UNION BANK, N.A.'S OPPOSITION**
                                            **TO DEBTOR'S MOTION TO SELL**
18                                          **PERSONAL PROPERTY**

19                                          Date:    August 4, 2016
                                            Time:    10:30 a.m.
20                                          Place:   280 S. First Street, Room 3070
                                                     San Jose, CA 95113
21                                          Judge:   Hon. Elaine Hammond

22

23

24

25

26

27

28

I, Steven B. Sacks, declare as follows:

1. I am a partner of the law firm of Sheppard, Mullin, Richter & Hampton LLP, counsel for MUFG Union Bank, N.A. ("Union Bank" or the "Bank"). I make this declaration in my above capacity. Except for those statements made upon information and belief, the following facts are based upon my personal knowledge and if called to testify, I could and would competently testify to such facts. As to those statements made upon information and belief, I believe them to be true.

2. This declaration is made in support of *MUFG Union Bank, N.A.'s Opposition to Debtor's Motion to Sell Personal Property* (the "Opposition"). I give capitalized terms not defined here the meanings provided to them in the Opposition. Certain documents referenced below were produced pursuant to a stipulation for a protective order and marked "Confidential." These documents, and any tax return documents referenced below, are being filed under seal with a motion to permit such filing.

3. Attached hereto as Exhibit A is a true and correct copy of a letter dated September 30, 2014 from the attorney for Chateau Julien, Inc., Douglas Oldfield, to my partner, Michael Lauter in connection with the Bank's ongoing dispute with Mr. Brower and Chateau Julien. The letter addressed Coastal Cypress Corporation's anticipated sale of its real property commonly referred to as 8890 and 8940 Carmel Valley Rd. in Carmel, CA (the "Coastal Property"). In the letter's second paragraph, Mr. Oldfield states "[w]e expect Bob's net share of the [Coastal] property's sales proceeds to be approximately $2 million, subject to confirmation by his CPAs."

4. Attached hereto as Exhibit B is a true and correct copy of an email from Gina Cochetti of Hayashi Wayland, the accountant of Coastal Cypress Corporation, produced in response to the Bank's Rule 2004 request in this case. This is the same e-mail I attached to my previous declaration submitted in support of the Bank's Opposition to Debtor's first Motion to Sell Personal Property (*see* ECF Doc. 67-2, Exh. A).

5. I questioned Robert S. Brower, Sr. (the "Debtor") in connection with a Rule 2004 examination (the "Examination") on July 31, 2015. A true and correct copy of

certain excerpts of the transcript and exhibits from the Examination is attached hereto as Exhibit C. Pages 33-45 reflect the discussion of the original acquisition of the Coastal Property and Coastal Cypress stock issuances and owners stock of Coastal Cypress, including the discussion of the sale of 250,000 shares in Coastal Cypress in 2011 at the same per share price used in 1982. Pages 111-117 reflect the discussion of the accountant email described in paragraph 4 above. Pages 155-156 reflect the Debtor's refusal to provide the closing statement for Coastal Cypress's sale of its primary asset, the real property commonly referred to as 8890 and 8940 Carmel Valley Rd. in Carmel, CA (the "Coastal Property"). The excerpted exhibits (which are referenced at footnotes 2 and 3 in the concurrently filed Declaration of John LaBella) include Debtor and his wife's personal financial statement presented to the Bank for the year 2011 (Exhibit 2) and Debtor and his wife's personal financial statement presented to the Bank for the year 2013 (Exhibit 3).

6. Debtor filed the Motion to Sell Personal Property that the Bank now opposes in December 2015 (*see* ECF Doc. 77). In the wake of that filing, the Bank served Coastal Cypress, its "special corporate legal counsel" (Richard Babcock), and its accounting firm (Hayashi Wayland), with subpoenas seeking documents related to Coastal Cypress's value and Debtor's calculation of his Coastal Cypress shares' value as reflected in Debtor's Motion, including the closing statement for the sale transaction and unredacted documents concerning the ownership of Coastal Cypress. Coastal Cypress, Mr. Babcock, and Hayashi Wayland refused to comply with the subpoenas even after their counsel negotiated a resolution of the subpoenas on their behalf and the Bank was ultimately forced to file a motion to compel (*see* ECF Doc. 101).

7. On April 4, 2016, the Court entered an order granting the Bank's motion to compel and ordering Coastal Cypress, Mr. Babcock, and Hayashi Wayland to produce all documents in their possession, custody, or control responsive to the subpoenas (subject to certain, specified limitations) (*see* ECF Doc. 117). While the three subpoenaed parties then produced some documents, Coastal Cypress in particular has still not fully complied with the subpoena and the Court's order despite repeated communications with

-3-

its counsel. Babcock has produced no documents reflecting his acquisition of any shares, no copies of communications with the Debtor or Coastal Cypress, and in fact nothing other than the documents that he was given by the Debtor in order to create the declaration he filed supporting this Motion.

8.    Among other things, Coastal Cypress produced the following key documents pursuant to the Bank's subpoena and the Court's order (all of which were provided to John LaBella and many of which are referenced in the concurrently-filed Declaration of John LaBella):

(a)    An unredacted Coastal Cypress stock register (CCC 010-011; *see* fn. 11 of LaBella Decl.) disclosing, for the first time, the identities of the shareholders to whom Coastal Cypress purportedly issued a total of 250,000 shares of stock on January 22, 2011 – Anthony A. Nobles and Richard J. Babcock. The latter is the same Richard J. Babcock who submitted a declaration (as Coastal Cypress's "special corporate legal counsel") purporting to provide a valuation of Coastal Cypress and Debtor's Coastal Cypress shares without disclosing his interest in Coastal Cypress. A true and correct copy of the stock register is attached hereto as Exhibit D.

(b)    The unredacted Final Settlement Statement for Coastal Cypress's sale of the Coastal Property (CCC 075-076) showing, among other things, a $1,120,000 payment from the sale proceeds to Med-Venture Investments, LLC. A true and correct copy of the Final Settlement Statement is attached hereto as Exhibit E.

(c)    The Escrow Agreement for the sale of the Coastal Property (CCC 090-097). Notably, the Escrow Agreement provided that a copy of any notices sent by the purchaser pursuant to Section 13 therein would be sent to Richard Babcock at Babcock & Associates, 18101 Von Karman, Suite 230, Irvine, CA 92612 (*see* CCC 094). A true and correct copy of the Escrow Agreement is attached hereto as Exhibit F.

-4-

(d)     An agreement between Chateau Julien, Inc. and Coastal
Cypress, on the one hand, and Med-Venture Investments, LLC, on the other
hand (CCC 116-119), as well as an agreement between Chateau Julien, Inc.
and Coastal Cypress, on the one hand, and Aurora Capital Advisors, LLC, on
the other hand (CCC 001-004). The Aurora Capital agreement purported to
entitle Aurora Capital to a 5% commission on the sale of Chateau Julien
and/or Coastal Cypress and/or substantially all of the companies' assets (*see*
CCC 001). Similarly, the Med-Venture agreement purported to entitle Med-
Venture to a "consulting fee" of $1.12 million on the sale of Chateau Julien
and/or Coastal Cypress and/or substantially all of the companies' assets (*see*
CCC 116; *and see* fn. 10 of LaBella Decl.).  Coastal Cypress shareholder
Anthony Nobles signed the agreements on behalf of Aurora Capital and
Med-Venture, respectively (*see* CCC 004 and 119).  In addition, the
letterhead for Aurora Capital and Med-Venture (*see* CCC 001 and 116)
reflected the same address – 18101 Von Karman, Suite 230, Irvine, CA
92612 – which was also the same address specified for Coastal Cypress
shareholder Richard Babcock's law firm in the aforementioned Escrow
Agreement (*see* Exh. F, CCC 094).  True and correct copies of the Med-
Venture and Aurora agreements are attached hereto as Exhibits G and H,
respectively.

(e)     A Great American Wineries invoice  (CCC 145; *see* fn. 16 of
LaBella Decl.) a true and correct copy of which is attached hereto as Exhibit
P.

9.     Among other things, Hayashi Wayland produced the following key
documents pursuant to the Bank's subpoena and the Court's order (all of which were
provided to John LaBella and many of which are referenced in the concurrently-filed
Declaration of John LaBella):

(a)     Page 5 of Form 1120 from Coastal Cypress's 2011 tax return (H&W 048; *see* fn. 1 of LaBella Decl.) a true and correct copy of which is attached hereto as Exhibit I.

(b)     Page 5 of Form 1120 from Coastal Cypress's 2013 tax return (HW Supp 000574; *see* fn. 4 of LaBella Decl.) a true and correct copy of which is attached hereto as Exhibit J.

(c)     Schedule G of Form 1120 from Coastal Cypress's 2011 tax return (H&W 0575; *see* fn. 6 of LaBella Decl.) a true and correct copy of which is attached hereto as Exhibit K.

(d)     E-mail correspondence between Debtor and accountant Gina Cochetti dated February 13 and 14, 2015 concerning the ownership of Coastal Cypress and Chateau Julien (HW Supp 000678; *see* fn. 7 of LaBella Decl.) a true and correct copy of which is attached hereto as Exhibit L.

(e)     E-mail correspondence between Debtor and Cochetti dated July 20 and 22, 2015 (HW Supp 000092; *see* fn. 8 of LaBella Decl.) a true and correct copy of which is attached hereto as Exhibit M.

(f)     The Seller's Final Settlement Statement (H&W 101-102; *see* fn. 9 and 12 of LaBella Decl.) a true and correct copy of which is attached hereto as Exhibit N.

(g)     A Monterey County 2014-2015 Property Tax Bill (H&W 106; *see* fn. 15 of LaBella Decl.) a true and correct copy of which is attached hereto as Exhibit O.

(h)     An Ameritrade statement for October 2015 (HW Supp 000010; *see* fn. 17 of LaBella Decl.) a true and correct copy of which is attached hereto as Exhibit Q.

(i)     An "Intangibles and Ammortization" table (H&W 124; *see* fn. 18 of LaBella Decl.) a true and correct copy of which is attached hereto as Exhibit R.

1          (j)     Form 1120 from Coastal Cypress's 2015 tax return (HW Supp

2    000143; *see* fn. 19 of LaBella Decl.) a true and correct copy of which is

3    attached hereto as Exhibit S.

4          (k)     Side 2 of Form 100 C1 from Coastal Cypress's 2015 tax return

5    (HW Supp 000164; *see* fn. 19 of LaBella Decl.) a true and correct copy of

6    which is attached hereto as Exhibit T.

7          (l)     Additional excerpts from Coastal Cypress's 2015 tax returns

8    (HW Supp 000159-184; *see* fn. 20 of LaBella Decl.) a true and correct copy

9    of which is attached hereto as Exhibit U.

10         (m)     October 2015 Coastal Cypress balance sheet  (HW Supp

11   000073; *see* fn. 21 of LaBella Decl.) a true and correct copy of which is

12   attached hereto as Exhibit V.

13         (n)     Page 5 of Form 1120 from Coastal Cypress's 2015 tax return

14   (HW Supp 000147; *see* fn. 22 of LaBella Decl.) a true and correct copy of

15   which is attached hereto as Exhibit W.

16   (o)     Excerpts from a Reports Journal dated November 11, 2015 (HW Supp

17   000033 and 35; *see* fn. 23 and 24 of LaBella Decl.) a true and correct copy of

18   which is attached hereto as Exhibit X.

19         (p)     E-mail correspondence between Debtor and accountant Gina

20   Cochetti dated July 20, 2015 (HW Supp 000094-96) wherein Ms. Cochetti

21   provides her preliminary calculations concerning the "Sale and Winding

22   Down" of Coastal Cypress including the Coastal Property sale price, a "tax

23   paid on liquidating event" of $634,978, and three other assumed

24   expenses/liabilities used to calculate net cash to shareholders and a dollars

25   per share figure of $2.54 (*i.e.*, the same figure Debtor proffered as the

26   Coastal Cypress share price in his first Motion to Sell Personal Property.

27   Mr. Brower's response asks Ms. Cochetti to "omit all items except the 3 that

28   counsel advises we can release at this time."  Subsequently, Ms. Cochetti

1   sends Mr. Brower the e-mail discussed in paragraph 4 above and attached

2   hereto as Exhibit B, reflecting only the Coastal Property sale price and her

3   figures for the net cash to shareholders and dollars per share. A true and

4   correct copy of the July 20, 2015 exchange between Mr. Brower and Ms.

5   Cochetti is attached hereto as Exhibit Y.

6   (q)    In a follow-up e-mail exchange on August 5 and 7, 2015 (HW

7   Supp 000077-78), Mr. Brower stated that he had "a shareholder that wants to

8   sell their shares back to CCC. The shareholder interest is only 24%...I do not

9   want to trigger a liquidation of the company…" Ms. Cochetti responded that

10  "[t]he amount I gave you is assuming the corporation is liquidating and the

11  shareholders are receiving the cash as a liquidating dividend…[t]he corp can

12  redeem the shareholders interest. This would not trigger a liquidation

13  event…" Accordingly, the $2.54 price per share that Ms. Cochetti calculated

14  and that Debtor used in his first Motion to Sell contemplated Coastal Cypress

15  paying a $634,978 tax that it would not actually need to pay upon the sale of

16  Debtor's alleged 24% interest. A true and correct copy of this e-mail

17  exchange is attached hereto as Exhibit Z.

18  (r)    On November 17, 2015 (*i.e.*, shortly after the Court denied

19  Debtor's original Motion to Sell and shortly before Debtor filed the instant

20  Motion to Sell) e-mail from Debtor to Ms. Cochetti attaching a Coastal

21  Cypress Balance Sheet and Income Statement as well as a declaration for

22  Ms. Cochetti's signature (HW Supp 000071). Though the Balance Sheet and

23  Income Statement attachments were included in Hayashi Wayland's

24  production (HW Supp 000072-73), the proposed declaration was omitted

25  without explanation and has not been produced since. A true and correct

26  copy of the e-mail and the attachments that were produced is attached hereto

27  as Exhibit AA.

28

-8-

1          (s)     Ms. Cochetti responded to Debtor's November 17 (HW Supp

2    000065-66) e-mail that same day and stated "[t]his is not something we

3    normally do and I think my insurance carrier would have a real issue with me

4    signing this."  Debtor responds later that same day by asking whether

5    "CCC's counsel" Rich Babcock can contact her for a few questions.  A true

6    and correct copy of this e-mail exchange is attached hereto as Exhibit BB.

7          I declare under penalty of perjury under the laws of the State of California

8    that the foregoing is true and correct, and I executed this declaration on July 28, 2016.

9

10                              */s/ Steven B. Sacks*

                           Steven B. Sacks

# EXHIBIT A

# EXHIBIT A

OLDFIELD & CREELY, LLP
ATTORNEYS AT LAW

26619 CARMEL CENTER PLACE, SUITE 202
CARMEL, CALIFORNIA 93923-8656

TELEPHONE (831) 625-3900
FACSIMILE (831) 625-6043

September 30, 2014

**By Email and US Mail**
Michael Lauter
SHEPPARD MULLIN
4 Embarcadero Ctr., 17th Floor
San Francisco, CA 94111-4109

### Re: Chateau Julien, Inc. - Union Bank
### Proposal to Restructure Credit

Dear Mr. Lauter:

I was disappointed to receive your Notice of Disposition of Collateral with regard to the above-referenced matter after we had made much progress in resolving this matter. Union Bank is not making a good faith effort to resolve the dispute and to enforce the security, as required under section 2.16 of the Modification Agreement and section 17.17 of the Loan and Security Agreement, as well as under the Commercial Code.

We have continued to inform you and Union Bank of the developments concerning the subject property and business and informed you that the underlying real property will be sold under a purchase agreement that is expected to be signed by the buyer tomorrow night and by the seller in the next day or two after that. As a result of sale, all of the CCC debt of almost $5 million will be paid in full and all of Bob Brower's net proceeds (less his taxes) generated from the sale will be used to pay down the Chateau Julien debt, assuming reasonable and mutually agreeable terms can be worked out for a 12 month extension of the loan. We expect Bob's net share of the sales proceeds to be approximately $2 million, subject to confirmation by his CPAs. That means the bank will be paid approximately $7 million upon close of escrow, leaving a balance of approximately $2.8 million. As previously mentioned, after the close of escrow, Chateau Julien can operate much more efficiently and profitably without the burden of the real estate operations and overhead attributable to the large Chateau Julien facilities. Bob is putting together a business plan for Union Bank and for the other banks from whom he is seeking to refinance the remaining debt.

It bears repeating that the only asserted default is the inability of Chateau Julien to pay the note in full by the note's maturity date. Importantly, Chateau Julien has continued to pay or tender the monthly payments due under the note so that Union Bank is not prejudiced by the delay in repayment.

P\C JULIEN\CORRESPONDENCE\Lauter Ltr (14Sep30).wpd

UB0010594

Michael Lauter
September 30, 2014
Page 2

Because the bank is not operating in good faith, Chateau Julien is cancelling the audit that was scheduled to begin this Monday October 6, 2014. Chateau Julien also objects and will not allow Union Bank to gather or sell the collateral pursuant to your recent Notice of Disposition of Collateral. Any attempt to gather or sell the collateral will result in a breach of the peace and Chateau Julien's claim for damages. Chateau Julien can also sell the inventory at a much higher price than Union Bank can sell it for at a foreclosure sale. As previously discussed, we can work out the terms of Chateau Julien's sale of the inventory as it benefits both parties.

I continue to hope that Union Bank will resume negotiations and not resort to heavy-handed enforcement methods which needlessly drive up the cost of attorneys' fees. This loan will not be repaid or worked out overnight. We do need time and patience to obtain a solution through a refinancing. Union Bank has stated its desire to work with Chateau Julien and has acknowledged, as it must, that more time is needed to resolve these issues. The bank's recent enforcement efforts are a giant step backwards and will only make negotiations much more adversarial instead of collaborative.

Very truly yours,

DOUGLAS W. OLDFIELD

DWO:dss
cc:    Client

P:\CH\     \JULIEN\CORRESPONDENCE\Lauter Ltr (14Sep30).wpd

UB0010595

# EXHIBIT B

# EXHIBIT B

| bob | Profile | ▾ | □ | Sign Out | Home |

| | Contacts | Notepad | Calendar | | | | | | Switch to the newest Yahoo Mail | |
| | | | | | | | | | | AutoRelease |

Actions    ▾   Reply   Previous

Inbox

Drafts

Sent

Spam   [Empty]

Trash [Empty]

My Folders   [Edit]

Notes

MONEY . .   Did this Billionaire Just Bet...
Sponsored   Did one of the world's richest

**Coastal Cypress Shareholde**   Monday July 20, 2015 12:15 PM
**r Data**

From: "Gina Cochetti" <gitiec@hwcpa.com>

To: "coastalcypress@yahoo.com"
<coastalcypress@yahoo.com>    ...

Full Headers Printable View

Bob,

Below is the preliminary calculation I have done for the sales price, net cash to shareholders and dollars per share.

Coastal Cypress Corporation
Sale and Winding Down of Corp
Cash Flow

| | |
|---|---|
| Cash upon sale of property | 12,330,033 |
| Net Cash to SH | 3,435,926 |
| Dollars per share | 2.54 |

Let me know if you need anything else.

Thanks,

Gina

**GINA COCHETTI, CPA, MST**
Partner
ginac@hw-cpa.com   /   831-759-6305

**HAYASHI**   **WAYLAND**
1188 Padre Drive, Suite 101
Salinas, CA 93901
FAX: 831.759.6380
☞ ↳ : hw-cpa.com

Click here to securely upload files to me

Notice:
The example is only intended for the personal use of the individual addressed and may contain information that is confidential, proprietary or otherwise protected by law. If you have received this message from someone other than the intended recipient, please notify the sender by reply e-mail and then delete this message from your system. Please do not copy or use this communication for any purpose. Thank you for your cooperation.

Any advice, recommendation or statement provided in this email is subject to professional judgment and does not constitute legal advice. Nothing contained in this email or in any attachment should be construed as professional advice to any third party. Any advice contained in this email relates only to the matters specifically referenced. You may rely on such advice in accordance with the terms contained in our engagement letter.

EXHIBIT
14
Brower

070/092
Brower

# EXHIBIT C

# EXHIBIT C

```
1               NORTHERN DISTRICT OF CALIFORNIA
2                     BANKRUPTCY COURT
3                    SAN JOSE DIVISION
4
5
                                   )
6   IN RE: ROBERT S. BROWER, SR.   )   15-50801
    (DEBTOR)                        )
7                                   )
                                    )
8
9
10
11           EXAMINATION OF ROBERT S. BROWER, SR.
12                  San Jose, California
13                  Friday, July 31, 2015
14                        Volume I
15
16
17
18
19
20
21  Reported by:
    LARRY BOSTOW
22  CSR NO. 5941
23  Job No. 2113869;
24
25  Pages 1 - 160
```

Veritext Legal Solutions
866 299-5127

```
1                 NORTHERN DISTRICT OF CALIFORNIA

2                     BANKRUPTCY COURT

3                    SAN JOSE DIVISION

4

5

                                    )

6    IN RE: ROBERT S. BROWER, SR.   )    15-50801

     (DEBTOR)                        )

7                                    )

                                     )

8

9

10

11          Rule 2004 Examination of ROBERT S. BROWER, SR.,

12    Volume I, taken at 440 N. First Street, Suite 100, San

13    Jose, California, beginning at 9:50 a.m., and ending at

14    3:46 p.m., on Friday, July 31, 2015, before Larry

15    Bostow, Certified Shorthand Reporter No. 5941.

16

17

18

19

20

21

22

23

24

25
```

Page 2

Case: 15-50801   Doc# 67-2   Filed: 11/05/15   Entered: 11/05/15 16:34:48   Page 7 of
32
Case: 15-50801   Doc# 130   Filed: 07/28/16   Entered: 07/28/16 22:17:24   Page 17 of
148

```
 1   APPEARANCES:
 2
 3   For MUFG Union Bank:
 4       SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
         BY: STEVEN B. SACKS, ESQ.
 5       Four Embarcadero Center, Seventeenth Floor
         San Francisco, California 94111
 6       415.774.2905
         ssacks@sheppardmullin.com
 7
 8   For Robert S. Brower, Sr.
 9       CAMPEAU, GOODSELL, SMITH
         BY: WILLIAM J. HEALY, ESQ.
10       440 N. 1st Street, Suite 100
         San Jose, California 95112
11       408.295.9555
         whealy@campeaulaw.com
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

Veritext Legal Solutions
866 299-5127

Case: 15-50801   Doc# 67-2   Filed: 11/05/15   Entered: 11/05/15 16:34:48   Page 8 of
32
Case: 15-50801   Doc# 130   Filed: 07/28/16   Entered: 07/28/16 22:17:24   Page 18 of
148

```
1    the acquisition of the property that Chateau Julien's

2    business was located on?

3         A    Yes, I was.

4         Q    How did that come about?

5         A    Specifically what is your question?

6              How did what come about?

7         Q    How did you acquire the property?

8              How did whoever acquired it obtain it?

9         A    Let's see.  I believe, to the best of my

10   recollection, found a piece of property and put that

11   piece of property into contract to purchase, subject to

12   obtaining certain permits, use permits, from the County

13   and, upon obtaining those permits, purchased the

14   property.

15        Q    Who was it that purchased the property at that

16   time?

17        A    The property was under contract to Coastal

18   Cypress Corporation.

19        Q    Did that company exist before the property was

20   purchased?

21        A    To the best of my recollection they were -- the

22   approximate dates of its creation and the acquisition of

23   the property were reasonably close.

24        Q    Is it fair to say that company was formed in

25   order to acquire the property?
```

Page 33

```
  1      A    Yes.

  2      Q    What was the purchase price at that time?

  3      A    Best of my recollection, under $1,000,000.

  4      Q    What was the financing for the property?

  5      A    I believe there was owner carryback, and the

  6  rest was financed by paid-in capital.

  7      Q    What do you mean by paid-in capital?

  8      A    Equity shares in the company.

  9      Q    Who were the original owners of the equity

 10  shares in the company?

 11      A    I believe the stock record reflects that.

 12      Q    Okay.

 13           MR. HEALY:  Just for the record, as you look

 14  for that, we do have -- I mean, the names are there, and

 15  I'm sure you'll get into it.  We do have deep concerns

 16  of his duty, as president of some of these companies, to

 17  protect the privacy rights of the shareholders, so we're

 18  very sensitive to that.  So just a statement for the

 19  record, I guess.

 20           MR. SACKS:  Okay.  We'll, let's talk off the

 21  record for a second.

 22           (Off the record.)

 23           (Exhibit 4 was marked for identification by the

 24  court reporter and is attached hereto.)

 25           MR. SACKS:  We've marked as Exhibit 4 a
```

Page 34

Veritext Legal Solutions
866 299-5127

Case: 15-50801   Doc# 67-2   Filed: 11/05/15   Entered: 11/05/15 16:34:48   Page 11
of 32
Case: 15-50801   Doc# 130   Filed: 07/28/16   Entered: 07/28/16 22:17:24   Page 20 of
148

```
 1   document that says at the top "Register of Original And"
 2   -- and I think that the title continues on the second
 3   page -- "Reissued Stock Certificates."
 4            MR. HEALY:  Mr. Sacks, if I may, I think that
 5   the witness will confirm --
 6            MR. SACKS:  Maybe I shouldn't have stapled it.
 7            MR. HEALY:  Yes, that it is actually an 8 and a
 8   half, so that's a 17-by-11 type of document, and it's
 9   photocopied, like a book, on top of a copy machine.  So
10   you were correct, as I understand it, to read that as a
11   single title.
12            MR. SACKS:  Okay.
13      Q    Mr. Brower, do you accept your counsel's
14   representation?
15      A    Yes, I do.
16      Q    Did you make the copy of this from a stock
17   book?
18      A    Yes, I did.
19      Q    Okay.  And is this copy an accurate depiction
20   of the pages from the Coastal Cypress Corporation stock
21   book?
22      A    I believe it is, yes.
23      Q    Do you have that stock book in your possession?
24      A    I do.
25      Q    Am I correct, in reading this, that there were
```

Page 35

Case: 15-50801   Doc# 67-2   Filed: 11/05/15   Entered: 11/05/15 16:34:48   Page 12
of 32
Case: 15-50801   Doc# 130   Filed: 07/28/16   Entered: 07/28/16 22:17:24   Page 21 of
148

```
1    four original shareholders in 1982?
2         A    That's how I would understand it, yes.
3         Q    And two of those original shareholders sold
4    their shares shortly thereafter, in 1983; is that
5    correct?
6         A    That is what I understand also, yes.
7         Q    So Stock Certificates 3 and 4 were surrendered
8    at the end of August 1983?
9         A    Yes.
10        Q    And did those individuals have any further
11   involvement in Coastal Cypress thereafter?
12        A    Not to my recollection.
13        Q    Okay.  And in 1982 you purchased 80,000 shares
14   of Coastal Cypress?
15        A    Yes, sir.
16        Q    And your wife purchased 25,000 shares?
17        A    Yes, sir.
18        Q    And then, in 1983, you purchased additional
19   shares, totaling 300,000 shares, over the course of
20   1983; am I correct?
21        A    No, you have to deduct the 100,000 shares in
22   Certificate No. 5, because it was redeemed in '83 also.
23        Q    And Certificate 9 was redeemed in 1984?
24        A    Let me go ahead and put the entire exhibit up
25   here.
```

Page 36

Case: 15-50801  Doc# 67-2  Filed: 11/05/15  Entered: 11/05/15 16:34:48  Page 13
of 32
Case: 15-50801  Doc# 130  Filed: 07/28/16  Entered: 07/28/16 22:17:24  Page 22 of
148

```
 1              Yes.

 2        Q    So by the end of 1984 you had purchased an

 3   additional 150,000 shares; am I correct?

 4              Well, no, I take that back.  Let me start

 5   again.

 6              All right.  So you had --

 7              Let's start with the purchase in January of

 8   1983.  There were two purchases totaling 200,000 shares,

 9   but one was later redeemed; correct?

10        A    Yes.  '83.

11        Q    So, over the course of 1983, you purchased but

12   didn't redeem, in '83, 200,000 shares?

13        A    No, 100,000 shares.  Oh, hold on.

14              200,000.  You are correct.  I'm sorry.  I

15   thought that first one was '82.

16        Q    Okay.  And then, in 1984, you redeemed 50,000

17   shares, but you also purchased another 45,000; correct?

18        A    And redeemed them also.

19        Q    And redeemed them also.  Okay.

20              So you were left with a net ownership, as of

21   1984, and I guess thereafter, of how many shares?

22        A    I don't know.  I would have to take a look at

23   this here (indicating).

24              MR. HEALY:  I have a calculator if you want

25   one.
```

Page 37

Case: 15-50801   Doc# 67-2   Filed: 11/05/15   Entered: 11/05/15 16:34:48   Page 14
                                          of 32
Case: 15-50801   Doc# 130   Filed: 07/28/16   Entered: 07/28/16 22:17:24   Page 23 of
                                          148

```
1                MR. SACKS:  No, that's okay.

2         Q    Let me do this for you and see if this helps.

3              You never redeemed stock Certificate No. 1 for

4    80,000 shares; correct?

5         A    Yes, that is correct.

6         Q    You also did not redeem Stock Certificate No. 6

7    for 100,000 shares?

8         A    I believe that is correct, yes.

9         Q    And you didn't redeem Stock Certificate 7 and 8

10   that totaled 50,000 shares; correct?

11        A    That is correct.  It looks -- that's what it

12   looks like, yes.

13        Q    And there were no other certificates issued to

14   you that weren't redeemed?

15        A    Correct.

16        Q    So your total shares would be reflected in

17   Stock Certificates 1, 6, 7 and 8, and total 230,000

18   shares?

19        A    That's correct.

20        Q    Your wife, Mrs. Brower, we've already talked

21   about her buying 25,000 shares at the inception of the

22   company.  And in Stock Certificates 12 did she purchase

23   an additional 100,000 shares?

24        A    Yes.

25        Q    And whose funds were used for the acquisition
```

Page 38

Veritext Legal Solutions
866 299-5127

Case: 15-50801   Doc# 67-2   Filed: 11/05/15   Entered: 11/05/15 16:34:48   Page 15
of 32
Case: 15-50801   Doc# 130   Filed: 07/28/16   Entered: 07/28/16 22:17:24   Page 24 of
148

1    of those shares in 1984?

2         A    Those would be her dollars.

3         Q    Did she, at that time, maintain a bank account

4    of her own, that you had no involvement with?

5         A    I'm sure she did.

6         Q    Does she still, today, have such an account?

7         A    She still has her own bank account, yes.

8         Q    Do the records of Coastal Cypress include

9    copies of the checks or other transfers that were made

10   to purchase shares?

11        A    They do not.

12        Q    Do you have any records that show either your

13   purchase of shares or your wife's purchase of shares?

14        A    Not to my recollection.

15        Q    All right.  The share purchases that are shown

16   on this ledger between 1985, and up to December 16th,

17   1987, all of those shares were redeemed; correct?

18             So that would be Stock Certificates 13, 14, 15,

19   16 and 17.

20             Do you want me to say that again?

21        A    13 was redeemed.

22             MR. HEALY:  Speak louder, please.

23             THE WITNESS:  13 was redeemed, 14 was redeemed,

24   15 was redeemed, 16 was redeemed and 17 was redeemed.

25   BY MR. SACKS:

Page 39

Case: 15-50801   Doc# 67-2   Filed: 11/05/15   Entered: 11/05/15 16:34:48   Page 16
of 32
Case: 15-50801   Doc# 130   Filed: 07/28/16   Entered: 07/28/16 22:17:24   Page 25 of
148

| | | |
|---|---|---|
| 1 | Q | So, in addition to the shares owned by you and |
| 2 | | your wife, there are Certificates 18, 19 and 20; |
| 3 | | correct? |
| 4 | A | That is correct. |
| 5 | Q | Are there any other share issuances besides |
| 6 | | those shown here? |
| 7 | A | Not to my knowledge. |
| 8 | Q | Do you maintain this document? |
| 9 | A | Actually, my wife maintains this document. |
| 10 | Q | Is that her handwriting with dates in January |
| 11 | | of 2011? |
| 12 | A | January 22nd, '11, yes, I recognize them as her |
| 13 | | handwriting. |
| 14 | Q | Okay. And those reflect that shares were sold. |
| 15 | | 200,000 shares were sold to Anthony and 50,000 |
| 16 | | shares were sold to Richard; correct? |
| 17 | A | Yes, sir. |
| 18 | Q | and back in 1987, shares were sold to something |
| 19 | | called Ranch Supply. |
| 20 | | What is the name there? |
| 21 | A | Ranch Supply. |
| 22 | Q | Can you tell me the full name? |
| 23 | A | No. |
| 24 | Q | Why is that? |
| 25 | A | Shareholders are confidential. |

Page 40

Case: 15-50801   Doc# 67-2   Filed: 11/05/15   Entered: 11/05/15 16:34:48   Page 17
of 32
Case: 15-50801   Doc# 130   Filed: 07/28/16   Entered: 07/28/16 22:17:24   Page 26 of
148

```
 1        Q    Are you refusing to answer the question?

 2        A    Yes, I am.

 3             MR. SACKS:  Counsel, are you instructing him

 4    not to answer the question?

 5             MR. HEALY:  I don't need to because he's

 6    already invoked what he believes is his obligation to

 7    maintain the privacy rights of the shareholders of

 8    Coastal.

 9             I guess I will instruct him, because Coastal

10    does have counsel, and Coastal is not on notice of this

11    and I don't know Coastal's position.

12    BY MR. SACKS:

13        Q    At the outset, what was the price per share

14    that you paid for your shares in Coastal?

15        A    My general recollection was $1 per share.

16        Q    Did that price per share ever change as

17    additional shares were issued?

18        A    I have no recollection of whether it was or

19    whether it was not.

20        Q    So you don't recall, as you sit here today,

21    what the price paid by Anthony was in 2011?

22        A    I do recall that price.  That was $1 per share.

23        Q    And was it also the same as what was paid by

24    Richard in 2011?

25        A    Yes.
```

Page 41

Case: 15-50801   Doc# 67-2   Filed: 11/05/15   Entered: 11/05/15 16:34:48   Page 18
of 32
Case: 15-50801   Doc# 130   Filed: 07/28/16   Entered: 07/28/16 22:17:24   Page 27 of
148

```
1    Q    And you don't recall what price was paid -- or
2    let me ask it this way.
3          What price was paid by Ranch Supply in 1987?
4    A    I don't recall.
5    Q    How was the price at which shares were sold
6    determined with the sales in 2011?
7    A    I believe that's what I was asking for a share
8    of Coastal Cypress at that time, was $1 per share.
9    Q    And what led you to determine that asking
10   price?
11   A    I don't recollect what I used at that point.
12   Q    Was it intended to be a reflection of what the
13   fair market value was of the shares?
14   A    I don't remember at all what was used to
15   determine that value.
16   Q    Is Anthony Anthony Gogliucci?
17   A    There are two Anthonys on this sheet.
18   Q    And I'm just referring to the one who bought
19   shares in January of 2011.
20   A    The answer is no.
21   Q    Who is the Anthony who bought shares in 2011?
22   A    I am not at liberty to discuss who the
23   shareholders are.
24   Q    So your refusal to answer would be the same
25   with respect to who Richard is?
```

Page 42

Case: 15-50801   Doc# 67-2   Filed: 11/05/15   Entered: 11/05/15 16:34:48   Page 19
of 32
Case: 15-50801   Doc# 130   Filed: 07/28/16   Entered: 07/28/16 22:17:24   Page 28 of
148

```
1          A    That is correct.

2          Q    Am I correct that the total shares outstanding

3     for Coastal Cypress are 960,000?

4          A    It's my recollection that that should be the

5     number.

6          Q    So approximately 1/4 of the shares outstanding

7     were issued in 2011 at a price of $1 per share; correct?

8          A    Yes.

9               MR. SACKS:  Let's go off the record a second.

10              (Off the record.)

11              MR. SACKS:  All right.

12         Q    Let's go back to Coastal Cypress.

13              The intention in buying that property, was that

14    to be used by Chateau Julien?

15         A    No.  The intention was to build a winery.

16         Q    And it actually was bought before Chateau

17    Julien was formed; correct?

18         A    Yes.

19         Q    Did Chateau Julien become the winery that you

20    intended to have use the property when you bought -- I'm

21    sorry -- when Coastal Cypress bought the property?

22              THE WITNESS:  Would you read that question for

23    me, please.

24              (Record read.)

25              THE WITNESS:  Chateau Julien, Inc. became the
```

Page 43

Case: 15-50801   Doc# 67-2   Filed: 11/05/15   Entered: 11/05/15 16:34:48   Page 20
of 32
Case: 15-50801   Doc# 130   Filed: 07/28/16   Entered: 07/28/16 22:17:24   Page 29 of
148

1    tenant on the property to operate its business.

2    BY MR. SACKS:

3        Q    Was there a written lease between Coastal

4    Cypress and Chateau Julien?

5        A    Yes.

6        Q    Was it one lease or were there more than one

7    over time?

8        A    There were multiples over time.

9        Q    Have you ever seen any minutes of Coastal

10   Cypress reflecting the sale of shares that occurred

11   after the initial formation?

12       A    I don't believe so.

13       Q    Were any minutes ever prepared?

14       A    There were minutes prepared for every meeting

15   that took place, but I have no specific recollection of

16   what is contained in those minutes.

17       Q    You produced, in advance of this deposition,

18   this examination, a number of documents relating to

19   Coastal Cypress, including share certificates that were

20   issued around the inception of the company.

21            Do you recall that?

22       A    I produced all the certificates that I own.  I

23   also produced, as a courtesy, the shares that my wife

24   owns.

25       Q    Do you have copies of the certificates that

Page 44

Case: 15-50801   Doc# 67-2   Filed: 11/05/15   Entered: 11/05/15 16:34:48   Page 21
of 32
Case: 15-50801   Doc# 130   Filed: 07/28/16   Entered: 07/28/16 22:17:24   Page 30 of
148

```
1    were issued to other shareholders?

2         A    No, I do not.

3         Q    Do you have any records that reflect the

4    issuance of shares to these other shareholders?

5         A    Yes, Exhibit No. 4.

6         Q    Is there anything besides Exhibit 4 in the

7    possession -- in your possession, that reflects those

8    additional share issuances?

9         A    The coupons next to the certificates have the

10   names written in, and the dates.

11        Q    And you have those coupons?

12        A    Yes.

13        Q    But as far as you're aware, there weren't any

14   corporate minutes prepared to reflect the sale of those

15   shares?

16        A    I don't know that.

17             MR. HEALY:  I'll object.  That misstates the

18   testimony.

19   BY MR. SACKS:

20        Q    Is there a corporate minute book from which you

21   extracted the minutes that you did produce?

22        A    Yes, there is.

23        Q    Are there any other minutes in that book, or

24   with that book, that you did not produce?

25             MR. HEALY:  Wait.
```

Page 45

Case: 15-50801   Doc# 67-2   Filed: 11/05/15   Entered: 11/05/15 16:34:48   Page 22
of 32
Case: 15-50801   Doc# 130   Filed: 07/28/16   Entered: 07/28/16 22:17:24   Page 31 of
148

```
 1    Q    If I'm reading the dates correctly, it looks
 2  like the sales were on or about January 22nd, 2011.
 3    A    That's what it looks like.
 4    Q    Okay.  So you would agree with me that your
 5  loans came after these share sales?
 6    A    Yes, these are all after the share sales.
 7    Q    Were you the one who asked Anthony and Richard
 8  to put money into Coastal in January 2011?
 9    A    Yes.
10    Q    Was Coastal then in need of funds for its
11  business operations?
12    A    Coastal was in need of funds for business
13  operations, yes.
14    Q    And was that because it wasn't receiving as
15  much rent as it expected from Chateau Julien?
16    A    Primarily, yes.
17    Q    Any other reasons?
18    A    Not that comes to my present recollection.
19    Q    Would you take a look back at Exhibit 3.
20    A    Yes.
21    Q    Exhibit 3, with respect to Coastal, says that
22  there were "Property appraisals dated 2012 listed
23  property value at $12,170,000."
24         Was that, in fact, the appraised value as of
25  that time?
```

Page 111

```
1          A     To the best of my knowledge.

2          Q     And it then says, "Value of current interest is

3    $3,486,700."

4                 Do you see that?

5          A     Yes, I do.

6          Q     And do you know how you calculated that amount?

7          A     I do not, no.

8                 MR. SACKS:   Okay.   Let's mark this as No. 14.

9                 (Exhibit 14 was marked for identification by

10   the court reporter and is attached hereto.)

11   BY MR. SACKS:

12         Q     This is an e-mail that you produced as No. 070

13   as part of your production in connection with this

14   examination; correct?

15         A     Correct.

16         Q     And it is addressed from Gina Cochetti to an

17   e-mail address at coastalcypress@yahoo.com; correct?

18         A     Correct.

19         Q     And it's dated July 20th, 2015, am I reading

20   that right?

21                Let me get my glasses here.

22         A     July 20th, 2015.

23         Q     Okay.   And was this received by you as the

24   holder of the e-mail address coastalcypress@yahoo.com?

25         A     That is correct.
```

Page 112

Case: 15-50801   Doc# 67-2   Filed: 11/05/15   Entered: 11/05/15 16:34:48   Page 24
of 32
Case: 15-50801   Doc# 130   Filed: 07/28/16   Entered: 07/28/16 22:17:24   Page 33 of
148

```
 1       Q    And is that an e-mail address that you've had

 2    for some time in connection with your work on Coastal

 3    Cypress matters?

 4       A    Yes, it is.

 5       Q    And do you maintain any file of e-mails at that

 6    address?

 7       A    I do not.

 8       Q    So you don't have hardcopies or online copies

 9    of those e-mails?

10       A    That is correct.

11            I have this (indicating).

12       Q    You do have this (indicating).  I'm sorry if I

13    suggested otherwise.

14            All right.  Is there a reason why you saved

15    this in particular as compared to other e-mails at that

16    address?

17       A    I was requested this information, and Coastal's

18    counsel said there were three items that could be

19    released at this time, the cash sales price, the

20    distribution to shareholders and the dollars per share.

21       Q    Was there other information on this e-mail that

22    you removed?

23       A    There was not, to the best of my knowledge.

24       Q    Okay.  Sometimes people block things out and

25    you can't tell.  I'm just making sure this is the whole
```

Page 113

```
 1    e-mail.

 2         A    I believe it is the whole e-mail.

 3         Q    Okay.  And what it says is -- and this is a

 4    little hard to read, so tell me if you read it

 5    differently -- "Coastal Cypress Corporation sale and

 6    winding down of corporation cash flow."

 7         A    That's the way I understand it also.

 8         Q    And then it says, "Cash upon sale of property,"

 9    and I believe it says 12,300,000 and some odd dollars,

10    is that --

11         A    No, I believe that's just $12,000,000.

12         Q    Oh, okay.  So the sale price of the Coastal

13    property paid by the buyer in connection with the sale

14    was $12,000,000?

15         A    Yes.

16         Q    And you know that independently of this e-mail,

17    I assume?

18         A    Yes, that's correct.

19         Q    Okay.  And then I gather Ms. Cochetti made a

20    calculation of the net cash to shareholders, and it

21    looks to be 2,435,000 odd dollars?

22         A    And 926.

23         Q    And do you know what the process was to

24    calculate the net cash to shareholders?

25         A    I don't know what she used, but I know -- I
```

Page 114

Veritext Legal Solutions
866 299-5127

Case: 15-50801   Doc# 67-2   Filed: 11/05/15   Entered: 11/05/15 16:34:48   Page 26
of 32
Case: 15-50801   Doc# 130   Filed: 07/28/16   Entered: 07/28/16 22:17:24   Page 35 of
148

```
1     have reason to believe if you take the 4,000,000 -- I'm
2     sorry, the 2,435,926, and divide it by 960,000
3     outstanding shares, you get $2.54.  Or you multiply 254
4     times 960 and you get 2,400,000.
5          Q    You moved onto a question ahead of where I was,
6     but that's okay.  I was going to ask you that question
7     eventually.
8               But the question I was trying to ask is, how
9     did she get the $12,000,000 to 2,435,926?
10         A    After all the expenses of sale and costs of
11    Coastal, the only amount available on liquidation is
12    that amount.
13         Q    And that reflect that Coastal had to pay the
14    outstanding debt on the property?
15         A    Yes.
16         Q    And Coastal owed you some money in connection
17    with the -- your loans to it; correct?
18         A    That is correct.
19         Q    And has it paid those recently?
20         A    It has.
21         Q    I think I noticed in the bankruptcy case that
22    you had received something like 70 or 80,000 in the last
23    couple months, was that a payment from Coastal?
24         A    Yes, it was.
25         Q    Do you recall how much that was?
```

Veritext Legal Solutions
866 299-5127

1      A    Not offhand.

2      Q    In that range somewhere, 70 to 80,000?

3      A    I believe that's correct.

4      Q    Was this the amount that you were anticipating

5  would be available as net cash to shareholders at the

6  time of the sale?

7      A    Yes, give or take.

8      Q    And we've looked, just before, at Exhibit 3,

9  and that showed that you estimated your and Patricia's

10  interest in Coastal, as of the end of 2013, as almost

11  $3,500,000; is that right?

12      A    That is correct.

13      Q    Okay.  What changed, if anything, between the

14  end of 2013 and the time of the actual sale in April of

15  2015 that reduced what the shareholders received?

16      A    Probably two things, the market value for

17  winery properties failed to continue to support a higher

18  level, number one; and, number two, is the purchasers

19  reduced their purchase price 11 percent and caused for a

20  lower sales price.

21      Q    Wasn't your estimate in Exhibit 3 based on a

22  sale price of 12,170,000?

23      A    No.

24      Q    What was it based on?

25      A    Those were probably appraisals.  I used a

Page 116

Case: 15-50801   Doc# 67-2   Filed: 11/05/15   Entered: 11/05/15 16:34:48   Page 28
of 32
Case: 15-50801   Doc# 130   Filed: 07/28/16   Entered: 07/28/16 22:17:24   Page 37 of
148

```
 1     higher value, figuring that wine properties were still
 2     going up.  The market in 2013 was recovering, not
 3     falling apart.
 4          Q    So was that true consistently, as you valued
 5     Coastal, over these financial statements we've looked
 6     at?
 7          A    Yes.
 8          Q    That you looked at what you thought the value
 9     of Coastal was as opposed to the property appraisals?
10          A    Correct.
11          Q    So, if we look at Exhibit 2, for instance, at
12     that time you had an appraisal for 10,200,000, but
13     that's not how you valued the current interest?
14          A    Correct.
15          Q    And as you sit here, you don't know how you --
16     what starting price you used as the value of the current
17     interest; correct?
18          A    I do not recollect.
19          Q    In calculating these amounts that are shown on
20     the balance sheet, such as the 2,558,000 on Exhibit 2,
21     did you apply your share of ownership, Patricia's share
22     ownership, to what you calculated as being the equity in
23     Coastal?
24          A    That is what I believe I did, yes.
25          Q    And has your equity, at least since the 2011
```

Veritext Legal Solutions
866 299-5127

```
 1       Q    Right.  And you weren't repaid?

 2       A    Correct.

 3       Q    And you received expense reimbursements?

 4       A    I did.

 5       Q    And perhaps some small salary, the dollar?

 6       A    $1.

 7       Q    Other than that, no goods, no money, no

 8    nothing?  Nothing came to you from Chateau Julien?

 9       A    That is correct.

10       Q    The 9th category is -- I'm sorry.

11            The 8th category is documents reflecting

12    transfers, within the four year period, between you and

13    Coastal Cypress.

14       A    There are none, other than the notes that

15    Coastal Cypress owed to me for money advanced.

16       Q    Okay.  And the 9th category is the value --

17    documents concerning the value of your shares in Coastal

18    Cypress, and specifically requesting a copy of the

19    closing statement.

20            You haven't produced a closing statement;

21    correct?

22       A    Under advice of counsel, that is correct.

23       Q    And have you other documents reflecting the

24    value of your shares other than the ones you produced?

25       A    No, but I did produce a document of my value
```

Page 155

Case: 15-50801   Doc# 67-2   Filed: 11/05/15   Entered: 11/05/15 16:34:48   Page 30
of 32
Case: 15-50801   Doc# 130   Filed: 07/28/16   Entered: 07/28/16 22:17:24   Page 39 of
148

1    and after-tax value, by a CPA, that I requested to
2    review, and I supplied that to you.
3        Q    Okay.  Before Ms. Cochetti made the calculation
4    that we looked at earlier as to the value of your
5    shares, had anyone made any calculations before that?
6        A    Actually, Gina made an earlier calculation and
7    came back and updated the calculation.
8        Q    And when was that first one?
9        A    I think it was April or May, and then she
10   updated it in July.
11       Q    Before the property was sold had there been any
12   calculations on what the share value was?
13       A    No.
14       Q    And I think we've covered this, but Category 10
15   requests documents provided by you to the bank.  And
16   you've given us all the documents you have --
17       A    That is correct.
18       Q    -- that you ever sent to the bank?
19            And the same is true of communications?  You
20   don't have any other documents that constitute
21   communications with the bank?
22       A    That is correct.
23       Q    Okay.  Are there any documents referred to in
24   Category 12, with regard to obligations owed to you by
25   any of those entities?

Page 156

```
 1              I, the undersigned, a Certified Shorthand

 2     Reporter of the State of California, do hereby certify:

 3              That the foregoing proceedings were taken

 4     before me at the time and place herein set forth; that

 5     any witnesses in the foregoing proceedings, prior to

 6     testifying, were administered an oath; that a record of

 7     the proceedings was made by me using machine shorthand

 8     which was thereafter transcribed under my direction;

 9     that the foregoing transcript is a true record of the

10     testimony given.

11              Further, that if the foregoing pertains to the

12     original transcript of a deposition in a Federal Case,

13     before completion of the proceedings, review of the

14     transcript [ ] was [ ] was not requested.

15              I further certify I am neither financially

16     interested in the action nor a relative or employee of

17     any attorney or any party to this action.

18              IN WITNESS WHEREOF, I have this date

19     subscribed my name.

20

21     Dated: August 6, 2015

22

23

24                         LARRY BOSTOW

25                         CSR No. 5941
```

Page 160

Veritext Legal Solutions
866 299-5127

Case: 15-50801   Doc# 67-2   Filed: 11/05/15   Entered: 11/05/15 16:34:48   Page 32
of 32
Case: 15-50801   Doc# 130   Filed: 07/28/16   Entered: 07/28/16 22:17:24   Page 41 of
148

ROBERT S. AND PATRICIA BROWER
BALANCE SHEET

as at December 31, 2011

DATE REC'D 4|2u|12
OFFICER
TICKLER

ASSETS:

CURRENT ASSETS:

| | |
|---|---|
| Cash on hand and in banks | $16,271 |
| Due from Chateau Julien Inc. | $89,973 |
| ING Investment Account | $120,636 |

TOTAL CURRENT ASSETS | $226,880

INVESTMENT - COLLECTOR AUTOMOBILES
275 GTS FERRARI - 99 POINT CAR | $532,739

$532,739

LONG TERM ASSETS:

Securities of Privately Held Companies:

Common Stock - Coastal Cypress Corporation
Common Stock purchased in 1982 for $933,000
Property appraisals dated 2010
listed property value at $10,200,000. Value of
current interest is: | $2,558,292

Value of Wine Trademarks - Brands
Estimated Value | $2,500,000

Common Stock - Chateau Julien Inc.
Value at 12/31/11 as per Statement: | $2,565,860

Common Stock - American Commercial Properties Inc.
Valued at Cost in 1983: | $476,145
Unrealized real estate gain | $850,000

TOTAL LONG TERM ASSETS: | $8,950,297

OTHER ASSETS:

| | |
|---|---|
| 2008 SL55 Mercedes Benz AMG | $22,000 |
| 2005 Cadillac | $6,500 |
| Furnishings, at cost | $98,840 |
| Private Wine Cellar Collection | $14,500 |
| Membership - Carmel Valley Ranch | $12,500 |

TOTAL OTHER ASSETS: | $154,340

EXHIBIT
2
Brower

## ROBERT S. AND PATRICIA BROWER
## BALANCE SHEET

as at December 31, 2011

| | |
|---|---|
| TOTAL ASSETS: | $9,864,256 |

LIABILITIES AND NET WORTH:

CURRENT LIABILITIES:

| | |
|---|---|
| Accounts Payable | $6,952 |
| TOTAL CURRENT LIABILITIES | $6,952 |
| TOTAL LONG TERM LIABILITIES: | $0 |
| **NET WORTH:** | **$9,857,304** |
| TOTAL LIABILITIES AND NET WORTH | $9,864,256 |

*[signatures]* April 23, 2012
April 23, 2012



**FREMONT BANK**

24 Hour Information Hotline (510) 723.5778
*(Out of your local calling area dial 1.800.359.2265)*

ACCOUNT:

PAGE: 1
14000423 01/12/2012



Ill.|||.||||...|.|.||.|.....|.||.||||||||.|..|.|.||||||.|||||.|..|.|.|

**********AUTO**MIXED AADC 945
2417 1.3110 MB 0.515    10 22 7
ROBERT S BROWER SR
PATRICIA A BROWER
PO BOX 222422                                    12-0
CARMEL CA  93922-2422                               3
                                                   25

```
=====================================================================
              CALIFORNIA LIFESTYLE CHECKING ACCOUNT 14000423
=====================================================================
```

| DESCRIPTION | DEBITS | CREDITS | DATE | BALANCE |
|---|---|---|---|---|
| BALANCE LAST STATEMENT .............................. | | | 12/12/11 | 16,553.07 |
| CHECK # 9429 | 280.76 | | 12/14/11 | 16,272.31 |
| CHECK # 9430 | 25.00 | | 12/15/11 | 16,247.31 |
| DEPOSIT | | 1,075.43 | 12/16/11 | 17,322.74 |
| HARLAND CLARKE CHK ORDERS 0D9K40870178600 | | | | |
| | 4.25 | | 12/21/11 | 17,318.49 |
| CHECK # 9077 | 135.00 | | 12/22/11 | 17,183.49 |
| CHECK # 9439 | 120.00 | | 12/22/11 | 17,063.49 |
| DEPOSIT | | 2,080.24 | 12/23/11 | 19,143.73 |
| CHECK # 9100 - AT&T SERVICES LA CHECK PYMT 9100 | | | | |
| | 140.32 | | 12/27/11 | 19,003.41 |
| CHECK # 9101 - CHASE CHECK PYMT 9101 | | | | |
| | 489.25 | | 12/27/11 | 18,514.16 |
| CHECK # 9105 - CHASE CHECK PYMT 9105 | | | | |
| | 85.00 | | 12/27/11 | 18,429.16 |
| CHECK # 9442 - FIA CardServices CHECK PYMT 9442 | | | | |
| | 103.00 | | 12/27/11 | 18,326.16 |
| CHECK # 9441 - BLOOMINGDALESPAY CHECK PYMT 9441 | | | | |
| | 25.00 | | 12/28/11 | 18,301.16 |
| CHECK # 9444 - Nordstrom Visa CHECK PYMT 9444 | | | | |
| | 300.00 | | 12/28/11 | 18,001.16 |
| CHECK # 9102 | 380.32 | | 12/28/11 | 17,620.84 |
| CHECK # 9447 | 360.00 | | 12/28/11 | 17,260.84 |
| CHECK # 9104 - AT&T Services CHECKPAYMT 9104 | | | | |
| | 244.80 | | 12/29/11 | 17,016.04 |
| CHECK # 9099 | 66.93 | | 12/29/11 | 16,949.11 |
| CHECK # 9436 | 30.00 | | 12/29/11 | 16,919.11 |
| CHECK # 9437 | 40.00 | | 12/29/11 | 16,879.11 |
| CHECK # 9446 | 100.00 | | 12/29/11 | 16,779.11 |
| CHECK # 9098 | 158.51 | | 12/30/11 | 16,620.60 |
| CHECK # 9424 | 50.00 | | 12/30/11 | 16,570.60 |
| CHECK # 9445 | 50.00 | | 12/30/11 | 16,520.60 |
| CHECK # 9440 - CITICARD PAYMENT CHECK PYMT 9440 | | | | |
| | 250.00 | | 01/03/12 | 16,270.60 |

*Corporate Headquarters* 39150 Fremont Boulevard * Fremont, CA 94538 NMLS (510) 792.2300 * *



ING
PO Box 990067
Hartford, CT 06199-0067

010114565 02 AB 0.490 **AUTO  T4 1 0717 93922-242222  C01-M1-1

ROBERT S BROWER
PO BOX 222422
CARMEL, CA 93922-2422

## Your Account Balance as of December 31, 2011

# $120,636.41

## Your Account Summary

| | |
|---|---|
| Account Balance on 10/01/2011 | $113,703.36 |
| Your Contributions | $1,200.00 |
| Withdrawals | -$7.50 |
| Investment Earnings | $5,740.55 |
| Account Balance on 12/31/2011 | $120,636.41 |

## Your Personal Performance

| | |
|---|---|
| Your return for the quarter | 5.02% |
| Your return for the prior 12 months | 0.00% |

Past performance is no guarantee of future results. Data above
as of most recent calendar quarter end. Important information
regarding calculation methodology can be found in the
Message section.

See Messages on Page , 4

## Your Current Investment Mix



| | | |
|---|---|---|
| ▓ Stability of Principal | 44% |
| ▥ Large Cap Growth | 27% |
| ■ Balanced | 27% |
| ▓ Global / International | 2% |

Percentages may not be exact due to rounding.

## At Your Service:

>www.ingretirementplans.com

>Customer Service: 1-800-232-5422

Automated Voice Response System available 24/7

Representatives available Monday thru Friday,
8 a.m. - 9 p.m. ET

>TDD (Hearing Impaired): 1-800-855-2880

## Your Representative

**WILLIAM HASTIE**
LINSCO PRIVATE LEDGER CORP
STE 201
1188 PADRE DR
SALINAS, CA 93901-0001
831-422-4910

0002938320111231PH9149PART

Case: 15-50801   Doc# 130   Filed: 07/28/16   Entered: 07/28/16 22:17:24   Page 45 of
148

| | Now 3707 | 6 Months Ago 3620 | Change from 3707 | 1 Yr Ago 3607 | Change from 3707 | 2 Yrs Ago 3507 | Change from 3707 | 3 Yrs Ago 3407 | Change from 3707 |
|---|---|---|---|---|---|---|---|---|---|
| 250 PF CAB | 551,118 | 496,960 | 10.90% | 521,419 | 5.70% | 384,835 | 43.21% | 353,014 | 56.12% |
| 250 PF CPE | 231,360 | 153,552 | 50.67% | 165,183 | 40.06% | 187,268 | 23.54% | 172,925 | 33.79% |
| 250 GTE | 121,164 | 104,391 | 16.07% | 96,617 | 25.41% | 98,479 | 23.04% | 71,922 | 68.47% |
| 250 GTL | 619,076 | 538,190 | 15.03% | 558,499 | 10.85% | 629,240 | -1.62% | 574,518 | 7.76% |
| 330 GT 2+2 | 97,091 | 83,888 | 15.74% | 78,950 | 22.98% | 81,294 | 19.43% | 93,213 | 4.16% |
| 275 GTB | 884,900 | 808,570 | 9.44% | 829,289 | 6.71% | 709,100 | 24.79% | 777,429 | 13.82% |
| 275 GTS | 532,739 | 465,400 | 14.47% | 471,184 | 13.07% | 391,016 | 36.24% | 397,572 | 34.00% |
| 330 GTC | 282,775 | 204,417 | 38.33% | 208,410 | 35.68% | 206,324 | 37.05% | 218,060 | 29.68% |
| 330 GTS | 670,162 | 682,343 | -1.79% | 630,995 | 6.21% | 563,750 | 18.88% | 430,564 | 55.65% |
| 275 GTB/4 | 1,282,394 | 1,177,720 | 8.89% | 1,208,047 | 6.15% | 813,636 | 57.61% | 1,018,250 | 25.94% |
| 365 GT 2+2 | 96,540 | 106,779 | -9.59% | 93,571 | 3.17% | 101,019 | -4.43% | 102,726 | -6.02% |
| 365 GTB/4 | 344,442 | 326,931 | 5.36% | 313,745 | 9.78% | 313,595 | 9.84% | 325,567 | 5.80% |
| 365 GTB/4 SPYDER | 1,007,332 | 887,094 | 13.55% | 905,038 | 11.30% | 840,238 | 19.89% | 1,092,424 | -7.79% |
| 365 GTC/4 | 103,511 | 103,348 | 0.16% | 108,258 | -4.38% | 109,694 | -5.64% | 107,253 | -3.49% |
| 365 GT4 2+2 | 28,756 | 24,883 | 15.56% | 26,521 | 8.43% | 25,882 | 11.10% | 34,599 | -16.87% |
| 365 GT4/BB | 130,295 | 126,802 | 2.75% | 131,947 | -1.25% | 124,250 | 4.87% | 115,647 | 12.67% |
| 400 GT & A | 19,988 | 20,333 | -1.70% | 21,211 | -5.77% | 20,100 | -0.56% | 18,643 | 7.21% |
| 512 BB | 112,280 | 107,815 | 4.14% | 109,700 | 2.35% | 111,217 | 0.96% | 107,781 | 4.17% |
| 400i GT & A | 22,206 | 24,465 | -9.23% | 21,615 | 2.74% | 21,000 | 5.74% | 23,130 | -3.99% |
| 512 BBi | 114,824 | 112,179 | 2.36% | 118,278 | -2.92% | 131,816 | -12.89% | 126,186 | -9.00% |
| TR 85-87 | 41,290 | 41,797 | -1.21% | 44,449 | -7.11% | 49,321 | -16.28% | 49,606 | -16.76% |
| TR 88-91 | 54,387 | 57,553 | -5.50% | 55,779 | -2.50% | 74,990 | -27.47% | 62,798 | -13.39% |
| 412 GT & A | 30,560 | 30,900 | -1.10% | 32,395 | -5.66% | 37,963 | -19.50% | 33,959 | -10.01% |
| 512 TR | 73,568 | 75,292 | -2.29% | 82,434 | -10.76% | 93,870 | -21.63% | 94,427 | -22.09% |
| 456 GT | 46,796 | 48,549 | -3.61% | 52,022 | -10.05% | 56,279 | -16.85% | 61,960 | -24.47% |
| F512 M | 99,095 | 112,622 | -12.01% | 123,688 | -19.88% | 164,442 | -39.74% | 123,454 | -19.73% |
| F50 | 697,587 | 648,686 | 7.54% | 666,666 | 4.64% | 767,828 | -9.15% | 662,453 | 5.30% |
| 550M | 75,879 | 77,746 | -2.40% | 81,264 | -6.63% | 85,302 | -11.05% | 101,514 | -25.25% |
| 456M GT & A | 58,180 | 59,369 | -2.00% | 64,393 | -9.65% | 87,877 | -33.79% | 83,091 | -29.98% |
| 550 BARCHETTA | 158,838 | 158,810 | 0.02% | 177,197 | -10.36% | 197,925 | -19.75% | 229,217 | -30.70% |
| 575M MARANELLO | 99,658 | 103,754 | -3.95% | 110,240 | -9.60% | 110,436 | -9.76% | 136,226 | -26.84% |
| ENZO | 1,000,138 | 998,876 | 0.13% | 1,102,000 | -9.24% | 1,110,870 | -9.97% | 1,065,533 | -6.14% |
| 612 SCAGLIETTI | 155,917 | 156,984 | -0.68% | 170,522 | -8.56% | 205,916 | -24.28% | 193,227 | -19.31% |
| SUPERAMERICA | 197,490 | 206,825 | -4.51% | 219,440 | -10.00% | 234,974 | -15.95% | 268,098 | -26.34% |
| 599 GTB FIORANO | 229,030 | 229,102 | -0.03% | 244,973 | -6.51% | 336,982 | -32.03% | 323,900 | -29.20% |
| 246 GT | 129,422 | 124,020 | 4.36% | 128,764 | 0.51% | 120,990 | 6.97% | 109,809 | 17.86% |
| 246 GTS | 155,812 | 164,341 | -5.19% | 162,462 | -4.09% | 156,000 | -0.12% | 188,247 | -17.23% |
| 308 GT4 | 21,959 | 22,488 | -2.35% | 21,925 | 0.16% | 23,116 | -5.01% | 26,721 | -17.82% |
| 308 GTB FG | 36,996 | 36,435 | 1.54% | 38,811 | -4.68% | 46,471 | -20.39% | 41,986 | -11.88% |
| 308 GTB | 29,176 | 30,801 | -5.28% | 31,756 | -8.12% | 27,605 | 5.69% | 30,517 | -4.39% |
| 308 GTS | 28,924 | 28,512 | 1.45% | 32,971 | -12.27% | 35,119 | -17.64% | 29,007 | -0.29% |
| 308 GTBi | 26,695 | 26,868 | -0.64% | 27,820 | -4.04% | 28,093 | -4.98% | 31,318 | -14.76% |
| 308 GTSi | 29,107 | 28,299 | 2.86% | 29,044 | 0.22% | 31,038 | -6.22% | 30,702 | -5.20% |
| MONDIAL 8 | 18,921 | 19,004 | -0.44% | 19,869 | -4.77% | 17,718 | 6.79% | 18,699 | 1.19% |
| 308 GTB QV | 32,565 | 32,639 | -0.23% | 34,447 | -5.46% | 23,150 | 40.67% | 32,906 | -1.04% |
| 308 GTS QV | 30,995 | 32,080 | -3.38% | 34,181 | -9.32% | 33,408 | -7.22% | 39,983 | -22.48% |
| MON QV CPE | 19,075 | 19,089 | -0.07% | 19,388 | -1.60% | 20,883 | -8.66% | 23,369 | -18.37% |
| MON QV CAB | 28,612 | 28,941 | -1.14% | 26,344 | 8.61% | 22,156 | 29.14% | 30,063 | -4.83% |
| 288 GTO | 556,423 | 547,292 | 1.67% | 538,586 | 3.31% | 518,400 | 7.33% | 451,699 | 23.19% |
| 328 GTB Si | 35,664 | 35,160 | 1.43% | 38,562 | -7.52% | 33,380 | 6.84% | 36,820 | -3.14% |
| 328 GTB 89 | 40,370 | 41,855 | -3.55% | 45,616 | -11.50% | 52,246 | -22.73% | 49,045 | -17.69% |
| 328 GTS Si | 36,637 | 35,964 | 1.87% | 39,464 | -7.16% | 51,142 | -28.36% | 36,771 | -0.36% |
| 328 GTS 89 | 54,171 | 44,185 | 22.60% | 46,675 | 16.06% | 53,036 | 2.14% | 46,017 | 17.73% |
| 3.2 MON CPE | 23,385 | 23,378 | 0.03% | 25,038 | -6.79% | 20,319 | 15.09% | 26,828 | -12.83% |
| 3.2 MON CAB | 31,493 | 32,328 | -2.58% | 34,900 | -9.76% | 26,753 | 17.72% | 34,367 | -8.36% |
| F40 | 479,008 | 433,723 | 10.44% | 456,585 | 4.91% | 436,271 | 9.80% | 517,456 | -7.43% |
| MON T CPE | 31,308 | 26,994 | 15.98% | 28,121 | 11.33% | 29,226 | 7.12% | 31,371 | -0.20% |
| MON T CAB | 32,035 | 33,466 | -4.28% | 34,399 | -6.87% | 36,025 | -11.08% | 39,622 | -19.15% |
| 348 TB | 39,961 | 40,264 | -0.75% | 42,236 | -5.39% | 42,748 | -6.52% | 50,860 | -21.43% |
| 348 TS | 41,084 | 41,230 | -0.35% | 44,437 | -7.55% | 42,297 | -2.87% | 48,643 | -15.61% |
| 348 SPIDER | 42,899 | 44,932 | -4.52% | 45,516 | -5.75% | 45,726 | -6.18% | 56,658 | -24.28% |
| 355 BERLINETTA | 48,026 | 50,762 | -5.39% | 58,950 | -18.53% | 63,223 | -24.04% | 70,568 | -31.94% |
| 355 GTS | 59,318 | 60,854 | -1.72% | 64,889 | -8.58% | 59,686 | -0.62% | 75,884 | -21.83% |
| 355 SPIDER | 63,929 | 63,733 | 0.31% | 68,649 | -6.88% | 64,859 | -1.43% | 81,124 | -21.20% |
| 360 MODENA | 73,617 | 75,813 | -2.90% | 84,657 | -13.04% | 91,802 | -19.81% | 106,487 | -30.87% |
| 360 SPIDER | 94,912 | 99,581 | -4.69% | 109,992 | -13.71% | 116,780 | -18.73% | 134,087 | -29.22% |
| CHALLENGE STRADALE | 135,940 | 135,501 | 0.32% | 139,907 | -2.84% | 161,543 | -15.85% | 169,460 | -19.78% |
| F430 | 135,873 | 141,031 | -3.66% | 149,730 | -9.25% | 156,332 | -13.09% | 182,083 | -25.38% |
| F430 SPIDER | 163,573 | 165,880 | -1.39% | 175,760 | -6.93% | 198,984 | -17.80% | 216,739 | -24.53% |
| F430 SCUDERIA | 201,340 | 212,298 | -5.16% | 234,810 | -14.25% | 263,592 | -23.62% | 301,310 | -33.18% |
| SCUDERIA SPIDER 16M | 266,895 | 296,212 | -9.90% | 300,671 | -11.23% | 330,438 | -19.23% | N/A | N/A |

Online at: www.mymerrill.com

AMERICAN COMMERCIAL PROP INC
P O BOX 22918
CARMEL CA 93922-0918

Account Number: 29N-96A16

24-Hour Assistance: (866) 4MLBUSINESS
Access Code: 21-296-96216

## Net Portfolio Value:                                    $18,611.66

**Your Financial Advisor:**
ALEJANDRO MENDOZA VELASCO
701 B ST
SAN DIEGO CA    92101
alejandro_mendoza@ml.com
1-619-699-3739

# WCMA® ACCOUNT

December 31, 2011 - January 31, 2012

| ASSETS | January 31 | December 30 |
|---|---|---|
| Cash/Money Accounts | 10,083.30 | 11,540.35 |
| Fixed Income | | |
| Equities | 8,528.36 | 8,609.30 |
| Mutual Funds | | |
| Options | | |
| Other | | |
| Subtotal (Long Portfolio) | 18,611.66 | 20,149.65 |
| **TOTAL ASSETS** | **$18,611.66** | **$20,149.65** |
| LIABILITIES | | |
| Debit Balance | | |
| Short Market Value | | |
| **TOTAL LIABILITIES** | | |
| **NET PORTFOLIO VALUE** | **$18,611.66** | **$20,149.65** |
| MARGIN AVAILABLE CREDIT | 13,964.50 | |

| CASH FLOW | This Statement | Year to Date |
|---|---|---|
| **Opening Cash/Money Accounts** | **$11,540.35** | |
| **CREDITS** | | |
| Funds Received | 4,120.28 | 4,120.28 |
| Electronic Transfers | | |
| Other Credits | | |
| Subtotal | 4,120.28 | 4,120.28 |
| **DEBITS** | | |
| Electronic Transfers | | |
| Margin Interest Charged | | |
| Other Debits | | |
| Visa Purchases (debits) | | |
| ATM/Cash Advances | | |
| Checks Written/Bill Payment | (5,619.83) | (5,619.83) |
| Subtotal | (5,619.83) | (5,619.83) |
| **Net Cash Flow** | **($1,499.55)** | **($1,499.55)** |
| Dividends/Interest Income | 42.50 | 42.50 |
| Security Purchases/Debits | | |
| Security Sales/Credits | | |
| **Closing Cash/Money Accounts** | **$10,083.30** | |
| Securities You Transferred In/Out | | |

Merrill Lynch Wealth Management makes available products and services offered by Merrill Lynch, Pierce, Fenner & Smith Incorporated (MLPF&S) and other subsidiaries of
Bank of America Corporation. MLPF&S is a registered broker-dealer, Member Securities Investor Protection Corporation (SIPC) and a wholly owned subsidiary of Bank of America
Corporation. Investment products:     Are Not FDIC Insured | Are Not Bank Guaranteed | May Lose Value

# COASTAL CYPRESS CORPORATION
## BALANCE SHEET
### FOR THE PERIODS ENDING DECEMBER 2011 AND 2010
(UNAUDITED)

| A S S E T S | 12/31/11 | 12/31/10 |
|---|---|---|
| **CURRENT ASSETS:** | | |
| CASH OR EQUIVELENTS | $9,407 | $4,363 |
| ACCOUNTS/NOTES RECEIVABLE | $1,344,142 | $1,208,812 |
| DEPOSITS AND PREPAID EXPENSES | $0 | $0 |
| **TOTAL CURRENT ASSETS:** | $1,353,548 | $1,213,175 |
| **EQUIPMENT & LEASEHOLD IMPROVEMENTS:** | | |
| LAND | $703,573 | $703,573 |
| BUILDINGS | $5,509,541 | $5,509,541 |
| EQUIPMENT | $1,819,619 | $1,819,619 |
| **TOTAL EQUIP. AND IMPROVEMENTS** | $8,032,733 | $8,032,733 |
| LESS: ACCUMULATED DEPRECIATION | ($3,995,148) | ($3,762,529) |
| **EQUIPMENT & LEASEHOLD IMPROVEMENTS, NET** | $4,037,585 | $4,270,204 |
| **OTHER ASSETS:** | | |
| AMORTIZABLE EXPENSES & FEES AT NET | $13,248 | $21,550 |
| **TOTAL OTHER ASSETS** | $13,248 | $21,550 |
| **TOTAL ASSETS:** | $5,404,381 | $5,504,929 |

## LIABILITIES AND STOCKHOLDERS' EQUITY

| | | |
|---|---|---|
| **CURRENT LIABILITIES:** | | |
| ACCOUNTS PAYABLE | $11,451 | $16,451 |
| CURRENT MATURITY OF LONG TERM DEBT | $140,016 | $140,016 |
| **TOTAL CURRENT LIABILITIES** | $151,467 | $156,467 |
| **LONG-TERM DEBT, NET OF CURRENT MATURITY** | $4,931,948 | $5,072,485 |
| **STOCKHOLDERS' EQUITY:** | | |
| CAPITAL /PREFERED STOCK | $1,183,000 | $933,000 |
| RETAINED EARNINGS | ($862,033) | ($657,023) |
| **TOTAL STOCKHOLDERS' EQUITY** | $320,967 | $275,977 |
| **TOTAL LIABILITIES AND STOCKHLDS EQUITY** | $5,404,381 | $5,504,929 |

# AMERICAN COMMERCIAL PROPERTIES, INC.
## BALANCE SHEET
### FOR THE PERIODS ENDING DECEMBER 2011 AND 2010
(UNAUDITED)

| A S S E T S | 12/31/11 | 12/31/10 |
|---|---|---|
| **CURRENT ASSETS:** | | |
| CASH OR EQUIVELENTS | $10,101 | $6,831 |
| ACCOUNTS/NOTES RECEIVABLE | $16,787 | $16,067 |
| MARKETABLE SECURITIES | $186,829 | $186,830 |
| **TOTAL CURRENT ASSETS:** | **$213,717** | **$209,728** |
| **EQUIPMENT & LEASEHOLD IMPROVEMENTS:** | | |
| LAND | $85,000 | $85,000 |
| BUILDINGS | $519,412 | $519,413 |
| EQUIPMENT | $214,153 | $214,153 |
| **TOTAL EQUIP. AND IMPROVEMENTS** | **$818,566** | **$818,566** |
| LESS: ACCUMULATED DEPRECIATION | ($484,898) | ($463,289) |
| **EQUIPMENT & LEASEHOLD IMPROVEMENTS, NET** | **$333,668** | **$355,277** |
| **OTHER ASSETS:** | | |
| AMORTIZABLE EXPENSES & FEES AT NET | $0 | $0 |
| **TOTAL OTHER ASSETS** | **$0** | **$0** |
| **TOTAL ASSETS:** | **$547,385** | **$565,004** |

## LIABILITIES AND STOCKHOLDERS' EQUITY

| | | |
|---|---|---|
| **CURRENT LIABILITIES:** | | |
| ACCOUNTS PAYABLE | $10,976 | $8,974 |
| CURRENT MATURITY OF LONG TERM DEBT | $3,720 | $3,720 |
| **TOTAL CURRENT LIABILITIES** | **$14,696** | **$12,694** |
| **LONG-TERM DEBT, NET OF CURRENT MATURITY** | **$127,362** | **$137,500** |
| **STOCKHOLDERS' EQUITY:** | | |
| CAPITAL /PREFERED STOCK | $476,145 | $476,145 |
| RETAINED EARNINGS | ($70,818) | ($61,335) |
| **TOTAL STOCKHOLDERS' EQUITY** | **$405,327** | **$414,810** |
| **TOTAL LIABILITIES AND STOCKHLDS EQUITY** | **$547,385** | **$565,004** |

## ROBERT S. AND PATRICIA BROWER
## BALANCE SHEET

as at December 31, 2013

ASSETS:

    CURRENT ASSETS:

| | |
|---|---:|
| Cash on hand and in banks | $25,866 |
| Due from CJ, Inc./CCC | $272,000 |
| ING 401K Investment Account | $149,000 |
| Sorento Pacific Financial | $197,000 |

    TOTAL CURRENT ASSETS                                  **$643,866**

    LONG TERM ASSETS:

    Securities of Privately Held Companies:

| | |
|---|---:|
| Common Stock - Coastal Cypress Corporation | |
| Property appraisals dated 2012 | |
| listed property value at $12,170,000. Value of | |
| current interest is: | $3,486,700 |
| | |
| Value of Wine Distribution | |
| Estimated Value - Ongoing business | $2,080,000 |
| | |
| Common Stock - Chateau Julien Inc. | |
| Value at 12/31/13 as per Statement: | $1,838,969 |
| | |
| Common Stock - American Commercial Properties Inc. | |
| Valued at Cost in 1983: | $476,145 |
| Unrealized real estate gain | $650,000 |

    TOTAL LONG TERM ASSETS:                               **$8,531,814**

    OTHER ASSETS:

| | |
|---|---:|
| 2008 SL55 Mercedes Benz AMG | $22,000 |
| 2005 Cadillac | $4,000 |
| Furnishings, at cost | $62,840 |
| Private Wine Cellar Collection | $14,500 |
| Membership - Carmel Valley Ranch | $12,500 |

    TOTAL OTHER ASSETS:                                   **$115,840**

    TOTAL ASSETS:                                          **$9,291,520**



EXHIBIT

3

*Brower*

tabbies

## ROBERT S. AND PATRICIA BROWER
## BALANCE SHEET

as at December 31, 2013

LIABILITIES AND NET WORTH:

CURRENT LIABILITIES:

| | |
|---|---|
| Accounts Payable | $32,762 |
| TOTAL CURRENT LIABILITIES | $32,762 |
| TOTAL LONG TERM LIABILITIES: | $0 |
| **NET WORTH:** | **$9,258,758** |
| TOTAL LIABILITIES AND NET WORTH | **$9,291,520** |

# EXHIBIT D

# EXHIBIT D

# EXHIBIT E

# EXHIBIT E

# EXHIBIT E

# EXHIBIT F

# EXHIBIT F



# EXHIBIT G

# EXHIBIT G

# EXHIBIT H

# EXHIBIT H

# EXHIBIT I

# EXHIBIT I

# EXHIBIT J

# EXHIBIT J

# EXHIBIT K

# EXHIBIT K

# EXHIBIT L

# EXHIBIT L

## HAYASHI | WAYLAND

| | |
|---|---|
| **From:** | Gina Cochetti <ginac@hw-cpa.com> |
| **Sent:** | Saturday, February 14, 2015 8:35 AM |
| **To:** | 'Bob Brower' |
| **Subject:** | RE: Ownership |
| **Attachments:** | image001.gif; image002.gif; image003.gif |

This is exactly what I need. Does shareholder #1 directly own CCC and CJ or thru another entity? I just want to make sure we are looking at this correctly.

 GINA COCHETTI, CPA, MST
Partner
ginac@hw-cpa.com | 831.759.6305

**HAYASHI** | **WAYLAND**

1188 Padre Drive, Suite 101
Salinas, CA 93901
FAX: 831.759.6380

🔲 🔲 hw-cpa.com

Click here to securely upload files to me.

**From:** Bob Brower [mailto:bob2@chateaujulien.com]
**Sent:** Friday, February 13, 2015 9:14 PM
**To:** Gina Cochetti
**Subject:** Re: Ownership

I guess what you want is CCC:
37 % Patty and I ( me 24% and Patty 12%)
43 % shareholder # 1
20 % shareholder # 2
This is for CCC only as

Chateau Julien Inc. is owned as follows
Shareholder #1 (above.) is 50%
Patty is 50%

Sent from my iPad

On Feb 13, 2015, at 5:14 PM, Gina Cochetti <ginac@hw-cpa.com> wrote:

> Great. Can you send me the details?
>
> GINA COCHETTI, CPA, MST
> <image001.gif>Partner
> ginac@hw-cpa.com | 831.759.6305
> **HAYASHI** | **WAYLAND**

1

HW Supp 000678

# EXHIBIT M

# EXHIBIT M

## HAYASHI | WAYLAND

| | |
|---|---|
| From: | Bob Brower <coastalcypress@yahoo.com> |
| Sent: | Wednesday, July 22, 2015 12:13 AM |
| To: | Gina Cochetti |
| Subject: | Re: Coastal Cypress Shareholder Data |
| Attachments: | image004.png; image001.gif |

Could you just recap the 3 numbers that I can release? I would greatly appreciate a response on a clean email.

Sent from my iPad

On Jul 20, 2015, at 1:18 PM, Gina Cochetti <ginac@hw-cpa.com> wrote:

> Bob,
>
> Below is the preliminary calculation I have done for the sales price, net cash to shareholders and dollars per share.
>
> Coastal Cypress Corporation
> Sale and Winding Down of Corp
> Cash Flow
>
> | | |
> |---|---|
> | Cash upon sale of property | 12,000,000 |
> | Commissions, Fees and Property Taxes | (1,584,258) |
> | Payment for equip | (596,500) |
> | Estimated Taxes paid at corp level | (2,031,552) |
> | Pay off of AP and Debt | (4,716,786) |
> | Tax Paid on Liquidating Dividend | (634,978) |
> | Net Cash to SH | 2,435,926 |
> | Dollars per share | 2.54 |
>
> Let me know if you need anything else.
>
> Thanks,
>
> Gina

1

HW Supp  000092

# EXHIBIT N

# EXHIBIT N

# EXHIBIT O

# EXHIBIT O

Use this information to obtain actual property tax amount from escrow statement and portion paid that is attributable to penalties.

# Monterey COUNTY 2014 - 2015 PROPERTY TAX BILL
## MARY A. ZEEB Treasurer-Tax Collector

1/28/2015
10:11:41AM

P.O. Box 891, Salinas, CA 93902-0891 (831) 755-5057 www.co.monterey.ca.us/taxcollector

### SECURED TAX ROLL FOR FISCAL YEAR JULY 1, 2014 - JUNE 30, 2015

| PROPERTY INFORMATION - TAX YEAR: 2013 | | IMPORTANT MESSAGES |
|---|---|---|

**ASMT NUMBER:** 169-151-022-000    **TAX RATE AREA:** 060-058
**FEE NUMBER:** 169-151-022-000    **ACRES:** 6.98
**LOCATION:** DBA: Chateau Julien
**ASSESSED OWNER:**

Original bill date 01/27/2015
Values include 10% penalty
No BPS filed, audit by Vega, no BPS filed
Bills paid 12/10/2013 & 4/8/2014
**ESCAPE YEAR***: 2013

COASTAL CYPRESS CORPORATION
DBA CHATEAU JULIEN
PO BOX 22918
CARMEL CA 93922

**Pay Taxes by Credit Card or E-Check**
1-800-491-8003 or www.co.monterey.ca.us/taxcollector

   

### COUNTY VALUES, EXEMPTIONS AND TAXES

**PHONE #S**
VALUATIONS (831) 755-5035
TAX RATES (831) 755-5040
EXEMPTIONS (831) 755-5035
PAYMENTS (831) 755-5057
PERS PROP (831) 755-5035
ADDR CHGS (831) 755-5035
GENERAL INQ (831) 755-5057

| VALUE DESCRIPTION | PRIOR | CURRENT | THIS BILL |
|---|---|---|---|
| LAND | 1,216,733 | 1,216,733 | |
| FIXED IMPROVEMENTS | 1,474 | 353,194 | 351,720 |
| GROWING IMPROVEMENTS | 20,495 | 20,495 | |
| STRUCTURAL IMPROVEMENTS | 1,611,199 | 1,611,199 | |
| PERSONAL PROPERTY | 7,469 | 17,845 | 10,376 |
| NET TAXABLE VALUE | | | 362,096 |

VALUES X TAX RATE PER $100 1.000000    3,620.96

### VOTER APPROVED TAXES, TAXING AGENCY DIRECT CHARGES AND SPECIAL ASSESSMENTS

| PHONE #S | CODE | DESCRIPTION | | ASSESSED VALUES | X | TAX RATE PER $100 | | AGENCY TAXES |
|---|---|---|---|---|---|---|---|---|
| (831) 624-1546 | 10900 | Carmel Unf Series 2000 2002 2006 2008 & 2013Ref | | 362,096 | X | 018706 | | 67.74 |
| (831) 646-4040 | 12100 | Monterey Pen CCD 2013 Ref | | 362,096 | | 015772 | | 57.10 |
| PHONE #S | CODE | DESCRIPTION | DIR CHRG | PHONE #S | CODE | DESCRIPTION | DIR CHRG | PHONE #S | CODE | DESCRIPTION | DIR CHRG |
| (831) 755-5035 60000 | | 506 interest | 306.18 | | | | | | | | |

| | |
|---|---|
| AGENCY TAXES | 124.84 |
| DIRECT CHARGES | 306.18 |
| AGENCY TAXES + DIRECT CHARGES + FEES + PENALTY + COST + DELINQUENT PENALTIES | 431.02 |

| 1ST INSTALLMENT $2,025.99 | 2ND INSTALLMENT $2,025.99 | **TOTAL TAXES $4,051.98** |
|---|---|---|
| DELINQUENT AFTER 3/7/2015 | DELINQUENT AFTER 4/10/2015 | |

### Monterey COUNTY SECURED PROPERTY TAXES - 2ND INSTALLMENT PAYMENT STUB

**ASMT NUMBER:** 169-151-022-000    2013
**ORIG ASMT** 169-151-022-000
**FEE NUMBER:** 169-151-022-000
**LOCATION** DBA: Chateau Julien
**CURRENT OWNER** COASTAL CYPRESS CORPORATION
DBA CHATEAU JULIEN
PO BOX 22918
CARMEL CA 93922

MAKE CHECK PAYABLE TO:
Monterey County Tax Collector
P.O. Box 891
Salinas, CA 93902-0891

**2ND**

| IF PAID BY 4/10/2015 | $2,025.99 |
|---|---|

DELINQUENT AFTER 4/10/2015 (INCLUDES 10% PENALTY OF $202.59 AND $20.00 COST)    $2,248.58

# EXHIBIT P

# EXHIBIT P

# EXHIBIT Q

# EXHIBIT Q

TD AMERITRADE
DIVISION OF TD AMERITRADE INC
PO BOX 2209
OMAHA, NE 68103-2209
TD Ameritrade Clearing, Inc., Member SIPC

Statement for Account # 869-392859
COASTAL CYPRESS CORPORATION ATTN
ROBERT BROWER
2601 GARDEN RD. SUITE 210D
MONTEREY, CA 93940-5344

Announcements:
Filed with fresh thinking and creative
approaches, The Ticker Tape® is your go-to
resource for investing & trading. Stay up
to date with market insights & commentary
from TD Ameritrade every market day.
Visit www.thetickertape.com

## Portfolio Summary

| Investment | Current Value | Prior Value | Period Change | % Changes | Estimated Income | Estimated Yield | Portfolio Allocation |
|---|---|---|---|---|---|---|---|
| Cash | $0.16 | $ - | $0.16 | - | $ - | - | |
| Insrd Dep Acct (IDA) | 570,636.18 | 570,631.34 | 4.84 | - | - | 0.01% | |
| Money Market | - | - | - | - | - | - | |
| Short Balance | - | - | - | - | - | - | |
| Stocks | 445,820.00 | 410,270.00 | 35,550.00 | 8.7% | 8,626.00 | 1.9% | |
| Short Stocks | - | - | - | - | - | - | |
| Fixed Income | - | - | - | - | - | - | |
| Options | - | - | - | - | - | - | |
| Short Options | - | - | - | - | - | - | |
| Mutual Funds | - | - | - | - | - | - | |
| Other | - | - | - | - | - | - | |
| Total | $1,016,456.34 | $980,901.34 | $35,555.00 | 3.6% | $8,626.00 | 0.8% | |
| Margin Equity | 100.0% | | | | | | |



Stocks 43.9%
IDA 56.1%

## Income & Expense Summary

| | Income | Reportable | Non Reportable |
|---|---|---|---|
| Dividends | $ | $ - | $ - |
| Interest | | | |
| Other | | | |
| Expense | | | |
| Interest | | | |
| Fees | | | |
| Other | | | |
| Net | | $0.00 | $0.00 |

## Performance Summary

| | YTD |
|---|---|
| Cost Basis As Of - 10/31/15 ** | $430,969.97 |
| Unrealized Gains | 15,080.02 |
| Unrealized Losses | (229.99) |
| Funds Deposited/(Disbursed) *** | 1,000,600.00 |
| Income/(Expense) *** | 975.31 |
| Securities Received/(Delivered) *** | 0.00 |
| **For cost basis information, refer to www.tdameritrade.com | |

## Cash Activity Summary

| | Current | YTD |
|---|---|---|
| Opening Balance | $ 0.00 | $ - |
| Securities Purchased | - | (430,969.97) |
| Securities Sold | - | - |
| Funds Deposited | - | 1,000,600.00 |
| Funds Disbursed | - | - |
| Income | - | 975.31 |
| Expense | - | - |
| Other | 0.16 | (570,605.18) |
| Closing Balance | $0.16 | $0.16 |

# EXHIBIT R

# EXHIBIT R

CONFIDENTIAL

Coastal Cypress Corporation
Tax Year Ended 12/31/2014
Intangibles and Amortization

39.1 & 18

| Description | Cost Basis | Date Acquired | Tax Prior Accumulated Amortization | Tax Current Year Amortization | Book Prior Accumulated Amortization | Book Current Year Amortization | Current Year Book to Tax Adjustment |
|---|---|---|---|---|---|---|---|
| Char Permits/Fees | 404,553 | 12/15/2004 | 242,730 | 26,970 | 98,545 | 10,373 | 16,597 |
| P. Char. Permit/Fees | 101,905 | 12/15/2004 | 61,128 | 6,794 | 35,204 | 3,706 | 3,088 |
| Loan Fees | 30,230 | 1/15/2003 | 34,768 | (4,538) | 30,300 | - | |
| Loan Fees | 22,705 | 6/15/2007 | 18,164 | 2,271 | 15,894 | 2,271 | |
| | 559,393 | | 356,790 | 31,497 | 179,943 | 16,350 | 19,685  M-1 |
| | | | | (4,538) | | | |
| | | | Current tax amortization | 26,959 | | | |

A  A full year of amortization was taken in 2004. No amortization was taken in 2013. A total of 9 years worth of amortization taken as of 12/31/2013.

B  This asset should have been fully depreciated by 06/30/2013 for tax purposes. An additional one and a half years of amortization were taken in 2013. The over amortized amount was included on the 2014 return as other income.

C  Full year of amortization taken in the first year as indicated on PBC schedules. Amortization was taken twice for this assets on the 2013 tax return. No adjustment made.

Other income in 2014 and M-1.

# EXHIBIT S

# EXHIBIT S

# EXHIBIT T

# EXHIBIT T



# EXHIBIT U

# EXHIBIT U



# EXHIBIT V

# EXHIBIT V

## COASTAL CYPRESS CORPORATION
### BALANCE SHEET
#### FOR THE PERIOD ENDING OCTOBER 31, 2015
#### (UNAUDITED)

| A S S E T S | 10/31/2015 |
|---|---|
| **CURRENT ASSETS:** | |
| CASH OR EQUIVELENTS | $2,165,716 |
| INVENTMENT ACCOUNTS | $3,000,000 |
| DEPOSITS AND PREPAID EXPENSES | $800 |
| **TOTAL CURRENT ASSETS:** | $5,166,516 |
| **EQUIPMENT & LEASEHOLD IMPROVEMENTS:** | |
| EQUIPMENT | $1,090 |
| TOTAL EQUIP. AND IMPROVEMENTS | $1,090 |
| LESS: ACCUMULATED DEPRECIATION | $0 |
| **EQUIPMENT & LEASEHOLD IMPROVEMENTS, NET** | $1,090 |
| **TOTAL ASSETS:** | $5,167,606 |

## LIABILITIES AND STOCKHOLDERS' EQUITY

| | |
|---|---|
| **CURRENT LIABILITIES:** | |
| ACCOUNTS PAYABLE | $3,286,281 |
| TOTAL CURRENT LIABILITIES | $3,286,281 |
| **STOCKHOLDERS' EQUITY:** | |
| CAPITAL /PREFERED STOCK | $1,183,000 |
| RETAINED EARNINGS | $698,325 |
| **TOTAL STOCKHOLDERS' EQUITY** | $1,881,325 |
| **TOTAL LIABILITIES AND STOCKHLDS EQUITY** | $5,167,606 |

HW Supp 000073

# EXHIBIT W

# EXHIBIT W

# EXHIBIT X

# EXHIBIT X

11/21/2015

Report Journal

| | | | Check #1527 in ACP<br>Inc. | Accounts Payable | $12,000.00 | |
|---|---|---|---|---|---|---|
| | | | April Disbursements | 1002 Bank Account | | $372,051.55 |
| | | | | | $372,051.55 | $372,051.55 |
| 04/30/2015 | Journal Entry | 14 | Debit Card - FedEX<br>shipment | 6041 Office<br>Supplies | $6.94 | |
| | | | Debit Card - Corp<br>meeting | 6025 Meeting and<br>Conventions | $302.92 | |
| | | | Debit Card - Corp<br>meeting | 6025 Meeting and<br>Conventions | $406.79 | |
| | | | Debit Card - Debit<br>Card Transactions<br>April | 1002 Bank Account | | $716.65 |
| | | | | | $716.65 | $716.65 |
| 04/30/2015 | Journal Entry | 26 | Taxes Due on Sale | Taxes & Licenses | $634,978.00 | |
| | | | Taxes Due on Sale | Accounts Payable | | $634,978.00 |
| | | | | | $634,978.00 | $634,978.00 |
| 05/01/2015 | Journal Entry | 19 | Check #1330 - Sale<br>Expense | 7020 Sale of<br>Assets | $95.93 | |
| | | | Check #1329 Payoff<br>Balance of Principal | 2000 Notes<br>Payable | $74,057.74 | |
| | | | Check #1331 - Sale<br>Expense | 7020 Sale of<br>Assets | $45.26 | |
| | | | Check #1332 - Sale<br>Expense | 7020 Sale of<br>Assets | $600.00 | |
| | | | Check #1333 - Sale<br>Expense | 7020 Sale of<br>Assets | $1,288.00 | |
| | | | Check #1334 - Sale<br>Expense | 7020 Sale of<br>Assets | $42.26 | |
| | | | Check #1335 - Sale<br>Expense | 7020 Sale of<br>Assets | $405.00 | |
| | | | Check #1336 - Sale<br>Expense | 7020 Sale of<br>Assets | $2,465.00 | |
| | | | Check #1337 - Sale<br>Expense | 7020 Sale of<br>Assets | $9,826.23 | |
| | | | Check #1338 -<br>Pepay Advance | 2000 Notes<br>Payable | $12,000.00 | |
| | | | Check #1339 - Sale<br>Expense | 7020 Sale of<br>Assets | $6,509.15 | |
| | | | Check #1340 - First<br>Bankcard | 7505 Interest Paid | $117.65 | |
| | | | Check #1340 - First<br>Bankcard | Accounts Payable | $508.42 | |
| | | | Check #1341 - First<br>Bankcard | 7020 Sale of<br>Assets | $14,384.77 | |
| | | | Check # 1343 - Note<br>Investment | 1031 Investments -<br>Other | $500,000.00 | |
| | | | Debit Card Use | 6025 Expenses -<br>Board Approved | $501.25 | |
| | | | Bank Charges and<br>Fees | 6044 Bank<br>Charges - Fremont | $30.00 | |
| | | | Wire to set up<br>E-Trade account | 1035 Investments -<br>Etrade | $1,000,000.00 | |
| | | | May Disbursements | 1002 Bank Account | | $1,630,981.66 |
| | | | Refund of Interest | 7505 Interest Paid | | $36,913.33 |

HW Supp 000033

Report Journal

| | | | To remove fix | 1000 Bank Account Fremont Bank | |
|---|---|---|---|---|---|
| | | | | | $0.00 |

| 09/23-2015 | Check | | Created by QB Online to adjust balance for deletion To remove error | 1001 Bank Account Cash on hand 1001 Bank Account Cash on hand | $0.00 |
|---|---|---|---|---|---|
| | | | | | $0.00 |

| 09/30/2015 | Journal Entry | 23 | | | |
|---|---|---|---|---|---|

| | | | Check #1361 - Hayashi Wayland | 6035 Accounting Fees | $1,900.00 |
|---|---|---|---|---|---|
| | | | Check #1362 - First Bankcard | 7505 Interest Paid | $113.56 |
| | | | Check #1362 First Bankcard | Accrunts Payable | $103.44 |
| | | | Check #1363 - Investment GAW 2 | 1022 Investments - Other Notes | $500,000.00 |
| | | | Debit Card - Meeting | 6025 Meeting and Conventions | $54.60 |
| | | | Debit Card - Post Office | 6041 Office Supplies | $98.00 |
| | | | September Disbursements | 1002 Bank Account | | $507,159.40 |
| | | | | | $507,159.40 | $507,159.40 |

| 10/31/2015 | Journal Entry | 24 | | | |
|---|---|---|---|---|---|
| | | | Check #1365 | Accounts Payable | $152.84 |
| | | | Check #1365 | 7505 Interest Paid | $120.16 |
| | | | Check #1366 | 6025 Meeting and Conventions | $802.57 |
| | | | Debit Cash Purchase 10/09 | 6060 Travel Expenses | $2,253.20 |
| | | | Debit Card Purchase 10/09 | 8060 Travel Expenses | $2,393.20 |
| | | | Debit Card Purchase 10/13 | 6041 Office Supplies | $106.28 |
| | | | Debit Card Purchase 10/21 | 8060 Travel Expenses | $2,710.50 |
| | | | Debit Card Purchase 10/25 - Parking | 6060 Travel Expenses | $84.00 |
| | | | Debit Card Purchase 10/26 | 6060 Travel Expenses | $1,486.06 |
| | | | Debit Card Purchase 10/26 | 6060 Travel Expenses | $1,486.06 |
| | | | Debit Card Purchase 10/28 | 6041 Office Supplies | $39.99 |
| | | | Debit Card Purchase 10/29 | 6041 Office Supplies | $395.96 |
| | | | Debit Card Purchase 10/30 | 6027 Dues and Subscriptions | $62.89 |
| | | | October Cash Disbursements | 1002 Bank Account | | $15,062.51 |
| | | | | | $15,062.51 | $15,062.51 |

# EXHIBIT Y

# EXHIBIT Y

**HAYASHI | WAYLAND**

| | |
|---|---|
| From: | Bob Brower <coastalcypress@yahoo.com> |
| Sent: | Monday, July 20, 2015 4:09 PM |
| To: | Gina Cochetti |
| Subject: | Re: Coastal Cypress Shareholder Data |
| Attachments: | image004.png; image002.gif; image003.gif |

Gina - please omit all items except the 3 that counsel advises we can release at this time. Sorry for the confusion.

Sent from my iPhone

On Jul 20, 2015, at 1:18 PM, Gina Cochetti <ginac@hw-cpa.com> wrote:

> Bob,
>
> Below is the preliminary calculation I have done for the sales price, net cash to shareholders and dollars per share.
>
> Coastal Cypress Corporation
> Sale and Winding Down of Corp
> Cash Flow
>
> | | |
> |---|---:|
> | Cash upon sale of property | 12,000,000 |
> | Commissions, Fees and Property Taxes | (1,584,258) |
> | Payment for equip | (596,500) |
> | Estimated Taxes paid at corp level | (2,031,552) |
> | Pay off of AP and Debt | (4,716,786) |
> | Tax Paid on Liquidating Dividend | (634,978) |
> | Net Cash to SH | 2,435,926 |
> | Dollars per share | 2.54 |
>
> Let me know if you need anything else.
>
> Thanks,
>
> Gina

1

HW Supp 000094

**GINA COCHETTI, CPA, MST**
<image001.gif>Partner
ginac@hw-cpa.com | 831.759.6305

### HAYASHI | WAYLAND

1188 Padre Drive, Suite 101
Salinas, CA 93901
FAX: 831.759.6380

🔗 📧 hw-cpa.com

Click here to securely upload files to me.

————

Notice:
This e-mail is only intended for the person(s) to whom it is addressed and may contain confidential information. Unless stated to the contrary, any opinions or comments are personal to the writer and do not represent the official view of the company. If you have received this e-mail in error, please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

Any advice or information in the body of this email is subject to, and limited by, the terms in the applicable engagement letter or statement of work, including provisions regarding tax advice. HW is not responsible for, and no person should rely upon, any advice or information in the body of this email unless such advice or information relates to services contemplated by an engagement letter or statement of work in effect between such person and HW

For information on new tax laws, upcoming events, or other useful information, please visit our website at www.hw-cpa.com

HW Supp 000095

# EXHIBIT Z

# EXHIBIT Z

## HAYASHI | WAYLAND

From: bob brower <coastalcypress@yahoo.com>
Sent: Friday, August 7, 2015 11:36 AM
To: Gina Cochetti
Subject: Re: Coastal Cypress Shareholder Data

Thank you - I just wanted to make sure that CCC does not run afoul my mistake.

On Friday, August 7, 2015 9:33 AM, Gina Cochetti <ginac@hw-cpa.com> wrote:

Bob,

The amount I gave you is assuming the corporation is liquidating and the shareholders are receiving the cash as a liquidating dividend. This amount is also net of any taxes the shareholders would pay on that liquidating dividend. But, you do not need to liquidate the corporation. If you did not liquidate or pay out any dividends, the corp would have about $3M left in it (before the redemption of 24% of the stock).

The corp can redeem the shareholders interest. This would not trigger a liquidation event and the corp would still remain open with the remaining cash to do further investing.

I don't think there is anything else to consider. This is a pretty straightforward transaction.

Gina

**GINA COCHETTI, CPA, MST**
Partner
ginac@hw-cpa.com | 831.759.6305
HAYASHI | WAYLAND

1188 Padre Drive, Suite 101
Salinas, CA 93901
FAX: 831.759.6380

hw-cpa.com

Click here to securely upload files to me.

From: bob brower [mailto:coastalcypress@yahoo.com]
Sent: Wednesday, August 05, 2015 9:46 AM
To: Gina Cochetti
Subject: Re: Coastal Cypress Shareholder Data

Gina - Based on the per share price you provided, I have a shareholder that wants to sell their shares back to CCC. The shareholder interest is only 24%. Is there (pending overall Shareholder approval) any other rules I need to know about. I do not want to trigger a liquidation of the company as everyone else has deceided to keep the corporation active and formulate a business plan for the future. Please advise.

HW Supp 000077

Case: 15-50801 Doc# 130 Filed: 07/28/16 Entered: 07/28/16 22:17:24 Page 140 of 148

On Friday, July 24, 2015 10:22 AM, bob brower <coastalcypress@yahoo.com> wrote:

Just received from the state, apparently no action required.

On Wednesday, July 22, 2015 9:08 AM, Bob Brower <coastalcypress@yahoo.com> wrote:

Great - thank you

Sent from my iPhone

On Jul 22, 2015, at 8:23 AM, Gina Cochetti <ginac@hw-cpa.com> wrote:

Bob,

Below are the items you requested in regards to the sale of the property.

Sales Price $12,000,000

Net Cash to Shareholders $2,435,926

Dollars per Share $2.54

Let me know if you need anything else.

Gina


**GINA COCHETTI, CPA, MST**
<image001.gif>Partner
ginac@hw-cpa.com | 831.759.6305
**HAYASHI | WAYLAND**

**1188 Padre Drive, Suite 101**
**Salinas, CA 93901**
**FAX: 831.759.6380**

<image002.gif><image003.gif> hw-cpa.com

Click here to securely upload files to me.

Notice:
This e-mail is only intended for the person(s) to whom it is addressed and may contain confidential information. Unless stated to the contrary, any opinions or comments are personal to the writer and do not represent the official view of the company. If you have received this e-mail in error, please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

Any advice or information in the body of this email is subject to, and limited by, the terms in the applicable engagement letter or statement of work, including provisions regarding tax advice. HW is not responsible for, and no person should rely upon, any advice or information in the body of this email unless such advice or information relates to services contemplated by an engagement letter or statement of work in effect between such person and HW.

For information on new tax laws, upcoming events, or other useful information, please visit our website at www.hw-cpa.com

2

HW Supp 000078

# EXHIBIT AA

# EXHIBIT AA

| From: | bob brower <coastalcypress@yahoo.com> |
|-------|----------------------------------------|
| Sent: | Tuesday, November 17, 2015 12:33 PM |
| To: | Gina Cochetti |
| Subject: | Can you assist |
| Attachments: | CCC INCOME STATEMENT 103115.XLS; CCC BALANCE SHEET 103115 (1).XLS; Declaration for sale.doc |

I am attaching the Balance Sheet and Income Statement for Coastal Cypress Corporation at at
10/31/2015 as well as a suggested declaration that I require. Can you review and let me know if this
is okay by you and can you return this to me soon.
I appreciate your assistance.
Regards, Bob Brower
President, Coastal Cypress Corporation

.

1

HW Supp 000071

## COASTAL CYPRESS CORPORATION
## STATEMENT OF INCOME AND EXPENSE
### FOR THE PERIOD ENDING OCTOBER 31, 2015
### (UNAUDITED)

|  | 10/31/2015 |
|---|---|
| **INCOME:** | |
| LEASE REVENUE | $52,044 |
| **TOTAL REVENUE** | **$52,044** |

**OPERATING EXPENSES:**

| | |
|---|---|
| LEGAL/ACCOUNTING FEES | $34,494 |
| MEETINGS & CONVENTIONS | $6,325 |
| BANK CHARGES | $105 |
| LICENSES/FEES/PERMITS | $18,434 |
| OFFICE & TELEPHONE | $1,592 |
| GENERAL MAINTENANCE | $4,620 |
| TRAVEL | $14,375 |
| TAXES AND LICENSES | $634,978 |
| **TOTAL EXPENSES** | **$714,923** |

**OPERATING INCOME:**      -$662,880

**OTHER INCOME & EXPENSE:**

| | |
|---|---|
| INTEREST EXPENSE | -$105,743 |
| TAXES DUE ON SALE | -$2,031,552 |
| SALE OF ASSETS | $5,096,238 |

**NET PRETAX PROFIT**      $2,296,063

**NET INCOME**      $2,296,063

HW Supp  000072

Case: 15-50801   Doc# 130   Filed: 07/28/16   Entered: 07/28/16 22:17:24   Page 144 of 148

## COASTAL CYPRESS CORPORATION
### BALANCE SHEET
#### FOR THE PERIOD ENDING OCTOBER 31, 2015
#### (UNAUDITED)

| ASSETS | 10/31/2015 |
|---|---|
| **CURRENT ASSETS:** | |
| CASH OR EQUIVELENTS | $2,165,716 |
| INVENTMENT ACCOUNTS | $3,000,000 |
| DEPOSITS AND PREPAID EXPENSES | $800 |
| **TOTAL CURRENT ASSETS:** | $5,166,516 |
| **EQUIPMENT & LEASEHOLD IMPROVEMENTS:** | |
| EQUIPMENT | $1,090 |
| TOTAL EQUIP. AND IMPROVEMENTS | $1,090 |
| LESS: ACCUMULATED DEPRECIATION | $0 |
| **EQUIPMENT & LEASEHOLD IMPROVEMENTS, NET** | $1,090 |
| **TOTAL ASSETS:** | $5,167,606 |

### LIABILITIES AND
### STOCKHOLDERS' EQUITY

| | |
|---|---|
| **CURRENT LIABILITIES:** | |
| ACCOUNTS PAYABLE | $3,286,281 |
| **TOTAL CURRENT LIABILITIES** | $3,286,281 |
| **STOCKHOLDERS' EQUITY:** | |
| CAPITAL /PREFERED STOCK | $1,183,000 |
| RETAINED EARNINGS | $698,325 |
| **TOTAL STOCKHOLDERS' EQUITY** | $1,881,325 |
| **TOTAL LIABILITIES AND STOCKHLDS EQUITY** | $5,167,606 |

HW Supp 000073

# EXHIBIT BB

# EXHIBIT BB

| | |
|---|---|
| From: | Bob Brower <coastalcypress@yahoo.com> |
| Sent: | Thursday, November 19, 2015 12:58 PM |
| To: | Gina Cochetti |
| Subject: | Re: Can you assist |
| Attachments: | image003.gif; image003.gif |

Gina - has Rich Babcock reached out for you and have you spoke with him?

Sent from my iPad

On Nov 17, 2015, at 5:27 PM, Gina Cochetti <ginac@hw-cpa.com> wrote:

> That would be fine.
>
> Gina
>
> **GINA COCHETTI, CPA, MST**
> <image001.gif>Partner
> ginac@hw-cpa.com | 831.759.6305
>
> **HAYASHI | WAYLAND**
>
> 1188 Padre Drive, Suite 101
> Salinas, CA 93901
> FAX: 831.759.6380
> <image002.gif> hw-cpa.com
>
> Click here to securely upload files to me.
>
> **From:** Bob Brower [mailto:coastalcypress@yahoo.com]
> **Sent:** Tuesday, November 17, 2015 5:14 PM
> **To:** Gina Cochetti
> **Cc:** Rich Babcock
> **Subject:** Re: Can you assist
>
> Would you mind if I had CCC's counsel contact you for a few questions. His name is Rich Babcock, and he is from So. Cal.
> Please let me know.
>
> Sent from my iPad
>
> On Nov 17, 2015, at 12:22 PM, Gina Cochetti <ginac@hw-cpa.com> wrote:
>
>> Bob,
>>
>> This is not something we normally do and I think my insurance carrier would have a real issue with me signing this. If you really need this, I can forward it to my managing partner and see if he thinks we can do this. Let me know.
>>
>> Gina

1

HW Supp 000065

**GINA COCHETTI, CPA, MST**
<image001.gif>Partner
ginac@hw-cpa.com | 831.759.6305

### HAYASHI · WAYLAND

1188 Padre Drive, Suite 101
Salinas, CA 93901
FAX: 831.759.6380

<image002.gif> hw-cpa.com

Click here to securely upload files to me.

**From:** bob brower [mailto:coastalcypress@yahoo.com]
**Sent:** Tuesday, November 17, 2015 10:33 AM
**To:** Gina Cochetti
**Subject:** Can you assist

I am attaching the Balance Sheet and Income Statement for Coastal
Cypress Corporation at at 10/31/2015 as well as a suggested declaration
that I require. Can you review and let me know if this is okay by you and
can you return this to me soon.
I appreciate your assistance.
Regards, Bob Brower
President, Coastal Cypress Corporation

Notice:
This e-mail is only intended for the person(s) to whom it is addressed and may contain confidential information. Unless stated to the contrary, any opinions or comments are personal to the writer and do not represent the official view of the company. If you have received this e-mail in error, please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

Any advice or information in the body of this email is subject to, and limited by, the terms in the applicable engagement letter or statement of work, including provisions regarding tax advice. HW is not responsible for, and no person should rely upon, any advice or information in the body of this email unless such advice or information relates to services contemplated by an engagement letter or statement of work in effect between such person and HW.

For information on new tax laws, upcoming events, or other useful information, please visit our website at www.hw-cpa.com

Notice:
This e-mail is only intended for the person(s) to whom it is addressed and may contain confidential information. Unless stated to the contrary, any opinions or comments are personal to the writer and do not represent the official view of the company. If you have received this e-mail in error, please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

Any advice or information in the body of this email is subject to, and limited by, the terms in the applicable engagement letter or statement of work, including provisions regarding tax advice. HW is not responsible for, and no person should rely upon, any advice or information in the body of this email unless such advice or information relates to services contemplated by an engagement letter or statement of work in effect between such person and HW.

For information on new tax laws, upcoming events, or other useful information, please visit our website at www.hw-cpa.com

HW Supp 000066