STEVEN T. GUBNER – Bar No. 156593
JASON B. KOMORSKY – Bar No. 155677
JESSICA L. BAGDANOV – Bar No. 281020
JESSICA S. WELLINGTON – Bar No. 324477
BRUTZKUS GUBNER
21650 Oxnard Street, Suite 500
Woodland Hills, CA 91367
Telephone: (818) 827-9000
Facsimile: (818) 827-9099
Email:     sgubner@bg.law
           jkomorsky@bg.law
           jbagdanov@bg.law
           jwellington@bg.law

Attorneys for Michael G. Kasolas, Liquidating Trustee
For the Robert Brower, Sr. Liquidating Trust

**UNITED STATES BANKRUPTCY COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| In re | Bk. Case No. 15-50801 MEH |
| ROBERT BROWER, SR., | Chapter 11 |
| Debtor. | Adv. Case No. 21-_____ MEH |
| MICHAEL G. KASOLAS, solely in his capacity as the Liquidating Trustee for the Robert Brower, Sr. Liquidating Trust, | **COMPLAINT FOR:** |
| Plaintiff, | **(1) AVOIDANCE OF POST PETITION TRANSFERS PURSUANT TO 11 U.S.C. § 549;** |
| v. | **(2) AVOIDANCE OF FRAUDULENT TRANSFERS PURSUANT TO CAL. CIV. CODE §§ 3439.04, 3439.07, 3439.08;** |
| PATRICIA BROWER, solely as trustee of the BROWER TRUST (2015), dated June 30, 2015; GREAT AMERICAN WINERIES, INC., a California corporation; DEERLEAF HOLDINGS, INC., a Delaware corporation; ROBERT BROWER, JR., an individual; MED-VENTURE INVESTMENTS, LLC, a California limited liability company; AURORA CAPITAL ADVISORS, a California general partnership; RICHARD BABCOCK, an individual and general partner of Aurora Capital Advisors; ANTHONY NOBLES, an individual and general partner of Aurora Capital Advisors; COASTAL WINE SERVICES, LLC, a California limited liability company; WILFORD BUTCH | **(3) RECOVERY OF AVOIDED TRANSFERS FOR BENEFIT OF ESTATE PURSUANT TO 11 U.S.C. §§ 550 AND 551;** **(4) TURNOVER OF ESTATE ASSETS PURSUANT TO 11 U.S.C. § 542;** **(5) ACCOUNTING;** **(6) BREACH OF FIDUCIARY DUTY;** **(7) AIDING AND ABETTING BREACH OF FIDUCIARY DUTY; AND** |

1

| | |
|---|---|
| LINDLEY, an individual; POHANKA OF SALISBURY, INC., a Maryland corporation, JAURIGUE LAW GROUP, a California professional corporation dba JLG Lawyers; JOHNSON, ROVELLA, RETTERER, ROSENTHAL & GILLES, LLP, a limited liability partnership; and OLDFIELD CREELY, LLP, a limited liability partnership, | **(8) DISGORGEMENT PURSUANT TO 11 U.S.C. § 330**<br><br>**(9) CONVERSION** |
| Defendants. | |

Plaintiff, Michael G. Kasolas, solely in his capacity as the Liquidating Trustee (the "Liquidating Trustee" or "Plaintiff") for the Robert Brower, Sr. Liquidating Trust (the "Liquidating Trust"), complaining of Patricia Brower, solely as trustee of the Brower Trust (2015), dated June 20, 2015, Great American Wineries, Inc., Deerleaf Holdings, Inc., Robert Brower, Jr., Med-Venture Investments, LLC, Aurora Capital Advisors, Richard Babcock, Anthony Nobles, Coastal Wine Services, LLC, Wilford Butch Lindley, Pohanka of Salisbury, Inc., Jaurigue Law Group, Johnson, Rovella, Retterer, Rosenthal & Gilles, LLP, and Oldfield Creely, LLP (collectively, the "Defendants"), alleges as follows:

## NATURE OF PROCEEDING

1. On March 11, 2015 (the "Petition Date"), Robert Brower Sr. (the "Debtor") commenced this bankruptcy case by filing a petition under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

2. At all relevant times, Debtor's bankruptcy estate owned 100% of Coastal Cypress Corporation ("Coastal"), and Debtor controlled all of Coastal's operations. Coastal was formed by Debtor in the early 1980's and owned real property located at 8890 and 8940 Carmel Valley Road in Carmel, California (the "Wine Estate Property").

3. In Spring of 2015 and after the Petition Date, Debtor caused Coastal to sell the Wine Estate Property for $12,035,707.24. Net proceeds from the sale were over $7,000,000. At all relevant times, these net proceeds were assets of Debtor's bankruptcy estate.

2

4.      After the sale of the Wine Estate Property, Coastal ceased all business operations, and Debtor began an elaborate and complex scheme to transfer the net proceeds from Coastal away from the bankruptcy estate outside the purview of the bankruptcy court to the Defendants, several of whom are insiders of the Debtor, in an effort to hinder, delay, and defraud creditors of Debtor's bankruptcy estate. These efforts left Coastal, which held the most valuable asset of Debtor's bankruptcy estate, as an empty shell.  Moreover, most of the transfers were made postpetition without approval by the Court or the Liquidating Trustee.

5.      By and through this Complaint, the Liquidating Trustee seeks to unwind these postpetition, fraudulent transfers and recover those transfers for the benefit of the estate from the Debtor's friends, family members, insiders, and attorneys who assisted him in his scheme.  The Liquidating Trustee further seeks damages for the Debtor's breaches of fiduciary duties owed to the Estate and its creditors, and to hold other defendants liable for aiding and abetting Debtor's breaches of those duties, as described herein.

## JURISDICTION AND VENUE

6.      The Bankruptcy Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334 and 11 U.S.C. §§ 542, 544, 549, 550, and 551.  This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (E), (H), and (O).

7.      The Bankruptcy Court has constitutional jurisdiction to enter a final judgment in this adversary proceeding.  To the extent the Court does not have constitutional jurisdiction to enter a final judgment, the Liquidating Trustee consents to the Court entering a final judgment in this proceeding.

8.      Venue properly lies in this judicial district in that the civil proceeding arises under title 11 of the United States Code as provided in 28 U.S.C. §§ 1408 and 1409.

9.      This adversary proceeding arises out of the case entitled *In re Robert Brower, Sr.*, Case No. 15-50801 MEH, currently pending in the United States Bankruptcy Court, Northern District of California, San Jose Division.

Case: 15-50801    Doc# 322    Filed: 07/22/21    Entered: 07/22/21 16:31:04    Page 3 of 151

2582374

## THE PARTIES

10.     Plaintiff is the duly appointed Liquidating Trustee for the Liquidating Trust and acts in this action not individually, but solely in his capacity as Liquidating Trustee.

11.     The *Creditor MUFG Union Bank, N.A.'s Third Amended Combined Plan of Reorganization and Disclosure Statement Dated November 2, 2017* (the "Plan") [Bankr. Doc. 233], which was confirmed by this Court pursuant to the Court order entered on November 6, 2017 (the "Confirmation Order") [Bankr. Doc. 236], specifically provided for the Liquidating Trustee to have the power to prosecute the claims held by Debtor's bankruptcy estate, including avoidance causes of action under, among others, Bankruptcy Code sections 542, 544, 549, 550, and 551.  Accordingly, the Liquidating Trustee has standing to bring this adversary proceeding on behalf of Debtor's bankruptcy estate (the "Estate").

12.     Defendant Patricia Brower ("P. Brower") is sued solely in her capacity as Trustee of the Brower Trust (2015) dated June 30, 2015, which is a California trust (the "Trust").  P. Brower is the Debtor's widow.  The Debtor died postpetition and on or about September 30, 2020.  Debtor and P. Brower married in 1980, and remained married at all relevant times stated herein.  From the early 1990's Debtor and P. Brower resided in a residence located in Carmel, California.  In approximately November 2016, Debtor and P. Brower relocated to Delaware, and on information and belief, P. Brower resides in Delaware as of the filing of this complaint.

13.     Defendant Great American Wineries, Inc. is a California corporation ("GAW") formed on March 16, 1982.  Defendant Robert Brower, Jr. is the President and a director of GAW.  Defendant P. Brower is the Secretary and a director of GAW.

14.     Defendant Deerleaf Holdings, Inc. is a Delaware corporation ("Deerleaf") formed on March 14, 2016.  Plaintiff is informed and believes that defendant Robert Brower, Jr. owns and controls Deerleaf.

15.     Defendant Robert Brower, Jr. ("R. Brower") is the son of the Debtor and P. Brower.  R. Brower holds an ownership interest in GAW and Deerleaf. Plaintiff is informed and believes that R. Brower resides in Katonah, New York but has frequent and ongoing contacts with the State of California.

4

2582374

16.     Defendant Med-Venture Investments, LLC is a California limited liability company ("Med-Venture") formed by defendant Richard Babcock on October 16, 2006.  Plaintiff is informed and believes that defendant Anthony Nobles is a member of Med-Venture, and that defendant Richard Babcock provided legal services to Med-Venture.

17.     Defendant Aurora Capital Advisors is a California general partnership ("Aurora") organized on January 1, 2014.  Defendants Babcock and Nobles are the general partners of Aurora.

18.     Defendant Richard Babcock ("Babcock") is an individual and general partner of Aurora Capital Advisors.  Babcock is also an attorney licensed to practice in the State of California.  Plaintiff is informed and believes that Babcock resides in Saint Thomas, US Virgin Islands and Alpharetta, Georgia.  Plaintiff is further informed and believes that Babcock has frequent and ongoing contacts with the State of California.  Plaintiff is informed and believes that Babcock provided legal services to Med-Venture.

19.     Defendant Anthony Nobles ("Nobles") is an individual and general partner of Aurora.  Plaintiff is informed and believes that Nobles resides in Saint Thomas, US Virgin Islands and Fountain Valley, California.  Plaintiff is further informed and believes that Nobles has frequent and ongoing contacts with the State of California.  Plaintiff is informed and believes that Nobles is a member of Med-Venture.

20.     Coastal Wine Services, LLC is a California limited liability company ("Coastal Services") formed on February 5, 1998 and is located in Salinas, California.  Plaintiff is informed and believes that defendant Wilford Butch Lindley is the managing member and registered agent for Coastal Services.

21.     Defendant Wilford Butch Lindley ("Lindley") is an individual and resides in Salinas, California.

22.     Defendant Pohanka of Salisbury, Inc. is a Maryland corporation ("Pohanka") formed on March 16, 1999.  Plaintiff is informed and believes that Pohanka is an automobile dealership.

23.     Defendant Jaurigue Law Group dba JLG Lawyers is a California professional corporation ("Jaurigue Group") formed on November 19, 2008 and is located in Glendale,

2582374

California.  Jaurigue Group provided legal services to Debtor in connection with Debtor's

bankruptcy case and related adversary proceeding, 17-05044 MEH.

24.     Defendant Johnson, Rovella, Retterer, Rosenthal & Gilles, LLP is a limited liability

partnership ("Johnson Rovella") located in Salinas, California.  Johnson Rovella provided legal

services to Debtor, Coastal Cypress Corporation, Lindley, P. Brower, and the Trust in connection to

adversary proceeding, 17-05044 MEH.  Plaintiff is informed and believes that Johnson Rovella also

provided legal services to Debtor in connection with a state court action against MUFG Union Bank,

N.A.

25.     Defendant Oldfield Creely, LLP is a limited liability partnership ("Oldfield Creely")

located in Carmel, California.  Plaintiff is informed and believes that Oldfield Creely represented

Chateau Julien, Inc. in connection with a state court action filed by MUFG Union Bank, N.A.

against Chateau Julien, Inc. and Debtor.

## GENERAL ALLEGATIONS

### Debtor's Wine Business and Constellation of Companies

26.     In 1982, Debtor and P. Brower established a wine estate in Carmel, California.  The

assets and operation of their business venture were split between multiple privately-held

corporations set up for different purposes all related to the wine business.  Debtor oversaw the wine

estate for decades as President of Coastal, Chateau Julien, Inc., a California corporation ("Chateau

Julien"), and GAW, each of which played a role in the wine estate.

27.     Also in 1982, Debtor formed Coastal as the sole shareholder.  As of the Petition Date

and until April 2015, Coastal owned real property located at 8890 and 8940 Carmel Valley Road in

Carmel, California (defined above as the "Wine Estate Property"), a roughly 16-acre estate that

included a wine tasting room, wine production facility, barrel aging room, offices, outdoor event

venues, and vineyards.  According to Coastal's books and records, Debtor was the President and a

director of Coastal, and P. Brower was the Secretary and a director.

28.     In 1985, Debtor formed Chateau Julien. Until April 2015, Chateau Julien operated the

winery on the Wine Estate Property, which it leased from Coastal.  Chateau Julien was the entity

responsible for wine sales, tours, and events at the Wine Estate Property.  Based on a review of

6

2582374

Chateau Julien's books and records in Plaintiff's possession, since its inception, Debtor was the President and a director of Chateau Julien, and P. Brower was the Secretary and a director.

29.     In 1982, Debtor formed GAW.  GAW was the entity responsible for producing, blending, and bottling the wine for Chateau Julien.  Plaintiff is informed and believes that from 1982 until December 1987, Debtor held a 90% interest in GAW.  However, in December 1987, Debtor purportedly gifted his entire interest in GAW to R. Brower.  Plaintiff is informed and believes that R. Brower was an infant at the time of that transfer.

30.     Based on a review of GAW's books and records in Plaintiff's possession, Debtor was a director of GAW from its inception until May 6, 2014.  Debtor was also the President of GAW until May 14, 2010, at which time he became Co-President with R. Brower until May 6, 2014, when the board of directors accepted Debtor's resignation as Co-President and director of GAW.  From May 6, 2014 through the present, on paper, R. Brower has been the President and a director of GAW, and P. Brower has been the Secretary and a director.

31.     In 1983, Debtor formed American Commercial Properties, Inc., a Nevada corporation ("ACP").  At all relevant times stated herein Debtor was the President and a director of ACP.  In 1991, ACP acquired a residence Carmel, California, where Debtor and P. Brower resided together until they moved to Delaware in November 2016.

32.     These businesses, Chateau Julien, Coastal, ACP, and GAW formed the Debtor's wine business and were identified by the Debtor as such in his bankruptcy schedules. Specifically, and on March 18, 2015, the Debtor filed an amended Statement of Financial Affairs [Bk. Doc. No. 17] (the "Amended SOFA") in his bankruptcy case, in which he disclosed the following as the "nature, location and name" of his ongoing business as a chapter 11 debtor:

- Chateau Julien, Inc. – wine production and related matters – 1985 to the present;
- Coastal Cypress Corporation – owner of real property used for wine production and related matters – 1982 to the present;
- American Commercial Properties, Inc. – owner of real property – 1983 to the present;
- Great American Wineries, Inc. – wine and spirits marketing and sales – 1983 to the present.

7

2582374

*See* Amended Statement of Financial Affairs, Bk. Doc. No. 17, Question No. 18.

33. Although Debtor purportedly resigned as Co-President and director of GAW in 2014, based on Debtor's admissions in the Amended SOFA, Plaintiff is informed and believes that at all relevant times, Debtor controlled the operations of GAW. Debtor remained as a signatory on GAW's bank account at Freemont Bank until at least August 2016, and continued to sign checks on behalf of GAW until approximately May 2016.

34. Despite having identified these businesses in his chapter 11 bankruptcy schedules, post-petition the Debtor caused a complete cessation of these businesses, sold all assets out from under the bankruptcy court, his estate, and the estate's creditors, without court approval and in patent disregard of his fiduciary duties as debtor in possession.

35. Specifically, and in April 2015, the Debtor sold the Wine Estate Property owned by Coastal, along with certain equipment and other assets related to the ongoing wine estate business operations, for total consideration of $12,035,707.24. Subsequently, in or around November 2016, Coastal acquired real property in Delaware, in which Debtor and P. Brower resided thereafter.

**The Bank's Funding of Debtor's Wine Enterprise and Debtor's Efforts to Shield Assets**

36. On information and belief and prior to the Petition Date, MUFG Union Bank, N.A. (the "Bank") funded the Debtor's wine business by providing over $4,800,000 in a line of credit that the Debtor had no intention of repaying. As explained herein, the Debtor hatched a complex scheme to secret away any available funds with which to repay the Bank (or any other creditor for that matter), falsely representing himself and his business to the bankruptcy court as an empty shell.

37. In 1986, the Bank, together with its relevant predecessors, began its relationship with Chateau Julien. Around the same time, Coastal borrowed funds from the Bank to acquire the Wine Estate Property.

38. Effective May 15, 2009, Chateau Julien entered into a Loan and Security Agreement with the Bank, along with an Amended and Restated Revolving Term Note in the principal amount of $4,850,000 (the "Bank Loan"). Debtor personally guaranteed the Bank Loan pursuant to an Unlimited Guaranty he executed on April 28, 2004, and his Reaffirmation of Guaranty of May 15, 2009 (together, the "Guaranty"). The Bank Loan was subsequently extended in June 2011, modified

8

2582374

in December 2011, extended in June 2012, modified in November 2012, amended in March 2013, and amended in September 2013. Despite several demands, neither Chateau Julien nor Debtor paid the Bank Loan in full.

39. Accordingly, on September 26, 2014, the Bank filed a complaint against Chateau Julien and Debtor in the Superior Court of the State of California, County of Monterey, commencing Case No. MI29403, seeking to enforce the obligation of Chateau Julien and Debtor under the Bank Loan (the "State Court Action"). On the same day, the Bank sent a Notice of Disposition of Collateral to Debtor and Chateau Julien's counsel.

40. Subsequently, in January 2015, the state court entered a Temporary Protective Order and Right to Attach Order against Debtor. The Bank then obtained a Writ of Attachment against the Debtor, providing the Bank with a lien over Debtor's assets to secure an eventual judgment on the Bank's claim against Debtor based on the Guaranty.

41. A little more than a month after the Bank obtained the Writ of Attachment, Debtor filed a voluntary chapter 11 petition, commencing the Bankruptcy Case. Plaintiff is informed and believes that Debtor commenced the Bankruptcy Case to dissolve the Bank's attachment lien under a state law provision that provides that such liens are automatically dissolved by a bankruptcy filing within 90 days of the issuance of the Temporary Protective Order.

42. After the sale of the Wine Estate Property, Coastal and ACP held valuable assets including nearly $7,000,000 in net proceeds from the sale of the Wine Estate Property, and Debtor and P. Brower's real properties located in Carmel, California and Delaware.

43. However, postpetition, Debtor represented that he conveniently divested himself of most of his shares in Coastal and ACP via various alleged stock transfer/issuance transactions that allegedly occurred prepetition.

44. Specifically, Debtor claimed that P. Brower, the Trust, Lindley, Nobles and Babcock collectively owned 76% of Coastal's stock—Debtor asserted that P. Brower and the Trust owned 13%, Lindley owned 37%, Nobles owned 21%, and Babcock owned 5%—leaving only 24% in the Debtor's name. Debtor also asserted that P. Brower and the Trust owned 100% of ACP's stock.

9

45.     Plaintiff is informed and believes that Debtor made these representations in order to shield Coastal and ACP's assets from creditors of his bankruptcy estate, including but not limited to the Bank, despite the fact that these businesses were explicitly disclosed as the businesses he managed as a debtor in possession in his bankruptcy case.

46.     On May 11, 2017, the Bank filed a complaint against Debtor, P. Brower, the Trust, Coastal, ACP, Lindley, Nobles, and Babcock commencing adversary proceeding 17-05044 MEH, seeking a determination that Debtor's interest in Coastal was greater than the 24% Debtor represented he held, and that Debtor's interest in ACP was greater than the 0% he represented he held (the "Enhancement Action").

47.     On April 18, 2017, *i.e.*, almost immediately after the filing of the Enhancement Action, Debtor, on behalf of Coastal, executed a merger, purporting to transform Coastal from a California corporation into a Delaware corporation ("Coastal Delaware"), and all shareholders exchanged their shares of the California corporation for shares of the new Delaware corporation. Debtor did not seek Court approval before executing the merger.

48.     The Bank learned of the merger and, on May 16, 2017, filed an amended complaint in the Enhancement Action adding Coastal Delaware as a defendant and a separate claim for relief seeking avoidance of the postpetition transfer under Bankruptcy Code section 549.

49.     On November 20, 2019, the Court issued a *Memorandum Decision on Motions for Summary Judgment in the Enhancement Action* [17-05044 MEH, Doc. 123]. In that Memorandum Decision, the Court found that the Coastal shares issued to Lindley and Babcock were void for lack of consideration, and that 150,000 of the shares issued to Nobles were void for lack of consideration. *Id.* The Court further found that, as of the Petition Date, 100% of the shares of ACP are property of Debtor's bankruptcy estate, either as Debtor's separate property or community property. The Court further found that the postpetition merger of Coastal violated Bankruptcy Code section 549 and was thus void. The Court declined to grant summary judgment with respect to whether 50,000 of the Coastal shares issued to Nobles were void for lack of consideration, and whether P. Brower's Coastal shares were void for lack of consideration, or alternatively, that they were community property. A true and correct copy of the Court's Memorandum Decision on Motions for Summary

2582374

Judgment in the Enhancement Action is attached hereto as **Exhibit 1**, and incorporated herein by this reference.

50.     Also on November 20, 2019, the Court entered two partial summary judgments consistent with the Court's Memorandum Decision on the Bank and the defendants' motions for summary judgment (the "Summary Judgments") [17-05044 MEH, Docs. 124 and 125].

51.     On September 2, 2020, the Court held a trial on the remaining issues in the Enhancement Action.  On September 9, 2020, the Court issued an Order After Trial [17-05044 MEH, Doc. 158].  In that Order After Trial, the Court found that the Coastal shares issued to P. Brower, which were later transferred to the Trust after its creation, and the remaining 50,000 shares in Coastal issued to Nobles were void for lack of consideration.  A true and correct copy of the Court's Order After Trial is attached hereto as **Exhibit 2**, and incorporated herein by this reference. Also on September 9, 2020, the Court entered judgment in the Enhancement Action in favor of the Bank (the "Enhancement Judgment") [17-05044 MEH, Doc. 159].

52.     As a result of the Summary Judgments and the Enhancement Judgment, Debtor's bankruptcy estate, at all relevant times, held a 100% interest in Coastal and ACP.  Pursuant to 11 U.S.C. § 541(a)(6), the proceeds, product, offspring, rents, or profits of or from the estate's interest in Coastal and ACP are, and have been at all relevant times, assets of Debtor's bankruptcy estate. Further, and pursuant to 11 U.S.C. § 541(a)(7), the 100% interest in Coastal and ACP constituted an "interest in property that the estate acquires after the commencement of the case."

**Liquidating Trustee's Exercise of Control Over Coastal and ACP**

53.     On September 18, 2020, the Liquidating Trustee, on behalf of Coastal's sole shareholder—Debtor's bankruptcy estate—executed a *Written Consent Resolution of the Sole Shareholder of Coastal Cypress Corporation* (the "Coastal Consent").  A true and correct copy of the Coastal Consent is attached hereto as **Exhibit 3** and incorporated herein by this reference. Through the Coastal Consent, Debtor and P. Brower were removed as directors of Coastal and the Liquidating Trustee was elected as sole director.

54.     On September 24, 2020, the Liquidating Trustee, on behalf of ACP's sole shareholder—Debtor's bankruptcy estate—executed a *Written Consent Of American Commercial*

Case: 15-50801    Doc# 322    Filed: 07/22/21    Entered: 07/22/21 16:31:04    Page 11 of
151

2582374

*Properties, Inc., a Nevada Corporationto* [*sic*] *the Holding of a Special Shareholder's Meeting and Written Consent Resolution* (the "ACP Consent," together with the Coastal Consent, the "Written Consents"). A true and correct copy of the ACP Consent is attached hereto as **Exhibit 4** and incorporated herein by this reference. Through the ACP Consent, P. Brower was removed as director of ACP and the Liquidating Trustee was elected as sole director.

55. Until the Written Consents were executed, Debtor controlled all aspects of Coastal and ACP's business operations, including disposition of their assets.

**Other Enforcement Actions Brought by the Bank Against Debtor, Chateau Julien and GAW**

56. On August 14, 2015, the Bank filed a complaint against Debtor, commencing adversary proceeding 15-05119 MEH, seeking a determination that its claim based on the Guaranty was nondischargeable under Bankruptcy Code section 523(a), and that Debtor was not eligible for a discharge under Bankruptcy Code section 727(a) (the "Nondischargeability Action").

57. In February 2017, the Court held a trial on the Nondischargeability Action. After trial, on March 22, 2017, the Court entered judgment in favor of the Bank on its assertion that its claim based on the Guaranty was nondischargeable under Bankruptcy Code section 523(a) (the "Nondischargeability Judgment") [15-05119 MEH, Doc. 48]. However, the Court ruled in favor of Debtor on the Bank's assertion that Debtor's discharge should be denied under Bankruptcy Code section 727(a). *Id.*

58. Plaintiff is informed and believes that in connection with the Guaranty, Debtor represented to the Bank that he and P. Brower jointly owned assets totaling $10,000,000. In the Court's Memorandum Decision in the Nondischargeability Action [15-05119 MEH, Doc. 47], the Court stated, "When examined, [Debtor's] financial statements establish a pattern of misrepresentations." *Id.* at p. 4, lines 24-25. The Court went on to find that "[Debtor] consistently overstated his assets by implying that his wife's separate property was his. He then skewed the disclosures to match the greatest value possible with the related financial statements of Chateau Julien and [ACP]. As such, it is clear that [Debtor] either knowingly made these false statements or made them so recklessly as to act fraudulently." *Id.* at p. 6, lines 17-21. A true and correct copy of

12

2582374

the Court's Memorandum Decision in the Nondischargeability Action is attached hereto as **Exhibit 5**, and incorporated herein by this reference.

59.     The Debtor's filing of his chapter 11 petition stayed litigation in the State Court Action against Debtor based on the Guaranty, however, it did not stay the litigation against Chateau Julien.  In May 2016 and June 2016, the Bank's action against Chateau Julien proceeded to trial.  After the trial, on November 17, 2016, the state court entered judgment in favor of the Bank and against Chateau Julien in the amount of $5,409,851.57 (the "State Court Judgment").

60.     On or around September 22, 2017, the Bank filed a motion in the State Court Action to amend the State Court Judgment to add GAW as Chateau Julien's alter ego.  Plaintiff is informed and believes that after Debtor filed his Amended SOFA representing that he was a director and the President of GAW, the Bank pursued discovery to understand GAW's role in Debtor's companies.  Through that discovery, the Bank learned of Debtor's scheme to protect his and Chateau Julien's assets from the Bank by transferring all of Chateau Julien's inventory and business to GAW.

61.     Approximately one week after the Bank filed the State Court Action and demanded its collateral, on or around September 30, 2014, Debtor caused Chateau Julien's bonded warehouse to create a new account under the name of GAW, and to transfer all Chateau Julien's taxpaid[1] inventory to GAW's account.  Based on a review of GAW's shipping receipts in Plaintiff's possession, shipments from GAW's new inventory to various former Chateau Julien customers began in October 2014.  Plaintiff is informed and believes that prior to October 2014, GAW had little to no business of its own and merely bottled wine that it delivered to Chateau Julien.

62.     After the transfer of Chateau Julien's inventory to GAW, Chateau Julien essentially ceased all national wine sales operations and terminated its lease of the Wine Estate Property effective January 31, 2015.  Plaintiff is informed and believes that in the months following the transfer, Debtor transferred the assets of Chateau Julien to himself or to third parties for his benefit leaving Chateau Julien as an empty shell.  From a review of Chateau Julien's First Capital Bank

---

[1] In this case, "taxpaid" inventory refers to bottled wine as to which the excise taxes have already been paid, making it eligible to be shipped to customers.  In contrast, "in bond" inventory refers to bottled wine as to which the excise tax has not been paid, which cannot be shipped for sale to a third party until the excise tax has been paid.

2582374

account, after the transfer, Chateau Julien wrote dozens of checks, signed by Debtor, to various companies for the benefit of GAW's business operations.  Additionally, Chateau Julien paid R. Brower $20,000, even though Chateau Julien did not employ him at this time, but rather GAW employed him.  Chateau Julien also paid ACP over $3,000, Debtor's attorneys at Campeau Goodsell & Diemer $5,000, and Coastal over $145,000.

63.    The state court granted the Bank's motion to amend the State Court Judgment, holding GAW liable under the State Court Judgment as Chateau Julien's alter ego.

**Debtor's Scheme to Hinder, Delay, and Defraud Creditors by Transferring Proceeds From the Sale of the Wine Estate Property Out of the Estate**

64.    As noted earlier, in April 2015, after the Petition Date, Coastal sold the Wine Estate Property along with certain equipment and other assets related to the ongoing wine estate business operations for total consideration of $12,035,707.24.  A true and correct copy of the Final Settlement Statement (the "Escrow Statement") is attached hereto as **Exhibit 6**, and incorporated herein by this reference.

65.    After paying secured loan balances (but not the Bank Loan to Chateau Julien which was secured by the Guaranty), taxes, and various other items from escrow, Coastal received net proceeds from escrow of at least $5,811,761.46 (the "Proceeds").[2]  The Proceeds consisted of $350,000 in early release of funds, a lump sum at the close of escrow in the amount of $5,477,761.46, and a $50,000 hold-back for a septic tank upgrade, which was received by Coastal in October 2016.

66.    The early release of funds consisted of three payments in the amount of $100,000, $100,000, and $150,000, released in February 2015, March 2015, and April 2015, respectively.  As of February 5, 2015—one day prior to the first early release of funds—Coastal's Freemont bank account ending in 1870 had only $3,316.62.

67.    Plaintiff is informed and believes that following the sale of the Wine Estate Property, Coastal ceased all business operations, yet the Proceeds did not remain with Coastal.  Consistent

---

[2] As discussed below, this amount would have been $7,011,761.46 without a payment to Med-Venture in the amount of $1,200,000 from escrow.

2582374

with Debtor's pattern of fraudulently concealing assets of his bankruptcy estate, beginning in February 2015, Debtor transferred the Proceeds from Coastal to Defendants, thereby removing the Proceeds from Debtor's bankruptcy estate in an effort to hinder, delay and defraud creditors of Debtor's bankruptcy estate, including the Bank. Moreover, most of the transfers were made postpetition without approval by the Court or the Liquidating Trustee.

68. In furtherance of his scheme, on May 15, 2015, Debtor caused Coastal to transfer $1,000,000 of the Proceeds to an account located at E*Trade Financial ending in 1690, and on June 4, 2015, Debtor caused Coastal to transfer an additional $1,000,000 of the Proceeds to an account located at TD Ameritrade ending in 2869 (the "Brokerage Accounts"). Debtor was the only signatory on the E*Trade account, and Debtor and P. Brower were signatories on the TD Ameritrade account.

69. Beginning in March 2016, Debtor caused wire transfers of the funds from the Brokerage Accounts to Coastal as needed to make the transfers discussed below. Although Debtor returned the majority of the $2,000,000 transferred to the Brokerage Accounts to Coastal, Plaintiff is informed believes that Debtor did so only to further his scheme to defraud creditors of his bankruptcy estate. By and through this Complaint, Plaintiff seeks to hold Debtor (via the Trust) liable for the Proceeds transferred to the Brokerage Accounts.

70. On March 14, 2016, Debtor caused Coastal to use $1,512,753 of the Proceeds to make a tax payment to the Internal Revenue Service. Between May 2017 and July 2020, the United States Treasury issued tax refunds to Coastal in the amount of $730,050.53. On information and belief, Debtor intentionally overpaid Coastal's taxes in an attempt to hide the Proceeds from Debtor's creditors.

71. At the time of these postpetition and fraudulent transfers discussed below, Debtor, as a chapter 11 debtor-in-possession, owed fiduciary duties of care and loyalty to the Estate and its creditors to put the Estate's interests ahead of his own personal interests and desires and to avoid self-dealing and personal gain.

2582374

72.     As outlined herein, Debtor breached these duties by causing the transfers to be made to himself, his related entities, or other insiders of the Debtor without regard to his obligations as a fiduciary of the Estate.

73.     From a review of Coastal's Fremont Bank account ending in 1870 and M&T Bank account ending in 5772, beginning in February 2015 with the first early release of funds, Debtor caused Coastal to transfer the Proceeds to himself, Chateau Julien, the Trust, ACP, GAW, R. Brower, Aurora, Johnson Rovella, Olfield Creely and Pohanka.

74.     After receiving the Proceeds, the Trust, GAW, and ACP further transferred the Proceeds to several of the Defendants, as discussed below, including Debtor, the Trust, R. Brower, Deerleaf, Jaurigue Group and Oldfield Creely.  Plaintiff is informed and believes that the subsequent transfers were made at Debtor's direction to further conceal assets of Debtor's bankruptcy estate.

75.     Attached hereto as **Exhibit 7** is a chart indicating the amount of Proceeds each entity received.

### A. *Transfers of the Proceeds to Debtor or for his Benefit*

76.     On February 6, 2015, Coastal received the first early release of funds in the amount of $100,000.  On February 9, 2015, Debtor caused Coastal to transfer the $100,000 early release of funds to Chateau Julien (the "First Chateau Julien Transfer").

77.     On May 14, 2015, Debtor caused Coastal to transfer an additional $14,364.77 of the Proceeds to Chateau Julien (the "Second Chateau Julien Transfer," and together with the First Chateau Julien Transfer, the "Chateau Julien Transfers").

78.     Plaintiff is informed and believes that there was no legitimate business purpose for the Chateau Julien Transfers as Chateau Julien had ceased business operations in early 2015.

79.     Plaintiff is further informed and believes that Debtor caused Coastal to make the Chateau Julien Transfers so that Debtor could use the funds for his personal benefit.  Thus, by and through this complaint, Plaintiff seeks to hold Debtor (via the Trust) liable for the Chateau Julien Transfers.

80.     In addition to the Chateau Julien Transfers, postpetition, Debtor personally received at least $170,076.35 of the Proceeds (the "Debtor Transfers").  *See* **Exhibit 8** attached hereto.

Case: 15-50801    Doc# 322    Filed: 07/22/21    Entered: 07/22/21 16:31:04    Page 16 of 151

2582374

Debtor is the initial transferee of $167,844.83 of the Proceeds from Coastal, and a subsequent

transferee of at least $2,231.52 of additional Proceeds from Coastal through GAW and the Trust.

Plaintiff is informed and believes that Debtor caused the Debtor Transfers to delay, hinder, and

defraud creditors of his bankruptcy estate, including the Bank.

81.     In 2011 and 2012, Coastal issued three promissory notes to Debtor totaling $115,000

(the "Debtor Notes").  Each of the Debtor Notes included an interest rate of three percent per annum,

and was signed by Debtor.  Plaintiff is informed and believes that a portion of the Debtor Transfers

were made as repayment of these alleged loans.

82.     On February 20, 2019 and February 21, 2019, Debtor testified under oath at a

deposition conducted by the Bank (the "Debtor Deposition"), at which he testified that no other

Coastal director or officer approved the alleged loans prior to the loans being made.  Debtor also

testified that he could not recall whether Coastal actually received funds pursuant to the alleged

loans.  Plaintiff is informed and believes that Debtor fabricated the Debtor Notes to create the

illusion of a legitimate transaction.  However, Plaintiff is informed and believes that Coastal did not

receive any benefit from the Debtor Notes, and that Debtor created the notes to further his scheme to

transfer the Proceeds to himself and his related insider entities.

83.     Additionally, ACP received at least $446,380.72 of the Proceeds from Coastal, GAW

and the Trust (the "ACP Transfers").  *See* **Exhibit 9** attached hereto.  Plaintiff is informed and

believes that Debtor caused the ACP Transfers to be made.  Plaintiff is informed and believes that at

the time of the ACP Transfers, Debtor controlled Coastal and GAW's business operations, including

disposition of their funds.

84.     On April 7, 2017 and November 10, 2017, ACP issued two promissory notes to

Coastal totaling $495,000 (the "ACP Notes").  Both of the ACP Notes included a 2.5% interest rate

per annum and were signed by P. Brower.  At the Debtor Deposition, Debtor testified that he

authorized the ACP Notes, and that he did not consult with any other directors or officers of Coastal

prior to the loans being made.  Debtor further testified that although Coastal disbursed the funds to

ACP, ACP never made any payments to Coastal due under the ACP Notes.

2582374

85.     Plaintiff is informed and believes that Debtor created the ACP Notes to make it appear as though the transfers between Coastal and ACP were made for legitimate business purposes.  However, these transactions were not legitimate.  The ACP Transfers are further examples of Debtor's self-dealing and scheme to transfer the Proceeds to himself and his insider entities to use the funds for his benefit and to the detriment of Debtor's creditors and estate.

86.     Debtor further testified that ACP used the Proceeds it received from Coastal to maintain and repair his and P. Brower's residence in Carmel, California, to pay for P. Brower's medical bills and living expenses, and to pay for legal fees.  By and through this Complaint, Plaintiff seeks to hold Debtor (via the Trust) liable for the ACP Transfers as the transfers were made for his benefit.

87.     Based on a review of ACP's bank account statements in Plaintiff's possession, ACP transferred at least $36,500 of the Proceeds it received from Coastal to Wendel Rosen, LLP.  Wendel Rosen, LLP provided legal services to ACP and P. Brower in connection with the Enhancement Action.

88.     Until the Court entered the Written Consents, Debtor controlled all aspects of ACP's business operations including disposition of its funds.  Plaintiff is informed and believes that there was no legitimate business purpose for Coastal to pay ACP and P. Brower's legal fees and that Coastal did not receive any benefit from these payments.  By and through this complaint, Plaintiff seeks to hold Debtor (via the Trust) liable for the Proceeds transferred to Wendel Rosen, LLP for legal services provided on behalf of and for the benefit of his related entities.

89.     Additionally, postpetition, the Trust received at least $375,126.34 of the Proceeds from Coastal, GAW, and ACP (the "Trust Transfers").  *See* **Exhibit 10** attached hereto.  The Trust is initial transferee of at least $134,800 of the Proceeds from Coastal, and subsequent transferee of at least $240,326.34 of the Proceeds from Coastal through GAW and ACP.  Plaintiff is informed and believes that Debtor caused the Trust Transfers to delay, hinder, and defraud creditors of his bankruptcy estate, including the Bank.

90.     Based on a review of Coastal's credit card statements and bank statements in Plaintiff's possession, Debtor used a significant amount of the Proceeds to fund his extravagant

lifestyle traveling around the world and eating at expensive restaurants, among other things. By and through this Complaint, Plaintiff seeks to hold Debtor (via the Trust) liable for the Proceeds used to pay his personal living expenses, the exact amounts of which according to proof at trial.

**B. Transfers of the Proceeds to R. Brower and His Related Entities or for their Benefit**

91. Postpetition, Coastal transferred $1,634,408.77 of the Proceeds to GAW (the "GAW Transfers"). *See* **Exhibit 11** attached hereto. Plaintiff is informed and believes that at the time of the GAW Transfers, although R. Brower was President of GAW, Debtor controlled all aspects of GAW's business operations.

92. Consistent with Debtor's pattern of creating promissory notes to drum up the appearance of legitimate transactions, on May 29, 2015, Plaintiff is informed and believes that Debtor fabricated a promissory note from GAW to Coastal in the amount of $500,000 with an interest rate of 3% per annum. This note was signed by R. Brower. At the Debtor Deposition, Debtor testified that Coastal made three other alleged loans to GAW in the amounts of $500,000, $200,000 and $50,000, which were memorialized in promissory notes (the "GAW Notes").

93. Debtor further testified that none of the GAW Notes were repaid. Debtor additionally testified that he authorized the alleged loans to GAW, and that none of the other officers or directors of Coastal approved the loans prior to the loans being made. Plaintiff is informed and believes that Coastal did not receive any benefit from the GAW Notes, and that Debtor created the notes to further his scheme to transfer the Proceeds to himself and his related insider entities in order to shield the Proceeds from creditors of Debtor's bankruptcy estate.

94. Postpetition, R. Brower received at least $469,318.04 of the Proceeds (the "R. Brower Transfers"). *See* **Exhibit 12** attached hereto. R. Brower is the initial transferee of $7,766.69 of the Proceeds from Coastal, and subsequent transferee of at least $461,991.22 of the Proceeds from Coastal through ACP, the Trust, and GAW.

95. Deerleaf is a subsequent transferee of $60,315.61 of the Proceeds from Coastal through the Trust and GAW (the "Deerleaf Transfers"). *See* **Exhibit 13** attached hereto. Plaintiff is informed and believes that R. Brower owns and controls Deerleaf.

Case: 15-50801   Doc# 322   Filed: 07/22/21   Entered: 07/22/21 16:31:04   Page 19 of 151

2582374

96.     By and through this complaint, Plaintiff seeks to hold R. Brower jointly and severally liable for the GAW Transfers, the R. Brower Transfers, and the Deerleaf Transfers as these transfers were made for his benefit.

97.     Plaintiff is informed and believes that R. Brower used the Proceeds he received to purchase real property located at 25 Sunderland Lane, Katonah, New York 10536 (the "New York Property"). Plaintiff is informed and believes that R. Brower and his wife reside at the New York Property. By and through this Complaint, Plaintiff seeks the imposition of a constructive trust over the portion of the New York Property that was purchased with the Proceeds, the exact amount of which according to proof at trial.

### C. Coastal's Transfers of the Proceeds to Med-Venture, Aurora, Nobles and Babcock or for their Benefit

98.     Prior to the bankruptcy filing, the Debtor engaged numerous marketing and consulting firms under the auspices of forming a strategy for the eventual sale of his wine business. However, as detailed herein, these firms provided little to no benefit for the Debtor's business (and duplicated each other's efforts), yet reaped thousands of dollars from the postpetition sale transaction.

99.     On January 15, 2011, Debtor, as Chairman and Chief Executive Officer of Coastal and Chateau Julien, executed an agreement with Med-Venture for Med-Venture to provide consulting and advisory services to Coastal and Chateau Julien for a period of two years regarding a potential sale of their respective businesses and/or assets (the "Med-Venture Agreement"). A true and correct copy of the Med-Venture Agreement is attached hereto as **Exhibit 14**, and incorporated herein by this reference. Nobles executed the Med-Venture Agreement on behalf of Med-Venture.

100.     Under the Med-Venture Agreement, Med-Venture was to assist Coastal and Chateau Julien in developing a strategy for the sale of their businesses, identify potential acquirers, and assist in the implementation of the sale strategy.

101.     The Med-Venture Agreement provides that Coastal and Chateau Julien pay Med-Venture a consulting fee in the amount of $1,120,000 at the time of receipt of any funds from any sale occurring at any time during the five year period extending from the date of the agreement,

2582374

whether or not the eventual sale was a result of Med-Venture's services. The Med-Venture Agreement further provides that in the event of a termination of the Med-Venture Agreement, the provisions relating to the payments of fees and expenses would survive any such termination. The Med-Venture Agreement further provides that in the event testimony from, or appearance by, any employee or consultant of Med-Venture is required by Coastal or Chateau Julien before any tribunal in connection with the Med-Venture Agreement, Coastal and Chateau Julien agree to reimburse Med-Venture for all expenses, including reasonable legal expenses, as well as compensation at the rate of $300 per hour for all time expended in preparing for and appearing and/or testifying. The Med-Venture Agreement further provides that upon the request of Med-Venture, Coastal and Chateau Julien will pay a reasonable retainer to Med-Venture's counsel required in connection with the preceding sentence.

102.    Plaintiff is informed and believes that at the time of execution of the Med-Venture Agreement, Nobles was a member of Med-Venture and Babcock was Med-Venture's legal counsel. Plaintiff is informed and believes that around the time of the execution of the Med-Venture Agreement, Nobles and Babcock were engaged in discussions with Debtor to make an investment in Coastal and become shareholders. Shortly thereafter, Coastal issued 50,000 shares to Babcock and 200,000 shares to Nobles.[3]

103.    However, at the Debtor Deposition, Debtor testified that Coastal was not represented by counsel during the negotiations of the Med-Venture Agreement. Debtor further testified that although he generally discussed the Med-Venture Agreement with Lindley and P. Brower prior to entering into the agreement, he did not give them specifics of the arrangement. Debtor also testified that he had no specific recollection of speaking to Lindley prior to entering into the Med-Venture Agreement.

104.    On August 8, 2011, Debtor, as President of Chateau Julien, executed an agreement with Global Wine Partners (U.S.), LLC ("GWP") for GWP to advise and assist Chateau Julien with the sale of its brand and assets (the "GWP Agreement"). A true and correct copy of the GWP

---

[3] As discussed above, in the Summary Judgments and the Enhancement Judgment, the Court found that the issuance of these shares was void for lack of consideration.

Agreement is attached hereto as **Exhibit 15**, and incorporated herein by this reference. Under the GWP Agreement, "GWP, with Aurora Capital Advisors, is Chateau Julien's exclusive advisor on the transaction." Plaintiff is informed and believes that Aurora did not have an agreement with Chateau Julien or Coastal at this time, and in fact, Aurora was not even in existence as Nobles and Babcock formed Aurora in 2014.

105. Although the GWP Agreement was only between Chateau Julien and GWP, the services provided by GWP included marketing of the Wine Estate Property. In connection with the GWP Agreement, GWP created marketing materials titled "Project Zoom," which included marketing of the Wine Estate Property. A true and correct copy of the GWP marketing materials is attached hereto as **Exhibit 16**, and incorporated herein by this reference.

106. From a review of the Med-Venture Agreement and the GWP Agreement, it appears that the services provided by each entity were essentially the same. However, the GWP Agreement provides that GWP would have received a fee in the amount of only 3% of the sale price up to $22,000,000. The GWP Agreement further provided that the agreement was for a 12 month term, and a "tail" period of 12 months after termination for all prospects that GWP worked with during the engagement.

107. At the Debtor Deposition, in response to the question why it was necessary hire GWP in addition to Med-Venture, Debtor testified that he "felt very strongly that there was brand expertise that was necessary." Debtor further testified that Med-Venture did not have that expertise, and that Nobles did not have any experience selling companies in the wine industry.

108. During the term of the GWP Agreement, neither a sale of the Wine Estate Property nor of Chateau Julien occurred.

109. On or around May 15, 2014, Peter Baird, Managing Partner of Mahoney & Associates, a commercial real estate firm, contacted Debtor regarding a buyer, One Lantern, LLC (the "Buyer"), that was interested in purchasing the Wine Estate Property along with certain equipment and other assets related to the ongoing wine estate business operations.

2582374

110.     After being contacted by Mr. Baird, Debtor informed Nobles and Babcock about the Buyer.  Plaintiff is informed and believes that neither Nobles nor Babcock had any prior contacts with Mr. Baird or the Buyer.

111.     Plaintiff is further informed and believes that none of the alleged consulting and advisory services provided by Nobles, Babcock, Med-Venture, and Aurora resulted in Mr. Baird and/or the Buyer reaching out to Debtor regarding a sale of the Wine Estate Property.

112.     After negotiations had already begun for the sale of the Wine Estate Property, on August 8, 2014, Debtor, as Chairman and Chief Executive Officer of Coastal and Chateau Julien, executed an agreement with Aurora for Aurora to provide consulting and advisory services to Coastal and Chateau Julien for a period of two years regarding a potential sale of their respective businesses and/or assets (the "Aurora Agreement").  A true and correct copy of the Aurora Agreement is attached hereto as **Exhibit 17**, and incorporated herein by this reference.  Nobles executed the Aurora Agreement on behalf of Aurora.  The provisions in the Aurora Agreement are essentially the same as the Med-Venture Agreement.  Under the Aurora Agreement, Aurora was to assist Coastal and Chateau Julien in developing a strategy for the sale of their businesses, identify potential acquirers, and assist in the implementation of the sale strategy.

113.     The Aurora Agreement provides that Coastal and Chateau Julien pay Aurora a consulting fee in the amount of 5% of any and all funds or value received by Coastal or Chateau Julien from any sale occurring during the 24 month period extending from the date of termination or expiration of the agreement, whether or not the eventual sale was a result of Aurora's services.  The Aurora Agreement further provides that in the event testimony from, or appearance by, any employee or consultant of Aurora is required by Coastal or Chateau Julien before any tribunal in connection with the Aurora Agreement, Coastal and Chateau Julien agree to reimburse Aurora for all expenses, including reasonable legal expenses, as well as compensation at the rate of $300 per hour for all time expended in preparing for and appearing and/or testifying.  The Aurora Agreement further provides that upon the request of Aurora, Coastal and Chateau Julien will pay a reasonable retainer to Aurora's counsel required in connection with the preceding sentence.

23

2582374

114.    Plaintiff is informed and believes that at the time of execution of the Aurora Agreement, Nobles and Babcock were general partners of Aurora and purported shareholders of Coastal.

115.    At the Debtor Deposition, Debtor testified that Coastal was not represented by counsel during the negotiations of the Aurora Agreement, and that he did not discuss the Aurora Agreement with any of Coastal's purported shareholders, other than Babcock and Nobles, prior to entering into the Aurora Agreement.

116.    As noted above, the sale of the wine business assets to Buyer ultimately closed in April 2015, and Coastal received gross sale proceeds of approximately $12,035,707.24.

117.    According to the Escrow Statement, at the close of escrow, Med-Venture received a payment of $1,120,000 (the "Med-Venture Transfer").  On January 24, 2019, the Bank conducted a deposition of Babcock (the "Babcock Deposition") wherein Babcock testified under oath that he received a portion of the Med-Venture Transfer.  Plaintiff is further informed and believes that Nobles received the remaining portion of the Med-Venture Transfer.

118.    Additionally, after the close of escrow, Debtor caused Coastal to transfer $600,000 to Aurora by check dated December 31, 2015, which is signed by Debtor (the "Aurora Transfer").  On January 26, 2016, Aurora deposited the check into its Chase bank account.  At the Babcock Deposition, Babcock testified that the Aurora Transfer was distributed to himself and Nobles.

119.    On March 20, 2019, the Bank conducted a deposition of Nobles (the "Nobles Deposition") wherein Nobles testified under oath that the proceeds from the Aurora Transfer were distributed to himself and Babcock.

120.    At the Babcock Deposition, Babcock testified under oath that in connection sale of the Wine Estate Property, he provided legal services to Debtor in the form of assisting in negotiations of the transaction and drafting legal documents. Babcock further testified that, in his capacity as a business consultant for Aurora, he provided consulting services in the form of reviewing Chateau Julien and Coastal's financial statements and assisting in preparation of marketing materials to be provided to the Buyer.  However, Babcock was unable to recall if any marketing materials were actually provided to the Buyer.

24

2582374

121.     Plaintiff is informed and believes that Coastal did not receive reasonably equivalent value in exchange for the Med-Venture Transfer and the Aurora Transfer, which total $1,720,000.

122.     By and through this Complaint, Plaintiff seeks to hold Nobles and Babcock, the general partners of Aurora, jointly and severally liable for the Aurora Transfer.  Plaintiff also seeks to hold Nobles and Babcock liable for the Med-Venture Transfer as the transfer was made for their benefit.  Additionally, to the extent that Coastal paid any of Nobles or Babcock's legal services in connection with the Enhancement Action as provided for in the Med-Venture Agreement and Aurora agreement, Plaintiff seeks to hold Nobles and Babcock liable for those transfers as they were made for their benefit, the exact amount of which according to proof at trial.

### D.   *Transfers of the Proceeds to Jaurigue Group*

123.     Jaurigue Group is the subsequent transferee of at least $60,319.96 of the Proceeds from Coastal through the Trust (the "Jaurigue Group Transfers").  *See* **Exhibit 18** attached hereto. Jaurigue Group provided legal services to Debtor in connection with his bankruptcy case and the Enhancement Action.  Plaintiff is informed and believes that the Trust and/or Debtor transferred additional amount of proceeds to Jaurigue Group since February 2018.

124.     Although the Jaurigue Group filed an application to be employed as debtor in possession counsel [Bankr. Doc. 211], such application was never approved by the Court, and Jaurigue Group has not received Court approval for payment of any of its fees, yet was paid over $60,000 in Estate property for its services.  Accordingly, Plaintiff also seeks disgorgement of the fees that Jaurigue Group received under 11 U.S.C. § 330.

125.     Additionally, Plaintiff is informed and believes that the Jaurigue Group did not provide reasonably equivalent value in exchange for the Jaurigue Group Transfers.  Plaintiff is informed and believes that after the pleading stage in the Enhancement Action, the Jaurigue Group abdicated their duties representing Debtor to Johnson Rovella.  Indeed, the Jaurigue Group did not even attend the Debtor Deposition—Johnson Rovella attended the Debtor Deposition and provided legal services to Debtor in connection with defending him during that deposition.

126.    By and through this complaint, Plaintiff also seeks to hold Debtor (via the Trust) liable for the Proceeds transferred to Jaurigue Group as the transfers were made on his behalf and for his benefit—not for the benefit of the bankruptcy estate.

### E.  Transfers of the Proceeds to Johnson Rovella

127.    Postpetition, Coastal transferred to Johnson Rovella $280,288.48 of the Proceeds (the "Johnson Rovella Transfers").  *See* **Exhibit 19** attached hereto.

128.    As Stephen A. Barber testified in the declaration attached to Johnson Rovella's *Motion to Be Relieved as Counsel for Appellants, Robert Brower Sr., Coastal Cypress Corporation, Wilfred "Butch" Lindley, Patricia Brower, and the Patricia Brower Trust* [5:19-cv-08135-EJD, doc. 20], Johnson Rovella provided legal services to Debtor, Coastal, Lindley, P. Brower and the Trust in connection with the Enhancement Action, even though such representation was an actual, unwaivable conflict of interest as between the bankruptcy estate and parties adverse to the bankruptcy estate.

129.    Stephen A. Barber further testified that Coastal paid for the legal services provided on behalf of Debtor, Lindley, P. Brower and the Trust.  Plaintiff is informed and believes that Coastal received no benefit from the payment of legal services on behalf of Debtor, Lindley, P. Brower and the Trust.

130.    Coastal also paid Johnson Rovella to provide legal services to Debtor in connection with the State Court Action.  During the course of Debtor's bankruptcy case, the Bank obtained relief from stay to proceed with the State Court Action to liquidate its guaranty claim against Debtor [Bk. Doc. No. 166].  Ultimately, the state court granted the Bank's motion for summary judgment against Debtor under the doctrine of *res judicata* based on the Court's Memorandum Decision in the Nondischargeability Action and the Nondischargeability Judgment, and entered a second amended State Court Judgment against Chateau Julien, GAW, and Debtor.  After filing a meritless appeal, Johnson Rovella recently withdrew from that representation as well because once the Liquidating Trustee became sole director of Coastal, he stopped paying for Johnson Rovella's services.  Plaintiff is informed and believes that Coastal, *i.e.*, the Estate, did not receive any benefit from making these payments on Debtor's behalf.

Case: 15-50801    Doc# 322    Filed: 07/22/21    Entered: 07/22/21 16:31:04    Page 26 of 151

131.     Additionally, Coastal paid Johnson Rovella to provide legal services to Coastal in connection with a frivolous lawsuit against the Bank, which was filed by Coastal in 2017 in the Superior Court of the State of California, County of Monterey (the "Coastal Action"). Plaintiff is informed and believes that the Coastal Action was nothing more than Debtor trying to manufacture leverage for his own benefit, and it did not benefit Coastal in anyway. After successive demurrers filed by the Bank, the state court ultimately dismissed the Coastal Action without leave to amend. Johnson Rovella filed two appeals of that order, even though the Coastal Action is meritless and of absolutely no benefit to Coastal. Plaintiff is informed and believes that in connection with receiving payment for its services in the Coastal Action, Johnson Rovella did not have a good faith belief that it was actually serving Coastal's interests, as they knew the Coastal Action only benefitted Debtor.

132.     Johnson Rovella never filed an application to be employed as Debtor's special litigation counsel in his bankruptcy case for any of these lawsuits, and Johnson Rovella has not received Court approval for payment of any of its fees. Accordingly, Johnson Rovella may not retain Estate proceeds. As such, Plaintiff also seeks disgorgement of the fees that Johnson Rovella received under 11 U.S.C. § 330.

133.     By and through this Complaint, Plaintiff also seeks to hold Debtor (via the Trust), Lindley, and the Trust liable for the Proceeds transferred to Johnson Rovella for legal services provided on their behalf and for their benefit, amounts to be proven at trial.

### F. Transfers of Proceeds to Oldfield Creely

134.     Postpetition, Oldfield Creely received at least $200,357.59 from Coastal and the Trust (the "Oldfield Creely Transfers"). *See* **Exhibit 20** attached hereto. Oldfield Creely is an initial transferee of $187,737.64 of the Proceeds from Coastal, and subsequent transferee of at least $15,338.80 in additional Proceeds from Coastal through the Trust.

135.     Plaintiff is informed and believes that Oldfield Creely represented Chateau Julien in connection with the State Court Action. Plaintiff is informed and believes that Coastal did not receive any benefit from its payment of legal fees on behalf of Chateau Julien.

136.     Oldfield Creely never filed an application to be employed as Debtor's special litigation counsel in his bankruptcy case, and Oldfield Creely has not received Court approval for

2582374

payment of any of its fees, yet was paid over $200,000 in Estate property for its services. Accordingly, Plaintiff also seeks disgorgement of the fees that Oldfield Creely received under 11 U.S.C. § 330.

137.    By and through this Complaint, Plaintiff also seeks to hold Debtor (via the Trust) liable for the Oldfield Creely Transfers as the transfers were made for his benefit.

### G. Transfers of Proceeds to Coastal Services

138.    Postpetition, Coastal Services received $7,214 of the Proceeds from Coastal (the "Coastal Services Transfers").  *See* **Exhibit 21** attached hereto.  Plaintiff is informed and believes that Lindley is the managing member and registered agent for Coastal Services.

139.    Plaintiff is informed and believes that there was no legitimate business purpose for Coastal to make the Coastal Services Transfers as Coastal had ceased business operations in early 2015, and that Coastal did not receive any benefit from the transfers.

140.    By and through this Complaint, Plaintiff also seeks to hold Lindley jointly and severally liable for the Coastal Services Transfers, the total and exact amount according to proof at trial, as Plaintiff is informed and believes that the transfers were made on behalf of Lindley and for his benefit.

### H. Transfers of the Proceeds to Pohanka

141.    Postpetition, Pohanka received $62,791 of the Proceeds from Coastal (the "Pohanka Transfers").  *See* **Exhibit 22** attached hereto.  Plaintiff is informed and believes that there was no legitimate business purpose for Coastal to make the Pohanka Transfers as Coastal had ceased business operations in early 2015, and that Coastal did not receive any benefit from the transfers.

### FIRST CLAIM FOR RELIEF

### AVOIDANCE OF POST-PETITION TRANSFERS
### 11 U.S.C. § 549
### [Against All Defendants]

142.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

143.    The Second Chateau Julien Transfer, the Debtor Transfers, the ACP Transfers, the Trust Transfers, the GAW Transfers, the R. Brower Transfers, the Deerleaf Transfers, the Med-

28

2582374

Venture Transfers, the Aurora Transfer, the Jaurigue Group Transfers, the Johnson Rovella

Transfers, the Oldfield Creely Transfers, the Coastal Services Transfers and the Pohanka Transfers

identified on **Exhibit 7 through 13 and 18 through 22**, were made postpetition. None of these

transfers were authorized by the Liquidating Trustee of the Bankruptcy Court.

144.   As determined by the Court in the Summary Judgments and the Enhancement

Judgment, Debtor at all relevant times owned 100% of Coastal. Accordingly, pursuant to Pursuant

to 11 U.S.C. § 541(a)(6), the proceeds, product, offspring, rents, or profits of or from the estate's

interest in Coastal, *i.e.*, the Proceeds, have been at all relevant times assets of Debtor's bankruptcy

estate. Further, and pursuant to 11 U.S.C. § 541(a)(7), the 100% interest in Coastal and ACP

constituted an "interest in property that the estate acquires after the commencement of the case."

145.   Accordingly, the Liquidating Trustee may avoid and recover these transfers, and each

of them, from Defendants, pursuant to 11 U.S.C. § 549.

### SECOND CLAIM FOR RELIEF

**AVOIDANCE OF ACTUAL FRAUDULENT TRANSFERS**
**Cal. Civil Code §§ 3439.04(a)(1), 3439.07, 3439.08**
**[Against All Defendants]**

146.   Plaintiff repeats and realleges each of the allegations set forth above as if fully set

forth herein.

147.   On information and belief, the Debtor made the Chateau Julien Transfers, the Debtor

Transfers, the ACP Transfers, Trust Transfers, the GAW Transfers, the R. Brower Transfers, the

Deerleaf Transfers, the Med-Venture Transfer, the Aurora Transfer, the Jaurigue Group  Transfers,

the Johnson Rovella Transfers, the Oldfield Creely Transfers, the Coastal Services Transfers and the

Pohanka Transfers identified on **Exhibit 7 through 13 and 18 through 22** (collectively, the

"Transfers"), and each of them, with the actual intent to hinder, delay, or defraud creditors of the

Debtor.

148.   Accordingly, the Transfers are avoidable, and should be avoided pursuant to Cal.

Civil Code §§ 3439.04(a)(1) and 3439.07, and to the extent the Proceeds were used to the purchase

the New York Property, imposition of a constructive trust as to the percentage used in relation to the

purchase price.

Case: 15-50801    Doc# 322    Filed: 07/22/21    Entered: 07/22/21 16:31:04    Page 29 of
151

2582374

1    149.    To the extent any of the Transfers are subsequent transfers, Plaintiff seeks recovery

2    from these defendants as subsequent transferees, or initial transferees, according to proof at trial.

3    Cal. Civ. Code § 3439.08.

4                            **THIRD CLAIM FOR RELIEF**

5              **AVOIDANCE OF CONSTRUCTIVE FRAUDULENT TRANSFERS**
                   **Cal. Civ. Code §§ 3439.04(a)(2), 3439.07, 3439.08**
6                          **[Against All Defendants]**

7    150.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set

8    forth herein.

9    151.    On information and belief, Debtor made the Transfers without Debtor having

10   received reasonably equivalent value in exchange for such transfers, and Debtor (a) was insolvent on

11   the date that such transfer was made or such obligation was incurred, or became insolvent as a result

12   of such transfer or obligation; (b) was engaged in business or a transaction, or was about to engage

13   in business or a transaction, for which any property remaining with the debtor was an unreasonably

14   small capital; (c) intended to incur, or believed that the debtor would incur, debts that would be

15   beyond the debtor's ability to pay as such debts matured; or (d) made such transfer to or for the

16   benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an

17   employment contract and not in the ordinary course of business.

18   152.    Accordingly, the Transfers are avoidable, and should be avoided pursuant to Cal.

19   Civil Code §§3439.04(a)(2) and 3439.07, and to the extent the Proceeds were used to the purchase

20   the New York Property, imposition of a constructive trust as to the percentage used in relation to the

21   purchase price.

22   153.    To the extent any of the Transfers are subsequent transfers, Plaintiff seeks recovery

23   from these defendants as subsequent transferees, or initial transferees, according to proof at trial.

24   Cal. Civ. Code § 3439.08.

25   / /

26

27   / / /

28

2582374

## FOURTH CLAIM FOR RELIEF

### RECOVERY OF TRANSFERS FOR THE BENEFIT OF THE ESTATE
### 11 U.S.C. §§ 550 AND 551
### [Against All Defendants]

154. Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

155. Debtor, the Trust, GAW, R. Brower, Med-Venture, Aurora, Babcock, Nobles, Oldfield Creely, Johnson Rovella, Coastal Services and Pohanka were the initial transferees of the avoidable transfers described herein.

156. Debtor, the Trust, R. Brower, Deerleaf, Lindley, Jaurigue Group, and Oldfield Creely were the subsequent transferees of the avoidable transfers described herein.

157. Pursuant to 11 U.S.C. §§ 550 and 551, Plaintiff is entitled to recover and preserve for the Transfers for the benefit of Debtor's bankruptcy estate.

## FIFTH CLAIM FOR RELIEF

### TURNOVER OF ESTATE PROPERTY
### 11 U.S.C. § 542
### [Against All Defendants]

158. Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

159. The Proceeds are property of Debtor's bankruptcy estate, but Defendants retain control over the Proceeds. Since the Petition Date, Defendants and Debtor have been in possession, custody and control of the Proceeds.

160. Accordingly, Plaintiff seeks turnover of the Proceeds, pursuant to 11 U.S.C. § 542, to the Liquidating Trustee to be administered as assets of the Estate.

## SIXTH CLAIM FOR RELIEF

### ACCOUNTING OF PROPERTY OF THE ESTATE
### 11 U.S.C. § 542
### [Against All Defendants]

161. Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

Case: 15-50801    Doc# 322    Filed: 07/22/21    Entered: 07/22/21 16:31:04    Page 31 of 151

2582374

162.    Plaintiff is informed and believes and based thereon alleges that each of the Defendants have received transfers of assets of Debtor and are thus in possession of property of this Estate.

163.    Accordingly, the Defendants, and each of them, are required to account for such property as follows:

a.  The Liquidating Trustee is entitled to an accounting for all transfers of the Proceeds to Debtor, including the exact identification of amounts transferred to Debtor, whether the Trust still has possession, custody or control of any of the Proceeds, and whether any of the Proceeds were transferred or otherwise alienated by Debtor.

b.  The Liquidating Trustee is entitled to an accounting for all transfers of the Proceeds to the Trust, including the exact identification of amounts transferred to the Trust, whether the Trust still has possession, custody or control of any of the Proceeds, and whether any of the Proceeds were transferred or otherwise alienated by the Trust.

c.  The Liquidating Trustee is entitled to an accounting for all transfers of the Proceeds to R. Brower, including the exact identification of amounts transferred to R. Brower, whether R. Brower still has possession, custody or control of any of the Proceeds, and whether any of the Proceeds were transferred or otherwise alienated by R. Brower.

d.  The Liquidating Trustee is entitled to an accounting for all transfers of the Proceeds to GAW, including the exact identification of amounts transferred to GAW, whether GAW still has possession, custody or control of any of the Proceeds, and whether any of the Proceeds were transferred or otherwise alienated by GAW.

e.  The Liquidating Trustee is entitled to an accounting for all transfers of the Proceeds to Deerleaf, including the exact identification of amounts transferred to Deerleaf, whether Deerleaf still has possession, custody or control of any of the Proceeds, and whether any of the Proceeds were transferred or otherwise alienated by Deerleaf.

f.  The Liquidating Trustee is entitled to an accounting for all transfers of the Proceeds to Med-Venture, including the exact identification of amounts transferred to Med-Venture, whether Med-Venture still has possession, custody or control of any of the

2582374

Proceeds, and whether any of the Proceeds were transferred or otherwise alienated by Med-Venture.

g.  The Liquidating Trustee is entitled to an accounting for all transfers of the Proceeds to Aurora, including the exact identification of amounts transferred to Aurora, whether Aurora still has possession, custody or control of any of the Proceeds, and whether any of the Proceeds were transferred or otherwise alienated by Aurora.

h.  The Liquidating Trustee is entitled to an accounting for all transfers of the Proceeds to Babcock, including the exact identification of amounts transferred to Babcock, whether Babcock still has possession, custody or control of any of the Proceeds, and whether any of the Proceeds were transferred or otherwise alienated by Babcock.

i.  The Liquidating Trustee is entitled to an accounting for all transfers of the Proceeds to Nobles, including the exact identification of amounts transferred to Nobles, whether Nobles still has possession, custody or control of any of the Proceeds, and whether any of the Proceeds were transferred or otherwise alienated by Nobles.

j.  The Liquidating Trustee is entitled to an accounting for all transfers of the Proceeds to Jaurigue Group, including the exact identification of amounts transferred to Jaurigue Group, whether Jaurigue Group still has possession, custody or control of any of the Proceeds, and whether any of the Proceeds were transferred or otherwise alienated by Jaurigue Group.

k.  The Liquidating Trustee is entitled to an accounting for all transfers of the Proceeds to Johnson Rovella, including the exact identification of amounts transferred to Johnson Rovella, whether Johnson Rovella still has possession, custody or control of any of the Proceeds, and whether any of the Proceeds were transferred or otherwise alienated by Johnson Rovella.

l.  The Liquidating Trustee is entitled to an accounting for all transfers of the Proceeds to Oldfield Creely, including the exact identification of amounts transferred to Oldfield Creely, whether Oldfield Creely still has possession, custody or control of

Case: 15-50801   Doc# 322   Filed: 07/22/21   Entered: 07/22/21 16:31:04   Page 33 of 151

2582374

any of the Proceeds, and whether any of the Proceeds were transferred or otherwise alienated by Oldfield Creely.

m. The Liquidating Trustee is entitled to an accounting for all transfers of the Proceeds to Lindley, including the exact identification of amounts transferred to Lindley, whether Lindley still has possession, custody or control of any of the Proceeds, and whether any of the Proceeds were transferred or otherwise alienated by Lindley.

n. The Liquidating Trustee is entitled to an accounting for all transfers of the Proceeds to Coastal Services, including the exact identification of amounts transferred to Coastal Services, whether Coastal Services still has possession, custody or control of any of the Proceeds, and whether any of the Proceeds were transferred or otherwise alienated by Coastal Services.

o. Finally, the Liquidating Trustee is entitled to an accounting for all transfers of the Proceeds to Pohanka, including the exact identification of amounts transferred to Pohanka, whether Pohanka still has possession, custody or control of any of the Proceeds, and whether any of the Proceeds were transferred or otherwise alienated by Pohanka.

## SEVENTH CLAIM FOR RELIEF

### BREACH OF FIDUCIARY DUTY
**[Against the Trust]**

164. Plaintiff realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

165. Prior to the Written Consents being executed, Debtor adversely dominated Coastal's operations as Debtor operated, managed and controlled all Coastal's operations. Prior to the Written Consents, Debtor was the individual who had knowledge of the fraudulent scheme he was perpetrating on Debtor's creditors and creditors of Coastal. It wasn't until the execution of the Written Consents that Plaintiff could have discovered Debtor's scheme to defraud creditors of the Estate.

2582374

166.     As a Chapter 11 debtor in possession, Debtor owed fiduciary duties of care and loyalty to Estate and its creditors, and owed a duty not to engage in self-dealing conduct that could harm the Estate, and a duty of loyalty to avoid placing his own interest ahead of those of the Estate.

167.     Additionally, as officer and director of Coastal, Debtor owed fiduciary duties of loyalty, care, and good faith to act in the best interests of the corporation rather than Debtor's own self-interest.

168.     The fiduciary duty of loyalty and good faith required that Debtor put the Estate and Coastal's interests above his own personal interests and desires and to avoid self-dealing, personal gain, or a cognizable conflict of interest.  The duties of loyalty and good faith further required that Debtor refrain from intentionally acting with a purpose other than that of advancing the best interests of the Estate and Coastal and from intentionally failing to act in the face of a known duty to act, thereby consciously disregarding his responsibilities.

169.     The duties of loyalty and good faith further required that Debtor exercise a level of diligence when approving Coastal's business transactions such that he did not act grossly negligent or consciously disregard practical reality.

170.     Debtor breached his fiduciary duties of loyalty, care, and good faith in the following ways:

    a.  Failing to conduct due diligence for important contracts, including the Med-Venture Agreement and the Aurora Agreement;

    b.  Failing to ensure that Coastal's officers (including himself) were not exceeding their authority;

    c.  Deciding to lend funds to ACP and GAW without conducting sufficient due diligence into the *bona fides* of those companies;

    d.  Causing the Transfers to be made without Court approval or approval by the Liquidating Trustee in violation of 11 U.S.C. § 549; and

    e.  Causing the Transfers to be made for benefit of the Debtor, his related entities and his insiders to the detriment of creditors of the Estate and Coastal.

171.    Despite the duty of care that Debtor owed the Estate and Coastal, Debtor breached these duties, as outlined *supra*.

172.    These failures were of such a basic nature that they are not excused by any legal doctrine, including but not limited to the business judgment rule.

173.    In all, Coastal received or should have received approximately $7,000,000 from the sale of the Wine Estate Property.  However, all of these proceeds have been dissipated and transferred out of the Estate.

174.    As a direct and proximate result of Debtor's breaches of the fiduciary duty of care and loyalty, Coastal, which held the most valuable asset of the Estate, is now an empty shell.  This caused damages to the Estate by diverting, dissipating and unduly risking Coastal's assets that may otherwise have been available for creditors.

175.    These breaches of the fiduciary duty of care and loyalty were the underlying, direct, and proximate cause of damage caused to the Estate, in an amount according to proof at trial, but presently estimated to be in excess of $7,000,000.

## EIGHTH CLAIM FOR RELIEF

### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### [Against Johnson Rovella]

176.    Plaintiff realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

177.    Johnson Rovella is sued under this claim in their capacity as Debtor's legal counsel.

178.    To the extent they did not owe direct duties of care and loyalty to the Estate, Johnson Rovella provided material assistance and aided Debtor in breaching his fiduciary duties by, among other things:

    a.    Failing to file an application to be employed as Debtor's special litigation counsel;

    b.    Receiving payment of its fees without Court approval;

    c.    Failing to disclose to the Court the terms of its representation of Debtor, Coastal, Lindley, P. Brower and the Trust in connection with the Enhancement Action;

Case: 15-50801    Doc# 322    Filed: 07/22/21    Entered: 07/22/21 16:31:04    Page 36 of 151

d.  Representing Debtor, Coastal, Lindley, P. Brower and the Trust even though such representation was a conflict of interest; and

e.  On information and belief, knowingly and intentionally helped, participated in, and provided substantial assistance to Debtor in breaching his fiduciary duties to the Estate by receiving payments for legal services provided on behalf of Debtor, Lindley, P. Brower and the Trust notwithstanding that the services provided to those defendants did not benefit the Estate or Coastal.

179.  As a direct and proximate result of Johnson Rovella's aiding and abetting Debtor, the Estate and its creditors individually and en masse, have been harmed in an amount to be proved a trial, but presently estimated to be in excess of $7,000,000.

## NINTH CLAIM FOR RELIEF

### DISGORGEMENT
### 11 U.S.C. § 330
### [Against Jaurigue Group, Johnson Rovella and Oldfield Creely]

180.  Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

181.  Although the Jaurigue Group filed an application to be employed as debtor in possession counsel [Bankr. Doc. 211], such application was never approved by the Court, and Jaurigue Group has not received Court approval for payment of any of its fees, yet was paid over $60,000 in Estate property for its services.

182.  Johnson Rovella provided legal services to Debtor, Coastal, Lindley, P. Brower and the Trust in connection with the Enhancement Action, even though such representation was an actual, unwaivable conflict of interest as between the bankruptcy estate and parties adverse to the bankruptcy estate.

183.  Johnson Rovella never filed an application to be employed as Debtor's special litigation counsel in his bankruptcy case, and Johnson Rovella has not received Court approval for payment of any of its fees yet was paid over $280,000 in Estate property for its services.

37

2582374

184.    Oldfield Creely never filed an application to be employed as Debtor's special litigation counsel in his bankruptcy case, and Oldfield Creely has not received Court approval for payment of any of its fees, yet was paid over $200,000 in Estate property for its services.

185.    Accordingly, Plaintiff seeks disgorgement of the fees that Jaurigue Group, Johnson Rovella and Oldfield Creely received under 11 U.S.C. § 330.

## TENTH CLAIM FOR RELIEF

### CONVERSION
### [Against All Defendants]

186.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

187.    The Proceeds have at all relevant times been assets of the Estate.

188.    Postpetition, Defendants converted the Proceeds they received identified on **Exhibit 7 through 13 and 18 through 22** to their own use and benefit.

189.    Accordingly, Plaintiff seeks damages from each Defendant based on the amount of Proceeds each Defendant converted to its own use and benefit, exact amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment in its favor and against Defendants as follows:

A.      On the First Claim for Relief (Avoidance of Postpetition Transfers)

> i.    Avoidance of the Second Chateau Julien Transfer, the Debtor Transfers, the ACP Transfers, the Trust Transfers, the GAW Transfers, the R. Brower Transfers, the Deerleaf Transfers, the Med-Venture Transfers, the Aurora Transfers, the Jaurigue Group Transfers, the Johnson Rovella Transfers, the Oldfield Creely Transfers, the Coastal Services Transfers and the Pohanka Transfers identified on **Exhibit 7 through 13 and 18 through 22**, and any subsequent transfers, the exact amounts according to proof at trial.

B.      On the Second and Third Claims for Relief (Avoidance of Actual and Constructive Fraudulent Transfers)

Case: 15-50801    Doc# 322    Filed: 07/22/21    Entered: 07/22/21 16:31:04    Page 38 of 151

2582374

i. Avoidance of the Chateau Julien Transfers, the Debtor Transfers, the ACP Transfers, the Trust Transfers, the GAW Transfers, the R. Brower Transfers, the Deerleaf Transfers, the Med-Venture Transfers, the Aurora Transfers, the Jaurigue Group Transfers, the Johnson Rovella Transfers, the Oldfield Creely Transfers, the Coastal Services Transfers and the Pohanka Transfers identified on **Exhibit 7 through 13 and 18 through 22**, and any subsequent transfers, the exact amounts according to proof at trial.

C. On the Fourth Claim for Relief (Recovery of Avoided Transfers)

    i. Recovery of the avoided Transfers, including the Chateau Julien Transfers, the Debtor Transfers, the ACP Transfers, the Trust Transfers, the GAW Transfers, the R. Brower Transfers, the Deerleaf Transfers, the Med-Venture Transfers, the Aurora Transfers, the Jaurigue Group Transfers, the Johnson Rovella Transfers, the Oldfield Creely Transfers, the Coastal Services Transfers and the Pohanka Transfers identified on **Exhibit 7 through 13 and 18 through 22**; and

    ii. A constructive trust over the portion of the New York Property that was purchased with the Proceeds.

D. On the Fifth Claim for Relief (Turnover)

    i. Turnover of the amount of the Proceeds each Defendant received.

E. On the Sixth Claim for Relief (Accounting)

    i. An order requiring the Defendants to provide detailed records of their receipt of the Proceeds and account for such property of the Estate.

F. On the Seventh Claim for Relief (Breach of Fiduciary Duty):

    i. For compensatory damages from Debtor's probate estate, the exact amount of which to be proved at trial and presently alleged to be no less than $7,000,000.

G. On the Eighth Claim for Relief (Aiding and Abetting Breach of Fiduciary Duty):

    i. For compensatory damages from Johnson Rovella, the exact amount of which to be proved at trial and presently alleged to be no less than $7,000,000.

Case: 15-50801   Doc# 322   Filed: 07/22/21   Entered: 07/22/21 16:31:04   Page 39 of 151

2582374

1    H.    On the Ninth Claim for Relief (Disgorgement)

2          i.   Disgorgement of the fees that Jaurigue Group, Johnson Rovella and Oldfield

3               Creely received without Court approval.

4    I.    On the Tenth Claim for Relief (Conversion)

5          i.   For compensatory damages from each Defendant equal to the amount of the

6               Proceeds each Defendant converted for their own use and benefit presently

7               alleged to be the amount identified on **Exhibit 7 through 13 and 18 through**

8               **22**, exact amount of which to be proved at trial.

9    J.    As to All Claims for Relief:

10         i.   Pre-judgment interest and post-judgment interest;

11         ii.  Punitive and exemplary damages for all claims for which such damages may

12              be awarded under applicable law;

13         iii. Reasonable attorneys' fees and costs permitted under applicable law; and

14         iv.  Such other and further relief as is just and proper.

15   DATED:  July 21, 2021                      BRUTZKUS GUBNER

16

17                                        By: _/s/ Jessica S. Wellington_____

18                                            Steven T. Gubner
                                             Jason B. Komorsky
19                                           Jessica L. Bagdanov
                                             Jessica S. Wellington
20                                       Attorneys for Michael G. Kasolas, Liquidating Trustee
                                         For the Robert Brower, Sr. Liquidating Trust
21

22

23

24

25

26

27

28

40

2582374

**Entered on Docket**
**November 20, 2019**
EDWARD J. EMMONS, CLERK
U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA



The following constitutes the order of the Court.
Signed: November 20, 2019

_M. Elaine Hammond_

**M. Elaine Hammond**
**U.S. Bankruptcy Judge**

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | ) Case No. 15-50801 MEH |
| | ) |
| Robert S. Brower, Sr., | ) Chapter 11 |
| | ) |
| | ) |
| Debtor. | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) Adv. No. 17-5044 |
| | ) |
| MUFG Union Bank, N.A., | ) |
| | ) |
| Plaintiff. | ) |
| | ) |
| v. | ) |
| | ) |
| Robert Brower, Sr., Coastal Cypress | ) **MEMORANDUM DECISION ON** |
| Corporation, *a California corporation*, | ) **MOTIONS FOR SUMMARY JUDGMENT** |
| | ) |
| Wilfred "Butch" Lindley, Patricia | ) |
| Brower, American Commercial | ) Date: 09/09/19 |
| Properties, Inc., Anthony Nobles, | ) Time: 2:00 p.m. |
| | ) Ctrm: 11 |
| Richard Babcock, Patricia Brower | ) |
| Trust, and Coastal Cypress | ) |
| Corporation, *a Delaware corporation*, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

# EXHIBIT 1

Case: 15-50801   Doc# 323   Filed: 07/22/20   Entered: 07/22/20 16:34:08   Page 41 of
Case: 15-50801   Doc# 323   Filed: 07/22/20   Entered: 07/22/20 16:40:05   Page 41 of
151

41

MUFG Union Bank, N.A. ("Plaintiff") and Robert Brower, Sr., Patricia Brower, Coastal Cypress Corporation, a California corporation, Coastal Cypress Corporation, a Delaware corporation, American Commercial Properties, Inc., Anthony Nobles, Wilfred "Butch" Lindley, Richard Babcock, and Patricia Brower Trust (collectively, "Defendants") brought cross-motions for summary judgment (Dkt. #108, #113). The matters were heard September 9, 2019. Ori Katz and Isaiah Weedn appeared on behalf of Plaintiff. Cathleen Giovannini and Michael Vacchio appeared on behalf of Defendants. Following the hearing, the matter was taken under submission. As explained below, the parties' motions for summary judgment are denied in part and granted in part.

This court has jurisdiction pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O). Venue is proper pursuant to 28 U.S.C. § 1408. This decision constitutes the court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

**Background**

Robert Brower ("Brower") and Patricia Brower ("Patty") married in 1980. Brower founded Coastal Cypress Corporation ("Coastal") as a California corporation in 1982. Coastal initially issued 105,000 shares of stock that year: 80,000 shares to Brower and 25,000 shares to Patty. In 1984, Patty received an additional 125,000 shares of Coastal stock. The 125,000 shares were subsequently placed in Patty's trust ("Patty Trust") after its creation in 2015.

Until 2015, Coastal owned the real property at 8890 and 8940 Carmel Valley Road in Carmel, California (the "Wine Estate"), a roughly 16-acre estate that included a wine tasting room, wine production facility, barrel aging room, offices, outdoor event venues, and vineyards. Brower oversaw the Wine Estate for decades as President of Chateau Julien, Inc. ("CJ"), Great American Wineries, Inc., and Coastal.

In 1987, Coastal issued 335,000 shares to Chualar Canyon Ranch Supply, a company owned by Wilfred "Butch" Lindley. Lindley provided goods and services in exchange for the

shares.  In 2011, Coastal further issued 50,000 shares to Richard Babcock and 200,000 shares to Anthony Nobles, who paid a combined $250,000 for the shares.

Brower formed American Commercial Properties, Inc. ("ACP") in 1983.  Brower asserts that on November 8, 2000, he gifted all of the ACP stock to Patty.  Patty later transferred ownership of the ACP shares into the Patty Trust.

In 2017, two years after Brower filed for bankruptcy, Coastal executed a merger ("Coastal Merger") and transformed from a California corporation to a Delaware corporation. Defendants exchanged their shares in the California corporation for new shares in the Delaware corporation.

## Legal Standard

Through the motions for summary judgment, Plaintiff seeks to establish that Coastal and ACP are solely the property of Brower's bankruptcy estate.  Defendants seek to establish that Lindley, Babcock, and Nobles own collectively 63% of Coastal, and that Patty and the Patty Trust own 13% of Coastal and 100% of ACP.

Federal Rule of Civil Procedure 56, made applicable through Federal Rule of Bankruptcy Procedure 7056, states that summary judgment shall be granted if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  A fact is material if it might affect the outcome of a proceeding under the governing substantive law.  In a motion for summary judgment, the moving party bears the initial burden of persuasion in demonstrating that no issues of material fact exist. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).  A genuine issue of material fact exists when the trier of fact could reasonably find for the non-moving party.  *Id.* at 248.  The court may consider pleadings, depositions, answers to interrogatories and any affidavits. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  In determining whether the movant has met its burden, the court should consider all reasonable inferences in a light most favorable to the non-movant.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

<u>**Analysis**</u>

### A. Lindley, Babcock, and Nobles' Coastal Shares

Plaintiff argues that Lindley, Babcock, and Nobles did not provide consideration for their Coastal shares, and as a result, their interests in Coastal should be deemed void. Defendants assert Coastal received consideration in exchange for issuance of the stock. Specifically, Defendants assert they provided consideration for their shares in Coastal, the California corporation and these interests were subsequent consideration for Coastal, the Delaware corporation. Here, the court analyzes the issuance of Coastal stock prior to the Coastal Merger.

Pursuant to California Corporations Code § 409(a), a corporation may issue shares for consideration in the form of:

- money paid,

- labor done,

- services actually rendered to the corporation or for its benefit or in its formation or reorganization,

- debts or securities canceled, and

- tangible or intangible property actually received either by the issuing corporation or by a wholly owned subsidiary.

Neither promissory notes of the purchaser (unless otherwise permitted) nor future services may be consideration for shares. Cal. Corp. Code § 409(a). The consideration is determined by the board of directors, or by the shareholders if the articles so provide. Cal. Corp. Code § 409(e). If the consideration is anything other than money for which the shares are issued, the board of directors must state by resolution its determination of the consideration's fair value to the corporation in monetary terms. Cal. Corp. Code § 409(e). Shares issued by a corporation without having received consideration in return are void. *See Cortelyou v. Imperial Land Co.*, 156 Cal. 373, 376 (1909).

The undisputed facts are that (1) Lindley provided services for his shares, and (2) Babcock and Nobles paid a combined $250,000 for their shares, of which $240,000 was paid

directly into Robert and Patty Brower's joint bank account and $10,000 was paid directly to CJ. The parties dispute the flow of funds after these initial payments. The issue for the court is whether these transactions satisfy the statutory requirement for issuance of stock.

Lindley Shares

Lindley asserts that he provided goods and services for the benefit of Coastal in the 1980's as consideration for his shares. Specifically, Lindley contends that: (1) he provided grape crops to be used in the production of wine; (2) he assisted Coastal and CJ in CJ's efforts to lease land, grow grapes and produce wine; (3) through his network in the wine industry he helped obtain and install necessary equipment; and (4) due to his reputation in the wine industry, he lent credibility to Coastal and CJ.

As an initial matter, the issuance of shares to Lindley did not satisfy the requirements of Cal. Corp. Code § 409(e). Coastal's board was required to determine the fair value of Lindley's non-monetary consideration and state its determination by board resolution. Lindley provided no evidence that this occurred.

Additionally, Lindley's position is inconsistent with the business operations. It is undisputed that Coastal owned the land upon which the Wine Estate was located. Great American Wineries, Inc. made the wine and CJ sold the wine on Coastal's property. Coastal neither sold nor produced wine. As such, it had no need for wine-making equipment. Even supposing that Coastal owned wine-making equipment, the benefit derived from mere ownership of such equipment was tangential at best.

On the evidence presented, the court finds that the services provided by Lindley did not provide consideration to or for the benefit of Coastal.

Nobles Shares

In January 2011, Nobles paid $200,000 into the Browers' joint account. Nobles maintains that his $200,000 payment to Brower was consideration for the Coastal shares because $50,000 was promptly deposited into Coastal's bank account, and the remaining $150,000 was loaned from Coastal to CJ. The loan was booked on Coastal's general ledger as an account receivable, and in 2015, Coastal received a tax break when this account receivable

was written off as "bad debt." Plaintiff opposes the designation of the $150,000 payment as a Coastal loan, because the money flowed to CJ from the Browers' account.

There is no support for the argument that the $200,000 paid to Brower was "money paid" to Coastal. Nobles asserts that the $150,000 loan is on Coastal's books as "paid in capital," but this is not evidence of "money paid" where the facts establish that the funds never reached Coastal. Cal. Corp. Code § 409(a) recognizes money paid to the issuing corporation or a wholly owned subsidiary. CJ is not a subsidiary. Further, a tax write-off does not fit within any category of consideration authorized by § 409(a). The tax write-off did not occur until four years after the stock was issued. It is therefore equivalent to a promissory note or future service—both of which are expressly prohibited as consideration. The undisputed facts establish that the funds supposedly "loaned" to CJ and later applied as a tax write-off do not satisfy § 409(a)'s requirements.

Nobles asserts for the first time in the Opposition to Plaintiff's motion for summary judgment that $50,000 of the $200,000 wired on January 31, 2011 was subsequently transferred to Coastal. Support for this assertion is provided in the Supplemental Declaration of Robert Brower (#116-1, ¶17). Brower states therein that $50,000 of the funds received from Nobles was transferred by check from Brower's joint account to Coastal. Attached to the declaration is a February 11, 2011 transaction report for the joint account. This report evidences receipt of $200,000 from "ORG TECHNOS DEVELOPMENT LLC" on January 31, 2011. Fourteen transactions later, on February 4, 2011, check number 4898, in the amount of $50,000, is posted. A copy of this check, made payable to Coastal Cypress Corporation, is provided with the February 28, 2011 statement.

Plaintiff objected to the Brower Supplemental Declaration ¶17 on numerous grounds. The bank statements provided in support of this paragraph, Exhibits I and J, lack foundation as Brower has not properly authenticated them, and as such they offer improper hearsay. As a result, this testimony and bank statements are not sufficient to establish on summary judgment that funds received from Nobles were subsequently transferred to Coastal as money paid for stock.

Further, the bank statements raise additional questions not addressed by the parties. In order to determine whether money was paid by Nobles for the Coastal shares the transferor of the $200,000 needs to be identified. Assuming the funds were provided by Nobles, what is the effect of the funds having been commingled with Brower's personal funds? Is tracing appropriate, and if so, what methodology should be applied?

As a result, no consideration was provided for 150,000 of Nobles' shares and the question of whether Nobles paid $50,000 for Coastal shares is not appropriate for resolution on summary judgment.

Babcock Shares

Babcock and Nobles paid a total of $50,000 for Babcock's shares, $10,000 by Babcock and $40,000 by Nobles. Babcock's $10,000 payment went directly into CJ's account; Nobles' $40,000 payment went into the Browers' joint account. Babcock and Nobles assert that the $40,000 paid to Brower satisfied a loan Brower previously made to Coastal.

No portion of the $50,000 was received by Coastal, thus, no money was paid to Coastal. Cancellation of debts or securities is recognized as consideration, but the debt or claim against the corporation must be relinquished by the purchaser as consideration for the shares. *See* 15 Cal. Jur. 3d Corporations § 140 ("'Debts or securities canceled,' as acceptable consideration for the issuance of shares, clearly means a debt or claim against the corporation that the subscriber or purchaser relinquishes as consideration for the shares."); *see also Reed v. Norman*, 41 Cal. 2d 17 (1953). As Nobles' payment was made to satisfy a claim held by Robert Brower, rather than a claim held by Nobles, the alleged $40,000 loan payment is not recognized as a cancellation of debts or securities for purposes of § 409(a). Further, as with Lindley, Coastal's board failed to determine and state the fair value of the cancellation of indebtedness as required by § 409(e).

As such, the funds provided by Babcock do not satisfy § 409's requirements for consideration provided to Coastal.

<u>"Bona Fide Purchaser" Defense</u>

Lindley, Babcock, and Nobles argue that, even in the absence of sufficient consideration, the "bona fide purchaser" defense applies to preserve their shareholder status. Defendants rely on *Cortelyou v. Imperial Land Co.*, 156 Cal. 373 (1909) and *Michaels v. Pac. Soft Water Laundry*, 104 Cal. App. 349 (Ct. App. 1930).

*Cortelyou* concerned a corporate stock purchase from a general manager, a third-party purchaser whose rights in the shares were at issue. The court upheld Cortelyou's stock purchase on the basis that a subsequent bona fide purchaser should not have his shareholder's rights hindered if a prior transaction was invalid for lack of consideration. The court found Cortelyou "a shareholder to the extent of his purchase." *Cortelyou*, 156 Cal. at 376. The presupposition that Cortelyou paid consideration for the shares was never questioned. *Cortelyou* is distinguishable on the basis the shareholder was a purchaser for value from a prior shareholder. Here, Lindley, Babcock, and Nobles received initial stock issuances from the corporation. Accordingly, *Cortelyou* does not support Defendants' position.

In *Michaels*, two director-stockholders sought to cancel the fraudulent sale of corporate treasury stock after the stock was transferred to a good faith purchaser. The court denied this attempt, because the equities of the case did not favor a corporation benefitting from its own misrepresentation and fraud. Further, this case did not address whether consideration was provided as it was undisputed that it was. Here, Defendants do not allege fraud or misrepresentation on Coastal's part which would justify upholding an otherwise invalid transaction. *Michaels* is therefore inapplicable.

As such, the "bona fide purchaser" defense does not apply. There being no genuine dispute as to the material facts, Plaintiff's request for summary judgment that Lindley and Babcock do no hold valid interests in Coastal is granted and Defendants' request is denied. There being a genuine dispute as to $50,000 of Nobles' payment to Brower, both parties' requests for summary judgment as to Nobles' interest in Coastal is denied.

**B. Patty's Coastal Shares**

Plaintiff argues that Patty's Coastal shares are either void for lack of consideration or are community property, and either way are an asset of Brower's bankruptcy estate. Patty asserts that she purchased the Coastal shares using separate assets and the shares are her separate property.

"Except as otherwise provided by statute, all real and personal property, wherever it is located, acquired by a married person during the marriage while the person is domiciled in California is community property." Cal. Fam. Code § 760. The interests of each spouse in community property during the marriage are present, existing, and equal interests. Cal. Fam. Code § 751. Neither spouse has any interest in the separate property of the other spouse. Cal. Fam. Code § 752. But the general presumption of community property is rebuttable. *See Marriage of Ciprari*, 32 Cal. App. 5th 83, 91 (Ct. App. 2019). The party contesting community property bears the burden of proof in rebutting the presumption by a preponderance of the evidence. *In re Marriage of Foley*, 189 Cal. App. 4th 521, 527 (Ct. App. 2010). Virtually any credible evidence may be used to overcome the presumption. For example, tracing the assets to a separate property source, showing an agreement or clear understanding between the spouses regarding ownership status, and presenting evidence that the item was acquired as a gift can be sufficient to rebut the presumption. *In re Marriage of Haines*, 33 Cal. App. 4th 277, 291 (Ct. App. 1995).

Separate property may be acquired during the marriage by gift, devise, bequest, or descent; as rents, issues, and profits of separate property; or as property acquired with separate property funds or proceeds. *See* Cal. Fam. Code § 770(a). Property may also transmute from community to separate, by written agreement of the spouses, either before or after marriage and while living together. Cal. Fam. Code § 850.

In support of her position that the Coastal stock was purchased with her separate assets, Patty relies on (i) the Coastal stock certificate bearing Patty's name and showing the number of shares issued, (ii) Brower's declaration that Patty had $515,000 worth of separate property when they married, and that she paid for the shares using her separate property, (iii)

the declaration of her attorney David Balch that Patty disclosed a personal bank account in her discovery responses, and (v) the 1980 premarital agreement between Brower and Patty ("Premarital Agreement").

In exchange for Patty's being excused from deposition, an order was entered precluding Patty from "offering any testimony at trial, directly or indirectly through discovery responses or by an expert's reliance upon her testimony . . ." (Dkt# 104). Balch's declaration is a direct violation of this order and disregarded. Plaintiff also asserted an evidentiary objection to Brower's declaration on the basis that it is inadmissible on multiple grounds. In response, Brower asserted his testimony was based on his personal knowledge as Coastal's chief executive officer. Upon review of Plaintiff's objection, the court overrules it and finds Brower's declaration admissible.

Under § 409(a), corporate stock cannot be validly issued without consideration. Money paid directly to the issuing corporation is an accepted form of consideration pursuant to § 409(a). Patty asserts the Coastal stock was purchased with her separate property. However, neither the stock certificate nor the premarital agreement evidence that money was paid for the shares. Further, while Brower's declaration is admissible, the credibility of his testimony requires evaluation at an evidentiary hearing. As such, the validity of Patty's receipt of stock in Coastal cannot be resolved on summary judgment.

In the interest of judicial efficiency, the court also addresses Patty's argument regarding the Premarital Agreement. Patty asserts that the Premarital Agreement mandates that all property acquired during marriage is separate property; hence, the Coastal shares she acquired are her separate property. Under California law, premarital agreements or marital property agreements may alter the statutory property rights of spouses. Cal. Fam. Code § 1500. The Premarital Agreement stipulates that all property owned or acquired by the spouses is separate property notwithstanding community property laws. Hence, if Patty establishes that she provided consideration from separate property for the Coastal stock, then the stock will also be her separate property.

As the consideration provided by Patty for Coastal stock is subject to a genuine issue of material fact, summary judgment is denied as to both parties' motions.

### C. Patty's ACP Shares

The Browers argue that the ACP shares were validly transmuted from Brower's separate property to Patty's separate property.

Plaintiff disputes that the ACP shares were Brower's separate property because they were acquired during the Browers' marriage. Regardless of whether the shares are community property, Plaintiff argues that the November 2000 transfer did not change the character of the stock or eliminate Brower's ownership interest therein.

Married persons may by agreement or transfer, with or without consideration, transmute community property to separate property, or transmute the separate property of one spouse to separate property of the other spouse. Cal. Fam. Code § 850. A transmutation of real or personal property is not valid unless made in writing by an express declaration that is made, joined in, consented to, or accepted by the spouse whose interest in the property is adversely affected. Cal. Fam. Code § 852.

To qualify as an "express declaration," the writing must contain language which expressly states that the characterization or ownership of the property is being changed. *In re Marriage of Valli*, 58 Cal. 4th 1396, 1400 (2014) (citing *Estate of MacDonald*, 51 Cal. 3d 262, 272 (1990))[1]. The declaration must also include "a clear and unambiguous expression of intent to transfer an interest in the property.*" Estate of Bibb*, 87 Cal. App. 4th 461, 468 (Ct. App. 2001).

While the statute does not require any particular words of transmutation, *Estate of MacDonald*, 51 Cal. 3d at 273, courts more frequently find that an "express declaration" is present when the writing at issue is within a formally drafted document such as a deed or contract. *See Estate of Bibb*, 87 Cal. App. 4th at 462 (grant deed conveying real property

---

[1] *Estate of MacDonald* referred to Civil Code § 5110.730 which became Family Code § 852 in 1992. An analysis of § 5110.730 is for all intents and purposes identical to an analysis of § 852.

from one spouse to both spouses as joint tenants was an "express declaration"); *In re Marriage of Lund*, 174 Cal. App. 4th 40, 51 (Ct. App. 2009) ("Agreement to Establish Interest in Property" unambiguously effected a transmutation of a spouse's separate property into community property); *In re Marriage of Holtemann*, 166 Cal. App. 4th 1166, 1172 (Ct. App. 2008) (transmutation agreement and trust which stated that the spouse's property was "hereby transmuted from his separate property to the community property" was sufficient for valid transmutation).

Conversely, when such formality is lacking, courts find that an "express declaration" is not established. *See In re Marriage of Barneson*, 69 Cal. App. 4th 583, 591 (Ct. App. 1999) (husband's written instructions to "transfer" stock into his spouse's name was not an expression that ownership of the property was being changed); *In re Marriage of Leni*, 144 Cal. App. 4th 1087, 1096 (Ct. App. 2006) (escrow instructions that community proceeds of a house sale were to be split "50/50" did not expressly declare that the character of the property was being changed); *Estate of Petersen*, 28 Cal. App. 4th 1742, 1744 (Ct. App. 1994) (mere reference of a joint tenancy on an account statement was insufficient for transmutation).

The Browers rely on the following writings: (i) a gift card that reads "ACP is now yours," (ii) a signed note that includes the statement "I am proud to give you all my interest in that company to do as you choose," and (iii) a stock transfer.

Plaintiff objected to the signed note as inadmissible based on Defendants' inability to produce the original, and suspicious circumstances surrounding the production of the document.[2] Patty's counsel conceded at the hearing that the signed note is inadmissible.

Brower also submitted declarations of his intent to transfer property to supplement the writings provided. In enacting the writing requirement of § 852, the Legislature intended to enable courts to validate transmutations without resort to extrinsic evidence. *See Estate of*

_____

[2] Federal Rule of Evidence 1002 provides that "[a]n original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise." A duplicate is inadmissible if a genuine question is raised about the original's authenticity or the circumstances make it unfair to admit the duplicate. Federal Rule of Evidence 1003.

*MacDonald*, 51 Cal. 3d at 272. Accordingly, Brower's declarations are not considered in the analysis.

In reviewing the remaining writings, the court finds that the gift card "ACP is now yours" may be interpreted in several ways. On that basis, it is analogous to the informal written instructions found in *Barneson* and *Leni*. While the card could indicate Brower's intent to transfer the property, it does not expressly provide that the characterization or ownership of the property is changed. The mere intent to transfer property is not enough for valid transmutation without a clear expression that the spouse's interest in the property is being changed. *See In re Marriage of Barneson*, 69 Cal. App. 4th at 590 ("Transfer is clearly not synonymous with transmutation.").

Nor does the stock transfer provide an "express declaration" sufficient for transmutation. The share certificates were endorsed to Patty by Brower, but the mere act of transferring shares does not express an intent to change the character or ownership of the property. *See In re Marriage of Barneson*, 69 Cal. App. 4th at 590 (placement of stock belonging to one spouse in the stock brokerage account of the other spouse was not sufficient to establish a transmutation); *Estate of Bibb*, 87 Cal. App. 4th at 469 (DMV printout reflecting the re-registration of an automobile in the name of one spouse to the name of either spouse did not show intent to transmute).

In sum, neither the gift card nor share certificate establish transmutation of property of Brower's separate property to Patty's separate property, or transmutation of community property to Patty's separate property. There is no material fact in dispute as to the writings considered or the existence of other writings. As such, the court finds Plaintiff is entitled to summary judgment that the ACP shares are property of Brower's bankruptcy estate (either as his separate or community property), and the request of Patty and Patty Trust for summary judgment is denied.

### D. Whether Plaintiff's claims are time-barred.

California Civil Procedure Code § 338(a) provides a three-year statute of limitations for bringing "[a]n action upon a liability created by statute, other than a penalty or forfeiture."

Defendants assert this statute bars Plaintiff's claims. Plaintiff, in response, maintains that the transfers did not occur for failure to satisfy the requirements set by Corp. § 409, and therefore Civ. Proc. § 338(a) does not apply.

In reviewing these issues, other bankruptcy courts have held that the court may determine that certain property belongs to the bankruptcy estate notwithstanding time limitations under state law. *In re Blasingame*, 598 B.R. 864, 875 (6th Cir. BAP 2019). Defendants assert that *Blasingame* does not apply to this case, because Plaintiff seeks affirmative relief to void the shares, contrary to mere declaratory relief. Defendants are incorrect. Plaintiff does not seek to void the alleged stock transfers. Rather, Plaintiff seeks a finding that no transfers occurred at all. This is a determination the court may make at any time. Further, this court ruled as such in denying Defendants' motion to dismiss the adversary proceeding on October 3, 2017 (Dkt. #36). In that motion, Defendants asserted that Plaintiff's request for declaratory relief was a disguised avoidance action pursuant to 11 U.S.C. § 548 (Dkt. #13). This argument was rejected on the basis that Plaintiff's claims only sought declaratory relief (Dkt. #36). As such, the law of the case doctrine requires the same result here unless: "(1) the decision is clearly erroneous and its enforcement would work a manifest injustice, (2) intervening controlling authority makes reconsideration appropriate, or (3) substantially different evidence was adduced at a subsequent trial." *In re Rainbow Magazine*, *Inc.*, 77 F.3d 278, 281 (9th Cir. 1996). Defendants presented no evidence of an exception that would prevent application of the law of the case.

As a result, Plaintiff's claims are not time-barred.

**E. Whether the Coastal Merger should be avoided.**

Bankruptcy Code § 549 provides that a trustee may avoid a transfer of property of the estate that (1) occurs after the commencement of the case and (2) is not authorized by the court. Plaintiff asserts that the 2017 Coastal Merger transaction should be avoided, because it is an unauthorized post-petition transfer to the extent Coastal is part of Brower's bankruptcy estate. Defendants assert the merger cannot be unwound because their Coastal shares are valid.

After application of the issues decided herein, the shares are allocated as follows:

- Brower: 230,000 Coastal shares
- Patty (through Patty Trust): 125,000 Coastal shares (subject to further proceedings)
- Nobles: 50,000 Coastal shares (subject to further proceedings)

Brower owned at least 57% of Coastal at the time of the Coastal Merger. This percentage may increase upon determination of Patty and Nobles' shares. But it is undisputed that the Coastal Merger was executed after the filing of Brower's bankruptcy petition. Brower owned more than 50% of Coastal at the time of the merger. As such, § 549 was violated by merger of Brower's interest in Coastal a new entity post-petition, without court authorization and in a manner not otherwise allowed by the Bankruptcy Code.

Plaintiff's request for summary judgment is granted.

**F. Whether Plaintiff's third and fourth claims for relief should be dismissed.**

Defendants assert that Plaintiff's third and fourth claims for relief should be dismissed because they are derivative claims of Plaintiff's first and second claims for relief. And should fail for the same reasons.

This court grants partial judgment in Plaintiff's favor on the first claim and denied Defendant's related claim. On the second and third claims, the court grants judgment in Plaintiff's favor. Plaintiff did not seek summary judgment on its fourth claim. Defendant's claim that it should be dismissed based on denial of the prior claims is without merit.

As such, Defendants' request for summary judgment as to these claims is denied.

<u>Conclusion</u>

For the reasons stated herein, the court hereby

(i)  grants Plaintiff's request for summary judgment as to Lindley and Babcock's interests in Coastal as consideration was not received by Coastal for the shares, and denies Lindley and Babcock's request for summary judgment;

(ii)  denies in part and grants in part Plaintiff's and Defendants' requests for summary judgment as to whether consideration was received by Coastal for 150,000 of the shares allocated to Nobles;

(iii)  denies Plaintiff's and Defendants' requests for summary judgment as to Patty's Coastal shares;

(iv)  grants Plaintiff's request for summary judgment as ACP is Brower's separate or community property, and denies Patty and Patty Trust's request for summary judgment;

(v)  grants Plaintiff's request for summary judgment avoiding the Coastal Merger; and

(vi)  denies Defendants' request for summary judgment as to Plaintiff's third and fourth claims.

**END OF MEMORANDUM DECISION**

## COURT SERVICE LIST

All ECF Recipients



The following constitutes the order of the Court.
Signed: September 9, 2020

UNITED STATES B *M. Elaine Hammond*

NORTHERN DISTRICT OF CALIFORNIA

M. Elaine Hammond
U.S. Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**for the Northern District of California**

| | |
|---|---|
| In re | Case No. 15-50801 MEH |
| Robert S. Brower, Sr., | Chapter 11 |
| Debtor. | |
| MUFG Union Bank, N.A., | Adv. No. 17-5044 |
| Plaintiff. | |
| v. | |
| Robert S. Brower, Sr., Coastal Cypress Corporation, a California corporation, Wilfred "Butch" Lindley, Patricia Brower, American Commercial Properties, Inc., a Nevada corporation, Anthony Nobles, Richard Babcock, Patricia Brower Trust, and Coastal Cypress Corporation, a Delaware corporation, | Video Trial<br>Date:   September 2, 2020<br>Time:  9:00 a.m. |
| Defendants. | |

<u>ORDER AFTER TRIAL</u>

    Plaintiff, MUFG Union Bank, N.A., seeks a determination that the bankruptcy estate
of Robert Brower Sr ("Brower" or "Debtor") is the sole shareholder of Coastal Cypress

1

# EXHIBIT 2

UNITED STATES BANKRUPTCY COURT
for the Northern District of California

1    Corporation ("Coastal"). Defendants Anthony Nobles ("Nobles") and Patricia Brower and

2    the Patricia Brower Trust ("Patty" and "Patty Trust") oppose. An evidentiary hearing was

3    held on September 2, 2020. Isaiah Weedn appeared on behalf of Plaintiff. Bobby Samini

4    appeared on behalf of Nobles. Richard Barber appeared on behalf of Patty, Patty Trust, and

5    Robert Brower, Sr. ("Brower").

6          This court has jurisdiction pursuant to 28 U.S.C. § 1334. This is a core proceeding

7    pursuant to 28 U.S.C. § 157(b)(2)(A) and (O). This order incorporates my findings of fact

8    and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

9          Before turning to the merits, a procedural issue must be addressed. A review of the

10   docket shows that in November 2017 the defendants in this adversary proceeding made a

11   demand for jury trial. Defendants then filed motions for jury trial and the right to a jury trial

12   was found for all defendants except Brower. The parties then pursued cross-motions for

13   summary judgment that resolved most of the issues in this adversary proceeding. Following a

14   scheduling conference, I entered a trial scheduling order in December 2019, setting a bench

15   trial for March 2020. On March 4, 2020, the parties filed a stipulation to continue trial and I

16   issued an order approving the stipulation and setting a bench trial for September 2-3, 2020.

17   On July 27, 2020, I issued an amended trial scheduling order that included additional

18   information required for a video trial. The trial was conducted on September 2, 2020 based

19   on stipulated exhibits; no witnesses testified.

20         Whether intentional or inadvertent, Nobles and Patty waived their right to a jury trial

21   by failing to object to any of the three court orders setting a bench trial. *See Palmer v. Valdez*,

22   560 F.3d 965, 969-70 (9th Cir. 2009). *See also White v. McGinnis*, 903 F.2d 699 (9th Cir.

23   1990) (*en banc*), and *Fuller v. City of Oakland*, 47 F.3d 1522 (9th Cir. 1995) (finding that

24   knowing participation in a bench trial without objection constitutes a jury waiver).

25

26   Issues for Trial

27         The cross-motions for summary judgment resolved most of the issues in the adversary

28   proceeding. As a result, the remaining issues for trial are:

2

(1)     Whether the $50,000 paid by Nobles was received by Coastal in exchange for 50,000 shares of Coastal stock issued to Nobles; and

(2)     Whether Patty paid $125,000 to Coastal in exchange for 125,000 shares of Coastal stock issued to Patty that were subsequently transferred to the Patty Trust; and if so, whether the $125,000 paid is traceable to her sole and separate property.

Background

Brower and Patty married in 1980. Brower founded Coastal as a California corporation in 1982.  On January 31, 2011, Nobles caused $200,000 to be transferred to the joint personal bank account of Brower and Patty at Fremont Bank.  Brower transferred $50,000 by check from his joint personal account to Coastal's bank account on February 4, 2011.  On that same date, in his capacity as President of and on behalf of Coastal, Brower executed a promissory note in favor of himself (in his individual capacity) in the amount of $50,000 (the "Promissory Note").  Coastal repaid Brower all principle and interest due under the Promissory Note.

Coastal shares issued to Nobles

Pursuant to California Corporations Code § 409(a), a corporation may issue shares for consideration in the form of "money paid" or other means not relevant here.  Shares issued by a corporation without having received consideration in return are void. *See Cortelyou v. Imperial Land Co.*, 156 Cal. 373, 376 (1909).  Plaintiff bears the ultimate burden to establish that the 50,000 shares of Coastal that Nobles asserts he owns are property of Debtor's bankruptcy estate.

On January 31, 2011, Nobles paid $200,000 into the Browers' joint account. Nobles maintains that $50,000 of this $200,000 payment to Brower was consideration for 50,000 Coastal shares based on the Browers' subsequent transfer of $50,000 to Coastal.  On February 4, 2011, Brower paid $50,000 to Coastal by check number 8948.  In opposition to Plaintiff's motion for summary judgment a new argument was presented – that the $50,000 check

3

1  transferred the money paid by Nobles to Coastal as consideration for his shares.  In support,

2  Brower stated in his Supplemental Declaration that "$50,000 of the money paid by Nobles

3  was transferred from my bank account directly into Coastal Cypress via check number

4  8948. . .  This money was shown as a 'cash receipt' and 'paid in capital' on the [Coastal]

5  general ledger."  Exhibit 6, p. 6-7, ¶ 17.  However, in his Supplemental Declaration Brower

6  failed to note that also on February 4, 2011, Brower loaned $50,000 to Coastal, received a

7  promissory note in exchange, and that note was subsequently repaid by Coastal.  Exhibit 9, p.

8  3-4.  There was only one $50,000 transfer between Brower and Coastal between January 12

9  and February 11, 2011.  Exhibit 4.

10       Plaintiff asserts that the $50,000 originally provided by Nobles was used by Brower to

11  fund his loan to Coastal evidenced by the promissory note.  Further, since the promissory note

12  was subsequently repaid, it is not money paid to Coastal for Nobles' shares.  Nobles contends

13  that there is no evidence to directly tie the check and promissory note together and that the

14  inference that they are related is insufficient to overcome Plaintiff's burden of proof.

15  But Nobles argument ignores the prior misdirection by Brower of investments intended for

16  Coastal.  Brower stated in a prior declaration that following receipt of $200,000 from Nobles

17  to Brower's personal account, he wired $150,000 of the funds to Chateau Julian as a loan.

18  Further, in March 2011, when Nobles paid an additional $40,000 into the personal account,

19  Brower used those funds for repayment of a loan he previously made to Coastal.  Brower's

20  transfer of funds to Coastal and Coastal's immediate issuance of a promissory note to Brower

21  is not a coincidence – it is a pattern and practice of Brower to take investment funds as they

22  were received and direct them among the associated corporations as he deemed necessary and

23  in his best interests.  Unfortunately for Nobles, that did not include transfer of $50,000 to

24  Coastal as "money paid" for the Coastal shares issued to Coastal. Further, Brower's taking of

25  a promissory note and its repayment precludes these funds from qualifying as an investment

26  in Coastal.

27       Two alternate defenses were also presented at trial.  Nobles argued that the "bona fide

28  purchaser" defense applies to preserve his shareholder status.  This argument was rejected in

4

the summary judgment memorandum decision.   For the reasons stated therein, neither *Cortelyou v. Imperial Land Co.*, 156 Cal. 373 (1909) nor *Michaels v. Pac. Soft Water Laundry*, 104 Cal. App. 349 (Ct. App. 1930) support application of the defense based on these facts.  As such, I find that the "bona fide purchaser" defense does not apply.

Finally, Brower argued that Nobles provided consideration for a contractual agreement to purchase stock and the issue is whether Nobles provided funds, not whether those funds were received by Coastal.  Applicable law does not support this argument.  Cal. Corp. Code § 409(a) provides for the issuance of shares "for consideration in the form of money paid" and prohibits promissory notes as a form of consideration.  Similarly, an unfulfilled contract to purchase stock does not provide consideration to the corporation.  As recognized by the California Supreme Court, shares issued without receipt of consideration are void.  *See Cortelyou*, 156 Cal. at 376.

Coastal shares issued to Patty Brower

As with Nobles, Plaintiff asserts that Patty did not provide consideration for the 125,000 shares of Coastal she received, and as such, the shares are void.  Patty asserts that she paid $125,000 for the shares and that the funds were paid from her separate property.

"Except as otherwise provided by statute, all real and personal property, wherever it is located, acquired by a married person during the marriage while the person is domiciled in California is community property." Cal. Fam. Code § 760. The interests of each spouse in community property during the marriage are present, existing, and equal interests. Cal. Fam. Code § 751. Neither spouse has any interest in the separate property of the other spouse. Cal. Fam. Code § 752. But the general presumption of community property is rebuttable. *See Marriage of Ciprari*, 32 Cal. App. 5th 83, 91 (Ct. App. 2019). The party contesting community property bears the burden of proof in rebutting the presumption by a preponderance of the evidence. *In re Marriage of Foley*, 189 Cal. App. 4th 521, 527 (Ct. App. 2010). Virtually any credible evidence may be used to overcome the presumption. For example, tracing the assets to a separate property source, showing an agreement or clear

5

understanding between the spouses regarding ownership status, and presenting evidence that the item was acquired as a gift can be enough to rebut the presumption. *In re Marriage of Haines*, 33 Cal. App. 4th 277, 291 (Ct. App. 1995).

Separate property may be acquired during the marriage by gift, devise, bequest, or descent; as rents, issues, and profits of separate property; or as property acquired with separate property funds or proceeds. *See* Cal. Fam. Code § 770(a). Property may also transmute from community to separate, by written agreement of the spouses, either before or after marriage and while living together. Cal. Fam. Code § 850.

Plaintiff has the initial burden to establish that money was not paid to Coastal for the issuance of stock to Patty. The burden then shifts to Patty to establish that money was paid for the Coastal shares and that the money used was not subject to the community property presumption.

Following discovery, Plaintiff established that neither Brower nor Patty produced documentary evidence of a payment from Patty to Coastal for issuance of her 125,000 shares. Although a Coastal stock certificate bearing Patty's name and the number of shares exists, the certificate does not provide proof of payment – as is the case with shares issued to Babcock, Nobles, and Lindley. The only evidence provided in support of Patty's assertion that she provided consideration is the Browers' prenuptial agreement and Brower's Supplemental Declaration.

Brower and Patty entered into a premarital agreement in 1980. It provides that Brower and Patty each had separate property at that time and that each party would retain sole ownership, control, and power of disposal of all property each then owned or subsequently acquired and free and clear of any interests, including rights under community property laws. The premarital agreement evidences their intent to maintain separate property. But it does not establish a payment was made by Patty for the Coastal stock.

Brower stated in his Supplemental Declaration that Patty "paid $125,000 for her shares – from her separate property money that she brought into our marriage." Exhibit 6, p. 4, ¶ 8. He further asserted that Patty had $515,000 prior to their marriage but that amount is

6

subject to dispute.  The typed recital in the premarital agreement states that Patty "presently has property and investments in an amount in excess of $15,000."  Exhibit A, p. 2.  Brower stated that prior the marriage the agreement was amended by hand to increase the amount of Patty's assets to $515,000 with initials by the change. Exhibit 6, p. 2, ¶ 4.  At his deposition in February 2019, Brower testified that Patty had approximately $600,000 in separate assets at the time they entered into the premarital agreement.  Exhibit B, p. 2.

I find that the premarital agreement, combined with Brower's February 2019 testimony establishes that the Browers intended to maintain separate property and that Patty held more than $125,000 in separate assets at the time of their marriage.  That said, it does not establish that a payment was made by Patty for the Coastal stock from her separate property. The only evidence presented for this is Brower's Supplemental Declaration.  Exhibit 6, ¶ 8. The determination then is whether I find Brower's testimony credible.  I do not.

Brower's chapter 11 case was filed in March 2015.  In February 2017, I conducted a three-day trial to determine whether Brower's debt to Plaintiff should be exempt from discharge due to fraudulent misrepresentations made by Brower in a written statement regarding his financial condition.  Plaintiff prevailed at trial and Brower was denied a discharge of his debt to Plaintiff.  More to the point, I found that Brower's testimony was neither compelling nor credible and that the annual financial statements provided to the Bank established a pattern of misrepresentations.

Brower's willingness to do what it takes to avoid losing was borne out in other ways as well.  At two times during this adversary proceeding Brower presented eleventh hour evidence to avoid an unfavorable ruling. First, Plaintiff brought a request for a preliminary injunction to halt the sale of the only asset of American Commercial Properties ("ACP") – the Browers' home – on the basis that ACP was a community property asset and had not been transmuted to Patty's separate property.  In support of the opposition Brower presented for the first time a letter and handwritten card, each dated November 8, 2000, and providing language that arguably established a transmutation of ACP as community property to Patty's separate property.  These documents were responsive to discovery requests from at least two years

7

prior, had never been produced before, and Brower previously testified did not exist. Doc # 83, p. 2, ¶ 3. Brower's story was that these were documents Patty had kept and he recently discovered. Exhibit 6, p. 4, ¶ 6. There were significant questions as to the authenticity of each and the card was submitted to forensic testing. A forensic report finding it highly probable that the card was modified sometime after the initial text had been written was filed in support of Plaintiff's motion for summary judgment. Doc # 109-12, p. 19. Second, as discussed above, when forced to identify funds provided by Nobles paid to Coastal, Brower asserted that the $50,000 . . . for stock to support his opposition to Plaintiff's arguments at summary judgment. In so doing, he failed to also state that he testified in a deposition six months before that he loaned $50,000 to Coastal on that same date.

In sum, there is no documentary evidence to support a finding that Patty provided $125,000 to Coastal for her shares. Brower provided the only testamentary evidence in his Supplemental Declaration filed after Plaintiff's presentation of its case in the motion for summary judgment. Based on Brower's statements and actions throughout five years of litigation I do not find his testimony credible and find that it should be given no weight in this determination. As such, there is in no evidence to support a finding that Patty paid money to Coastal for her shares, and I find pursuant to Cal. Corp Code § 409(a) Patty's shares in Coastal are void.

Conclusion

For the reasons stated herein, I find that the Coastal shares issued to Nobles and Patty, and that Patty subsequently transferred to the Patty Trust, are void for lack of consideration. The subsequent transition of Coastal from a California corporation to a Delaware corporation does not change these findings.

A judgment consistent with this with this order after trial shall be issued contemporaneously.

**END OF ORDER**

8

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COURT SERVICE LIST

**Via ECF:**

All ECF Recipients

9

## WRITTEN CONSENT RESOLUTION OF THE SOLE SHAREHOLDER OF COASTAL CYPRESS CORPORATION

Coastal Cypress Corporation ("Coastal Cypress") is a Delaware corporation, and was formerly a California corporation. It has one shareholder, the bankruptcy estate of Robert S. Brower, Sr., U.S. Bankruptcy Court, N.D. Cal., San Jose Division, 15-50801-MEH (the "Bankruptcy Case"). Michael G. Kasolas is entitled to act for the sole shareholder, because he is the duly appointed Liquidating Trustee in the Bankruptcy Case, pursuant to the Order Confirming Creditor MUFG Union Bank N.A.'s Third Amended Plan of Reorganization and Disclosure Statement Dated November 2, 2019 and the related Liquidating Trust Agreement, dated as of November 2019. In that capacity and pursuant to Coastal Cypress's Amended and Restated Articles of Incorporation dated February 2, 2011 and filed with the California Secretary of State on March 24, 2011, he hereby removes Robert S. Brower, Sr. and Patricia Brower as Coastal Cypress's two directors, and in their stead, elects himself as Coastal Cypress's sole director.

Dated: September 18, 2020

By: Michael G. Kasolas, as Liquidating Trustee for the Estate of Robert S. Brower, Sr., Case No. 15-50801-MEH (Bankr. N.D. Cal., San Jose Division)

# EXHIBIT 3

## WRITTEN CONSENT RESOLUTION OF THE SOLE DIRECTOR OF
## COASTAL CYPRESS CORPORATION

The undersigned is the sole director of Coastal Cypress Corporation ("Coastal Cypress") is a Delaware corporation, formerly a California corporation. In that capacity and pursuant to Coastal Cypress's Amended and Restated Articles of Incorporation dated February 2, 2011 and filed with the California Secretary of State on March 24, 2011, he hereby removes Robert S. Brower, Sr. and Patricia Brower from all offices of as Coastal Cypress, including as President, Chief Executive Officer, Chief Financial Officer, and Secretary and elects himself as Coastal Cypress's President, Chief Executive Officer, Chief Financial Officer, and Secretary.

Dated: September 18, 2020

By: Michael G. Kasolas, Liquidating Trustee for the Estate of Robert S. Brower, Sr., Case No. 15-50801-MEH (Bankr. N.D. Cal., San Jose Division), as sole director of Coastal Cypress Corporation

**WRITTEN CONSENT OF AMERICAN COMMERCIAL PROPERTIES, INC., A NEVADA CORPORATIONTO THE HOLDING OF A SPECIAL SHAREHOLDER'S MEETING AND WRITTEN CONSENT RESOLUTION**

American Commercial Properties, Inc. ("ACP") is a Nevada corporation. It has one shareholder, the bankruptcy estate of Robert S. Brower, Sr., U.S. Bankruptcy Court, N.D. Cal., San Jose Division, 15-50801-MEH (the "Bankruptcy Case"). Michael G. Kasolas is entitled to act for the sole shareholder, because he is the duly appointed Liquidating Trustee in the Bankruptcy Case, pursuant to the Order Confirming Creditor MUFG Union Bank N.A.'s Third Amended Plan of Reorganization and Disclosure Statement Dated November 2, 2019 and the related Liquidating Trust Agreement, dated as of November 2019. In that capacity and pursuant to ACP's Bylaws and/or Nevada law, a Special Shareholder's meeting was called to remove the existing director(s), including but not limited to Patricia Bower, and to elect Michael G. Kasolas, in her stead, as the sole director.

Dated: September 21, 2020

By: Michael G. Kasolas, as Liquidating Trustee for the Estate of Robert S. Brower, Sr., Case No. 15-50801-MEH (Bankr. N.D. Cal., San Jose Division)

**EXHIBIT 4**

**Entered on Docket**
**March 22, 2017**
**EDWARD J. EMMONS, CLERK**
**U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

The following constitutes
the order of the court. Signed March 22, 2017

**M. Elaine Hammond**
**U.S. Bankruptcy Judge**

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | Case No. 15-50801 |
| Robert S. Brower, Sr., | Chapter 11 |
| Debtor. | |
| | Adv. No. 15-05119 |
| MUFG Union Bank, N.A., | |
| Plaintiff. | |
| v. | |
| Robert Brower, Sr., | Date:      February 22, 2017 |
| Defendant. | Time:     10:00 a.m. |
| | Ctrm:     3020 (San Jose) |

### MEMORANDUM DECISION

Plaintiff MUFG Union Bank, N.A. (together with its relevant predecessors, the "Bank") seeks to have the obligation of Debtor Robert Brower, Sr. ("Brower") excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(B) and Brower's discharge denied pursuant to § 727(a)(3). A trial on these matters was held on February 14, 15, and 22, 2017. For the reasons stated herein, I find Brower's debt to the Bank is exempted from discharge pursuant

# EXHIBIT 5

to § 523(a)(2)(B) but that the Bank did not establish discharge should be denied pursuant to § 727(a)(3).

This court has jurisdiction pursuant to 28 U.S.C. § 1334. These are core proceedings pursuant to 28 U.S.C. § 157(b)(2)(I) and (J).

Background

In 1982, Brower and his wife, Patricia Brower ("Patricia") established a wine estate in Monterey County, California. The assets and operations of their business venture were split between multiple privately-held corporations. For the purposes of this decision, the key entities are:

- Chateau Julien, Inc., ("Chateau Julien") entity responsible for wine sales, tours, and events at the wine estate.
- Coastal Cypress Corporation, ("Coastal Cypress") entity that owned the real property on which the wine estate was operated.
- Great American Wineries, Inc., ("GAW") entity responsible for producing, blending, and bottling wine.
- American Commercial Properties, Inc., ("American Commercial") entity that owned Brower's residence as of the period in dispute. Brower and Patricia rented the residence from American Commercial.

The Bank began its relationship with Chateau Julien in 1986. Around the same time, Coastal Cypress borrowed funds from the Bank to acquire the real property for the wine estate. Effective May 15, 2009, Chateau Julien entered into a Loan and Security Agreement with the Bank, along with an Amended and Restated Revolving Term Note in the principal amount of $4,850,000 (collectively, the "Loan"). Brower guaranteed the Loan pursuant to an Unlimited Guaranty he executed April 28, 2004 and his Reaffirmation of Guaranty of May 15, 2009 (collectively, the "Guaranty"). The Loan was subsequently extended in June 2011, modified in December 2011, extended in June 2012, modified in November 2012, amended in March 2013, and amended September 2013. Ultimately, the Loan was not paid in full by

2

Chateau Julien or Brower. Following litigation in Monterey County Superior Court, the Bank obtained a judgment against Chateau Julien of over $5.4 million. Brower's Guaranty extends to the judgment.

When the Bank sought to collect on its Guaranty, Brower asserted a significant portion of the assets included in his annual financial statements were Patricia's separate property.

<u>Section 523(a)(2)(B) – Debt exempted from discharge based upon materially false written statement of the debtor's financial condition</u>

Following its standard credit practices, the Bank prepared a credit authorization review of Chateau Julien and Brower in connection with the Loan in 2009, and for each subsequent modification and extension. The credit review included: (1) submission by the borrower, Chateau Julien, of a balance sheet and income and expense statement for the prior year, and (2) submission by Brower, as guarantor, of a balance sheet for the prior year. In support of his balance sheet Brower also submitted a balance sheet and income and expense statement for American Commercial, the entity that owned Brower's home. The Bank then incorporated this information into its internal Credit Authorization report used to review and determine whether the loan, extension, or modification should be approved.

Section 523(a)(2)(B) provides that a debt is nondischargeable if it is a debt for money, or an extension or renewal of credit, to the extent obtained by –

(B) use of a statement in writing –

(i) that is materially false;

(ii) respecting the debtor's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money or credit reasonably relied; and

(iv) that the debtor caused to be made with intent to deceive.

These elements must be proven by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991).

The Ninth Circuit reworded the § 523(a)(2)(B) requirements as:

3

(1) A representation of fact by the debtor,

(2) That was material,

(3) That the debtor knew at the time to be false,

(4) That the debtor made with the intention of deceiving the creditor,

(5) Upon which the creditor relied,

(6) That the creditor's reliance was reasonable,

(7) That damage proximately resulted from the representation.

*Candland v. Ins. Co. of Am., (In re Candland)*, 90 F. 3d 1466, 1469 (9th Cir. 1996).

At trial, the parties established that Brower provided a written representation of fact regarding his financial condition in the form of an annual balance sheet. Each balance sheet included approximately $7 million in assets—70% of his stated net worth—that he now discloses are Patricia's separate property. Brower knew his balance sheets were requested by the Bank because he was guarantor of the Chateau Julien loan. The Bank increased the amount of the Chateau Julien loan, extended its term, and lost collection remedies as a result of Brower's statements regarding his financial condition. Thus, factors (1), (2), and (7) are satisfied.

*Factors (3) and (4) – Knowingly false with the intent to deceive*

"The scienter requirement for a fraudulent misrepresentation is established by showing 'either actual knowledge of the falsity of a statement, or reckless disregard for its truth . . .'" *Gertsch v. Johnson & Johnson, Fin. Corp., (In re Gertsch)*, 237 B.R. 160, 167 (9th Cir. B.A.P. 1999) (quoting *In re Houtman*, 568 F.2d 651, 656 (9th Cir. 1978)). "Intent to deceive can be inferred from the totality of the circumstances, including reckless disregard for the truth." *Id.* at 167-68.

When examined, Brower's financial statements establish a pattern of misrepresentations. For the restatement of loan effective May 15, 2009, Brower provided a balance sheet as of December 31, 2008 for Robert S. and Patricia Brower ("2008 Balance Sheet"). (Exhibit 10). The 2008 Balance Sheet is signed by both Robert and Patricia Brower, and provides a total net worth of $9,837,229. The bulk of their net worth is from equity

4

1   interests in privately-held companies, including Chateau Julien and American Commercial.

2   The 2008 Balance Sheet lists the value of the Browers' common stock interest in Chateau

3   Julien as $2,505,030.  A 2008 balance sheet for Chateau Julien was not provided at trial,

4   however, this number matches the value placed on Chateau Julien in the April 15, 2009 Credit

5   Authorization prepared by the Bank, based upon tax returns provided to the Bank.  Similarly,

6   the 2008 Balance Sheet lists American Commercial as having a stock value of $476,145.  This

7   is the exact value of American Commercial's 2008 capital stock, based on the American

8   Commercial balance sheet also provided to the Bank by Brower.  (Exhibit 119).

9         Balance sheets from following years mimic this pattern.  The December 31, 2009

10  Robert S. and Patricia Brower Balance Sheet (the "2009 Balance Sheet") (Exhibit 11) is

11  signed by both individuals.  The 2009 Balance Sheet reflects a common stock interest of

12  $2,506,060 in Chateau Julien and $476,145 in American Commercial.  The Chateau Julien

13  balance sheet (Exhibit 63) lists the exact same amount for total stockholders' equity as the

14  2009 Balance Sheet.  And again, the American Commercial balance sheet (Exhibit 119) lists a

15  capital stock value equal to that provided on the 2009 Balance Sheet.  The Brower balance

16  sheets for 2010 and 2011 correlate with the Chateau Julien and American Commercial 2010

17  and 2011 balance sheets in the same manner.

18        Yet, Brower now asserts:

19  •   As to Chateau Julien, he is not a shareholder, and that Patricia owns 50% of the

20      company with another individual, and

21  •   As to American Commercial, he is not a shareholder as a result of his gifting to

22      Patricia 100% of the company in 2000 as her separate property.

23        Brower contends that his balance sheets were not false because each balance sheet

24  states that it is for both Brower and Patricia, and in addition, the Bank never inquired whether

25  some of the assets were Patricia's separate property.  In an attempt to address how Patricia's

26  50% interest in Chateau Julien is equal to 100% of the stated shareholder equity in the

27  company, Brower raises the novel argument that since the Chateau Julien balance sheet does

28  not take into consideration accumulated depreciation, the equity value should be doubled as

an adjustment. By doubling the shareholder value, and then taking 50% of it, he reaches a shareholder value exactly the same as on the balance sheet. The court is unfamiliar with this approach and the only evidence presented in support of it is Brower's testimony. Brower's testimony is not compelling, and is further undercut by his failure to consistently apply this valuation method. In contrast, no manipulation is required to determine Patricia's 100% interest in American Commercial—the capital stock value is merely carried over to the Brower balance sheets.

Additionally, the line item Brower chose to use as the equity value varies between the two companies. For Chateau Julien, total stockholders' equity equal to capital stock plus retained earnings is always used. This is in contrast with American Commercial, where capital stock is used for the equity value, without any reduction for retained earnings. The factor that remains consistent is that the Brower balance sheets reflect the greatest shareholder value possible based on the related company balance sheets.

Finally, there is no dispute that Brower knew that only he, and not Patricia, was a guarantor to the Bank. He provides no credible testimony for why her substantial separate assets were regularly included with his balance sheet without any further disclosure or notice.

Brower consistently overstated his assets by implying that his wife's separate property was his. He then skewed the disclosures to match the greatest value possible with the related financial statements of Chateau Julien and American Commercial. As such, it is clear that Brower either knowingly made these false statements or made them so recklessly as to act fraudulently.

*Factor (5) – Creditor's reliance*

Brower disputes that the Bank relied upon his personal balance sheets, arguing instead that this was a "check the box" requirement, requested merely as a formality. Two former Bank managers responsible for managing the Chateau Julien portfolio, Todd Stornetta and Roland Pascua, offered contrary testimony. Stornetta testified that the Bank typically required a personal guaranty of the business owner to provide additional protection on a small business loan. This was required in order to form an additional source for repayment, and to

1  ensure that the interests of the owner and company were aligned.  The testimony of Pascua,

2  and Brad Hall, the Bank's expert witness, are consistent.  Further, the Credit Authorizations

3  include "Recourse to Guarantor" as a tertiary source of repayment and include a specific

4  statement of Brower's net worth based upon the balance sheet he provided.  The testimony of

5  Stornetta and Pascua is supported by the Credit Authorizations created and maintained by the

6  Bank, and overall is more credible than Brower's testimony.  Thus, I find the Bank relied on

7  the balance sheets provided by Brower.

8  *Factor (6) – Creditors reliance was reasonable*

9      Brower contends that the Bank could not reasonably rely on the balance sheets as to

10  his assets because it never inquired whether the joint balance sheet included separate assets of

11  his wife.  This position is not consistent with the law.  The Ninth Circuit has recognized that

12  assertions of fact about an individual's financial condition require little, if any, further review

13  when they are presented to an entity considering a loan or other financial benefit to the

14  individual.  *See In re Candland*, 90 F.3d at 1471; *La Trattoria, Inc. v. Lansford (In re*

15  *Lansford)*, 822 F.2d 902, 903 (9th Cir. 1987).  Further, the Bank regularly audited Chateau

16  Julien's inventory and visited its business premises.  The image presented in these visits and

17  in Brower's public representations that he was one of the proprietors of Chateau Julien Wine

18  Estates, support the balance sheets' implication that he had an ownership interest in Chateau

19  Julien.[1]  The Bank's reliance was therefore reasonable.

20      Each of the six factors having been established, I find that Brower's obligation to the

21  Bank for his guaranty of the Chateau Julien loan is exempted from discharge pursuant to

22  § 523(a)(2)(B).

23

24

25

26  [1] Brower introduced evidence at trial that GAW, the owner of the permit issued by the
Alcohol and Tobacco Tax and Trade Bureau, included in its authorized trade names numerous

27  "Chateau Julien" entities.  (Exhibits 232 and 233).  Notably absent from these list of
authorized trade names is "Chateau Julien Wine Estate," the name presented to the public for

28  the Chateau Julien retail and special event operations.

7

"In order to state a prima facie case under § 727(a)(3), [the Bank] must show (1) that [Brower] failed to maintain and preserve adequate records, and (2) that such failure makes it impossible to ascertain Brower's financial condition and material business transactions." *Lansdowne v. Cox (In re Cox)*, 41 F.3d 1294, 1296 (9th Cir. 1994). The Bank is not required to prove fraudulent intent. *See id.* at 1297. If the Bank makes this showing, the burden shifts to Brower to justify or provide a credible explanation for the failure or inadequacy. *See id.* at 1296–97 (Holding that the debtor must show more than that she did not comprehend the need for business records. "In such cases, the justification must indicate that because of unusual circumstances, the debtor was absolved from the duty to maintain records herself.")

The statute does not require absolute completeness in keeping records, but Brower must present sufficient written evidence to enable his creditors to reasonably ascertain his present financial condition and follow his transactions for a reasonable period in the past. *In re Caneva*, 550 F.3d 755, 761 (9th Cir. 2008) (citations omitted). This exception to dischargeability is strictly construed in order to serve the purpose of giving debtors a fresh start. *Id.* (citing *Industrie Aeronautiche v. Kasler (Matter of Kasler)*, 611 F.2d 308, 310 (9th Cir.1979)).

The parties do not dispute that Brower destroyed records of Chateau Julien following its sale. After the Bank moved to enforce its loan, Brower disposed of the books and records associated with company transactions. Specifically, Brower discarded credit card receipts, inventory reports, point of sale material, detail for accounts payable, and general stationary supplies. He emphasized that this information was incorporated into the general ledger and bank statements he retained. In addition, Brower discarded the Chateau Julien computers because he did not have adequate storage space and the hard drives were destroyed. He maintained that the hard drives were removed and destroyed to protect sensitive customer and employee data.

While the destruction of certain records is admitted, the Bank must also prove that Debtor's financial condition cannot be ascertained as a result of the destruction. The records

8

1   need not be absolutely complete, but should be sufficient to ascertain Brower's financial

2   condition and material business transactions.

3        Brower stresses that after wrapping up the company's affairs, he kept over thirty years

4   of general ledgers, payroll records reaching one to two years back, at least six months of bank

5   statements, copies of checks and teller receipts, insurance policies, and inventory reports. The

6   question then is whether this information is enough.

7        Brower maintained significantly more than the debtors in *Cox*, where the debtor kept

8   no financial records of businesses in which she had an interest. 41 F.3d at 1296; *see also In re*

9   *Hussain*, 508 B.R. 417, 425 (B.A.P. 9th Cir. 2014) (Debtor's production of only tax returns

10  was insufficient to inform a creditor as to the nature and quality of profits and expenditures).

11  Unlike these cases, Brower kept records of importance that enabled Chateau Julien to file tax

12  returns and the Bank to deduce Brower's financial condition. At trial, it was clear that the

13  Bank's primary concern is the ability to identify transfers from Chateau Julien to Brower or

14  other entities. Brower testified that these transactions can be reconstructed using the general

15  ledger and bank records. Although it may be cumbersome, there is no evidence to the

16  contrary. That said, the Bank did not meet its burden to establish a prima facie case for denial

17  of discharge pursuant to § 727(a)(3).

18       Contemporaneous with entry of this memorandum decision, the court will enter

19  judgment exempting the Bank's claim against Brower from discharge pursuant to

20  § 523(a)(2)(B) but denying its request for relief pursuant to § 727(a)(3).

                                         **\*\*END OF ORDER\*\***

21

22

23

24

25

26

27

28

**COURT SERVICE LIST**

**Via ECF:**

All ECF Recipients

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

10



# First American Title Company

409 Washington Street, Suite 101 • Monterey, CA 93940

Office Phone:(831)649-2498 Office Fax:(866)427-6118

## Final Settlement Statement

| | | | |
|---|---|---|---|
| **Property:** | 8890 & 8940 Carmel Valley Road, Carmel, CA | **File No:** | 2713-4740315 |
| | | **Officer:** | Natalie Nickerson/NN |
| | | **Settlement Date:** | 04/17/2015 |
| | | **Disbursement Date:** | 04/17/2015 |
| | | **Print Date:** | 04/18/2015, 3:33 PM |

CERTIFIED TO BE A TRUE
AND CORRECT COPY
First American Title Company
By _____

| | |
|---|---|
| **Buyer:** | One Lantern, LLC |
| **Address:** | 8890 & 8940 Carmel Valley Road, Carmel, CA |
| **Seller:** | Coastal Cypress Corporation |
| **Address:** | Post Office Box 22918, Carmel, CA 93922 |
| **Lender:** | Pinnacle Bank |
| **Address:** | 1276-A South Main Street, Salinas, CA, 93901 |
| **New Loan No.:** | 320011600 |

| Buyer Charge | Buyer Credit | Charge Description | Seller Charge | Seller Credit |
|---|---|---|---|---|
| | | **Consideration:** | | |
| 10,470,000.00 | | Total Consideration | | 10,470,000.00 |
| | | | | |
| | | **Deposits in Escrow:** | | |
| | 100,000.00 | Receipt No. 111415574 on 10/07/2014 by Greg Ahn | | |
| | 50,000.00 | Receipt No. 111415821 on 12/18/2014 by Greg Ahn | | |
| | 100,000.00 | Receipt No. 111416166 on 03/30/2015 by One Lantern, LLC | | |
| | 25,000.00 | Receipt No. 111416254 on 04/16/2015 by One Lantern, LLC | | |
| | 1,585,000.00 | Receipt No. 111416243 on 04/14/2015 by One Lantern, LLC | | |
| | | | | |
| | | **Adjustments:** | | |
| 1,530,000.00 | | Personal Property Purchase/Install Equipment | | 1,530,000.00 |
| | 64,190.92 | Credit to Buyer fr Seller for Event Deposits | 64,190.92 | |
| | 7,500.00 | Cr to Buyer fr Seller Atty permit related mtr | 7,500.00 | |
| | 4,200,000.00 | Loan proceeds from 2nd interim loan | | |
| | | | | |
| | | **Prorations:** | | |
| 7,073.07 | | County Tax APN: 169-151-022 04/17/15 to 07/01/15 @$34422.25/yr | | 7,073.07 |
| 5,304.42 | | County Tax 169-161-001 04/17/15 to 07/01/15 @$25814.86/yr | | 5,304.42 |
| | | | | |
| | | **Commission:** | | |
| | | Commission Paid at Settlement to Mahoney & Associates | 300,000.00 | |
| | | | | |
| | | **New Loan(s):** | | |
| | | Lender: Pinnacle Bank | | |
| | 6,000,000.00 | New Loan to File - Pinnacle Bank | | |
| 60,000.00 | | Our origination charge - Pinnacle Bank | | |
| 7,500.00 | | Appraisal fee - Stephen Brown & Associates, Inc. | | |
| 9.25 | | Credit report - Advantage Credit | | |
| 118.00 | | Tax service - Nationwide Real Est Tax & Compliance Svc | | |
| 38.00 | | Flood certification - Nationwide Real Est Tax & Compliance Svc | | |
| 1,200.00 | | Appraisal Review Fee - The Meridian Valuation Group | | |
| 140.00 | | UCC Fees - Corporations Service Company, Inc. | | |
| 100.00 | | Fees - Dunn & Bradstreet | | |
| | 7,500.00 | Deposit received by Borrower (Appraisal) - Pinnacle Bank | | |
| | | | | |
| | | **Payoff Loan(s):** | | |
| | | Lender: Union Bank, N.A. | | |
| | | Principal Balance - Union Bank, N.A. | 1,351,840.50 | |
| | | Interest on Payoff Loan 03/31/15 to 04/20/15 @$108.867970/day - Union Bank, N.A. | 2,286.23 | |
| | | Statement/Forwarding Fee - Union Bank, N.A. | 90.00 | |
| | | Reconveyance Fee - Union Bank, N.A. | 93.00 | |
| | | Late Charge - Union Bank, N.A. | 679.10 | |
| | | Interest to 3/31/2015 - Union Bank, N.A. | 3,278.43 | |
| | | Lender: Union Bank, N.A. | | |
| | | Principal Balance - Union Bank, N.A. | 3,196,415.37 | |
| | | Interest on Payoff Loan 03/31/15 to 04/16/15 @$607.227540/day - Union Bank, N.A. | 10,322.87 | |
| | | Statement/Forwarding Fee - Union Bank, N.A. | 60.00 | |

# EXHIBIT 6

Case: 15-50801    Doc# 322    Filed: 07/22/21    Entered: 07/22/21 16:31:04    Page 80 of 151

80

UB0044066

## Final Settlement Statement

| Settlement Date: | 04/17/2015 | | File No: | 2713-4740315 |
| Print Date: | 04/18/2015 | | Officer: | Natalie Nickerson/NN |

| Buyer Charge | Buyer Credit | Charge Description | Seller Charge | Seller Credit |
|---|---|---|---|---|
| | | Reconveyance Fee - Union Bank, N.A. | 93.00 | |
| | | Late Charge - Union Bank, N.A. | 4,678.55 | |
| | | Unapplied funds - Union Bank, N.A. | | 23,329.75 |
| | | Interest due 02/01/2015 to 03/31/2015 - Union Bank, N.A. | 36,463.03 | |
| | | Fee for Demand Statement - Union Bank, N.A. | 30.00 | |
| | | | | |
| | | **Title/Escrow Charges to:** | | |
| 160.00 | | Notary Fee B to First American Title Company | | |
| | | Notary Fee S to First American Title Company | 40.00 | |
| 270.00 | | New Loan Services Fee to First American Title Company | | |
| 2,875.00 | | Escrow Fee to First American Title Company | | |
| 3,676.25 | | ALTA Loan Policy Extended - 1 to First American Title Company | | |
| 125.00 | | ALTA Loan Policy Extended - 2 to First American Title Company | | |
| 6,272.60 | | ALTA Owners Policy Standard to First American Title Company | | |
| 1,254.52 | | Endorsement (Lender) Max Charge to First American Title Company | | |
| 18.00 | | Record Deed to First American Title Company | | |
| 48.00 | | Record Deed of Trust - 1 to First American Title Company | | |
| 36.00 | | Record Assignment to First American Title Company | | |
| 30.00 | | Record Hazardous Substances Cert.& Indemnity to First American Title Company | | |
| | | County Documentary Transfer Tax to First American Title Company | 11,517.00 | |
| | | | | |
| | | **Disbursements Paid:** | | |
| 17,000.00 | | Homeowner's insurance to Christensen Group Insurance | | |
| | | Flood insurance premium to          POC-B $1,325.00 Christensen Group Insurance | | |
| 18,500.00 | | General Liability/Auto/Umbrella to Christensen Group Insurance | | |
| | | Early release of funds to Coastal Cypress Corp | 150,000.00 | |
| 223.50 | | Mandatory NHD to JCP-LGS Reports Natural Hazard Disc. | | |
| | | Attorney Fees to Ghosheh Law Group A Professional Corporation | 7,500.00 | |
| | | Payment to Med-Ventures Investments, LLC | 1,120,000.00 | |
| | | 2nd Early Release of Funds to Coastal Cypress Corporation | 100,000.00 | |
| 1,450.00 | | Appraisal of Equipment to Nicholson and Company | | |
| | | Early Release of Funds to Coastal Cypress Corporation | 100,000.00 | |
| | | Liquor Escrow to Bay Commercial Bank | 5,000.00 | |
| | | Tax Installment: 1st/2nd 2013 + penalties to Monterey County Tax Collector | 4,477.46 | |
| | | Tax Installment: 2nd 2014-2015 and penalty to Monterey County Tax Collector | 20,861.84 | |
| | | Tax Installment: 1st/2nd 2012 + penalty to Monterey County Tax Collector | 4,916.58 | |
| | | Tax Installment: 1st/2nd 2011 + penalty to Monterey County Tax Collector | 5,611.90 | |
| | | Tax Installment: 1st/2nd instal.          POC-S $25,814.86 2014-15 to Monterey County Tax Collector | | |
| | | | | |
| | | **Funds Held:** | | |
| | | Funds Held Septic Upgrade Hold Back | 50,000.00 | |
| | | | | |
| 5,769.31 | | **Cash ( From) (X To) Buyer** | | |
| | | **Cash (X To) ( From) Seller** | 5,477,761.46 | |
| | | | | |
| 12,139,190.92 | 12,139,190.92 | **Totals** | 12,035,707.24 | 12,035,707.24 |

Case: 15-50801    Doc# 322    Filed: 07/22/21    Entered: 07/22/21 16:31:04    Page 81 of 151

**81**

UB0044067



**EXHIBIT 7**

**Proceeds Transferred to Debtor**

Transfers from Coastal

| Bank | Account Number | Check No. | Date | Amount |
|------|----------------|-----------|------|--------|
| Fremont | 1870 | 1319 | 4/6/2015 | $9,300 |
| Fremont | 1870 | 1329 | 5/1/2015 | $74,057.74 |
| Fremont | 1870 | 1405 | 4/30/16 | $1,500 |
| Fremont | 1870 | 1433 | 9/27/16 | $1,124 |
| Fremont | 1870 | 1441 | 10/24/16 | $11,199.34 |
| Fremont | 1870 | 1442 | 10/24/16 | $950 |
| M&T | 5772 | 5001 | 2/3/17 | $925 |
| M&T | 5772 | 5054 | 9/18/17 | $498.61 |
| M&T | 5772 | 5182 | 11/12/19 | $500 |
| M&T | 5772 | 5194 | 12/18/19 | $5,671.88 |
| M&T | 5772 | 5196 | 12/18/19 | $2,216.03 |
| M&T | 5772 | 5198 | 12/18/19 | $2,659.30 |
| M&T | 5772 | 5200 | 12/18/19 | $6,069.12 |
| M&T | 5772 | 5189 | 12/18/19 | $3,592.21 |
| M&T | 5772 | 5192 | 12/18/19 | $4,883.01 |
| M&T | 5772 | 5206 | 1/17/20 | $6,476.50 |
| M&T | 5772 | 5207 | 1/17/20 | $5,118.63 |
| M&T | 5772 | 5229 | 6/30/20 | $12,513.78 |
| M&T | 5772 | 5230 | 6/30/20 | $2,968 |
| M&T | 5772 | 5231 | 6/30/20 | $7,141.68 |
| M&T | 5772 | 5240 | 7/13/20 | $4,240 |
| M&T | 5772 | 5243 | 8/13/20 | $4,240 |
| | | | **Total** | **$167,844.83** |

Transfers from GAW

| Bank | Account Number | Check No. | Date | Amount |
|------|----------------|-----------|------|--------|
| Fremont | 0726 | 29925 | 9/26/15 | $1,436 |
| Fremont | 0726 | 30129 | 12/4/15 | $720 |
| | | | **Total** | **$2,156** |

Transfers from the Trust

| Bank | Account Number | Check No. | Date | Amount |
|------|----------------|-----------|------|--------|
| Chase | 5233 | 293 | 4/14/17 | $75.52 |
| | | | **Total** | **$75.52** |

**EXHIBIT 8**

## Amount of the Proceeds Transferred to ACP

Transfers from Coastal

| Bank | Account Number | Check No. | Date | Amount |
|------|----------------|-----------|------|--------|
| Fremont | 1870 | 1325 | 4/22/15 | $10,000 |
| Fremont | 1870 | 1327 | 4/21/15 | $12,000 |
| Fremont | 1870 | 1338 | 5/2/15 | $10,000 |
| Fremont | 1870 | 1468 | 4/6/17 | $10,000 |
| M&T | 5772 | 5026 | 5/25/17 | $50,000 |
| M&T | 5772 | 5035 | 6/16/17 | $50,000 |
| M&T | 5772 | 5047 | 9/2/17 | $50,000 |
| M&T | 5772 | 5060 | 10/19/17 | $75,000 |
| M&T | 5772 | 5063 | 11/16/17 | $10,000 |
| M&T | 5772 | 5073 | 1/16/18 | $8,500 |
| M&T | 5772 | 5075 | 2/11/18 | $12,500 |
| M&T | 5772 | 5087 | 5/8/18 | $8,000 |
| M&T | 5772 | 5092 | 6/4/18 | $19,500 |
| M&T | 5772 | 5101 | 7/22/18 | $15,000 |
| M&T | 5772 | 5104 | 8/15/18 | $25,000 |
| M&T | 5772 | 5118 | 10/24/18 | $35,000 |
| M&T | 5772 | 5205 | 1/15/20 | $5,000 |
| M&T | 5772 | 5213 | 2/2/20 | $3,000 |
| M&T | 5772 | 5222 | 5/6/20 | $4,000 |
| M&T | 5772 | 5228 | 6/30/20 | $7,000 |
| | | | **Total** | **$419,500** |

Transfers from GAW

| Bank | Account Number | Check No. | Date | Amount |
|------|----------------|-----------|------|--------|
| Fremont | 0726 | 29504 | 6/5/15 | $2,986.78 |
| Fremont | 0726 | 29577 | 6/26/15 | $2,986.78 |
| Fremont | 0726 | 29678 | 7/24/15 | $2,986.78 |
| Fremont | 0726 | 30154 | 12/11/15 | $5,973.56 |
| | | | **Total** | **$14,933.90** |

Transfers from the Trust

| Bank | Account Number | Check No. | Date | Amount |
|------|----------------|-----------|------|--------|
| Chase | 5233 | 259 | 2/1/17 | $2,986.78 |

## EXHIBIT 9

| | | | | |
|---|---|---|---|---|
| Chase | 5233 | 347 | 6/28/17 | $2,986.78 |
| Chase | 5233 | 365 | 7/31/17 | $2,986.78 |
| Chase | 5233 | 371 | 8/1/17 | $2,986.78 |
| | | | **Total** | **$11,947.12** |

**Proceeds Transferred to the Trust**

Transfers from Coastal

| Bank | Account Number | Check No. | Date | Amount |
|------|----------------|-----------|------|--------|
| Fremont | 1870 | 1380 | 1/7/16 | $65,000 |
| Fremont | 1870 | 1406 | 5/11/16 | $45,000 |
| Fremont | 1870 | 1438 | 10/21/16 | $18,000 |
| M&T | 5772 | 5022 | 5/11/17 | $6,800 |
| | | | **Total** | **$134,800** |

Transfers from GAW

| Bank | Account Number | Check No. | Date | Amount |
|------|----------------|-----------|------|--------|
| Fremont | 0726 | 30254 | 1/15/16 | $150 |
| | | | **Total** | **$150** |

Transfers from ACP

| Bank | Account Number | Check No. | Date | Amount |
|------|----------------|-----------|------|--------|
| Bank of America | 5227 | 1046 | 6/25/15 | $5,000 |
| Bank of America | 5227 | 1052 | 8/2/15 | $5,000 |
| Bank of America | 5227 | 1061 | 10/23/15 | $5,000 |
| Bank of America | 5227 | 1070 | 12/13/15 | $5,000 |
| Taylor Bank | 2501 | 1033 | 4/1/17 | $214.98 |
| Taylor Bank | 2501 | 1042 | 6/16/17 | $41,000 |
| Taylor Bank | 2501 | 1043 | 6/22/17 | $42,368.25 |
| Taylor Bank | 2501 | 1058 | 9/14/17 | $25,000 |
| Taylor Bank | 2501 | 1065 | 10/1/17 | $1,193.13 |
| Taylor Bank | 2501 | 1067 | 10/26/17 | $90,000 |
| Taylor Bank | 2501 | 1081 | 1/28/18 | $675 |
| Taylor Bank | 2501 | 1085 | 2/12/18 | $10,000 |
| Taylor Bank | 2501 | 1093 | 3/18/18 | $224.98 |
| Taylor Bank | 2501 | 1119 | 6/23/18 | $9,500 |
| | | | **Total** | **$240,176.34** |

# EXHIBIT 10

**Proceeds Transferred to GAW**

Transfers from Coastal

| Bank | Account Number | Check No. | Date | Amount |
|------|---------------|-----------|------|--------|
| Fremont | 1870 | 1326 | 4/21/15 | $290,000 |
| Fremont | 1870 | 1343 | 5/29/15 | $500,000 |
| Fremont | 1870 | 1363 | 9/21/15 | $500,000 |
| Fremont | 1870 | 1388 | 2/18/16 | $250,000 |
| Fremont | 1870 | 1397 | 4/2/16 | $50,000 |
| Fremont | 1870 | 1402 | 4/17/16 | $8,408.77 |
| M&T | 5772 | 5070 | 1/17/18 | $36,000 |
| | | | **Total** | **$1,634,408.77** |

**EXHIBIT 11**

## Proceeds Transferred to R. Brower

Transfers from Coastal

| Bank | Account Number | Check No. | Date | Amount |
|------|----------------|-----------|------|--------|
| Fremont | 1870 | 1413 | 5/22/16 | $1,088.06 |
| Fremont | 1870 | 1464 | 3/5/17 | $3,373.99 |
| Fremont | 1870 | 1469 | 4/12/17 | $1,928.32 |
| M&T | 5772 | 5097 | 7/7/18 | $936.62 |
| M&T | 5772 | 5237 | 7/8/20 | $439.70 |
| | | | **Total** | **$7,766.69** |

Transfers from ACP

| Bank | Account Number | Check No. | Date | Amount |
|------|----------------|-----------|------|--------|
| Bank of America | 5227 | 1037 | 5/2/15 | $4,295 |
| Bank of America | 5227 | 1044 | 6/13/15 | $3,631.72 |
| Bank of America | 5227 | 1049 | 7/12/15 | $1,345.51 |
| Bank of America | 5227 | 1067 | 12/1/15 | $2,484.30 |
| | | | **Total** | **$11,756.53** |

Transfers from the Trust

| Bank | Account Number | Check No. | Date | Amount |
|------|----------------|-----------|------|--------|
| Chase | 4863 | 192 | 1/7/16 | $2,372.08 |
| Chase | 4863 | 228 | 2/17/16 | $1,517.79 |
| Chase | 5233 | 253 | 1/15/17 | $2,041.17 |
| Delmarva | 2512 | 1021 | 9/3/17 | $829.79 |
| Delmarva | 2512 | 1086 | 12/13/17 | $1,724.69 |
| | | | **Total** | **$8,485.52** |

Transfers from GAW

| Bank | Account Number | Check No. | Date | Amount |
|------|----------------|-----------|------|--------|
| Fremont | 0726 | 29344 | 5/1/15 | $3,338.90 |
| Fremont | 0726 | 29368 | 5/5/15 | $2,738.48 |
| Fremont | 0726 | 29458 | 5/20/15 | $2,738.48 |
| Fremont | 0726 | 29471 | 5/22/15 | $14,662.60 |
| Fremont | 0726 | 29497 | 6/5/15 | $2,738.48 |

## EXHIBIT 12

| Fremont | 0726 | 29510 | 6/5/15 | $3,348.66 |
|---------|------|-------|--------|-----------|
| Fremont | 0726 | 29532 | 6/12/15 | $3,782.88 |
| Fremont | 0726 | 29581 | 6/26/15 | $2,771.83 |
| Fremont | 0726 | 29623 | 7/10/15 | $6,223.93 |
| Fremont | 0726 | 29648 | 7/20/15 | $2,738.48 |
| Fremont | 0726 | 29881 | 7/24/15 | $2,743.66 |
| Fremont | 0726 | 29725 | 8/5/15 | $2,277.83 |
| Fremont | 0726 | 29790 | 8/14/15 | $3,764.28 |
| Fremont | 0726 | 29810 | 8/20/15 | $2,277.83 |
| Fremont | 0726 | 29822 | 8/21/15 | $3,135.92 |
| Fremont | 0726 | 29865 | 9/4/15 | $3,689.31 |
| Fremont | 0726 | 29883 | 9/11/15 | $3,764.28 |
| Fremont | 0726 | 29905 | 9/20/15 | $2,277.83 |
| Fremont | 0726 | 29915 | 9/18/15 | $1,656.99 |
| Fremont | 0726 | 29949 | 10/5/15 | $2,277.83 |
| Fremont | 0726 | 29960 | 10/2/15 | $3,186.53 |
| Fremont | 0726 | 29996 | 10/20/15 | $2,277.83 |
| Fremont | 0726 | 30007 | 10/23/15 | $5,888.24 |
| Fremont | 0726 | 30100 | 11/20/15 | $3,764.28 |
| Fremont | 0726 | 30120 | 12/5/15 | $2,435.18 |
| Fremont | 0726 | 30158 | 12/11/15 | $3,764.28 |
| Fremont | 0726 | 30181 | 12/18/15 | $2,617.28 |
| Fremont | 0726 | 30281 | 1/20/16 | $2,220.15 |
| Fremont | 0726 | 30221 | 1/8/16 | $11,184.79 |
| Fremont | 0726 | 30196 | 1/5/16 | $2,220.15 |
| Fremont | 0726 | 30375 | 2/20/16 | $2,220.15 |
| Fremont | 0726 | 30321 | 2/5/16 | $2,220.15 |
| Fremont | 0726 | 30337 | 2/9/16 | $12,175.83 |
| Fremont | 0726 | 30521 | 3/18/16 | $3,764.28 |
| Fremont | 0726 | 30507 | 3/20/16 | $2,220.15 |
| Fremont | 0726 | 30463 | 3/4/16 | $5,553.14 |
| Fremont | 0726 | 30452 | 3/5/16 | $2,220.15 |
| Fremont | 0726 | 30598 | 4/1/16 | $2,220.15 |
| Fremont | 0726 | 30563 | 4/1/16 | $5,167.85 |
| Fremont | 0726 | 30667 | 5/23/16 | $7,383.78 |
| Fremont | 0726 | 30704 | 5/20/16 | $3,764.28 |
| Fremont | 0726 | 30655 | 5/10/16 | $2,277.83 |
| Fremont | 0726 | 30621 | 4/19/16 | $3,764.28 |
| Fremont | 0726 | 30611 | 4/29/16 | $2,268.82 |
| Fremont | 0726 | 30788 | 6/22/16 | $9,900.42 |
| Fremont | 0726 | 30760 | 6/20/16 | $2,277.83 |
| Fremont | 0726 | 30807 | 7/15/16 | $2,277.63 |
| Fremont | 0726 | 30802 | 7/1/16 | $15,087.54 |
| Fremont | 0726 | 40079 | 8/22/16 | $11,348.31 |
| Fremont | 0726 | 30847 | 8/25/16 | $2,277.83 |

| Fremont | 0726 | 40050 | 8/9/16 | $3,764.28 |
|---------|------|-------|--------|-----------|
| Fremont | 0726 | 30835 | 7/20/16 | $2,277.83 |
| Fremont | 0726 | 40144 | 9/20/16 | $7,741.70 |
| Fremont | 0726 | 40129 | 9/20/16 | $2,277.83 |
| Fremont | 0726 | 40091 | 9/2/16 | $2,277.83 |
| Fremont | 0726 | 40110 | 9/2/16 | $3,764.28 |
| Fremont | 0726 | 40191 | 10/18/16 | $3,764.28 |
| Fremont | 0726 | 40161 | 10/5/16 | $2,277.83 |
| Fremont | 0726 | 40379 | 1/16/17 | $5,153.72 |
| Fremont | 0726 | 40347 | 1/4/17 | $3,764.28 |
| Fremont | 0726 | 40451 | 2/22/17 | $4,632.94 |
| Fremont | 0726 | 40415 | 2/2/17 | $4,412.88 |
| Fremont | 0726 | 40398 | 2/1/17 | $8,907.63 |
| Fremont | 0726 | 40476 | 3/7/17 | $3,764.28 |
| Fremont | 0726 | 40533 | 4/14/17 | $14,156.92 |
| Fremont | 0726 | 40615 | 5/22/17 | $8,377.94 |
| Fremont | 0726 | 40604 | 5/19/17 | $3,764.28 |
| Fremont | 0726 | 40585 | 5/5/17 | $3,764.26 |
| Fremont | 0726 | 40670 | 6/20/17 | $10,347.38 |
| Fremont | 0726 | 40642 | 6/2/17 | $21,988.37 |
| Fremont | 0726 | 40743 | 7/17/17 | $3,764.28 |
| Fremont | 0726 | 40727 | 7/12/2017 | $7,064.28 |
| Fremont | 0726 | 40822 | 8/23/17 | $6,349.28 |
| Fremont | 0726 | 40807 | 8/14/17 | $3,764.28 |
| Fremont | 0726 | 40759 | 8/1/17 | $2,220 |
| Fremont | 0726 | 40860 | 9/19/17 | $3,160.07 |
| Fremont | 0726 | 40843 | 9/8/17 | $1,100 |
| Fremont | 0726 | 40904 | 10/13/17 | $2,484.42 |
| Fremont | 0726 | 40960 | 11/14/17 | $391.14 |
| Fremont | 0726 | 40932 | 11/1/17 | $3,685 |
| Fremont | 0726 | 40998 | 12/4/17 | $8,244.33 |
| Fremont | 0726 | 41082 | 1/24/18 | $7,797.47 |
| Fremont | 0726 | 41057 | 1/17/18 | $323.86 |
| Fremont | 0726 | 41018 | 12/18/17 | $8,470 |
| Fremont | 0726 | 41113 | 2/16/18 | $8,874.40 |
| Fremont | 0726 | 41089 | 2/5/18 | $1,656.39 |
| Fremont | 0726 | 41278 | 12/25/17 | $1,103.58 |
| Fremont | 0726 | 41269 | 12/29/17 | $3,897.51 |
| Fremont | 0726 | 41119 | 4/4/18 | $4,961.42 |
| Fremont | 0726 | 41136 | 5/18/18 | $4,961.43 |
| Fremont | 0726 | 41131 | 5/5/18 | $4,961.41 |
| Fremont | 0726 | 41142 | 6/5/18 | $4,961.41 |
| Fremont | 0726 | 41154 | 6/29/18 | $1,755.92 |
| Fremont | 0726 | 41186 | 10/22/18 | $6,255.54 |
| Fremont | 0726 | 41177 | 9/24/18 | $5,087.30 |

| | | | | |
|---|---|---|---|---|
| Fremont | 0726 | 41204 | 12/31/18 | $376.12 |
| | | | **Total** | **$441,749.17** |

**Proceeds Transferred to Deerleaf**

Transfers from GAW

| Bank | Account Number | Check No. | Date | Amount |
|------|----------------|-----------|------|--------|
| Fremont | 0726 | 40939 | 11/1/17 | $259.64 |
| Fremont | 0726 | 41056 | 1/17/18 | $55.97 |
| | | | **Total** | **$315.61** |

Transfers from the Trust

| Bank | Account Number | Check No. | Date | Amount |
|------|----------------|-----------|------|--------|
| Delmarva | 2512 | 1105 | 1/14/18 | $60,000 |
| | | | **Total** | **$60,000** |

**EXHIBIT 13**

# MED-VENTURE INVESTMENTS, LLC

18101 Von Karman
Suite 230
Irvine, California 92612
Tel. (714) 243-6123
Fax (714) 209-7678

January 15, 2011

**CONFIDENTIAL**

**Château Julien, Inc.**
**Coastal Cypress Corporation**
8940 Carmel Valley Road
Carmel, California 93923, USA

Attention: Robert Brower, Chairman and CEO

Per our discussions, we understand that Chateau Julien, Inc. ("CJ") and Coastal Cypress Corporation ("CC", and CJ and CC collectively, together with their respective subsidiaries and affiliates, the "Company") is evaluating the potential sale of their respective businesses and/or assets.

Based on the satisfactory completion of our due diligence investigation, our favorable evaluation of the Company's business model, and our favorable assessment of general conditions in the markets, Med-Venture Investments, LLC ("MVI") would be pleased to provide consulting and advisory services to the Company from the date of this letter agreement through and until the two-year anniversary of the date hereof (the "Term"). Specifically MVI will assist the Company in developing a strategy for the sale of its business, identify potential acquirors, and assist in the implementation of the Company's sale strategy. For purposes of this engagement letter, the term "Sale Transaction" shall mean any transaction with a third-party that results, through one or more related transactions, in the sale or licensing of all or substantially all of the business or assets of the Company (or of CJ or CC separately), or a merger or sale of ownership interests that results in the owners of the Company (or of CJ or CC separately) prior to such transaction owning less than fifty percent (50%) of the surviving entity of such transaction.

## Engagement of Agents

MVI may separately engage agents at its own expense and without the prior approval of the Company.

## Fees and Expenses

You and the Company agree to pay MVI, or its designee, a consulting fee (the "Fee") in the amount of $1,120,000 at the time of receipt of any funds from any Sale Transaction occurring at any time during the five (5) year period extending from the date of this letter agreement with any prospective acquirors (the "Term").

# EXHIBIT 14

Furthermore, regardless or whether or not any Sale Transaction occurs, the Company agrees that it will reimburse MVI's reasonable out-of-pocket expenses incurred in connection with the performance of its services hereunder, including but not limited to copy, telephone and travel expense, with the understanding that amounts over $500 will be submitted for prior approval.

## Termination

MVI shall have the right to immediately terminate this Agreement if information previously provided to it regarding the Company is materially different (as reasonably determined by MVI) than the information discovered by MVI during the due diligence period. Additionally, MVI's engagement hereunder may be terminated by either the Company or MVI at any time from the date hereof upon 30 days written notice to that effect to the other party, it being understood that the provisions relating to the payment of fees and expenses, indemnification, limitations on the liability of indemnified parties, contribution, settlements, and waiver of the right to trial by jury will survive any termination.

## Right to Advertise

Upon the completion of any Sale Transaction, MVI shall have the right to place advertisements on its website and in financial and other newspapers and journals at its own expense describing its services to the Company hereunder.

## Independent Contactor

The Parties acknowledge and agree that the Parties are independent contractors, and nothing in this Agreement is intended, and nothing shall be construed, to create a partnership, joint venture, employer-employee relationship, trust, or any other form of legal organization or association between the Company and MVI. Each Party shall be solely responsible for and shall comply with all state and federal laws pertaining to employment taxes, income withholding, unemployment compensation or contributions and other employment related statutes applicable to that Party. MVI shall be responsible for filing such tax returns and paying such self-employment taxes as may be required by law or regulations.

## Indemnification

The Company agrees to indemnify and hold harmless MVI and its affiliates and directors, officers, agents and employees (the "Indemnified Parties") from any losses, claims, damages, judgments, costs or other liabilities or expense, including, without limitation, reasonable legal fees ("Losses") incurred in connection with or as a result of our engagement or any services provided pursuant to this agreement including, but not limited to, Losses caused by or arising out of any untrue statement of a material fact contained in information furnished to MVI by the Company or its advisors in connection with our engagement, or any omission to state therein any material fact required or necessary to make the information not misleading in light of circumstances under which given, or any other violation of the federal securities laws or the securities laws of any state, or otherwise arising out of our engagement hereunder, provided, however, that the Company will not be liable under the foregoing indemnification provision to the extent that any loss, claim, damage, liability or expense is found in a non-appealable final judgment by a court to have resulted from MVI's gross negligence intentional misconduct. The Company also agrees that the Indemnified Parties shall not have any liability (whether direct or indirect, in contract or tort or

2

**BABC00008**
UB0012738

otherwise) to the Company or its security holders or creditors related to or arising out of the engagement of the Indemnified Parties pursuant to, or the performance by the Indemnified Parties of the services contemplated by, this letter agreement except to the extent that any loss, claim, damage or liability is found in a non-appealable final judgment by a court to have resulted from MVI's intentional misconduct or gross negligence, and then such liability shall not exceed the amount of any Cash Payment made to MVI hereunder, if any.

In the event testimony from, or appearance by, any employee or consultant of MVI's is required by the Company before any tribunal or other body or agency in connection with the Agent's engagement hereunder, the Company agrees to promptly reimburse MVI for all expenses (including reasonable legal expenses of MVI) as well as compensation at the rate of $300 per hour for all time expended in preparing for and appearing and/or testifying, notwithstanding that any such appearance and/or testimony shall be required by court or other process. Upon request of MVI, the Company will pay a reasonable retainer to MVI's counsel required in connection with the preceding sentence.

## Complete Information

The Company recognizes and confirms that, in performing its engagement, MVI will be using and relying on data, material and other information furnished to it by the Company, or its auditing firm, attorneys, or others (collectively "Advisors") as well as information otherwise available, both oral and written (such data, material and other information is hereinafter referred to as the "Information"). The Company recognizes and confirms that MVI does not assume responsibility for the accuracy or completeness of the Information. The Company hereby represents and warrants that any of the Information furnished by it or its Advisors to MVI will be complete in all material respects and not contain any untrue statement of a material fact or omit to state any material fact necessary to make the statement therein not false or misleading.

## Confidentiality

MVI recognizes and confirms that the Company that some of the Information provided to it is either non-public and confidential or proprietary in nature. MVI hereby agrees that the Information will be kept confidential and will not, without the prior consent of the Company, be disclosed by them, their agents or employees, other than in connection with the services to the Company as described above or as otherwise required by law.

## Arbitration

Each party hereby agrees to submit all disputes or controversies arising out of or in conjunction with this agreement to binding arbitration in Orange County, California in accordance with the commercial arbitration rules of the American Arbitration Association then in effect. The prevailing party in any such arbitration shall be entitled to an award of its reasonable attorneys' fees, costs and disbursements incurred as a result of such arbitration, including reimbursement for the costs of witnesses' travel and subsistence. Judgment upon any arbitration award rendered may be entered in any court having jurisdiction thereof.

3

## Nature of Services

We anticipate initiating discussions with institutional and private contacts for the transaction upon the receipt of an executed copy of this agreement, the completion of due diligence and the availability of the material relating to the transaction. We would endeavor to close the transaction as soon as practicable after gaining written commitments from potential acquirors.

MVI personnel will devote sufficient time to the foregoing activities as MVI deems shall be reasonably necessary to discharge its duties hereunder. However, MVI will not be required to devote any specific minimum amount of time to the Company's affairs. Accordingly, MVI may render services of the same or similar nature for or on behalf of any other persons, businesses or corporations.

The Company further expressly acknowledges and agrees that the services being provided by MVI are of a professional nature and necessarily involve issues of judgment and opinion, and that the judgment and opinions of other experts or professionals may differ substantially from those of MVI. Other professionals under the same circumstances might offer advice or perform services materially different than the advice provided or the services performed by MVI.

This agreement constitutes the entire agreement and understanding between the parties hereto, and supersedes any and all previous agreements and understandings, whether oral or written (if any), between the parties with respect to the matters set forth herein.

If the foregoing conforms with your understanding and has been appropriately approved by the Company, please so signify by signing this letter in the space provided and delivering it to me, whereupon after execution by MVI, this Agreement shall become a binding agreement among the Company, MVI and the Company's unit holders, shareholders, or partners. A telecopy of a signed original of this Agreement shall be sufficient to bind the parties whose signatures appear hereon.

We look forward to a successful and mutually beneficial relationship with the Company.


## AGREED TO AND ACCEPTED:


CHATEAU JULIEN, INC.
COASTAL CYPRESS CORPORATION

By: _____

Robert Brower, their respective
Chairman and Chief Executive Officer

Med-Venture Investments, LLC

By: _____
Anthony Nobles, President and CEO

4



**GLOBAL**
**WINE PARTNERS**
The Global Wine Investment Bank

August 5, 2011

Robert Brower
Chateau Julien
rbrower136@gmail.com

CC: Tony Nobles, Aurora Capital Advisors

Dear Bob,
This is to follow up on the discussions that I had with you and to outline the arrangements for our services to you and Chateau Julien.

## SERVICES

You wish to engage Global Wine Partners (U.S.) LLC, ("GWP") on an exclusive basis to advise and assist you as outlined in this letter for the sale of Chateau Julien, of its brands and assets.

GWP, with Aurora Capital Advisors, is Chateau Julien's exclusive advisor on the transaction. GWP agrees to act exclusively on its behalf.

### Prepare for a Transaction

We will advise and assist you in preparing for any transaction, in general as follows.

1. Continue to seek to understand your goals and other considerations and facilitate a decision process to prioritize alternatives

2. Coordinate the involvement as needed of your legal and other advisors

3. Advise you regarding the preparation of any needed due diligence and disclosure information in advance to maximize our chances of success. This will allow us to be better prepared to identify important transaction issues in advance and to be more responsive to the other party's decision process, all with the goal of building confidence and improving the potential for completing a transaction with the best outcome.

4. Advise you regarding the preparation of information for prospective parties to a transaction.

### Seek and Complete a Transaction

We will advise and assist you in seeking and completing any transaction of the type or types decided upon by you as follows.

1. Consult with you on the best process for pursuing a transaction.

2. As part of this process, assist and advise you in evaluating any offers and in formulating counter offers and advise you and your attorneys on business issues and transaction terms.

3. Lead all negotiations and conduct any transaction process in consultation with you and your attorneys all parties will be conducted by us or coordinated in advance through us, including communications with the other party's advisors. The purpose of this is to facilitate consistent communication, minimize potential miscommunication and improve understanding of the other party's issues and positions.

# EXHIBIT 15

The Wine Business Center, 899 Adams Street, Suite F, St. Helena, CA 94574 USA, +1 (707) 967 5303, www.globalwinebank.com

Case: 15-50801    Doc# 322    Filed: 07/22/21    Entered: 07/22/21 16:31:04    Page 97 of
151

**97**

UB0029915

4.  Once any letter of intent or term sheet is executed, we will work with you in completing the negotiation of a definitive transaction agreement through closing or termination. We will remain available to advise and assist you throughout this process, including assistance in resolving related transaction post-closing issues.

Throughout this process, our goal is to help you close a transaction and meet your related goals.

## GWP ARRANGEMENTS

This engagement is with Global Wine Partners (U.S.) LLC, ("GWP") the U.S. wine industry investment bank.

### Confidentiality

All non-public information about your business and this assignment will be maintained by GWP in strict confidence.

We understand the importance of privacy and confidentiality in this matter, and agree to maintain this engagement in strict confidence. You wish to keep this undertaking private and confidential.

### GWP Personnel

Don Brain will advise you and work personally with you throughout this process and will be your liaison with prospects. He will be supported by Aurora Capital Advisors. All will be held to the same strict standards of confidentiality and discretion.

### Term

We will work with you on an advisory basis in accordance with the terms of this engagement letter. The agreement is for a 12 month term. The engagement is subject to termination by either party on 90 days notice.

Once this engagement commences, we will have incurred substantial time and cost in advising you, and in exposing you to a number of important ideas and prospects. Accordingly, if a termination occurs, we retain the right to fees owed under the terms of this engagement through the effective date of termination.

This term includes a "tail" period of 12 months after termination for all prospects we work with during this engagement. In the event of a termination, the Transaction Completion Fee shall be owed if you transact with such a party within the term and "tail period" as herein provided.

### Fees

*Transaction Fees-*

GWP fees will consist of Initial Fees plus Transaction Completion Fees as further described below. Transaction Completion Fees will apply where contact with the other party to the transaction occurred during the term of this engagement. All unpaid fees are due and payable from escrow directly to GWP at the closing of any transaction.

A.  The fee is 3% of the sale price up to $22MM.
B.  The fee is 4% of the sale price over $22MM.

### Other Provisions

Our services and advice are intended solely for your benefit and shall not be disclosed to or relied upon by any person or organization.

*Indemnification*

Each party to this letter agrees to indemnify, defend, protect and hold harmless the other parties from and against any and all claims, demands, liabilities, costs and damages, including without limitation, reasonable attorneys' fees, resulting from the party's bad faith, willful misconduct or gross negligence in connection with this letter. This indemnification provision shall survive the termination of this letter agreement.

*Arbitration*

Any dispute between the parties concerning this agreement shall be submitted to binding arbitration in San Francisco, California in accordance with the rules of the California Arbitration Association. The prevailing party, as determined by the arbitrators, shall be entitled to recover any award plus all costs of arbitration, including reasonable attorneys' fees as determined by the arbitrator or arbitrators. Any final decision in any such arbitration shall be final and binding, and the prevailing party shall be entitled to entry of a judgment in the applicable court or courts.

*Information and Materials Provided*

You agree to make available to us information as needed for this process that we may request, including information with respect to the description, financial condition, historical performance, future prospects, financial projections, ownership, lease and operation of the assets. You authorize us to make appropriate use of such information with your permission, including providing it to potential parties and their representatives subject to suitable confidentiality arrangements for non-public information.

You will review any materials prepared by us that we submit to you and advise us of any revisions necessary to assure that such materials are not misleading or inaccurate. It is agreed that we will be indemnified in any claim based upon such materials. You will promptly advise us of any material developments affecting your ownership or operation of the assets that may bear on this assignment.

Thank you very much for your consideration, for your confidence and for the opportunity to assist you with this very important project. We look forward to working with you to meet your goals.

Sincerely,

**GLOBAL WINE PARTNERS (U.S.) LLC**

Don Brain

**APPROVAL AND ACCEPTANCE :**
**Robert Brower**

By: _____ Date: August 8, 2011

Print Name: Robert S. Brower Sr. Title: President

# Project

# Zoom

**EXHIBIT 16**

Case: 15-50801    Doc# 322    Filed: 07/22/21    Entered: 07/22/21 16:31:04    Page 100 of 151

**100** UB0030096





# Confidential Memorandum



UB0030097

## Confidential Memorandum-Required Notice

### Restricted Distribution and Use — Subject to Confidentiality Agreement

This Confidential Memorandum is based upon information provided Château Julien, ("Winery"). This memorandum is distributed by Global Wine Partners (U.S.) LLC ("Global Wine Partners") as Winery's financial advisors, solely for the use by prospective investors subject to Winery's confidentiality agreement in considering an acquisition of certain assets of Winery. This memorandum has been approved and is provided by Winery, the memorandum issuer.

This memorandum contains selected preliminary information to assist the recipient in making an initial decision whether to proceed with further investigation. Global Wine Partners and Winery expressly disclaim any and all liability for the information contained in this document or any omissions from it and reserve the right to supplement, amend and modify the information at any time, but have no obligation to do so.

This document does not constitute an offer to sell securities of Winery. Any acquisition of any assets of Winery should be based on further investigation. In connection with any transaction with Winery, Winery's sole responsibility with respect to the matters described herein shall be as set forth in the final executed agreement with Winery containing the terms of such transaction.

Each recipient of this document agrees that all the information contained herein is **confidential**, that the recipient will treat it confidentially and that the recipient **will not directly or indirectly disclose, reproduce or distribute such information** without prior written consent of Winery and Global Wine Partners.

This memorandum contains forward-looking statements based on certain Winery plans and estimates about the industry, management's beliefs and certain assumptions Winery has made. Any statements that refer to plans, opportunities, expectations, projections, forecasts, conditions or other statements regarding future events or circumstances, including any underlying assumptions, are forward-looking statements. These statements are not guarantees or assurances of future performance and are subject to many risks, uncertainties, circumstances and assumptions that are difficult to predict. Actual results may differ materially and adversely from those expressed in any forward-looking statements. Neither Global Wine Partners nor Winery undertakes any obligation to revise or update publicly any forward-looking statements for any reason.

Recipients who do not wish to pursue this matter must promptly return this document to Global Wine Partners.

**Under no circumstances shall recipients contact Winery, its owners, employees, suppliers, competitors, customers or the trade without consent in writing from Global Wine Partners.**

Direct all inquiries and requests for additional information to:

|  |  |
|---|---|
| **Don Brain** | **Mike Fisher** |
| +1 (707) 967-5328 direct | +1 (707) 967-5314 direct |
| +1 (913) 226-6895 mobile | +1 (707) 291-2388 mobile |
| dbrain@globalwinebank.com | mfisher@globalwinebank.com |

**Global Wine Partners (U.S.)** LLC
The Wine Business Center
899 Adams Street, Suite F
St. Helena, CA 94574, USA
+1 (707) 967-5303 main

GLOBAL
WINE PARTNERS



# Table of Contents

**I.     Highlights of the Opportunity            4**

**II.    Executive Summary                        5**

**III.   Brand Trends and Growth Information      7**

**IV.    Overview of the Property, Events         11**

**V.     Direct to Consumer and Distribution      17**

**VI.    Brand Details, Awards, Press            26**

**VII.   Financial Overview                       39**

GLOBAL
WINE PARTNERS

Case: 15-50801    Doc# 322    Filed: 07/22/21    Entered: 07/22/21 16:31:04    Page 103 of 151

**103**
UB0030099



## I. Highlights of the Opportunity

Opportunity to own the most important wine asset, both location and brand in the Monterey region.

Control the recognized leader in corporate events associated with wine related properties.

Acquire the only unlimited permitted site in Carmel Valley.

Own a profitable business growing revenue in every segment of the market significantly higher than the average for the wine industry.

GLOBAL
WINE PARTNERS

4

104
UB0030100



## II. Executive Summary

Château   Julien is the only operating winery in Carmel.  The 16 acres picturesque Estate consists of the tasting room, production facility, barrel aging Chai and offices. The property is beautifully landscaped with manicured gardens and six acres of vineyard.  The Estate is located only five miles from Monterey Peninsula and Carmel-by-the-Sea, two of the most highly regarded sites on earth.



GLOBAL
WINE PARTNERS

5

105
UB0030101

**The business consists of three profit centers: Events, Retail Wine Sales and National Wine Sales.**

The Winery use permits allows the winery to hold unlimited events at a number of venues throughout the property. Indoor venues range from 80 people in the Great Hall to 300 in the Chai. Two outdoor venues allow for larger groups. Over one hundred events were hosted in 2010 consisting mostly of corporate gatherings. The property carries unique entitles.



Retail wine sales include tasting room, wine club, corporate and event sales totaling 7,000 cases in 2011 of the total production and sales of over 42,000 cases.

The brand is highly recognized as a long term estate associated property. The current retail sales provide a strong foundation on which the current owner is building a strong growing retail presence, the buyer to expand sales of the Château Julien brand or provide a foundation for retail sales growth of an existing brand .

**GLOBAL**
WINE PARTNERS

Case: 15-50801   Doc# 322   Filed: 07/22/21   Entered: 07/22/21 16:31:04   Page 106
of 151

**106**
UB0030102



**Profitable and Growing Brand**



**Wine Sales Revenue**

Millions

| | |
|---|---|
| 7.00 | 6.02 |
| 6.00 | 5.10 |
| 5.00 | 4.06 |
| 4.00 | 2.97 |
| 3.00 | 2.23  2.06 |

■ 2009  ■ 2010  ■ 2011  ■ 2012  ■ 2013  ■ 2014

**Growth Opportunities**



**Tasting Room: Average Sales Per Visitor**

$35.00

$30.00 — $25.47  $26.18  $27.22  $30.33 *

$25.00

$20.00 — ■ 2008  ■ 2009  ■ 2010  ■ 2011* Thru 8 months

GLOBAL
WINE PARTNERS

7

Case: 15-50801   Doc# 322   Filed: 07/22/21   Entered: 07/22/21 16:31:04   Page 107 of 151

UB0030103



## Transaction Overview

Global Wine Partners has been retained by Château Julien as exclusive advisor in connection with the sale of the assets of Château Julien. Château Julien desires to sell the winery assets which include the real estate, equipment, inventory, and brands. Château Julien intends to structure the transaction as a sale of assets.

Monterey is one of the most visited sites in all of California. Visitors bring of $2 billion to the area annually. Château Julien is the most visited winery site in the area. This is the best location and brand between the Napa/Sonoma region and the Central Coast.



Case: 15-50801   Doc# 322   Filed: 07/22/21   Entered: 07/22/21 16:31:04   Page 108 of 151

UB0030104



## Brand History

In the late 1970's, Bob and Patty Brower set out to create a premier California winery. Originally from the East Coast, they had a passion for wine and admired the French hospitality encountered while traveling in Europe. They saw the potential in Monterey County as a quality wine growing region, and in 1982 began building what is now known today as Château Julien Wine Estate in Carmel Valley, California.

The winery's first release came in 1985 with Chardonnay and Merlot from the 1982 vintage. Today, the entire process of wine production takes place on the 16-acre estate, including the aging of nearly 2000 oak barrels of wine. Winemaker Bill Anderson joined the Brower's in 1982, and produced the winery's first 100% Merlot with the premier vintage. Bill continues to produce wine at Château Julien Wine Estate, and has played an integral part in establishing Merlot as the winery's flagship varietal.





9

Case: 15-50801    Doc# 322    Filed: 07/22/21    Entered: 07/22/21 16:31:04    Page 109 of 151

UB0030105



## 30 Years of Excellence in Winemaking



**2011** — Merlot recognized in *Beverage Dynamics* National Retailer Wine Panel as one of the "Fastest-Selling Wines in the U.S."

New "heritage and tradition" focused Barrel Selected package hits the national market.

**2010** — Malbec designated as "Private Reserve."

La Conviviance awarded Best Blended Red Wine in the World by the Ultimate Wine Challenge, NY.

**2009** — Release of two additional high-end blends — Black Nova and La Conviviance, contributing to a new tier of "Proprietary Blends" to the Château Julien wine portfolio. Continued focus on sustainability in winemaking and viticulture.

Second generation, Bobby Brower, joins the winery team in national sales.

**2008** — Private Reserve Merlot flagship wine recognized by *Wall Street Journal*

**2007** — Château Julien Wine Estate celebrates 25 years, and releases first Proprietary blend "Bravura" in commemoration of the historical data.

**2006** — Château Julien wines served at Vice President's birthday dinner.

Château Julien Wine Estate is one of over 65 wineries and 22 tasting rooms in Monterey County, and continues to be one of only two wineries offering daily tours of a full operating winery.

Château Julien Wine Estate presented Hospitality Business of the Year, Monterey Peninsula Chamber of Commerce.

**2005** — Wine Estate again honored as Business of the Year, Carmel Chamber of Commerce.

Syrah designated "Private Reserve."

**2003** — Zinfandel designated as "Private Reserve."

**2002** — Expanded emphasis on the vineyard with reduced yields and a focus on maximum quality — ultimately resulting in lower case production and superior quality wines.

**2001** — Chai is complete. Over 1200 oak barrels stored with aging wine. Gives the Winemakers the capacity to directly oversee quality of all wines, extend aging and barrel ferment 100% of the Chardonnay.

Over 40,000 guests visit the Wine Estate throughout the year.

5 acres of Sangiovese grapes planted at the Wine Estate in Carmel Valley.

**1998** — Château Julien Merlot recognized by *Wine & Spirits* Magazine as one of the top ten Merlots by the glass, solidifying Château Julien Merlot's position in the national marketplace.

Expansion of the Château grounds and vineyards, including Courtyard gardens, parking and addition of the Chai barrel room. 240 acres of vineyards in Lockwood Valley declared the "Estate Vineyard" and provides the source of most of the winery's production.

**1996**

**1988** — Barrel Selected label introduced. Private Reserve remains the original label of the Winery.

Rookie of the Year awarded for Château Julien wines.

Winemaker Bill Anderson joins the Château Julien family.

Château Julien wines served at the White House.

**1985** — First Hospitality Award received.

JUNE The winery's tasting room opens to the public. Tours offered to private groups, family and friends.

Cal-Ital label introduced.

**1984** — Cabernet Sauvignon joins Merlot and Chardonnay as the original "Private Reserve" designation.

**1983** — MARCH Permit approved to build the first significant Bordeaux-style Wine Estate in Monterey County.

First wine bottled and released — 1982 Merlot and 1982 Chardonnay.

JUNE Wine filtering and storage tanks were brought in by rail car on the old railroad that ran through the county to establish Château Julien Wine Estate as an official bonded winery, #5101 since Prohibition and #400 in the State of California.

**1982**

**1981** — 8 acres purchased on Carmel Valley Road from Zobel's Nursery and Christmas Farm.

**1979** — Bob & Patty venture out to the west coast to look at the Monterey Wine region.

8040 Carmel Valley Rd., Carmel, CA 93923 | 831 624 2600 | Facsimile 831 624 6138 | www.chateaujulien.com

Case: 15-50801    Doc# 322    Filed: 07/22/21    Entered: 07/22/21 16:31:04    Page 110 of 151

UB0030106



## Facility and Production

Château Julien Wine Estate is located on 16 acres at the foot of the majestic Carmel Valley mountains. Classic French architecture provides the foundation for the ultimate union of traditional winemaking, modern technology and old world ambiance. Beautifully manicured gardens, six acres of lush vineyards and meandering cobblestone pathways grace the Estate grounds, only a short 5 miles from the beautiful Monterey Peninsula and Carmel-by-the-Sea. The winery boasts breathtaking vistas of the lush green valley where sunsets are unforgettable and rainbows bounce off the hills.

Nestled amongst six acres of Sangiovese grapes is the winery's newest addition: the "Chai" (pronounced "shay"). All of Château Julien's barrels, over 1200, are set in the Chai for aging. Built one story into the ground, the Chai is kept at a naturally cool temperature and humidity for aging wines. The walls are 12"-15" thick, with a natural ventilation system extending from the west of the building to the east. The addition of the Chai in 1998 has enabled the winery to barrel ferment one hundred percent of the Chardonnays and age wine longer in oak. Custom ambiance lighting and the dramatic stacking of oak barrels, make the Chai an ideal setting for private events.



GLOBAL
WINE PARTNERS

Case: 15-50801    Doc# 322    Filed: 07/22/21    Entered: 07/22/21 16:31:04    Page 111
of 151

**111**
UB0030107



CHÂTEAU JULIEN
W I N E   E S T A T E

| Facility Summary | |
|---|---|
| **Location** | 8940 Carmel Valley Road, Carmel |
| **Size** | Main facility 15,000 square feet |
| | Chai 10,148 square feet |
| | Petite Château 3,190 square feet |
| | Residence 1,300 square feet |
| **Capacity** | Unlimited Use Permit |
| **Key Features** | ▪ Main facility divided into 3 sections, production, tasting and admin |
| | ▪ Bottling plant – 1,000 cases (750ML) per day |
| | ▪ Crush pad |
| | ▪ 300 ton daily crush |
| | ▪ 700 tons annual fermentation |
| | ▪ 1,700 barrel storage |
| **Water** | From two sources, public water and domestic wells |
| **Wastewater** | Processed through an onsite septic systems and Regional Discharge Permit with 5 aeration and settling ponds |
| **Stainless Steel Tanks** | 6 jacketed tanks with 6,000 gallon capacity per tank |
| | 6 jacketed tanks with 3,000 gallon capacity per tank |
| | 6 jacketed tanks with 1,500 gallon capacity per tank |
| | 5 jacketed tanks with 13,000 gallon capacity per tank |
| | 6 tanks with 19,500 total capacity |

GLOBAL
WINE PARTNERS

Case: 15-50801   Doc# 322   Filed: 07/22/21   Entered: 07/22/21 16:31:04   Page 112 of 151

UB0030108



**CHÂTEAU JULIEN**
WINE ESTATE

## Vineyard dinners for special events and groups



GLOBAL
WINE PARTNERS

13

113
UB0030109







14

UB0030110





Case: 15-50801   Doc# 322   Filed: 07/22/21   Entered: 07/22/21 16:31:04   Page 115 of 151

UB0030111



**CHÂTEAU JULIEN**
W I N E   E S T A T E
*Corporate & Private Events*



Parking

## Château Julien Wine Estate

The following capacities serve as guidelines for creating an event. Flexibility in planning allows use of multiple areas within the Estate to create a unique and personalized event venue.



**Château**

1. Great Hall
   Capacity: 90 reception / 90 sit down

2. Conservatory
   Capacity: 100 reception / 90 sit down

3. Lower Courtyard
   Capacity: 300 reception / 250 sit down



4. Upper Courtyard
   Capacity: 325 reception / 250 sit down

5. Cellar
   Capacity: upon request

**Chai**

6. Barrel Room
   Capacity: 300 reception / 250 sit down
   Walking distance between the Château and Chai is 200 yards

*Location venues above can be combined to allow for maximum use potential.*

---

**Château Julien Wine Estate**
8940 Carmel Valley Road, Carmel, California 93923 | P.O. Box 221775, Carmel, California 93022
ph. (831) 624-2600  fax: (831) 624-6138  info@chateaujulien.com  www.chateaujulien.com



GLOBAL
WINE PARTNERS

UB0030112



## V. Direct to Consumer and National Distribution

### Wine Sales

| Calendar years ending Dec 31 | 2009 | | 2010 | | 6 Months ended June 30, 2011 | |
|---|---|---|---|---|---|---|
| | Cases | $ (000s) | Cases | $ (000s) | Cases | $ (000s) |
| **BY PRODUCT LINE-** | | | | | | |
| **Proprietory Blends** | 446 | $ 350 | 538 | $ 427 | 123 | $ 124 |
| **Chateau Julien** | 13,458 | 1,543 | 12,764 | 1,399 | 10,655 | 1,035 |
| **Emeral Bay & Other** | 14,744 | 565 | 10,635 | 515 | 7,158 | 308 |
| Total Sales | 28,648 | $ 2,458 | 23,937 | $ 2,341 | 17,936 | $ 1,467 |
| | | | | | | |
| **BY CHANNEL** | | | | | | |
| **National** | 18,830 | $ 1,087 | 15,363 | $ 843 | 14,270 | $ 777 |
| **California House Accounts** | 2,792 | 126 | 1,747 | 86 | 516 | 29 |
| **International** | 46 | 3 | 378 | 22 | 41 | 3 |
| **Retail** | 6,980 | 1,242 | 6,449 | 1,390 | 3,109 | 658 |
| Total Sales | 28,648 | $ 2,458 | 23,937 | $ 2,341 | 17,936 | $ 1,467 |

GLOBAL
WINE PARTNERS

Case: 15-50801    Doc# 322    Filed: 07/22/21    Entered: 07/22/21 16:31:04    Page 117 of 151

UB0030113



## The Wine Club

|  | 2008 | 2009 | 2010 | 2011 to 7/31 |
|---|---|---|---|---|
| Members at First of Year | 402 | 349 | 332 | 364 |
| Members Year End | 364 | 334 | 369 | 364 |
| Canceled | 100 | 87 | 66 | 38 |
| New Members | 62 | 79 | 103 | 38 |
| Shipments | 2,110 | 1,444 | 1,600 | 1,010 |
| Sales Club Shipments | $ 103,756 | $ 195,222 | $ 106,529 | $ 46,177 |
| Re-order Sales | $ 208,936 | $ 88,215 | $ 81,259 | $ 68,119 |
| Annual Sales | $ 312,692 | $ 283,438 | $ 187,788 | $ 114,296 |

The winery's wine club, know as the "wine collector's program", began over 20 years ago.  There are three levels of participation with most members receiving 2 bottles bimonthly.  Members' benefits include priority status for tasting and events, discounts on additional purchases, invitations to wine club events and concierge services for member visiting the Monterey Peninsula.

Case: 15-50801   Doc# 322   Filed: 07/22/21   Entered: 07/22/21 16:31:04   Page 118 of 151

UB0030114




**About grapes produced/sourced**

Grapes purchases from numerous growers in Monterey County. With the exception of the Sangiovese which is grown on the estate, the contracts are on a one year evergreen renewal basis. The Winery's grower have been supplying the brand for numerous years . Also, bulk wine is sourced for the Emerald Bay brand.

| | | |
|---|---|---|
| **Merlot** | Up to 40 tons | $1,400 per ton |
| **Gewurztraminer** | Up to 20 tons | $1,000 per ton |
| **Cabernet Sauvignon** | Up to 20 tons | $1,500 per ton |
| **Syrah** | Up to 15 tons | $900 per ton |
| **Sangiovese** | Estimated at 12 tons | Growing price is about $2,400 per ton |

19

UB0030115



## About the People, Staff and Winemaker

**Bill Anderson**
**Winemaker**

Bill Anderson has been with Château Julien Wine Estate since the winery opened in 1982. With over forty years of experience in the wine industry, Bill's knowledge of enology and viticulture stems from his studies at Stanford and UC Davis. His philosophy continues to be as simple as the elegance he achieves in his wines.

"Elegance is what I keep in mind in winemaking. Simple, straightforward, clean; the truth is evident without frivolity. If you have good grapes and treat them well, do all the details every day and let them do what they will naturally do, you will have a good product." The winery's addition of the Chai has enabled Bill to continually focus on quality throughout each stage of growing and production



GLOBAL
WINE PARTNERS

Case: 15-50801    Doc# 322    Filed: 07/22/21    Entered: 07/22/21 16:31:04    Page 120
of 151

**120** UB0030116



**Mark Dreyer**
**Operations Manager**
Mark oversees Château Julien's office and technology functions. All electronic systems are managed by Mark, in addition to daily processing of accounts receivable, accounts payable, order processing, inventory management and various government reporting.


**Robert "Bobby" Brower Jr.**
**National Sales Manager**
Bobby is a Fresno State graduate, with a Bachelor's degree in Enology along with an emphasis in Chemistry and Entrepreneurship. Bobby's a strong motivator and his sales skills and product knowledge drives Château Julien's products and distribution in the national market. He brings a fresh, youthful, marketing and sales component to our distributor network.


**Kristin Horton**
**Director of Wine Estate Marketing**
Kristin is responsible for Château Julien's corporate identity. This includes maintaining the award winning website, public relations activities, marketing materials including package design. Her efforts include working with every internal department to provide fresh and updated material to aid sales.


**Michele Gogliucci**
**Special Events Manager**
Michele works with clients to create, develop and facilitate opportunities to build corporate client relationships. She develops clients that are diverse in culture and size, from local produce companies, to national and international fortune 500 companies with the idea to create memorable events.



Case: 15-50801   Doc# 322   Filed: 07/22/21   Entered: 07/22/21 16:31:04   Page 121 of 151

UB0030117



## Wine Sales to Distributors by State

| Calendar years ending Dec 31 | 2009 | | 2010 | | 9 Months ended September 30, 2011 | |
|---|---|---|---|---|---|---|
| | Cases | $ (000s) | Cases | $ (000s) | Cases | $ (000s) |
| Wisconsin | 2,980 | $ 109 | 2,224 | $ 81 | 1,674 | $ 60 |
| Texas | 2,972 | 161 | 2,497 | 126 | 3,598 | 202 |
| New Jersey | 2,913 | 129 | 2,438 | 125 | 3,033 | 149 |
| Lousianna | 2,809 | 151 | 683 | 65 | - | - |
| California | 2,644 | 154 | 2,700 | 188 | 2,864 | 173 |
| Massachusetts | 1,492 | 92 | 183 | 7 | 439 | 16 |
| Oregon | 404 | 17 | 112 | 5 | 41 | 2 |
| South Carolina | 364 | 15 | 168 | 7 | - | - |
| New Hampshire | 271 | 13 | 189 | 8 | 188 | 9 |
| Michigan | 246 | 9 | 347 | 13 | 424 | 19 |
| Virginia | - | - | 1,014 | 50 | 854 | 36 |
| Florida | 112 | 5 | 752 | 44 | - | - |
| Kansas | 193 | 7 | 726 | 50 | 1,710 | 110 |
| Remaining | 1,735 | 225 | 1,330 | 74 | 12,545 | 1,460 |
| Total Sales | 19,135 | $ 1,087 | 15,363 | $ 843 | 27,370 | $ 2,237 |

Case: 15-50801    Doc# 322    Filed: 07/22/21    Entered: 07/22/21 16:31:04    Page 122 of 151

UB0030118



## Retail Bottled Wine Inventory

| As of June 30, 2011 | 9L Cases | Case Price | Value (000s) |
|---|---|---|---|
| **RETAIL** | | | |
| **Proprietary Blends** | | | |
| La Conviviance | 1,017 | $1,080 | $ 1,098 |
| Bravura | 19 | $1,500 | 29 |
| Black Nova | 1,014 | $936 | 949 |
| **Private Reserve** | | | |
| Sangiovese Rosato | 247 | $264 | 65 |
| Gewurztramier | 84 | $264 | 22 |
| Sangiovese RSV | 41 | $300 | 12 |
| Quinta Port | 74 | $336 | 25 |
| Malbec | 46 | $456 | 21 |
| Syrah | 152 | $432 | 66 |
| Chardonnay | 56 | $384 | 22 |
| Cabernet Sauvignon | 438 | $456 | |
| Merlot | 3,264 | $504 | 1,645 |
| **Hawk House** | | | |
| Chardonnay | 189 | $144 | 27 |
| Cabernet Sauvignon | 90 | $144 | 13 |
| Merlot | 270 | $144 | 39 |
| **Poiz** | | | |
| Merlot | 297 | $300 | 89 |
| Rose of Sangiovese | 94 | $240 | 23 |
| Chardonnay | 128 | $264 | 34 |
| Retail Inventory | 7,520 | | $ 4,178 |

Case: 15-50801    Doc# 322    Filed: 07/22/21    Entered: 07/22/21 16:31:04    Page 123
of 151

UB0030119



# National Bottled Wine Inventory

| As of June 30, 2011 | 9L Cases | Case Price | Value (000s) |
|---|---|---|---|
| **Private Reserve** | | | |
| Malbec | 46 | $228 | 10 |
| Syrah | 152 | $216 | 33 |
| Chardonnay | 56 | $244 | 14 |
| Cabernet Sauvignon | 438 | $228 | 100 |
| Merlot | 2,803 | $244 | 684 |
| **Barrel Select** | | | |
| Pinot Grigio | 489 | $66 | 32 |
| Chardonnay | 3,548 | $66 | 234 |
| Cabernet Sauvignon | 3,168 | $66 | 209 |
| Merlot | 4,344 | $66 | 287 |
| **Hawk House** | | | |
| Chardonnay | 189 | $60 | 11 |
| Cabernet Sauvignon | 90 | $60 | 5 |
| Merlot | 270 | $60 | 16 |
| **Poiz** | | | |
| Merlot | 297 | $145 | 43 |
| Rose of Sangiovese | 94 | $120 | 11 |
| Chardonnay | 128 | $132 | 17 |
| **Emerald Bay** | | | |
| 750ML | | | |
| Merlot | 316 | $40 | 13 |
| Cabernet Sauvignon | 240 | $40 | 10 |
| Chardonnay | 2,362 | $40 | 94 |
| 1.5L | | | |
| Merlot | 472 | $33 | 16 |
| Cabernet Sauvignon | 514 | $33 | 17 |
| Chardonnay | 543 | $33 | 18 |
| White Zinfandel | 325 | $33 | 11 |
| Wholesale Inventory | 20,884 | | $ 1,707 |



Case: 15-50801    Doc# 322    Filed: 07/22/21    Entered: 07/22/21 16:31:04    Page 124 of 151

**124**
UB0030120



## Bulk Wine Inventory

| As of June 30, 2011 | Gallons | 9L Case Equivalents | Case Price | Value (000s) |
|---|---|---|---|---|
| **Proprietary Blends** | | | | |
| La Conviviance | 12,004 | 5,002 | $1,080 | $ 5,402 |
| Black Nova | 6,557 | 2,732 | $936 | 2,557 |
| **Private Reserve** | | | | |
| Pinot Grigio | 372 | 155 | $300 | 47 |
| Sangiovese RSV | 8,072 | 3,363 | $300 | 1,009 |
| Red Zinfandel | 120 | 50 | $936 | 47 |
| Syrah | 4,260 | 1,775 | $432 | 767 |
| Chardonnay | 6,000 | 2,500 | $384 | 960 |
| Merlot | 3,000 | 1,250 | $244 | 305 |
| **Barrel Select** | | | | |
| Chardonnay | 20,326 | 8,469 | $66 | 559 |
| Cabernet Sauvignon | 22,750 | 9,479 | $66 | 626 |
| Merlot | 29,652 | 12,355 | $66 | 815 |
| **Emerald Bay** | | | | |
| Merlot | 19,768 | 8,237 | $37 | 305 |
| Cabernet Sauvignon | 15,167 | 6,320 | $37 | 234 |
| Chardonnay | 13,352 | 5,563 | $37 | 206 |
| White Zinfandel | 3,024 | 1,260 | $37 | 47 |
| Retail Inventory | 164,424 | 68,510 | | $ 13,884 |

Case: 15-50801    Doc# 322    Filed: 07/22/21    Entered: 07/22/21 16:31:04    Page 125 of 151

UB0030121



## Product Overview

### Proprietary Blends

Winemaker Bill Anderson highlights select vineyard lots, unique blend and extremely limited production varietals for this exclusive collection of wines, available only through allocation or at the Wine Estate Carmel Valley. Proprietary blends provide winemaker Bill Anderson the creative freedom to blend optimum flavors, complexity and texture through  various varietals grown with long-time vineyard partners in the Monterey County wine region. Exquisite packaging, hand sealed wax and etching all enhance the overall finesse these wine have on the palate.

### Private Reserve

Château  Julien Private Reserve wines signify the heritage of the winery.  The label dates back to the first release of 1982 Merlot and represents the highest quality wines produced form each vintage, with only 300 cases produced annually.  Over the years, small production lots and traditional techniques have ensured ultimate quality and consistency.  Selected blocks of the highest quality fruit from the winery's Estate Vineyard are maintained at low yields an hand-harvested specifically for the Private Reserve wines.  Limited distribution and long aging potential make these wine very sough after by wine lovers worldwide.

### Barrel Selected

The Château  Julien Barrel Selected label was introduced in 1989.  these wines typically have mild tannins and forward fruit, making them extremely food-friendly and approachable upon release. While still produced from Monterey County grapes, the grapes are ultimately managed for consistency and value in the vineyard.  The Barrel Selected wines are aged in one to three-year-old French and American oak barrels and have been awarded numerous value accolades over the years.

### Emerald Bay

The Emerald Bay label was introduced in the national market in 1986 as a light fruity style wine ideal for restaurateurs.  Produced form grapes grown throughout California's central coast, these wine benefit from vineyard diversity and the coastal climate's long growing seasons.  They are stainless steel fermented with limited barrel aging and blending for smooth, fresh varietal flavors upon release.  All of the varietals are available in both 750ml and 1.5L sizes.

26





## Awards & Accolades

"Winemaker Bill Anderson, who has been with Bob & Patty since 1982, has had plenty of time to hone his craft as well as his imagination. As Bob speaks about the winery its creative philosophy is clear. They are always trying to re-imagine their wine while always keeping quality in the highest esteem. Their Black Nova, (a) an unusual blend of Zinfandel and Syrah, is the latest example of what an ideal climate and their forward thinking can produce."
~ Food & Beverage International, Jason Barlow

### Black Nova
#### 2007
90 Points, Gold Medal, Exceptional ~ "Deep garnet violet color. Aromas of nougat, raspberries, and spicy chocolate with a round, dry-yet-fruity medium body and a long, smooth, fine tannin finish." ~ tastings.com, Beverage Testing Institute

91 points ~ "An ultra-premium bottling composed of equal parts Malbec and Syrah. Purple-plum color. This unique proprietary blend bursts with cedar-tinged, bright, sassy, polished red plums and berries. It weighs in at a hefty 15% alcohol, yet is lithe and smooth in the mouth. With aeration, exotic perfumes emerge." ~ Winelinesonline.com

#### 2006
94 Points, Gold Medal "Exceptional" ~ tastings.com, Beverage Testing Institute

93 points ~ Cork'd

91 points ~ "...this is a lush, big, and ripe wine. Twelve months of aging in New American Oak brought out great complexity. Leisurely swirled and sipped, rich layers of flavors unfurl with cherry and raspberry flowing into deeper notes of vanilla, clove, oak, and spice. Bright, smooth, and lingering at its finish, this is a wine not soon forgotten. Only 300 cases were produced, so get yourself a bottle while you can." ~ Food & Beverage International, Jason Barlow

"a brilliant fusion of raspberries with an undercurrent of vanilla and is bursting with bright fruit flavors. This is a deep dark, luscious wine with just the right amount of oak." ~ Michael Cervin, Central Coast Magazine

### La Convivance
#### 2007
95 points ~ "Round and silky, an opaque and ripe blackberry and lavender thriller. The tongue-washing fruit seems limitless. Elegant and brightly lit." ~ Tasting Panel editor Meredith May

93 points, Cellar Selection ~ "Deep garnet color. Attractive aromas of dried apricot, waxy honeycomb, boysenberries, and toasty angel food cake with a supple fruity-yet-dry medium-to-full body and a zesty, savory cedar, pickled beet and earth accented finish. Great vibrancy and Old World meets New World style." ~ tastings.com, Beverage Testing Institute



Case: 15-50801   Doc# 322   Filed: 07/22/21   Entered: 07/22/21 16:31:04   Page 127 of 151





## Awards & Accolades

92+ points ~ "A Bordeaux-style blend of Merlot, Malbec, and Cabernet Sauvignon. Deep purple-plum color. Wow! A complex, layered nose of coffee, leather, chocolate, and vanilla frames concentrated black currant and blackberry fruit. Full-bodied, with medium-grained tannins, this is a serious wine that will age gracefully over the next 10+ years." ~ Winelinesonline.com

90 points ~ "Rich dark fruit aromas dominate the nose with accents of dark chocolate. The palate is mouth-filling and supple with flavors of blackberries, currants, cherries, very dark chocolate, earth, and vanilla. A fairly robust wine." ~ California WineList.com

### 2006
91 points & Best Blended Red Wine, "Chairman's Trophy Award ~ Excellent, Highly Recommended"
~ Ultimate Wine Challenge, New York

94 points ~ tastings.com, Beverage Testing Institute

91 points ~ T Lewis, Cork'd.com

### Private Reserve Merlot
### 2007
90 points ~ "Nice to see such a nice Merlot from Chateau Julien, their best ever. It does what Merlot should, being dry and lush, with complex sour cherry, currant, herb, cocoa and spice flavors wrapped into smooth tannins. A lovely wine for drinking now" ~ Wine Enthusiast Magazine

95 points, Gold Medal, Exceptional ~ "Exotic aromas of cherry cola, melted toffee, thyme, and pomegranate-mint gelato with a silky fruity medium-to-full body and a lively blueberry compote, dried meat, and spiced nut accented finish. A really fresh and fun merlot that will shine from every angle at every occasion." ~ tastings.com, Beverage Testing Institute

90 points ~ "Blackcherry and blackberries aromas mingle with notes of anise, chocolate, and coffee on the nose. A sip reveals flavors of cherry, blackberries, and strawberries along with suggestions of mocha, licorice, and oak. Layered, supple, and balanced, it is a fine example of what a Merlot can be." ~ California WineList.com, 2011

"finely balanced Merlot with deep, dark, rich-colors and Anderson's memorable 'yummy factor' that just hums along." ~ The Testing Panel, July 2011

88 points ~ "Very Good, Strong Recommendation" ~ Ultimate Wine Challenge

89 points ~ "Dark ruby color. An enticing nose of spicebox leads to aromas and flavors of ripe black fruits. Full-bodied yet supple, it sports mild, chocolately tannins on the finish. It will complement a number of foods, from nutty aged cheeses to charred red meats. The structure should offer drinking pleasure through 2018." ~ Winelinesonline.com

GLOBAL
WINE PARTNERS

28





## Awards & Accolades

### Barrel Selected Merlot

**2009**

88 points – "Tangy and bright with lively plum, spice and silky texture, earthy and dense with nice structure and length. A super value." – Anthony Dias Blue, The Tasting Panel, July 2011

BEST BUY, 88 points – "Clear ruby color. A pretty, varietal nose of red cherries and berries, with leather and spice notes adding complexity. Medium in body, nicely balanced, with a supple mouthfeel. The spiced berry and cherry follows through to the end." – Winelinesonline.com

**2008**

90 Points, 4 stars, *a very good wine and an excellent value. A wine for which customers will keep coming back* – "A chunky and fleshier style of merlot; hints of cocoa and black fruits in the nose; medium-bodied and mouth-filling and a long lasting finish." – Beverage Dynamics National Retailer Wine Panel, *Growth Brand Winner – the Fastest-Selling Wines in the US*, March/April 2011

BEST BUY, 87 points – "Plum, chocolate nuts, and cracked pepper aromas with a tangy medium-to-full body and a crisp, dried apple and citrus accented dusty tannin finish." – Tastings.com, Beverage Testing Institute

"... has aromas of butter, concord grape, and blackberry jam on toast before flavors dominated by blackberry and oak plus a moderate amount of tannin." – Colorado Wine News, September 2009

### Barrel Selected Cabernet Sauvignon

**2009**

BEST BUY, 88 points – "Purple-plum color. Cedar box aromas frame ample perfumed black currant and berry fruit. Medium in body, balanced, the dark fruits sweeten up in the mouth. Mild tannins at the end make this a very friendly Cab for drinking over the next three years." – Winelinesonline.com

**2008**

BEST BUY, 88 points – "Spicy cassis jam and vanilla aromas with a tangy medium-to-full body and a tart apple and oak accent on the finish." – tastings.com, Beverage Testing Institute

**2007**

BEST BUY, 87 points – "Very tasty and easy drinking." – tastings.com, Beverage Testing Institute

**2006**

BEST BUY – "Well balanced, structured, and integrated. It will be popular." – Colorado Wine News 2009

"... one of the best values I've ever found in a wine." – Brian Goodell, Lubbock Avalance-Journal, September 2008



Case: 15-50801    Doc# 322    Filed: 07/22/21    Entered: 07/22/21 16:31:04    Page 129 of 151

**129**

UB0030125





## *Awards & Accolades*

### Barrel Selected Chardonnay
**2009**

90 points ~ "Floral and bright: a sunny white that smacks of peaches and pansies. Mouthfilling and big-bodied, it dresses up like spring." ~ The Tasting Panel, October 2011

BEST BUY, 89 points ~ "Kiwi, guava, and pineapple aromas with a tangy, fruity-yet-dry medium body and a smooth passionfruit and lime finish. Very tasty." Tastings.com, Beverage Testing Institute

**2007**

BEST BUY ~ "... this is the kind of Chardonnay millions of people love. Totally Californian, and a good buy." ~ Wine Enthusiast Magazine, October 2009

"Subtle aromas of citrus with flavors of grapefruit and tropical fruit; full bodied with a slightly oily texture and well-integrated components with a very long finish. Try with Swordfish." ~ Sante Magazine, September 2009

Global Travelers' Wines on the Wing Awards ~ "Top 10 White Wine, First Class/Business Class"

### Barrel Selected Pinot Grigio
**2009**

BEST BUY, 88 points ~ "Apple, peach and nougat aromas with a round, clean light body and a tart citrus kiss. Nice." ~ tastings.com, Beverage Testing Institute

**2008**

BEST BUY, 89 Points ~ "Pale golden straw color. Bold aromas of peach cobbler and banana cream pie follow through on a soft, silky entry to a dryish medium body with apple cheese pastry and orange peel notes. Finishes with a crisp, wet limestone accented finish. Nice styled and proportioned fruit and acidity." ~ tastings.com, Beverage Testing Institute



Case: 15-50801    Doc# 322    Filed: 07/22/21    Entered: 07/22/21 16:31:04    Page 130 of 151

UB0030126





**CHÂTEAU JULIEN**
WINE ESTATE

## 2006 La Conviviance

# Voted the Best Blended Red Wine in the World

*Ultimate Wine Challenge 2010*

### Chairman's Trophy Award

**91 points** — Excellent, Highly Recommended
Red Blend Category
*Ultimate Wine Challenge, New York City, June 2010*





Scoring higher than any other red blend submitted in the competition, including national and international wines from Napa, California and Bordeaux, France.

46% Merlot, 38% Malbec and 16% Cabernet Sauvignon | Limited Availability

### Winemaker Notes

This wonderfully aromatic wine graces the palate with rich chocolate, dark Bing cherry and ripe blackberry essences. A touch of toasted vanilla and anise add complexity to the soft, full forward fruit flavors. Balanced with structure and acidity, this wine is a natural culinary accompaniment with a long mouth-filing finish and beautiful deep garnet hue.



8940 Carmel Valley Rd., Carmel, CA 93923 | P.O. Box 221775, Carmel, CA 93922
Telephone 831 624 2600 | Facsimile 831 624 6138 | www.chateaujulien.com

GLOBAL
WINE PARTNERS

31

UB0030127







**CHÂTEAU JULIEN**
WINE ESTATE

## 2007 La Conviviance

# Tasting Panel Recommended La Conviviance Earns 95 Points

*The Tasting Panel, July 2011*

### 95 Points

*The Tasting Panel's* Publisher and Executive Editor, Meridith May, selects her favorite wines and spirits of the month.



"Round and silky, an opaque and ripe blackberry and lavender thriller. The tongue-washing fruit seems limitless. Elegant and brightly lit."

46% Merlot, 38% Malbec and 16% Cabernet Sauvignon | Limited Availability

**Winemaker Notes**

This wonderfully aromatic wine graces the palate with rich chocolate, dark Bing cherry and ripe blackberry essences. A touch of toasted vanilla and anise add complexity to the soft, full forward fruit flavors. Balanced with structure and acidity, this wine is a natural culinary accompaniment with a long mouth-filing finish and beautiful deep garnet hue.



8940 Carmel Valley Rd., Carmel, CA 93923 | P.O. Box 221775, Carmel, CA 93922
Telephone 831 624 2600 | Facsimile 831 624 6138 | www.chateaujulien.com



GLOBAL
WINE PARTNERS





**Limited Availability**

# CHÂTEAU JULIEN
### WINE ESTATE

## 2006 Black Nova

*An exquisite blend of 60% Zinfandel and 40% Syrah*

**94 * Chateau Julien 2006 "Black Nova"*Monterey County**

*Deep garnet violet color. Lovely aromas of toffee, cedar, honeycomb, and blueberry cobbler a la mode follow through on a smooth, supple entry to a fruity–yet-dry medium-full body with excellent depth and highly polished oak beautifully supporting the fruit. Finishes with a long creamy, nutty fade. Very sensual and enticing. Pair with filet mignon. (tasted on May –27-2009)*

**94** points **Beverage Testing Institute**

"Rated by Cork'd - 93 points - November 2009"  **corkd** Review. Share. Discover.



UB0030129



**CHÂTEAU-JULIEN**
W I N E  E S T A T E



# BUYING GUIDE



**90** **Château Julien 2007 Private Reserve Merlot (Monterey County); $42.** Nice to see such a nice Merlot from Château Julien, their best ever. It does what Merlot should, being dry and lush, with complex sour cherry, currant, herb, cocoa and spice flavors wrapped into smooth tannins. A lovely wine for drinking now. —S.H.

**GLOBAL**
W I N E  P A R T N E R S

UB0030130



## CHÂTEAU JULIEN
### WINE ESTATE

---

## Barrel Selected Wines

---

The Barrel Selected label was introduced to the Château Julien wine portfolio in 1998. These wines typically have mild tannins and forward fruit, making them extremely food-friendly and approachable upon release. Winemaker Bill Anderson recently expanded beyond our own vineyard to explore quality, diversity and unique varietal characteristics with local vineyard partners throughout Monterey County. Long term relationships based on nearly 30 years of local wine production has allowed Anderson the flexibility to draw from multiple sources to produce the best quality and value for our Barrel Selected wines. Aged in one- to three-year-old French and American oak barrels, these wines have been awarded numerous value accolades over the years.
Varietals include: Merlot, Cabernet Sauvignon, Chardonnay, Pinot Grigio and Moscato.



### 2009 MERLOT

TASTING NOTES: Forward fruit aromas of ripe plum, cherry and soft raspberry balance mild tannins and a hint of cedar. A full bodied palate with complexity through the finish.

APPELLATION: Monterey County

VARIETAL COMPOSITION: 85% Merlot,
15% Cabernet Sauvignon

BARREL AGING: Aged for 14 months in 1- and 2-year-old French and American medium toast oak barrels after 12 days of warm, temperature-controlled fermentation on the skins.



### 2009 CABERNET SAUVIGNON

TASTING NOTES: Aromas of dark blackberry fruit, dark chocolate and spice and highlighted by the perfect touch of vanilla. Medium bodied and well balanced, with structure through a full, round finish.

APPELLATION: Monterey County

VARIETAL COMPOSITION: 100% Cabernet Sauvignon

BARREL AGING: Slow fermented on the skins for two weeks and aged for 14 months in 1- and 2-year-old French and American oak barrels.



### 2010 MOSCATO

TASTING NOTES: Refreshing aromas of white peaches, honey-dew melon and ripe apricots are balanced with a hint of citrusy lemon. This off-dry, easy sipping wine has a great mouth-feel with a bright, crisp finish. A wonderful aperitif, paired with a selection of light cheeses or sorbet.

APPELLATION: Monterey County

VARIETAL COMPOSITION: 100% Moscato



### 2010 CHARDONNAY

TASTING NOTES: Aromas of ripe peaches, pear and lemony citrus are complemented with notes of toasted vanilla on the palate. Nice texture and balanced acidity with well-integrated components through a full finish.

APPELLATION: Monterey County

VARIETAL
COMPOSITION: 100% Chardonnay

BARREL AGING: One hundred percent barrel fermented and aged for 9 months in 1- and 2-year-old French and American medium toast oak barrels.



### 2010 PINOT GRIGIO

TASTING NOTES: A forward floral aroma of sun basked honey-suckles complements lively acidity and fresh melon nuances. This lighter style wine holds a full mouth feel texture and soft lingering finish.

APPELLATION: Monterey County

VARIETAL
COMPOSITION: 97% Pinot Grigio
3% Gewürztraminer

---

8940 Carmel Valley Rd., Carmel, CA 93023  |  P.O. Box 221775, Carmel, CA 93922
Telephone 831 624 2600  |  Facsimile 831 624 6138  |  www.chateaujulien.com





# CHÂTEAU JULIEN
### WINE ESTATE

## Barrel Selected Merlot

# Top Retailer Recommended Merlot Earns 90 Points

*Beverage Dynamics, March/April 2011*

### ★★★★ Four Stars

**90 points** — A very good wine and an excellent value. A wine for which customers will keep coming back.

*Beverage Dynamics National Retailer Wine Panel*

"A chunky and fleshier style of merlot; hints of cocoa and black fruits in the nose; medium-bodied and mouth-filling and a long lasting finish."



87% Merlot and 13% Cabernet Sauvignon | Suggested Retail Price: $12 bottle

---

### Winemaker Notes

Aromas of cedar, black raspberry and ripe plum grace a full bodied palate. Mild tannins and earthy tones balance forward fruit and add complexity through the finish.

## beverage dynamics **National Retailer Wine Panel**

**David Alphonse**
Back Bay Restaurant Group

**Ryan Armstrong**
Bottle Bargains

**Bill Beard**
Bowery & Vine
Wine & Spirits

**Adam Betts**
Urban Tavern

**Brad Boarman**
North Ridge Wine

**Ralph J. Bondon**
Bertiglia Wine & Spirit

**Todd Brenthall**
Bay Ridge Wine & Spirit

**Bryan Brick**
K&L Wine Merchants

**Kenn Brodmerkel**
Cornwall Wine & Spirits

**Steve Burnell**
Washington State Liquor
Control Board

**Terri Burney**
Grand Tastings

**Steve Carpenter**
Bottle King Liquors

**Dave Cleveland**
Premium Wine & Spirits

**Ken Collura**
Pearl Wine Shop

**Benjamin W. English**
Season Onto Season
Wine & Liquor Shops

**Peter Finkelstein**
Mills Fine Wine & Spirits

**Erin Fitzpatrick**
The Waverly Inn

**Cliff Froehlich**
Twin Peaks Liquor

**Maggie Gephard**
Liquorama Wine Cellar

**Charles Gibson**
Hy Vee Wine & Spirit

**Dennis J. Kohl**
Trig's Cellar 70

**Bob Lechowicz**
Maliby's Finest Wine &
Spirits

**Arnie Lewin**
Hamilton Beverage

**Brad Lewis**
ABC Fine Wines & Spirits

**Daniel A. Manning**
Haskell's

**Jack Mantle**
Frugal MacDoogal's

**Jerry Martellaro**
Stew Leonard's Wines

**Rick McLeod**
Prime Wines & Spirits

**Jorge L. Mendoza**
The Ritz Carlton

**Dustin Mitzel**
Happy Harry's Bottle Shop

**Dan O'Brien**
Coluit Liquors

**Christina Pearce**
Total Wine & More

**Matthew A. Reay**
Crestwood Liquors

**John Riley**
Brown Derby Stores

**Michael A. Schaefer, CWE**
Vino 100

**Steve Small**
Yankee Wine

**Michael Sorg**
Liquor Barn

**Matt Swingo**
Swingos on the Lake

**Steve Tindle**
Shaw's Crab House

**Jeff Vignaux**
Prestige Wine & Spirits

**Rob Wand**
The Grog Shop

**Collin A. Williams**
Spec's Wine, Spirits and
Finer Foods

**Wilfred Wong**
Beverages and more!

---

8940 Carmel Valley Rd., Carmel, CA 93923 | P.O. Box 221775, Carmel, CA 93922
Telephone 831 624 2600 | Facsimile 831 624 6138 | www.chateaujulien.com

Case: 15-50801    Doc# 322    Filed: 07/22/21    Entered: 07/22/21 16:31:04    Page 136
of 151

UB0030132





# CHÂTEAU JULIEN
### WINE ESTATE

## Barrel Selected Chardonnay

# Tasting Panel Recommended Chardonnay Earns 90 Points

*The Tasting Panel, October 2010*

### 90 Points

*The Tasting Panel's* Publisher and Executive Editor, Meridith May, selects her favorite wines and spirits of the month.

"Floral and bright: a sunny white that smacks of peaches and pansies. Mouth-filling and big bodied, it dresses up like spring."

**100% Chardonnay**

**Suggested Retail Price: $12 bottle**

---

**Winemaker Notes**

Aromas of crisp apples, ripe pears and lemony citrus are complemented by subtle hints of vanilla and toasted oak. Nice texture and balanced acidity with well-integrated components through a full finish.

**Barrel Aged**

One hundred percent barrel fermented and aged for 9 months in 1- and 2-year-old French and American medium toast oak barrels.

8940 Carmel Valley Rd., Carmel, CA 93923 | P.O. Box 221775, Carmel, CA 93922
Telephone 831 624 2600 | Facsimile 831 624 6138 | www.chateaujulien.com

- 37 -

**137**

Case: 15-50801    Doc# 322    Filed: 07/22/21    Entered: 07/22/21 16:31:04    Page 137 of 151

UB0030133

# EMERALD BAY. *Sustainable*

*Water is essential to all known forms of known life, our world's most precious natural resource.*
*At Emerald Bay we are committed to further education and growth towards sustainable, environmental winemaking practices.*
*This process is essential in preserving the beauty of our environment and in keeping our bays pristine and **emerald.***

### CENTRAL COAST APPELLATION

California's coastal grape growing region presents an ideal climate for Emerald Bay wines. Cool ocean breezes and coastal mountain ranges maintain moderate temperatures throughout the growing season enabling the grapes to stay on the vines longer. These extra days on the vine allow the grape flavors to intensify and represent the true varietal character.



### 2009 CABERNET SAUVIGNON

TASTING NOTES: Aromas of black cherry, toasted almonds and chocolate notes are highlighted by mild tannins and subtle oak aging. A small blend of Merlot contributes smooth, soft finish and round, berry finesse.

ALCOHOL: 13.5%

VARIETAL COMPOSITION: 90% Cabernet Sauvignon, 10% Merlot.

FOOD PAIRINGS: Beef tenderloin with mushroom wine sauce, hearty selection of cheese, chocolate truffles, roasted meats, hearty stews.



### 2010 CHARDONNAY

TASTING NOTES: Fresh, crisp citrus, toasted vanilla and ripe pineapple notes grace the palate with forward fruit aromas. A nice balance and acidity through the finish, enhanced by hints of malolactic and barrel fermented Chardonnay.

ALCOHOL: 13.5%

VARIETAL COMPOSITION: 100% Chardonnay

FOOD PAIRINGS: Seasonal vegetables, grilled chicken, assorted shellfish, halibut, pasta with light wine or cream sauce.



### 2009 MERLOT

TASTING NOTES: Full forward fruit aromas highlighted by dark currant, Bing cherry and soft vanilla notes. Soft tannins and a moderate complexity are enhanced by the small blend of Cabernet Sauvignon. Smooth through the finish.

ALCOHOL: 13.5%

VARIETAL COMPOSITION: 85% Merlot, 15% Cabernet Sauvignon

FOOD PAIRINGS: Pork tenderloin, pasta with red sauce, grilled Salmon, wild mushroom risotto, roasted duck, vegetarian lasagna.



### 2010 WHITE ZINFANDEL

WINEMAKER NOTES: Crisp and refreshing, with notes of fresh picked ripe, plump strawberries. This wine was cold fermented in stainless steel tanks to maintain natural residual sugars, complemented by a balanced acidity. Best when served chilled.

RESIDUAL SUGAR: 5.0%

ALCOHOL: 11.5%

VARIETAL COMPOSITION: 100% White Zinfandel

FOOD PAIRINGS: Strawberry shortcake, fresh fruit cocktail, raspberry tart, lighter fare, a great picnic wine.

*Emerald Bay wines are available in 750 ml and 1.5 liter sizes. Product of U.S.A.*

8040 Carmel Valley Rd., Carmel, CA 93923 | P.O. Box 221775, Carmel, CA 93922

Telephone 831.624.2600 | Facsimile 831.624.6138 | www.emeraldbay.net

Case: 15-50801    Doc# 322    Filed: 07/22/21    Entered: 07/22/21 16:31:04    Page 138 of 151

UB0030134



## IV. Financial Overview

## Proforma Income Statements

| Calendar years ending Dec 31 | | 2011 | | 2012 | | 2013 | | 2014 | | 2015 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Wine Sales Revenue** | | | | | | | | | | |
| Wine Sales | | | | | | | | | | |
| National | $ | 1,851 | $ | 2,777 | $ | 3,610 | $ | 4,332 | $ | 4,766 |
| Retail | | 1,582 | | 1,819 | | 2,092 | | 2,301 | | 2,531 |
| Discounts | | (459) | | (505) | | (555) | | (611) | | (672) |
| Wine Sales Revenue | | 2,974 | | 4,091 | | 5,147 | | 6,022 | | 6,625 |
| **Cost of Wine** | | (1,320) | | (1,703) | | (2,202) | | (2,531) | | (2,837) |
| Gross Profit-Wine | | 1,654 | | 2,388 | | 2,945 | | 3,491 | | 3,788 |
| **Events Revenue** | | 1,194 | | 1,315 | | 1,328 | | 1,341 | | 1,355 |
| Gross Profit | | 2,848 | | 3,703 | | 4,273 | | 4,832 | | 5,143 |
| **Operating Expenses** | | 1,963 | | 2,167 | | 2,345 | | 2,522 | | 2,703 |
| Operating Income | $ | 885 | $ | 1,536 | $ | 1,928 | $ | 2,310 | $ | 2,440 |

GLOBAL
WINE PARTNERS

Case: 15-50801   Doc# 322   Filed: 07/22/21   Entered: 07/22/21 16:31:04   Page 139
of 151

UB0030135



# CHÂTEAU·JULIEN
WINE ESTATE

| Calendar years ending Dec 31 | 2008 | 2009 | 2010 | June 30, 2011 |
|---|---|---|---|---|
| **Wine Sales Revenue** | | | | |
| Wine Sales | | | | |
| National | $ 1,116 | $ 997 | $ 954 | $ 809 |
| Retail | 1,604 | 1,574 | 1,488 | 723 |
| Discounts | (321) | (340) | (384) | (200) |
| Wine Sales Revenue | 2,399 | 2,231 | 2,058 | 1,332 |
| **Cost of Wine** | | | | |
| Per Margin Contrib | (1,132) | (1,221) | (1,114) | (772) |
| Intercompany Rent | 15 | 306 | 116 | 65 |
| Gross Profit-Wine | 1,282 | 1,316 | 1,060 | 625 |
| **Other Revenue** | | | | |
| Events | 1,237 | 805 | 1,227 | 379 |
| Discounts | (51) | (46) | (67) | (29) |
| Bulk Wine | 749 | 680 | 546 | 189 |
| Merchandise | 70 | 70 | 70 | 32 |
| Other | 6 | 6 | 6 | 3 |
| Other Revenue | 2,011 | 1,515 | 1,782 | 574 |
| **Cost of Revenue-Other** | (234) | (469) | (123) | 52 |
| Gross Profit-Other | 1,777 | 1,046 | 1,659 | 626 |
| Gross Profit | 3,059 | 2,362 | 2,719 | 1,251 |
| **Operating Expenses** | | | | |
| Direct | 1,653 | 1,129 | 1,456 | 603 |
| Indirect | 64 | 143 | 76 | 85 |
| Operating Expenses | 1,717 | 1,272 | 1,532 | 688 |
| Operating Income | $ 1,342 | $ 1,090 | $ 1,187 | $ 563 |

Note: Operating Expenses exclude Owners' Compensation

# GLOBAL
WINE PARTNERS





## Margin Contribution

| Calendar years ending Dec 31 | 2008 | 2009 | 2010 | 6 Months ended June 30, 2011 |
|---|---|---|---|---|
| **NATIONAL SALES** | | | | |
| **Wine Sales Revenue** | | | | |
| Wine Sales | $ 1,116 | $ 997 | $ 954 | $ 809 |
| Discounts | - | - | - | - |
| Wine Sales Revenue | 1,116 | 997 | 954 | 809 |
| **Cost of Wine** | 735 | 748 | 682 | 553 |
| Gross Profit | 381 | 249 | 272 | 256 |
| **Operating Expenses** | 210 | 147 | 177 | 132 |
| Operating Income-Distributor Sales | $ 171 | $ 102 | $ 95 | $ 124 |
| | | | | |
| **RETAIL SALES** | | | | |
| **Wine Sales Revenue** | | | | |
| Wine Sales | $ 1,604 | $ 1,574 | $ 1,488 | $ 723 |
| Discounts | (321) | (340) | (384) | (200) |
| Wine Sales Revenue | 1,283 | 1,234 | 1,104 | 523 |
| **Cost of Wine** | 397 | 473 | 432 | 219 |
| Gross Profit | 886 | 761 | 672 | 304 |
| **Operating Expenses** | 592 | 442 | 438 | 194 |
| Operating Income-Retail Sales | $ 294 | $ 319 | $ 234 | $ 110 |
| | | | | |
| **EVENTS** | | | | |
| **Revenue** | | | | |
| Events Revenue | $ 1,237 | $ 805 | $ 1,227 | $ 379 |
| Discounts | (51) | (46) | (67) | (29) |
| Wine Sales Revenue | 1,186 | 759 | 1,160 | 350 |
| **Cost of Sales** | 12 | 13 | 25 | 4 |
| Gross Profit | 1,174 | 746 | 1,135 | 346 |
| **Operating Expenses** | 851 | 540 | 841 | 277 |
| Operating Income-Events | $ 323 | $ 206 | $ 294 | $ 69 |



GLOBAL
WINE PARTNERS

41

# Aurora Capital Advisors

18101 Von Karman
Suite 230
Irvine, California 92612
Tel. (714) 243-6123
Fax (714) 209-7678

August 8, 2014

CONFIDENTIAL

**Château Julien, Inc.**
**Coastal Cypress Corporation**
8940 Carmel Valley Road
Carmel, California 93923, USA

Attention: Robert Brower, Chairman and CEO

Per our discussions, we understand that Chateau Julien, Inc. ("CJ") and Coastal Cypress Corporation ("CC", and CJ and CC collectively, together with their respective subsidiaries and affiliates, the "Company") is evaluating the potential sale of their respective businesses and/or assets.

Based on the satisfactory completion of our due diligence investigation, our favorable evaluation of the Company's business model, and our favorable assessment of general conditions in the markets, Aurora Capital Advisors, LLC ("Aurora") would be pleased to provide consulting and advisory services to the Company from the date of this letter agreement through and until the two-year anniversary of the date hereof (the "Term"). Specifically Aurora will assist the Company in developing a strategy for the sale of its business, identify potential acquirors, and assist in the implementation of the Company's sale strategy. For purposes of this engagement letter, the term "Sale Transaction" shall mean any transaction with a third-party that results, through one or more related transactions, in the sale or licensing of all or substantially all of the business or assets of the Company (or of CJ or CC separately), or a merger or sale of ownership interests that results in the owners of the Company (or of CJ or CC separately) prior to such transaction owning less than fifty percent (50%) of the surviving entity of such transaction.

## Engagement of Agents

Aurora may separately engage agents at its own expense and without the prior approval of the Company.

## Fees and Expenses

You and the Company agree to pay Aurora, or its designee, a success fee (the "Success Fee") at the time of receipt of any funds from any Sale Transaction consisting of a cash payment equal to five percent (5%) of any and all funds or value received by the Company (or by CJ or CC separately) and/or its holders of ownership interests from any Sale Transaction or portion thereof occurring during the twenty-four (24) month period from the date of termination or expiration of

NOB0057
EXHIBIT 17
of 151
Case: 15-50801    Doc# 322    Filed 07/22/21    Entered: 07/22/21 16:31:04    Page 142

142
UB0038933

this letter agreement with any prospective acquirors during the Term.

Furthermore, regardless or whether or not any Sale Transaction occurs, the Company agrees that it will reimburse Aurora's reasonable out-of-pocket expenses incurred in connection with the performance of its services hereunder, including but not limited to copy, telephone and travel expense, with the understanding that amounts over $500 will be submitted for prior approval.

## Termination

Aurora shall have the right to immediately terminate this Agreement if information previously provided to it regarding the Company is materially different (as reasonably determined by Aurora) than the information discovered by Aurora during the due diligence period. Additionally, Aurora's engagement hereunder may be terminated by either the Company or Aurora at any time from the date hereof upon 30 days written notice to that effect to the other party, it being understood that the provisions relating to the payment of fees and expenses, indemnification, limitations on the liability of indemnified parties, contribution, settlements, and waiver of the right to trial by jury will survive any termination.

## Right to Advertise

Upon the completion of any Sale Transaction, Aurora shall have the right to place advertisements on its website and in financial and other newspapers and journals at its own expense describing its services to the Company hereunder.

## Independent Contactor

The Parties acknowledge and agree that the Parties are independent contractors, and nothing in this Agreement is intended, and nothing shall be construed, to create a partnership, joint venture, employer-employee relationship, trust, or any other form of legal organization or association between the Company and Aurora. Each Party shall be solely responsible for and shall comply with all state and federal laws pertaining to employment taxes, income withholding, unemployment compensation or contributions and other employment related statutes applicable to that Party. Aurora shall be responsible for filing such tax returns and paying such self-employment taxes as may be required by law or regulations.

## Indemnification

The Company agrees to indemnify and hold harmless Aurora Capital Advisors, LLC and their affiliates and directors, officers, agents and employees (the "Indemnified Parties") from any losses, claims, damages, judgments, costs or other liabilities or expense, including, without limitation, reasonable legal fees ("Losses") incurred in connection with or as a result of our engagement or any services provided pursuant to this agreement including, but not limited to, Losses caused by or arising out of any untrue statement of a material fact contained in information furnished to Aurora by the Company or its advisors in connection with our engagement, or any omission to state therein any material fact required or necessary to make the information not misleading in light of circumstances under which given, or any other violation of the federal securities laws or the securities laws of any state, or otherwise arising out of our engagement hereunder, provided, however, that the Company will not be liable under the foregoing indemnification provision to the extent that any loss, claim, damage, liability or

2

UB0038934

expense is found in a non-appealable final judgment by a court to have resulted from Aurora's gross negligence intentional misconduct. The Company also agrees that the Indemnified Parties shall not have any liability (whether direct or indirect, in contract or tort or otherwise) to the Company or its security holders or creditors related to or arising out of the engagement of the Indemnified Parties pursuant to, or the performance by the Indemnified Parties of the services contemplated by, this letter agreement except to the extent that any loss, claim, damage or liability is found in a non-appealable final judgment by a court to have resulted from Aurora's intentional misconduct or gross negligence, and then such liability shall not exceed the amount of any Cash Payment made to Aurora hereunder, if any.

In the event testimony from, or appearance by, any employee or consultant of Aurora's is required by the Company before any tribunal or other body or agency in connection with the Agent's engagement hereunder, the Company agrees to promptly reimburse Aurora for all expenses (including reasonable legal expenses of Aurora) as well as compensation at the rate of $300 per hour for all time expended in preparing for and appearing and/or testifying, notwithstanding that any such appearance and/or testimony shall be required by court or other process. Upon request of Aurora, the Company will pay a reasonable retainer to Aurora's counsel required in connection with the preceding sentence.

### Complete Information

The Company recognizes and confirms that, in performing its engagement, Aurora will be using and relying on data, material and other information furnished to it by the Company, or its auditing firm, attorneys, or others (collectively "Advisors") as well as information otherwise available, both oral and written (such data, material and other information is hereinafter referred to as the "Information"). The Company recognizes and confirms that Aurora does not assume responsibility for the accuracy or completeness of the Information. The Company hereby represents and warrants that any of the Information furnished by it or its Advisors to Aurora will be complete in all material respects and not contain any untrue statement of a material fact or omit to state any material fact necessary to make the statement therein not false or misleading.

### Confidentiality

Aurora recognizes and confirms that the Company that some of the Information provided to it is either non-public and confidential or proprietary in nature. Aurora hereby agrees that the Information will be kept confidential and will not, without the prior consent of the Company, be disclosed by them, their agents or employees, other than in connection with the services to the Company as described above or as otherwise required by law.

### Arbitration

Each party hereby agrees to submit all disputes or controversies arising out of or in conjunction with this agreement to binding arbitration in Orange County, California in accordance with the commercial arbitration rules of the American Arbitration Association then in effect. The prevailing party in any such arbitration shall be entitled to an award of its reasonable attorneys' fees, costs and disbursements incurred as a result of such arbitration, including reimbursement for the costs of witnesses' travel and subsistence. Judgment upon any arbitration award rendered may be entered in any court having jurisdiction thereof.

**NOB0059**
Case: 15-50801    Doc# 322    Filed: 07/22/21    Entered: 07/22/21 16:31:04    Page 144
of 151
**144**
UB0038935

## Nature of Services

We anticipate initiating discussions with institutional and private contacts for the transaction upon the receipt of an executed copy of this agreement, the completion of due diligence and the availability of the material relating to the transaction. We would endeavor to close the transaction as soon as practicable after gaining written commitments from potential acquirors.

Aurora personnel will devote sufficient time to the foregoing activities as Aurora deems shall be reasonably necessary to discharge its duties hereunder. However, Aurora will not be required to devote any specific minimum amount of time to the Company's affairs. Accordingly, Aurora may render services of the same or similar nature for or on behalf of any other persons, businesses or corporations.

The Company further expressly acknowledges and agrees that the services being provided by Aurora are of a professional nature and necessarily involve issues of judgment and opinion, and that the judgment and opinions of other experts or professionals may differ substantially from those of Aurora. Other professionals under the same circumstances might offer advice or perform services materially different than the advice provided or the services performed by Aurora.

This agreement constitutes the entire agreement and understanding between the parties hereto, and supersedes any and all previous agreements and understandings, whether oral or written (if any), between the parties with respect to the matters set forth herein.

If the foregoing conforms with your understanding and has been appropriately approved by the Company, please so signify by signing this letter in the space provided and delivering it to me, whereupon after execution by Aurora, this Agreement shall become a binding agreement among the Company, Aurora and the Company's unit holders, shareholders, or partners. A telecopy of a signed original of this Agreement shall be sufficient to bind the parties whose signatures appear hereon.

We look forward to a successful and mutually beneficial relationship with the Company.

## AGREED TO AND ACCEPTED:

CHATEAU JULIEN, INC.
COASTAL CYPRESS CORPORATION

By: _____

Robert Brower, their respective
Chairman and Chief Executive Officer

AURORA CAPITAL ADVISORS, LLC

By _____
Anthony Nobles, PhD.
Managing Director

4

UB0038936

**<u>Proceeds Transferred to Jaurigue Group</u>**

Transfers from the Trust

| Bank | Account Number | Check No. | Date | Amount |
|------|------|------|------|------|
| Chase | 5233 | 341 | 6/21/17 | $25,000 |
| Delmarva | 2512 | 1017 | 8/24/17 | $1,228 |
| Delmarva | 2512 | 1018 | 8/24/17 | $187.56 |
| Delmarva | 2512 | 1019 | 8/24/17 | $2,802 |
| Delmarva | 2512 | 1020 | 8/24/17 | $10,635 |
| Delmarva | 2512 | 1028 | 9/14/17 | $3,096 |
| Delmarva | 2512 | 1042 | 10/4/17 | $4,824 |
| Delmarva | 2512 | 1080 | 12/6/17 | $160.46 |
| Delmarva | 2512 | 1081 | 12/6/17 | $864 |
| Delmarva | 2512 | 1088 | 12/30/17 | $160.46 |
| Delmarva | 2512 | 1089 | 12/30/17 | $138 |
| Delmarva | 2512 | 1090 | 12/30/17 | $5.48 |
| Delmarva | 2512 | 2091 | 12/30/17 | $4,976 |
| Delmarva | 2512 | 1108 | 1/16/18 | $2,988 |
| Delmarva | 2512 | 1124 | 2/13/18 | $267 |
| Delmarva | 2512 | 1125 | 2/13/18 | $2,988 |
| | | | **Total** | **$60,319.96** |

# EXHIBIT 18

**Proceeds Transferred to Johnson Rovella**

Transfers from Coastal

| Bank | Account Number | Check No. | Date | Amount |
|------|----------------|-----------|------|--------|
| Fremont | 1870 | 1381 | 2/2/16 | $10,000 |
| Fremont | 1870 | 1396 | 4/3/16 | $57.50 |
| Fremont | 1870 | 1400 | 4/11/16 | $6,195 |
| Fremont | 1870 | 1409 | 5/14/16 | $1,085 |
| Fremont | 1870 | 1416 | 6/9/16 | $1,750 |
| Fremont | 1870 | 1424 | 7/12/16 | $1,592.50 |
| Fremont | 1870 | 1428 | 8/14/16 | $472.50 |
| Fremont | 1870 | 1437 | 10/10/16 | $2,082.50 |
| Fremont | 1870 | 1455 | 12/16/16 | $210 |
| Fremont | 1870 | 1460 | 2/22/17 | $85.75 |
| M&T | 5772 | 5029 | 6/8/17 | $857.50 |
| M&T | 5772 | 5038 | 7/7/17 | $3,045 |
| M&T | 5772 | 5045 | 8/11/17 | $5,337.50 |
| M&T | 5772 | 5053 | 9/14/17 | $3,919.18 |
| M&T | 5772 | 5059 | 10/4/17 | $4,749.68 |
| M&T | 5772 | 5066 | 12/13/17 | $15,986.67 |
| M&T | 5772 | 5069 | 1/11/18 | $9,599.76 |
| M&T | 5772 | 5076 | 2/18/18 | $22,773.60 |
| M&T | 5772 | 5081 | 3/18/18 | $10,193.50 |
| M&T | 5772 | 5085 | 4/26/18 | $7,773.60 |
| M&T | 5772 | 5090 | 5/18/18 | $12,790 |
| M&T | 5772 | 5094 | 6/15/18 | $18,693.60 |
| M&T | 5772 | 5099 | 7/10/18 | $3,482.20 |
| M&T | 5772 | 5102 | 8/11/18 | $713.75 |
| M&T | 5772 | 5110 | 9/19/18 | $9,330 |
| M&T | 5772 | 5115 | 10/8/18 | $2,751.35 |
| M&T | 5772 | 5122 | 11/11/18 | $3,235.53 |
| M&T | 5772 | 5126 | 12/10/18 | $3,801.50 |
| M&T | 5772 | 5132 | 1/1/19 | $3,692 |
| M&T | 5772 | 5135 | 2/24/19 | $9,397.46 |
| M&T | 5772 | 5145 | 4/12/19 | $7,625.50 |
| M&T | 5772 | 5148 | 4/22/19 | $12,711.50 |
| M&T | 5772 | 5151 | 5/15/19 | $4,942.91 |
| M&T | 5772 | 5155 | 6/15/19 | $7,217.40 |
| M&T | 5772 | 5158 | 7/12/19 | $248 |
| M&T | 5772 | 5162 | 8/11/19 | $604.60 |
| M&T | 5772 | 5167 | 9/16/19 | $14,797.01 |
| M&T | 5772 | 5175 | 10/14/19 | $22,229.85 |

# EXHIBIT 19

| M&T | 5772 | 5183 | 11/22/19 | $9,610.56 |
|-----|------|------|----------|-----------|
| M&T | 5772 | 5186 | 12/11/19 | $8,253.50 |
| M&T | 5772 | 5216 | 2/24/20 | $16,393.52 |
| | | | **Total** | **$280,288.48** |

**Proceeds Transferred to Oldfield Creely**

Transfers from Coastal

| Bank | Account Number | Check No. | Date | Amount |
|------|----------------|-----------|------|--------|
| Fremont | 1870 | 1328 | 4/28/15 | $6,225.03 |
| Fremont | 1870 | 1342 | 5/18/15 | $10,434.26 |
| Fremont | 1870 | 1344 | 6/3/15 | $7,434 |
| Fremont | 1870 | 1350 | 7/5/15 | $8,961.04 |
| Fremont | 1870 | 1354 | 8/2/15 | $6,468.15 |
| Fremont | 1870 | 1359 | 9/5/15 | $894.20 |
| Fremont | 1870 | 1364 | 10/8/15 | $997.50 |
| Fremont | 1870 | 1369 | 11/7/15 | $997.50 |
| Fremont | 1870 | 1372 | 12/7/15 | $178.50 |
| Fremont | 1870 | 1378 | 12/31/15 | $9,675.78 |
| Fremont | 1870 | 1385 | 2/3/16 | $6,031.81 |
| Fremont | 1870 | 1389 | 2/20/16 | $22,870.60 |
| Fremont | 1870 | 1391 | 3/8/16 | $14,350.42 |
| Fremont | 1870 | 1395 | 4/3/16 | $5,775.79 |
| Fremont | 1870 | 1401 | 4/14/16 | $13,092.45 |
| Fremont | 1870 | 1404 | 5/1/16 | $6,522.20 |
| Fremont | 1870 | 1407 | 5/11/16 | $19,195.60 |
| Fremont | 1870 | 1411 | 5/21/16 | $33,223.75 |
| Fremont | 1870 | 1415 | 6/9/16 | $2,613.54 |
| Fremont | 1870 | 1421 | 7/1/16 | $7,677.11 |
| Fremont | 1870 | 1426 | 8/5/16 | $591.70 |
| Fremont | 1870 | 1430 | 9/2/16 | $807.86 |
| M&T | 5772 | 5236 | 7/1/20 | $2,718.85 |
| | | | **Total** | **$187,737.64** |

Transfers from the Trust

| Bank | Account Number | Check No. | Date | Amount |
|------|----------------|-----------|------|--------|
| Chase | 4863 | 229 | 2/20/16 | $4,063.50 |
| Chase | 4863 | 228 | 2/17/16 | $1,517.79 |
| Chase | 5233 | 114 | 4/3/16 | $2,413.41 |
| Chase | 5233 | 138 | 5/14/16 | $5,459.59 |
| Chase | 5233 | 173 | 7/12/16 | $1,787.47 |
| Chase | 5233 | 250 | 1/4/17 | $97.04 |
| | | | **Total** | **$15,338.80** |

# EXHIBIT 20

## Amount of the Proceeds Transferred to Coastal Services

Transfers from Coastal

| Bank | Account Number | Check No. | Date | Amount |
|------|---------------|-----------|------|--------|
| M&T | 5772 | 5120 | 11/9/18 | $4,680 |
| M&T | 5772 | 5124 | 12/1/18 | $2,534 |
| | | | **Total** | **$7,214** |

# EXHIBIT 21

## Amount of the Proceeds Transferred to Pohanka

Transfers from Coastal

| Bank | Account Number | Check No. | Date | Amount |
|------|----------------|-----------|------|--------|
| M&T | 5772 | 5116 | 10/10/18 | $39,293 |
| M&T | 5772 | 5232 | 7/1/20 | $23,498 |
| | | | **Total** | **$62,791** |

# EXHIBIT 22